**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**

IN RE:

SOUTH TOWN BY 4M LLC,
    Debtor.

Case No. 26-40805-lsg
Chapter 11
Hon. Lisa S. Gretchko

## COUNTY NATIONAL BANK'S STATEMENT REGARDING THE FIRST AMENDED COMBINED CHAPTER 11 PLAN AND DISCLOSURE STATEMENT

County National Bank ("CNB") files this Statement Regarding The First Amended Combined Chapter 11 Plan and Disclosure Statement ("Second Statement") with respect to the Combined Chapter 11 Plan and Disclosure Statement ("Plan and DS"; ECF No. 154) filed by South Town by 4M LLC's ("Debtor").

On July 27, 2026, Debtor filed its Plan and DS. On July 29, 2026, the Court entered an Order Scheduling Hearing On Preliminary Approval of the Disclosure Statement Within the Debtor's Combined Plan and Disclosure Statement ("DS Order"; ECF No. 158) scheduling a hearing ("Hearing") to discuss deficiencies in the disclosure statement portion of the Plan and DS and identifying several of those issues. The Hearing on the DS Order occurred on August 3, 2026, at which time the Court advised the Debtor to file an amended plan and disclosure statement and scheduled a second hearing ("Second Hearing") to discuss any additional or remaining deficiencies. Debtor filed its First Amended Combined Chapter 11 Plan

and Disclosure Statement ("Second Plan and DS"; ECF No. 162).

For efficiency, CNB is filing this Second Statement to identify several issues with the Second Plan and DS to Debtor and the Court, so that, if the Court desires, they may be addressed at the Second Hearing and, in any event, so that they can be addressed by Debtor in any further amendment to the Second Plan and DS.

Without limitation, the Plan and DS is not complete and accurate for the following reasons:

(1) There does not appear to be a justification for the use of both an "Effective Date" and a "Payment Disbursement Date" as the date for the occurrence of actions required by Debtor. Debtor's actions with respect to the "Transferred Assets" to effectuate its reorganization should occur on the same date (or after) it has satisfied all requirements with respect to its creditors.

(2) The Second Plan and DS identifies all Classes of Claims (except Class 4, the Claim of Prentice, which is receiving equity, and Class 10, the Equity Interests of Debtor) as unimpaired. Debtor has asserted that it is solvent and that it is paying all claims (except Class 4 and Class 10) in full, however, the Second Plan and DS does not provide for payment of postpetition interest to its creditors. Each class of secured creditors, including without limitation, Class 2, the secured claim of CNB, must receive postpetition interest and fees to be "unimpaired," and, although the law is not completely settled on the issue of when postpetition interest

must be paid to unsecured creditors (and, there does not appear to be 6th Circuit authority that is on point), it appears that the "solvent debtor exception" applies here, and thus, that the class of unsecured creditors must receive postpetition interest if they are classified as unsecured. *See Ultra Petro. Corp. v. Ad Hoc Comm. of OpCo Unsecured Creditors (In re Ultra Petro. Corp.), 51 F.4th 138 (5th Cir. 2022)*; *Ad Hoc Comm. of Holders of Trade Claims v. PG&E (In re PG&E Corp.), 46 F.4th 1047 (9th Cir. 2022)*.

(3)     The sources and uses exhibit has errors and there are fees that are not explained. For example, there does not appear to be an explanation of the 2.25% "Broker + Consultant" fees or the 2% "Lender Fees," and Debtor should confirm that it is escrowing the claims that are not shown as being paid (e.g., Synecdoche and PayPal).

(4)     Attached at **Exhibit A** is a redlined version of the Second Plan and DS (marked pages only) identifying additional line edits that CNB believes should be required. The substantive comments are on pages 2, 5, 6, 9, 15, 16, 19, 20, 21, and 54.

CNB reserves its right to supplement this Second Statement and to timely file an objection to the Second Plan and DS.

BODMAN PLC

Date:  August 10, 2026               */s/  Robert J. Diehl, Jr.*

Robert J. Diehl, Jr. (P31264)
Jaimee L. Witten (P70068)
1901 St. Antoine Street
Detroit, Michigan 48226
(313) 259-7777
rdiehl@bodmanlaw.com

Attorneys for County National Bank

# EXHIBIT A

claims.

**ARTICLE 2: CLASSIFICATION OF CLAIMS**

**Class 1** consists of the City of Ann Arbor's Claim, secured by a tax lien against the [~~Properties~~]**Property** in the amount of $169,080.67.

**Class 2** consists of CNB's Claim, secured by a mortgage against the [~~Properties~~]**Property** for money loaned in the amount of $16,863,513.64 plus **postpetition** interest and attorneys' fees **and other charges and expenses, including appraisal fees**.

**Class 3** consists of Brownstone's Claim, secured by a mortgage against the [~~Properties~~]**Property** for money loaned in the amount of $7,794,566.33 plus interest and attorneys' fees.

**Class 4** consists of Prentice's Claim, secured by a mortgage against the [~~Properties~~]**Property** in the principal amount of $8,500,000.00.

**Class 5** consists of Higley's Claim, secured by a construction lien against the [~~Properties~~]**Property** in the amount of $948,115.00.

**Class 6** consists of SmithGroup's Claim, secured in part, by a construction lien against the [~~Properties~~]**Property** in the amount of $508,139.00.[3]

---

[3] The total amount of the SmithGroup Claim is $902,726.45 which, in addition to the Class 6 Claim, contains a general unsecured Class 9 Claim in the amount of $394,587.45.

2

4921-2609-2230_2

**Class 7** consists of BDS's Claim, secured by a construction lien against the [Properties]**Property** in the amount of $129,898.00.

**Class 8** consists of Synecdoche's Claim, secured by a disputed and unliquidated construction lien against the [Properties]**Property** in the amount of $822,140.96.

**Class 9** consists of all non-priority, general unsecured Claims.

**Class 10** consists of the Equity Interests of the Debtor, namely the Poscher Estate which holds 100 percent of the equity interest in the Debtor.

**Super-priority administrative expense Claims:** consists of the Claim of the Responsible Person, Ms. Poscher, in an amount equal to all amounts advanced prior to Plan confirmation consistent with the Amended DIP Financing Order, the Amended DIP Budget and any amendments thereto.

**Administrative Expenses:** consists of the Legal Expenses owing to Counsel to the Debtor and UST Quarterly Fees of $350. Payment of the Legal Expenses owing to Counsel to the Debtor is subject to court approval of the same. As of the time of filing of this Plan, the Legal Expenses incurred by Counsel to the Debtor were approximately $480,000.00. Additional Legal Expenses will be incurred through the Effective Date and the Payment Disbursement Date. Ms. Poscher, on behalf of the Debtor, has personally advanced the Retainer Deposits. The Legal Expenses will be paid in full, upon

3

Court approval of the same, by the Debtor, on the Payment Disbursement Date. To the extent the Debtor has insufficient funds to pay the Legal Expenses at the time of their approval by the Court, the Legal Expenses may be paid from the Retainer Deposits, in which case Ms. Poscher shall be subrogated to the rights of Counsel to the Debtor with respect to such amounts and shall be entitled to repayment of the same, on the Payment Disbursement Date. Ms. Poscher's subrogation claim, if it arises, would be in addition to the Claim which she has filed in this proceeding. Any excess Retainer Deposits shall be returned to Ms. Poscher. UST Quarterly Fees are being paid under the Amended DIP Financing Order and the Amended DIP Budget, with any remaining balance being paid on the Payment Disbursement Date.

**Priority claims:** consists solely of the unsecured priority tax Claim of the City of Ann Arbor for unpaid real property taxes represented by the July 1, 2026 tax bill in the amount of $28,888.29, which shall become due and payable on or prior to September 15, 2026.  **NTD:  This is a secured administrative expense claim.**

All creditors and equity security holders should refer to Articles 3 through 6 of this Plan for information regarding the precise treatment of their Claims and interests.

**ARTICLE 3: TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN**

4

**3.01 Class 1.** Secured Claim of the City of Ann Arbor.

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim: $ 169,080.67

Estimated Value of Collateral: $ 61,000,000.00

The City of Ann Arbor holds the Ann Arbor Tax Claim, which is secured by a tax lien against the ~~[Properties]~~**Property** for unpaid 2025 real property taxes. Under applicable Michigan law, such tax liens are afforded statutory priority and prime all prior recorded liens and encumbrances against the Property, regardless of the date of recording. The Ann Arbor Tax Claim will be paid in full on the Payment Disbursement Date.

**3.02 Class 2.** Secured Claim of CNB.

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim: $ 16,863,513.64

Estimated Value of Collateral: $ 61,000,000.00

CNB holds a Claim secured by a mortgage against the Property for money loaned to the Debtor. **CNB's lien on the Property and all of its rights and remedies under its mortgage and other loan documents are preserved until its Claim is paid in full on the Payment Disbursement Date.** The allowed amount of this Claim will be paid in full on the Payment Disbursement Date. CNB claims that it is owed interest of $1,554,048.07 and fees and expenses of not less than

5

$210,569.43 as of July 29, 2026 **plus fees, charges and expenses incurred after that date** with per diem interest thereafter at $5,110.54. The allowed amount of CNB's claim will be determined upon agreement of the Debtor and CNB or per resolution by the Court.

**3.03   Class 3.**  Secured Claim of Brownstone.

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim:                          $     7,794,566.33

Estimated Value of Collateral:  $   61,000,000.00

Brownstone holds a Claim secured by a mortgage against the Property for money loaned to the Debtor. The allowed amount of this Claim will be paid in full on the Payment Disbursement Date.

**3.04   Class 4.** Secured Claim of Prentice.

**Impaired. Entitled to vote on the Plan.**

Amount of claim:                          $     8,500,000.00

Estimated Value of Collateral:  $   61,000,000.00

Prentice holds a Claim secured by a mortgage against the Property for money allegedly loaned to the Debtor. On the Payment Disbursement Date, Prentice's Claim shall be converted to a 5% equity interest in the Reorganized Debtor.

**3.05   Class 5.** Secured Claim of Higley.

6

4921-2609-2230_2

**3.09 Class 9**. All Non-Priority Unsecured Claims Allowed Under Section 502 of the Bankruptcy Code.

**Unimpaired. Not entitled to vote on the Plan.**

Class 9 consists of eight (8) non-priority unsecured Claims, specifically: Graybar/Schneider ($122,310.04); Ms. Poscher ($1,985,012); Bill Me Later, Inc./PayPal, Inc. ($105,404.92); G2 ($26,425.00); Learfield ($180,000.00); Newmark Valuation Advisory, LLC ($10,500.00); SmithGroup ($394,587.45); and Resilient Solar of East Tennessee LLC ($0). The allowed amount of all Class 9 Claims will be paid in full on the Payment Disbursement Date. The BDS Claim will be paid pursuant to a joint check with Higley, as set forth in Section 3.05 hereof. If any of the Class 9 Claims are Contested Claims, they shall be paid in accordance with Article V hereof.

**3.10 Class 10**. Equity Interests of the Debtor.

**Impaired. Entitled to vote on the Plan.**

On the Payment Disbursement Date **after payment in full of all Claims**, the Debtor is transferring its ownership interest in the Transferred Assets to a Delaware special purpose entity (the "SPE"), in exchange for which the Debtor will receive one hundred percent (100%) of the equity in the SPE, making the Debtor the parent of the SPE. Thereafter, the equity in the Debtor will be addressed in one of two alternative transactions.

This transaction is diagramed as follows:

**Debtor** >Transfer of the Transferred Assets to the **SPE**

**Debtor** <Receipt of 100% of the membership interest in the **SPE**

This results in the Debtor being the holding company of the SPE, with the Debtor, in turn being [100]95% owned by the Poscher Estate **and 5% by Prentice**, diagramed as:



**Equity Transaction A**. Under Equity Transaction A, a newly formed entity ("Newco") will acquire 100% of the equity interests in the Debtor from the Poscher Estate, for a multiple of a seven-figure amount.

This transaction is diagramed as follows:

**Poscher Estate** >Transfer of 100% of membership interest in Debtor to **Newco**

10

4921-2609-2230_2

shall be issued as follows: Prentice, 5% (conversion of its debt position to equity); Blue Phoenix, 22%; Pullins, 2% (equity exercisable upon completion of vertical construction); APB, 5%; Vohwinkle, 2% (equity exercisable upon completion of vertical construction); and Reynolds, 5%. Blue Phoenix is an affiliate of Ms. Poscher. Prentice is owned fully by the Poscher Estate. Pullins, Vohwinkle, APB and Reynolds are not affiliates of Ms. Poscher, the Poscher Estate or any of their respective affiliates.

This results in the Debtor being the holding company of the SPE, with the Debtor, in turn being owed as diagramed below:



**Poscher Estate  Prentice  Blue Phoenix  Pullins  APB  Vohwinkle  Reynolds**

59%          5%          22%          2%        5%      2%          5%

100%

**Debtor**

100%

**SPE**

Equity Transaction A and Equity Transaction B will be brought before the Probate Court with governance over the Posher Estate, prior to the hearing on confirmation of this Plan (the "<u>Probate Court Approval</u>"), to obtain conditional approval of <del style="color:red">[the same]</del><ins style="color:blue"><u>both</u></ins>, subject only to confirmation of this Plan. The Debtor

4921-2609-2230_2

made on account of a Contested Claim unless and until it is an Allowed Claim.

**5.02: Settlement of Contested Claims.** The Debtor will have the power and authority to settle and compromise any Contested Claim with court approval and compliance with Bankruptcy Rule 9019.

**5.03 Contested Claims Reserve.** On the Payment Disbursement Date, the Reorganized Debtor shall establish and maintain the Contested Claims Reserve. Funds held in the Contested Claims Reserve shall not be distributed to a creditor holding a Contested Claim until the later of: (a) the date the Contested Claim becomes an Allowed Claim pursuant to a Final Order; or (b) the Payment Disbursement Date. Upon the disallowance of a Contested Claim by a Final Order, the amount reserved on account of such Contested Claim shall be released from the Contested Claims Reserve and shall revert to the Reorganized Debtor.

## ARTICLE 6: PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The Debtor is a party to the following executory contracts: DMC Real Estate Services who provided advisory services for the development of the [Properties]Property; Graybar/Schneider who provided a feasibility study for incorporating the MicroGrid into the Development; Nederveld who provided civil engineering plans and strategies for the site plan approvals; Learfield who provided marketing services; Newmark Valuation Advisory, LLC who provided a market revenue study and valuation guidance; [Ressiliant]Resilient Solar of East Tennessee LLC who provided an energy market analysis; and Higley who

14

provided various construction and advisory services for the Development. To the extent not terminated or concluded prior to the Petition Date, the Debtor will be filing a separate motion to reject each of the foregoing executory contracts pursuant to section 365 of the Bankruptcy Code. The Debtor reserves the right to amend this Plan prior to confirmation to assume any of the foregoing executory contracts.

## ARTICLE 7: MEANS FOR IMPLEMENTATION OF THE PLAN

The Plan shall be implemented through the following transactions:

1. On or prior to the hearing on confirmation, the Debtor shall have obtained the Probate Court Approval.

2. On the Payment Disbursement Date, ~~[the]~~**after payment in full of all Claims, the Reorganized** Debtor shall convey its interest in all of the Transferred Assets to the SPE.

3. On the Payment Disbursement Date, the equity in the Debtor shall be sold, as specified in Equity Transaction A, or re-allocated, as specified in Equity Transaction B. If the equity in the Debtor is re-allocated, as specified in Equity Transaction B, then on the Payment Disbursement Date, the Debtor shall enter into an Operating Agreement among its members, to reflect the equity allocations set forth in Equity Transaction B.

4. If the equity of the Debtor is sold, as specified in Equity Transaction

4921-2609-2230_2

A, then on the Payment Disbursement Date, Agile shall make a capital contribution into Newco and Newco, in turn, shall make a capital contribution into the Debtor, in an amount sufficient to pay in full the allowed amount of all Claims, with any necessary funds placed in the Contested Claims Reserve.

5.      If the equity of the Debtor is re-allocated, as specified in Equity Transaction B, then on the Payment Disbursement Date, the Debtor shall close on and obtain the Exit Financing from the Exit Financing Lender, in an amount sufficient to pay in full the allowed amount of all Claims, with any necessary funds placed in the Contested Claims Reserve.

6.      **[In]If applicable, in** conjunction with the Exit Financing, Reynolds, on the Payment Disbursement Date, shall execute a Guaranty Fee Agreement with the Debtor and the Exit Financing Lender, pursuant to which Reynolds shall provide credit enhancement to the Exit Financing Lender with respect to the Exit Financing, on terms acceptable to Reynolds, the Debtor and the Exit Financing Lender.

7.      As security for the Exit Financing, **if applicable** the SPE will **after all Claims have been paid in full,** grant to the Exit Financing Lender, pursuant to the Exit Financing Agreements, a first-priority lien on the assets of the SPE. With respect to the Exit Financing, one or more of the members of the Debtor may additionally be required to grant a pledge of their membership interest to the Exit

successors, and assigns, to the fullest extent permitted under sections 1141(a) and 1142 of the Bankruptcy Code, whether or not such parties (a) voted to accept or reject the Plan, (b) had a right to vote on the Plan, (c) hold a Claim or Equity Interest that is Impaired or Unimpaired under the Plan, (d) hold a Claim or Equity Interest that is an Allowed Claim, a Contested Claim, or a Claim that has been disallowed in whole or in part, (e) have filed a proof of claim or proof of interest in this case, or (f) are entitled to receive a distribution under the Plan.

**9.02 Vesting of Assets.**

Upon the Payment Disbursement Date, **after payment in full of all Claims,** pursuant to section 1141(b) and (c) of the Bankruptcy Code, the Debtor's assets shall be comprised of the Debtor's ~~[100% membership interest in the SPE and in the Avoidance Claims]~~**estate, including, without limitation, the Property, all causes of action, including Avoidance claims and all rights, claims, and defense of the Debtor and the estate, shall vest in the Reorganized Debtor**, free and clear of all liens, claims, charges, encumbrances, and interests of creditors and equity interest holders, except as otherwise expressly provided in the Plan or the Confirmation Order. From and after the Effective Date, the Reorganized Debtor may operate its business and use, acquire, and dispose of property and settle and compromise claims and interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy

19

Code or the Bankruptcy Rules, except as otherwise provided in the Plan or the Confirmation Order. Because all allowed Claims are being paid in full under the Plan, there would be no purpose to pursue any Avoidance Claims, other than the contemplated action against Synecdoche **[NTD: Is it an avoidance action?]**, as an offset to the Claim asserted by Synecdoche. Any proceeds of an action against ~~[Synechdoche]~~**Synecdoche** shall be utilized by the Debtor in its general operations.

**9.03 Injunction**

Except as otherwise expressly provided in the Plan or the Confirmation Order, and ~~[upon receipt of]~~**after** payment **in full of all Claims** on the Payment Disbursement Date, all Persons who have held, hold, or may hold Claims against or Equity Interests in the Debtor are, pursuant to sections 524 and 1141 of the Bankruptcy Code, permanently enjoined from (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtor, the Reorganized Debtor, or their respective property on account of any such Claim or Equity Interest; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Debtor, the Reorganized Debtor, or their respective property on account of any such Claim or Equity Interest; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against the Debtor, the Reorganized Debtor, or their respective property on account of any such Claim or Equity Interest; (d) asserting any right of setoff,

subrogation, or recoupment of any kind against any obligation due from the Debtor, the Reorganized Debtor, or their respective property on account of any such Claim or Equity Interest; and (e) commencing or continuing in any manner any action or other proceeding of any kind **against the Debtor, the Reorganized Debtor, or their respective property** in respect of any Claim or Equity Interest that is treated, classified, discharged, or otherwise addressed under the Plan. All such Persons shall be required to pursue satisfaction of their Claims and Equity Interests **against the Debtor, the Reorganized Debtor, or their respective property** solely through the distribution mechanisms provided under the Plan.

## ARTICLE 10: GENERAL PROVISIONS

**10.01 Definitions and rules of construction.** The definitions and rules of construction set forth in sections 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan, and they are supplemented by the following definitions:

"Administrative Expenses" means, collectively, the Legal Expenses and the Quarterly Fees.

"Agile" means Agile Solar Group, LLC or its assignee.

"Allowed Claim" means a Claim against the Debtor to the extent such Claim is not a Contested Claim and (a) has been scheduled by the Debtor in its Schedules as neither disputed, contingent, nor unliquidated and as to which no

4921-2609-2230_2

"Amended DIP Loan" means the post-petition multi-draw secured term loan in an amount not to exceed $650,000, provided to the Debtor by the DIP Lender as reflected in the Second Amended DIP Note and approved by the Amended DIP Financing Order.

"Amended DIP Stipulation" means the *Stipulation to Order Authorizing the Debtor to Increase the Amount of Its Post-Petition Financing* [ECF No. 140].

"Ann Arbor Tax Claim" means the City of Ann Arbor's tax lien claim secured against the [Properties]Property for unpaid real property tax from year 2025, in the amount of $169,080.67.

"APB" means American Platinum Builders.

"Avoidance Claims" means any Claims pursuant to sections 502(d), 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

"Bankruptcy Court" or the "Court" means the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division, having jurisdiction over this case.

"Bankruptcy Rule" means the Federal Rules of Bankruptcy Procedure.

"Bar Date" means the date established by the Bankruptcy Court as the deadline for filing proofs of claim in this case which in this case is May 27, 2026

4921-2609-2230_2

or August 25, 2026 as to claims by any governmental agencies or units.

"BDS" means Building Decommission Services, LLC.

"Blue Phoenix" means Blue Phoenix 19 LLC, a Michigan limited liability company.

"Brownstone" means Brownstone Realty Advisors, LLC.

"CBRE Appraisal" means the July 7, 2023 appraisal of the [Properties]**Property** that was performed [by]**for** CNB, [through]**by** CBRE Valuation and Advisory Services.

"Claim" means a claim against the Debtor.

"CNB" means County National Bank.

"Colliers" means Colliers International Valuation & Advisory Services, LLC.

"Colliers 2025 Appraisal" means the November 25, 2025 appraisal of the [Properties]**Property** performed by Colliers.

"Colliers BOV" means the Broker Opinion of Value of the [Properties]**Property** issued on May 20, 2024, by Colliers.

"Commitment Letter" means the commitment letter between Provizia and the Debtor, entered into on July 27, 2026.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

4921-2609-2230_2

"Effective Date" means the day after the date the Confirmation Order becomes a Final Order. If, however, a stay of the Confirmation Order is in effect on that date, the Effective Date will mean the day after the date on which the stay expires or is otherwise terminated. These periods are calculated as provided in Bankruptcy Rule 9006(a)(1).

"Equity Interest" means equity in the Reorganized Debtor as of the **Payment** Disbursement Date of the Plan, unless otherwise specified in the Plan.

"Exit Financing" means the post-confirmation financing arrangement pursuant to the Exit Financing Agreement between the Debtor and the Exit Financing Lender.

"Exit Financing Agreement" means the definitive agreement to be entered into by and between the Debtor and the Exit Financing Lender memorializing the terms and conditions of the Exit Financing.

"Exit Financing Lender" means Provizia.

"Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket, that has not been reversed, stayed, modified, or amended, and as to which (a) the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and no appeal, petition for certiorari, or motion for reargument or rehearing has been timely filed; or (b) any appeal, petition for certiorari, or motion for reargument or

"Interim DIP Financing Order" means the *Interim Order (a) Authorizing the Debtor to Obtain Post-Petition Secured Financing; and (b) Granting Liens, Security Interests, and Superpriority Claim* [ECF No. 105].

"Legal Expenses" means the fees and expenses of Counsel.

"MicroGrid" means a power generation system to deliver electrical power to the Property, to be sold to the Property's tenants with a secondary source of revenue generated from the creation of carbon credits.

"Motion to Extend" means the Debtor's *Motion for Entry of an Order (a) Extending the Deadline to File a Chapter 11 Plan and (b) Extending the Debtor's Exclusivity Period to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to 11 U.S.C. § 1121 of the Bankruptcy Code* which was filed on April 9, 2026 [ECF No. 80].

"Ms. Poscher" means the Responsible Person, Heidi Caroline Poscher.

"Operating Agreement" means the Debtor's Amended and Restated Operating Agreement.

"Payment Disbursement Date" means the date not later than twenty (20) days after the Effective Date.

"Plan" means this **First Amended** Combined Chapter 11 Plan of Reorganization and Disclosure Statement, as it may be amended, modified, or supplemented from time to time.

"Plan Deadline" means July 27, 2026, to the ~~[extend]~~**extent** modified by the Court.

"Plan Exclusivity Period" means the period in which the Debtor has the exclusive right to file a chapter 11 plan which was extended to July 27, 2026.

"Plan Extension Order" means the Bankruptcy Court's *Order Regarding Debtor's Motion for Entry of an Order (a) Extending the Deadline to File a Chapter 11 Plan and (b) Extending the Debtor's Exclusivity Period to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to 11 U.S.C. §1121 of the Bankruptcy Code* granted on May 20, 2026 [ECF No. 121] in which the Court granted Debtor's Motion to Extend with respect to the deadline to file the Plan thereby extending the deadline to file the Plan until July 27, 2026; extended the exclusivity period for the Debtor to file its Plan to July 27, 2026; and extended the exclusivity period for Debtor to solicit acceptances of its Plan to September 25, 2026.

"Petition Date" means January 27, 2026, 3:22 p.m. E.S.T. which is the date and time on which the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

"Poscher Estate" means the probate estate of Dr. Margaret Poscher (deceased).

"Post-Petition Liens" means certain construction liens recorded against the

4921-2609-2230_2

Property after the Petition Date. **[NTD: These are prepetition liens]**

"Prentice" means Prentice Partners of Ann Arbor, LLC.

"Property" means the real property owned by the Debtor on which the Development sits.

"Provizia" means The Provizia Organization Inc.

"Pullins" means Steven Pullins.

"Quarterly Fees" means the quarterly fees payable to the United States Trustee.

"RAM" means Reynolds Asset Mgmt, LLC.

"RAM Term Sheet" means the term sheet executed on April 14, 2026, by Debtor and **[Reynolds]RAM**.

"Reorganized Debtor" means the Debtor, on and after the Effective Date.

"Responsible Person" means Ms. Poscher, personal representative of the Poscher Estate, and the individual authorized to manage the affairs of, and act on behalf of, the Debtor as debtor-in-possession in this bankruptcy case.

"Retainer Deposits" means the retainer deposits advanced by Ms. Poscher on behalf of the Debtor to Counsel, in the amount of $100,000.00.

"Revised DIP Note" means the revised promissory note evidencing the DIP Loan executed by the Debtor in favor of the DIP Lender, as included in the recited terms of the Interim DIP Financing Order.

additional $8.5 million is held by Prentice. The passing of Dr. Poscher in October of 2025 delayed the ongoing development and funding for the Development. Ms. Poscher, who was very familiar with the Development, primarily assisted the Debtor in the coordination for placement of the MicroGrid. Since Dr. Poscher's passing, Ms. Poscher has had to take on the Debtor's work for the remaining portions of the Development.

Prior to her death, Dr. Poscher, on the Debtor's behalf, modified an existing loan with Brownstone, borrowing additional funds for Development costs, CNB loan-extension fees, and CNB loan interest payments. Following closure of the Brownstone loan modification in June 2025, Brownstone advanced funds for Development costs but refused to release approximately $1.0 million in funds escrowed for the specific purpose of covering CNB loan-extension and interest payments. As a result, the Debtor found itself behind on its prepetition loan payments with CNB.

### *CNB's Foreclosure Proceeding*

CNB initiated a foreclosure by advertisement [proceeding ]in early November of 2025. CNB adjourned the foreclosure [proceeding]sale until early January 2026, based on the transition issues faced by the Debtor. The Debtor brought forward a third party to acquire the participants' interest in CNB's facility, but the participants refused to engage with that third party. As a result, the

38

4921-2609-2230_2

Debtor's only option was to seek protection under Chapter 11 of the Bankruptcy Code in light of the impending foreclosure by advertisement sale date.

### III. Significant Post-Petition Events

There are four significant post-petition events that have occurred in this Bankruptcy Case. First, upon CNB's motion, the Debtor's case was designated a single asset real estate case. Second, the Debtor sought approval of, and this Court approved, post-petition secured financing from Ms. Poscher. Third, the Debtor filed a motion to extend the Plan-filing deadline, and exclusivity period to file the Plan and solicit ballots on the Plan. Fourth, the Debtor has negotiated two separate alternative exit transactions, either of which will provide for payment in full of all Claims.

### *The SARE Designation*

On February 13, 2026, CNB filed the SARE Motion and in opposition the Debtor filed its SARE Objection. CNB filed the SARE Reply and the Court held a hearing on the SARE Motion on March 12, 2026. The Court was unpersuaded by the Debtor's arguments in opposition to the SARE Motion and entered the SARE Order. As such, the Debtor was required to either file its Plan within 90 days of the Petition Date or commence making interest-only payments to secured creditors, as required under 11 U.S.C. § 362(d)(3). The Debtor opted to make the

Interest-Only Payments to the Interest-Only Payees.[4] Debtor's other secured ~~creditors~~ creditor entitled to interest-only payments—Brownstone and ~~Prentice~~—waived payment. **Prentice did not have**

4921-2609-2230_2

### DIP Financing

The Debtor has no business operations and in order to make the Interest-Only Payments to the Interest-Only Payees, the Debtor sought approval of the Initial DIP Loan to be provided to the Debtor by Ms. Poscher as the DIP Lender. After the filing of the First DIP Motion and hearings, the Court entered the Interim DIP Financing Order that authorized the Debtor to borrow money on an interim basis from Ms. Poscher, in an aggregate principal amount of up to $133,000.00 prior to entry of a final order on the First Dip Motion and pursuant to the terms of the Revised DIP Note.

On May 18, 2026, the Court held a final hearing on the First DIP Motion. On May 22, 2026, and on stipulation of the parties, the Court entered its Final DIP Financing Order. In addition to the terms of the Interim DIP Financing Order, the Final DIP Financing Order authorized the Debtor to borrow up to an aggregate principal amount of $400,000 from Ms. Poscher under the terms of the Amended DIP Note. The purpose of the Initial DIP Loan was to afford the Debtor the ability to fund its Interest-Only Payments to the Interest-Only Payees, and payment of U.S. Trustee fees as set forth in the DIP Budget. The Debtor elected to make interest-only payments to its secured creditors (other than Brownstone[ **and**

---

payments—Brownstone and [**Prentice**]—waived payment**. Prentice did not have an interest provision**.

4921-2609-2230_2

**Prentice**], who waived [**their**]its right to interest payments) and which became due on the 90th day after the Petition Date pursuant to Section 362(d)(3) of the Bankruptcy Code in order for the Debtor to maintain the automatic stay, due to its SARE designation.

In exchange for the Initial DIP Loan, Ms. Poscher, as the DIP Lender was granted an allowed superpriority administrative expense claim with priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, but only to the extent of amounts actually borrowed under the Final DIP Financing Order.

As security for amounts borrowed, the DIP Lender was granted (i) pursuant to section 364(c)(2) of the Bankruptcy Code, a lien on all property of the Debtor's estate not otherwise subject to a lien, and (ii) pursuant to section 364(c)(3) of the Bankruptcy Code, a junior lien on all property of the Debtor's estate that is subject to a lien, in each case perfected automatically upon entry of the Interim DIP Financing Order without the necessity of filing a financing statement.

The DIP Liens are in all instances subject to existing mortgage liens in favor of CNB, Prentice, and Brownstone, the construction lien in favor of Higley and Permitted Third Party Liens (i.e., liens that are senior by operation of law, including liens securing the payment of real property taxes).

41

existing and ground-up transactions. Materials outlining RAM, its principal members

and its current portfolio of projects are attached as **Exhibit C.**

On July 16, 2026, the Debtor and Agile executed an Amended Commitment Letter (**Exhibit D** hereto), pursuant to which Agile agreed, on the Payment Disbursement Date to: (a) enable Newco to acquire 100% of the membership interest in the Debtor held by the Poscher Estate from the Poscher Estate for an amount in a multiple of 7 figures; and (b) provide an additional amount, not to exceed $41,000,000.00, as an equity infusion into Newco and then as an equity infusion by Newco into the Debtor, in an amount sufficient to provide for payment in full of all [allowed]Allowed Claims and other working capital requirements of the Debtor, post-confirmation.

On August 5, 2026, Agile provided a Memorandum update as to its investment commitment (**Exhibit E** hereto). References to "The Finn" and "The Forge" therein are proposed names for the Development.

Agile is a leading provider of large-scale solar power solutions and EV charging infrastructure. It specializes in solar arrays, power provider services, and EV charging installations through strategic site partnerships with high-usage locations. Agile is specifically interested in the Project, based on the Micro-Grid to be developed and installed. This aligns with Agile past development and

45

management of large-scale solar farms, supplying clean, renewable energy to power grids and key infrastructure, ensuring a sustainable and reliable energy supply. Further, Agile builds new or retrofits buildings with its patented BESS and Shallow Geothermal to enhance a building's energy needs and apply to the grid. Agile has advised the Debtor that Agile has placed approximately $500 million of debt and equity during the preceding 12-month period.

On July 27, 2026, the Debtor and the Exit Financing Lender entered into a Commitment Letter (**Exhibit F** hereto), pursuant to which the Exit Financing Lender has agreed (under Equity Transaction B) to provide to the Debtor Exit Financing on the Payment Disbursement Date in an amount sufficient to provide for payment in full of all ~~[allowed]~~**Allowed** Claims and other working capital requirements of the Debtor, post-confirmation. The Exit Financing will result in a re-allocation of the equity in the Debtor (under Equity Transaction B), with the Poscher Estate retaining a 59% interest and a 41% membership interest in the Debtor being issued to a combination of parties, the percentage ownership of which is as follows: Prentice, 5% (conversion of its debt position to equity); Blue Phoenix, 22%; Pullins, 2% (equity exercisable upon completion of vertical construction); APB, 5%; Vohwinkle, 2% (equity exercisable upon completion of vertical construction); and Reynolds, 5%. Blue Phoenix is an affiliate of Ms. Poscher, its members being Ms. Poscher, her family trust and certain friends and

family. Prentice is owned fully by ~~[Dr.]~~**the** Poscher **Estate**. Pullins, Vohwinkle, APB and Reynolds are not affiliates of Ms. Poscher, the Poscher Estate or any of their respective affiliates.

The Exit Financing Lender is a private investment company that lends from a debt fund in conjunction with a Sovereign Wealth Fund and two major European Family offices. Over the last decade they have invested in, funded and participated in over $11.75B of real estate projects internationally. The Exit Financing Lender concentrates on funding projects in North, Central and South America, the United Kingdom, the Republic of Ireland, several European countries and Caribbean nations. These projects include hospitality, industrial, senior care, senior residences, and multifamily real estate development.

The Exit Financing Lender is made up of former division presidents from several international banks, the chief operating officer of a boutique investment bank, and individuals with extensive hands-on experience in multifamily, senior care, hospitality, retail, medical, social, and work housing. Historically, the Company has provided both debt and equity into client capital stacks.

At present the Exit Financing Lender is financing two Hyatt Properties in Mexico, a Hilton Luxury Resort in Costa Rica, a Hard Rock Hotel in USA, a Waldorf Astoria in Caribbean, a 600 unit Condominium Property in Ecuador, a Storage Facility in USA, a Mixed Use Property (Hotel, Apartments) in the USA,

47

4921-2609-2230_2

a unit apartment building also in the USA,  Conversion of a Hospital to a Medical Surgical Center in the USA and a High Tech Manufacturing Complex in the USA.

The Exit Financing Lender and its subsidiaries are headquartered in Canada, America, and Brazil, with subsidiaries and affiliates in the United States, Mexico, the United Kingdom, and Brazil.

Equity Transaction A and Equity Transaction B will be brought before the Probate Court for Probate Court Approval prior to the hearing on confirmation of this Plan, to obtain conditional approval of [the same]both, subject only to confirmation of this Plan.

The Debtor, through its representative, Ms. Poscher, prefers Equity Transaction A over Equity Transaction B, as there is an interest cost associated with Equity Transaction B, based on the need for Exit Financing, which is not necessary under Equity Transaction A. Further, Equity Transaction A would likely be more attractive to the Posher Estate, as it monetizes the Poscher's Estate's interest in the Debtor, rather than the Poscher Estate awaiting the completion of the vertical construction and a liquidity event. The Debtor has arranged for Equity Transaction B and the Exit Financing, if for some reason, Equity Transaction A and Agile's participation therein is somehow revoked or not approved.

Ms. Poscher, on behalf of the Debtor, is working on a parallel path to document Equity Transaction A and Equity Transaction B. Equity Transaction A

48

CNB:        $113,320.62

Higley:     $  4,306.42

The Debtor paid the Quarterly Fees as required, in the amount of $350. To date, the Debtor has made a total of $327,094.62 in transfers outside of the ordinary course in accordance with the terms of the DIP Budgets. The Debtor has made no other transfers outside of the ordinary course. Ms. Poscher, out of her own funds, paid a $150,000 due diligence fee to WhiteHawk and a $60,000 due diligence fee to Provizia, [but]**which were gifts to** the Debtor[ has no arrangement with Ms. Poscher for the repayment of these amounts].

### A.    Summaries of cash collateral, post-petition financing, and adequate protection orders

The details and summaries of the Debtor's DIP Facility, DIP Budgets, and Interest-Only Payments are provided above. *See supra*, Section III of the Disclosure Statement.

### B.    Pending litigation

On the Petition Date, the Debtor was party to two creditor enforcement actions. CNB had initiated a foreclosure by advertisement action against the Debtor, and Brownstone had initiated a foreclosure and receivership action against the Debtor—in the Circuit Court for Washtenaw County, Michigan. Both actions were stayed pursuant to section 362 of the Bankruptcy Code upon the

51

4921-2609-2230_2

filing of the Debtor's bankruptcy petition. Upon payment in full of the allowed amount of the Claims of CNB and Brownstone on the Payment Disbursement Date, each shall be permanently enjoined from pursuing or continuing such actions against the Debtor or its assets and such actions shall be **discontinued or** dismissed, **as applicable** based on payment in full having been received by CNB and Brownstone under the Plan.

## IV.    Liquidation Analysis and Risks

### A.    Liquidation Analysis

An appraisal was performed by CBRE Valuation and Advisory Services on July 7, 2023 in connection with CNB's loan. That CBRE Appraisal contained two values. The first value was $15,800,000, described to be the "As Is (Land Value)." The second value, which included the then in place early-stage enhancements to the Development (through site preparation, site plan application, etc.), known as "entitlements" placed the "As Entitled (Land Value)" of the Development at $29,500,000. A second valuation, the Colliers BOV, dated May 20, 2024, placed the value of the Development, with the then in-place entitlements, at $45,800,000. This reflected the additional work which had been undertaken with respect to the Development, including architectural, engineering and site plan approval. A third, and more recent appraisal, the Colliers 2025 Appraisal, was issued on November 25, 2025, and placed the value of the Development, with the then in-place

4921-2609-2230_2

entitlements, at $61,300,000. This reflected the additional development work that had ensued over the 18 months since the Colliers BOV.

The Colliers BOV and Colliers 2025 Appraisal reflect increased value in the Property since the CBRE Appraisal. The increase in valuation is based on the detailed and approved Development plans, and entitlements now attached to the Property, which allow for construction of the various Development components.

The Colliers 2025 Appraisal assessed various risks and conditions upon which the appraisal was based, including accessibility, exposure, flood-zone proximity, presence of easements or encumbrances, hazardous waste detection, et al. The Colliers 2025 Appraisal indicated a good rating for both accessibility and exposure, moderate and minimal flood risk, no adverse easements or encumbrances, and no presence or signs of hazardous waste, and summarized "[o]verall, the [Development's] location is rated as good/excellent . . . there are no known factors that would limit the site's development according to its highest and best use." Colliers 2025 Appraisal, p. 25.

Against these valuations, the Debtor has the secured, unsecured, superpriority and, administrative Claims identified in Section 3 of the Plan, which in the aggregate, exceed in total $34,000,000, if allowed in full. The Debtor's Plan provides for the payment in full of all ~~[allowed]~~**Allowed** Claims (other than the conversion of Prentice's secured claim to equity). If the Debtor were to be

liquidated, based on the appraisals above noted, it would appear that all creditors of the Debtor would be paid in full. However, it is unknown what value the Property and the other assets of the Debtor would bring, in relation to the values set forth in the appraisals, in a forced liquidation setting. If the entitlements are deemed to have no value, based on a purchaser's abandonment of the same with respect to the Development (electing instead a different or modified use of the [Development]Property), or a lesser value than as appraised, then the value to be obtained in a forced liquidation could approximate the acquisition cost of the Property, which was $18,982,170. This amount would be insufficient to satisfy the creditor Claims in full and would likely only cover the Claims of Ann Arbor[,] and a portion of allowed construction lien claims, and [a portion of ]the CNB indebtedness, depending on priorities.

## B.    Potential Claims and Causes of Action.

The Debtor has one known cause of action, which the Debtor intends to initiate in this bankruptcy case, through the filing of an adversary proceeding against Synecdoche. Synecdoche claims to hold a construction lien claim against the Property. Synecdoche was retained as an architect for the Development. The Debtor has substantial defenses to the amount claimed by Synecdoche to be due and owing and asserts that the Debtor has overpaid Synecdoche for failed work product and overbillings. The Debtor also asserts that the Debtor's termination of Synecdoche

54

pre-petition, which is undisputed by Synecdoche, excuses the Debtor from having to pay any residual payments to Synecdoche. Per the Plan, the Debtor will place into the Disputed Claims Reserve an amount sufficient to pay Synecdoche, should Synecdoche's Claim be allowed in full, as filed.

The Debtor intends to file certain unsecured Claim objections and reserves all other potential Avoidance Claims, whether now existing or hereafter arising, known or unknown, and any claims or causes of action not specifically identified herein are expressly reserved. However, the Debtor does not anticipate pursuing any other Avoidance Claims, for the reason that all **Allowed** Claims will be paid in full. Further, the Debtor is not aware of any material Avoidance Claims other than the Avoidance Claim against Synecdoche. Conversion of the Prentice Claim to equity includes a discount based on the Debtor's assertion that none or only a portion of the Prentice Claim should be deemed to be debt, but rather, an equity contribution by Dr. Poscher.

Upon entry of the Confirmation Order, all such causes of action shall vest in the Reorganized Debtor, which shall retain full authority to prosecute, settle, or otherwise resolve such claims. The Debtor further reserves the right to investigate, assert, and pursue any and all claims, causes of action, and avoidance actions arising under sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, 553, or any other applicable provision of the Bankruptcy Code, whether or not

55

However, at this time, the Debtor has every confidence in both and is proceeding on a parallel path as to both.

### C. Post-confirmation leadership

Ms. Poscher will remain as the responsible person to the Debtor post-confirmation. The acquisition or allocation of the equity of the Debtor is as is set forth under Equity Transaction A or Equity Transaction B described above.

Debtor's operations post-confirmation will involve the continuation of the work necessary to complete the Development.

Ms. Poscher has and will continue to receive no compensation or fringe benefits for her services to the Debtor through the Effective Date.

### Post-confirmation tax ramifications

The Plan contemplates a conveyance of the [Property]**Transferred Assets** to the SPE, in exchange for a 100% interest in the SPE. The Debtor does not believe that this Property transfer transaction will result in a taxable event to the Debtor. Further, the Debtor will have no debt forgiveness income related to its Plan, as the Plan provides for a 100% payment of all allowed Claims of the Debtor on the Payment Disbursement Date.

The Debtor recommends that the Creditors consult their tax specialist relative to the tax consequences of the Plan to the Creditors.

No ruling has been sought or obtained from the IRS with respect to any of the

4921-2609-2230_2