| | |
|---|---|
| In re: | Case No. 26-40805 |
| South Town By 4M, LLC, | Chapter 11 |
| Debtor. | Hon. Lisa S. Gretchko |
| _____/ | |

**FIRST AMENDED
COMBINED CHAPTER 11 PLAN AND DISCLOSURE STATEMENT**

South Town by 4M LLC, debtor and debtor-in-possession in the above captioned case, by and through its attorneys, states as follows for its *First Amended Combined Chapter 11 Plan of Reorganization and Disclosure Statement*:

### I. The Plan of Reorganization

### ARTICLE 1: SUMMARY

This Plan allows the Debtor to successfully exit this chapter 11 bankruptcy proceeding and complete the Development.[1] The Plan provides for the full payment of all allowed secured claims[2] and non-priority unsecured claims, super-priority administrative expenses, administrative expenses and priority claims.

### ARTICLE 2: CLASSIFICATION OF CLAIMS

**Class 1** consists of the City of Ann Arbor's Claim, secured by a tax lien against

---

[1] Please reference Article 10 of the Plan for all defined terms contained in this Plan.

[2] The secured claim of Prentice will be converted to equity.

the Property in the amount of $169,080.67.

**Class 2** consists of CNB's Claim, secured by a mortgage against the Property for money loaned in the approximate amount of $18,628,131.44 which includes postpetition interest and attorneys' fees and other charges and expenses, including appraisal fees.

**Class 3** consists of Brownstone's Claim, secured by a mortgage against the Property for money loaned in the amount of $7,794,566.33 which includes interest and attorneys' fees and other fees and costs.

**Class 4** consists of Prentice's Claim, secured by a mortgage against the Property in the principal amount of $8,500,000.00.

**Class 5** consists of Higley's Claim, secured by a construction lien against the Property in the amount of $976,084.21.[3]

**Class 6** consists of SmithGroup's Claim, secured in part, by a construction lien against the Property in the amount of $508,139.00.[4]

**Class 7** consists of BDS's Claim, secured by a construction lien against the Property in the amount of $129,898.00.

---

[3] The total amount of the Higley Claim is $1,010,351.77 and includes the separately filed claim of BDS, which, in addition to the Class 5 Claim, contains a general unsecured Class 9 Claim in the amount of $34,267.56.

[4] The total amount of the SmithGroup Claim is $902,726.45 which, in addition to the Class 6 Claim, contains a general unsecured Class 9 Claim in the amount of $394,587.45.

2

**Class 8** consists of Synecdoche's Claim, secured by a disputed and unliquidated construction lien against the Property in the amount of $822,140.96.

**Class 9** consists of all non-priority, general unsecured Claims.

**Class 10** consists of the Equity Interests of the Debtor, namely the Poscher Estate which holds 100 percent of the equity interest in the Debtor.

**Super-priority administrative expense Claims:** consists of the Claim of the Responsible Person, Ms. Poscher, in an amount equal to all amounts advanced prior to Plan confirmation consistent with the Second DIP Financing Order, the Second DIP Budget and any amendments thereto.

**Administrative Expenses:** consists of the Legal Expenses owing to Counsel to the Debtor and UST Quarterly Fees of $350. Payment of the Legal Expenses owing to Counsel to the Debtor is subject to court approval of the same. As of the time of filing of this Plan, the Legal Expenses incurred by Counsel to the Debtor were approximately $480,000.00. Additional Legal Expenses will be incurred through the Effective Date. Ms. Poscher, on behalf of the Debtor, has personally advanced the Retainer Deposits. The Legal Expenses will be paid in full by the Debtor after Court approval of the same. To the extent the Debtor has insufficient funds to pay the Legal Expenses at the time of their approval by the Court, the Legal Expenses may be paid from the Retainer Deposits, in which case Ms. Poscher shall be subrogated to the rights of Counsel to the Debtor with respect to such amounts

3

and shall be entitled to repayment of the same, on the Effective Date. Ms. Poscher's subrogation claim, if it arises, would be in addition to the Claim which she has filed in this proceeding. Any excess Retainer Deposits shall be returned to Ms. Poscher. UST Quarterly Fees are being paid under the Second DIP Financing Order and the Second DIP Budget, with any remaining balance being paid on the Effective Date.

**Secured administrative expense claims:** consists solely of the property tax Claim of the City of Ann Arbor for unpaid real property taxes represented by the July 1, 2026 tax bill in the amount of $28,888.29, which shall become due and payable on or prior to September 15, 2026.

All creditors and equity security holders should refer to Articles 3 through 6 of this Plan for information regarding the precise treatment of their Claims and interests.

## ARTICLE 3: TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

**3.01   Class 1.** Secured Claim of the City of Ann Arbor.

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim:                             $   169,080.67

Estimated Value of Collateral:  $   61,000,000.00

The City of Ann Arbor holds the Ann Arbor Tax Claim, which is secured by a tax lien against the Property for unpaid 2025 real property taxes. Under applicable Michigan law, such tax liens are afforded statutory priority and prime all prior recorded

4

liens and encumbrances against the Property, regardless of the date of recording. The Ann Arbor Tax Claim will be paid in full on the Effective Date.

**3.02 Class 2.** Secured Claim of CNB.

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim: $ 18,628,131.14

Estimated Value of Collateral: $ 61,000,000.00

CNB holds a Claim secured by a mortgage against the Property for money loaned to the Debtor. CNB's lien on the Property and all of its rights and remedies under its mortgage and other loan documents are preserved until its Claim is paid in full on the Effective Date. The allowed amount of this Claim will be paid in full on the Effective Date. CNB claims that it is owed interest of $1,554,048.07 and fees and expenses of not less than $210,569.43 as of July 29, 2026 (which is included in the amount of claim above) plus fees, charges and expenses incurred after that date with per diem interest thereafter at $5,110.54. The allowed amount of CNB's claim will be determined upon agreement of the Debtor and CNB or per resolution by the Court.

**3.03 Class 3.** Secured Claim of Brownstone.

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim: $ 7,794,566.33

Estimated Value of Collateral: $ 61,000,000.00

Brownstone holds a Claim secured by a mortgage against the Property for money loaned to the Debtor. The allowed amount of this Claim will be paid in full on the Effective Date.

**3.04   Class 4.** Secured Claim of Prentice.

**Impaired. Entitled to vote on the Plan.**

Amount of claim:                          $   8,500,000.00

Estimated Value of Collateral:  $   61,000,000.00

Prentice holds a Claim secured by a mortgage against the Property for money allegedly loaned to the Debtor. On the Effective Date, Prentice's Claim shall be converted to a 5% equity interest in the Reorganized Debtor.

**3.05   Class 5.** Secured Claim of Higley.

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim:                          $       976,084.21

Estimated Value of Collateral:  $   61,000,000.00

Higley holds a construction lien Claim against the Property for services performed. The allowed amount of this Claim will be paid in full on the Effective Date, pursuant to joint checks in the following amounts, based on the Higley Claim including the claims of various subcontractors to Higley;

Higley and BDS                                    $129,898.00

Higley and Blue Star, Inc                      $243,215.00

Higley and Eagle Excavation                                    $68,280.58

Higley and Industrial Fence & Landscaping, Inc.   $34,911.00

Balance to Higley                                              $369,881.63

**3.06 Class 6.** Secured Claim of SmithGroup

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim:                        $       508,139.00

Estimated Value of Collateral:  $   61,000,000.00

SmithGroup holds a construction lien Claim against the Property for services performed. The allowed amount of this Claim will be paid in full on the Effective Date.

**3.07   Class 7.** Secured Claim of BDS

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim:                        $       129,898.00

Estimated Value of Collateral:  $   61,000,000.00

BDS holds a construction lien Claim against the Property for services performed. The allowed amount of this Claim will be paid in full on the Effective Date pursuant to a joint check with Higley, as provided in Section 3.05 hereof.

**3.08   Class 8.** Secured Claim of Synecdoche

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim:                        $       822,140.96

7

Estimated Value of Collateral: $ 61,000,000.00

Synecdoche asserts a construction lien Claim against the Property for services performed. The Synecdoche Claim will be the subject of an adversary proceeding and claim objection seeking disallowance of the Synecdoche Claim and repayment of amounts owing to the Debtor. If the allowed amount of the Synecdoche Claim has not been resolved prior to the Effective Date, then the gross amount of the Synecdoche Claim will be escrowed until the amount of the Synecdoche Claim, if any, is determined. Once the allowed amount of the Synecdoche Claim is determined, the Allowed Synecdoche Claim will be paid in full from the Contested Claims Reserve.

**3.09 Class 9**. All Non-Priority Unsecured Claims Allowed Under Section 502 of the Bankruptcy Code.

**Unimpaired. Not entitled to vote on the Plan.**

Class 9 consists of eight (8) non-priority unsecured Claims, specifically: Graybar/Schneider ($122,310.04); Ms. Poscher ($1,985,012); Bill Me Later, Inc./PayPal, Inc. ($105,404.92); G2 ($26,425.00); Learfield ($180,000.00); Newmark Valuation Advisory, LLC ($10,500.00); SmithGroup ($394,587.45); and Resilient Solar of East Tennessee LLC ($0). The allowed amount of all Class 9 Claims will be paid in full on the Effective Date. The BDS Claim will be paid pursuant to a joint check with Higley, as set forth in Section 3.05 hereof. If any of the Class 9 Claims are Contested Claims, they shall be paid in accordance with

8

Article V hereof.

**3.10  Class 10**.  Equity Interests of the Debtor.

**Impaired. Entitled to vote on the Plan.**

On the Effective Date, contemporaneous with payment in full of all Claims, the Debtor is transferring its ownership interest in the Transferred Assets to a Delaware special purpose entity (the "SPE"), in exchange for which the Debtor will receive one hundred percent (100%) of the equity in the SPE, making the Debtor the parent of the SPE. The transfer of the Transferred Assets is subject to all liens securing Claims until the Claims are paid in full. Thereafter, the equity in the Debtor will be addressed in one of two alternative transactions.

This transaction is diagramed as follows:

**Debtor** >Transfer of the Transferred Assets to the **SPE**

**Debtor** <Receipt of 100% of the membership interest in the **SPE**

This results in the Debtor being the holding company of the SPE, with the Debtor in turn being 100% owned by the Poscher Estate, with the equity then reallocated according Equity Transaction A or Equity Transaction B below. This transaction from the Poscher Estate to the SPE is diagramed as:



**Poscher Estate**
|
100%
|
**Debtor**
|
100%
|
**SPE**

9

**Equity Transaction A**. Under Equity Transaction A, a newly formed entity ("Newco") will acquire 100% of the equity interests in the Debtor from the Poscher Estate, for a multiple of a seven-figure amount.

This transaction is diagramed as follows:

**Poscher Estate** >Transfer of 100% of membership interest in Debtor to **Newco**

**Newco**  <Receipt of 100% of the membership interest in the **Debtor**

This results in the Debtor being the holding company of the SPE, with the Debtor, in turn being 100% owned by Newco, diagramed as:



**Newco**
|
100%
|
**Debtor**
|
100%
|
**SPE**

Newco will be owned 59% by Agile Solar Group, LLC, or its affiliate and 41% will be owned by a combination of parties, the percentage ownership of which is as follows: Prentice, 5% (conversion of its debt position to equity); Blue Phoenix, 22%; Pullins, 2% (equity exercisable upon completion of vertical construction); APB, 5%; Vohwinkle, 2% (equity exercisable upon completion of vertical construction); and Reynolds, 5%. Blue Phoenix is an affiliate of Ms. Poscher. Prentice is owned fully by the Poscher Estate. Pullins, Vohwinkle, APB and

Reynolds are not affiliates of Ms. Poscher, the Poscher Estate or any of their respective affiliates.

**Equity Transaction B**. Under Equity Transaction B, 59% of the equity in the Debtor shall continue to be held by the Poscher Estate and the remaining 41% shall be issued as follows: Prentice, 5% (conversion of its debt position to equity); Blue Phoenix, 22%; Pullins, 2% (equity exercisable upon completion of vertical construction); APB, 5%; Vohwinkle, 2% (equity exercisable upon completion of vertical construction); and Reynolds, 5%. Blue Phoenix is an affiliate of Ms. Poscher. Prentice is owned fully by the Poscher Estate. Pullins, Vohwinkle, APB and Reynolds are not affiliates of Ms. Poscher, the Poscher Estate or any of their respective affiliates.

This results in the Debtor being the holding company of the SPE, with the Debtor, in turn being owed as diagramed below:



**Poscher Estate  Prentice  Blue Phoenix  Pullins  APB  Vohwinkle  Reynolds**

Equity Transaction A and Equity Transaction B will be brought before the

Probate Court with governance over the Poscher Estate, prior to the hearing on confirmation of this Plan (the "Probate Court Approval"), to obtain conditional approval of both, subject only to confirmation of this Plan. The Debtor will file a supplement to this Plan, to include the submission made to the Probate Court and will file a supplement to this Plan as to any order issued by the Probate Court. Each supplement shall be served on all parties.

**ARTICLE 4: TREATMENT OF ADMINISTRATIVE EXPENSES, PRIORITY TAX CLAIMS AND QUARTERLY FEES**

**4.01: Unclassified Claims.** Under section 1123(a)(1) of the Bankruptcy Code, allowed Administrative Expenses and priority tax claims captured under section 507(a) are not classified Claims.

**4.02: Administrative Expense Claims.** Claims for Administrative Expenses allowed under section 503 of the Bankruptcy Code will be paid in full upon the later of court approval of the same and the Effective Date, in cash, or upon such other terms as may be agreed upon by the holder of the Claim and the Debtor.

**4.03: Priority Tax Claim.** The priority tax Claim consists solely of the unsecured portion of the Claim of the City of Ann Arbor for unpaid real property taxes represented by the July 1, 2026 tax bill in the amount of $28,888.29, which shall become due and payable on or prior to September 15, 2026. This priority tax Claim shall be paid in full on the Effective Date.

26-40805-lsg    Doc 171    Filed 08/12/26    Entered 08/12/26 14:09:41    Page 12 of 176

**ARTICLE 5: ALLOWANCE AND DISALLOWANCE OF CLAIMS**

**5.01 Delay of Distribution on a Contested Claim.** No distribution will be made on account of a Contested Claim unless and until it is an Allowed Claim.

**5.02: Settlement of Contested Claims.** The Debtor will have the power and authority to settle and compromise any Contested Claim with court approval and compliance with Bankruptcy Rule 9019.

**5.03 Contested Claims Reserve.** On the Effective Date, the Reorganized Debtor shall establish and maintain the Contested Claims Reserve. Funds held in the Contested Claims Reserve shall not be distributed to a creditor holding a Contested Claim until the later of: (a) the date the Contested Claim becomes an Allowed Claim pursuant to a Final Order; or (b) the Effective Date. Upon the disallowance of a Contested Claim by a Final Order, the amount reserved on account of such Contested Claim shall be released from the Contested Claims Reserve and shall revert to the Reorganized Debtor.

**5.04 Claim Objection Deadline.** The Debtor or Reorganized Debtor shall file any objections to Claims whether by filing an objection to claim or an adversary proceeding on or before the Effective Date, unless such deadline is extended by order of the Bankruptcy Court upon a motion filed before its expiration.

## ARTICLE 6: PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The Debtor is a party to the following executory contracts: DMC Real Estate Services who provided advisory services for the development of the Property; Graybar/Schneider who provided a feasibility study for incorporating the MicroGrid into the Development; Nederveld who provided civil engineering plans and strategies for the site plan approvals; Learfield who provided marketing services; Newmark Valuation Advisory, LLC who provided a market revenue study and valuation guidance; Resilient Solar of East Tennessee LLC who provided an energy market analysis; and Higley who provided various construction and advisory services for the Development. To the extent not terminated or concluded prior to the Petition Date, on August 7, 2026 and August 10, 2026 the Debtor filed motions to reject each of the foregoing executory contracts pursuant to section 365 of the Bankruptcy Code. The Debtor reserves the right to amend this Plan prior to confirmation to assume any of the foregoing executory contracts.

## ARTICLE 7: MEANS FOR IMPLEMENTATION OF THE PLAN

The Plan shall be implemented through the following transactions:

1. On or prior to the hearing on confirmation, the Debtor shall have obtained the Probate Court Approval.

2. On the Effective Date, contemporaneous with payment in full of all Claims, the Reorganized Debtor shall convey its interest in all of the Transferred Assets to the SPE. The transfer of the Transferred Assets is subject to all liens

securing Claims until the Claims are paid in full.

3. On the Effective Date, the equity in the Debtor shall be sold, as specified in Equity Transaction A, or re-allocated, as specified in Equity Transaction B. If the equity in the Debtor is re-allocated, as specified in Equity Transaction B, then on the Effective Date, the Debtor shall enter into an Operating Agreement among its members, to reflect the equity allocations set forth in Equity Transaction B.

4. If the equity of the Debtor is sold, as specified in Equity Transaction A, then on the Effective Date, Agile shall make a capital contribution into Newco and Newco, in turn, shall make a capital contribution into the Debtor, in an amount sufficient to pay in full the allowed amount of all Claims, with any necessary funds placed in the Contested Claims Reserve.

5. If the equity of the Debtor is re-allocated, as specified in Equity Transaction B, then on the Effective Date, the Debtor shall close on and obtain the Exit Financing from the Exit Financing Lender, in an amount sufficient to pay in full the allowed amount of all Claims, with any necessary funds placed in the Contested Claims Reserve.

6. If applicable, in conjunction with the Exit Financing, Reynolds, on the Effective Date, shall execute a Guaranty Fee Agreement with the Debtor and the Exit Financing Lender, pursuant to which Reynolds shall provide credit

enhancement to the Exit Financing Lender with respect to the Exit Financing, on terms acceptable to Reynolds, the Debtor and the Exit Financing Lender.

7. As security for the Exit Financing, if applicable, the SPE will, contemporaneous with payment in full of all Claims, grant to the Exit Financing Lender, pursuant to the Exit Financing Agreements, a lien on the assets of the SPE, subject to all liens in the Transferred Assets securing the Claims until the Claims are paid in full, and thereafter, will become a first-priority lien in the assets of the SPE including the Transferred Assets. With respect to the Exit Financing, one or more of the members of the Debtor may additionally be required to grant a pledge of their membership interest to the Exit Financing Lender.

8. On the Effective Date, the Debtor shall make the payments provided for hereunder to all creditors holding Allowed Claims with any Claims subject to dispute to be paid from the Contested Claims Reserve, to the extent later allowed.

9. Any balance remaining in the Contested Claims Reserve and other cash received by the Debtor not necessary to pay the allowed Claims of the Debtor's creditors shall be released to the Reorganized Debtor.

10. On the Effective Date, RAM and Blue Phoenix shall enter into a Co-Development Agreement with the Debtor, pursuant to which RAM and Blue Phoenix shall assume various duties on a post-Effective Date basis with respect to the Development. This Co-Development Agreement would be effective under both

Equity Alternative A and Equity Alternative B, as it addresses the steps to be taken post the Effective Date to move the Development to vertical construction and completion. All payments under the Co-Development Agreement would be paid from the Vertical Financing.

**ARTICLE 8 EVENTS OF DEFAULT AND EFFECT THEREOF**

Any creditor remedies allowed by section 1112 of the Bankruptcy Code, including section 1112(b)(4)(N) of the Bankruptcy Code, shall be preserved to the extent otherwise available at law. In addition to any rights specifically provided to a claimant treated pursuant to this Plan, a failure by the Debtor to make a payment to a creditor pursuant to the terms of this Plan shall be an event of default as to such payment not cured within ten (10) days after mailing written notice of default from such creditor to the Debtor. Any default notice, inquiry, or other formal communication pursuant to the Plan shall be mailed by certified mail, return receipt requested to the following:

| | |
|---|---|
| To: | South Town by 4M, LLC<br>c/o Heidi Caroline Poscher<br>27777 Franklin Rd, Suite 2500<br>Southfield, MI 48034 |
| With a Copy To: | Taft Stettinius & Hollister, LLP<br>c/o Jay Welford; Kimberly Ross Clayson;<br>Anthony Cimini<br>27777 Franklin Rd, Suite 2500<br>Southfield, MI 48034 |

(Noticing Requirements Cont'd on Next Page)

17

jwelford@taftlaw.com

kclayson@taftlaw.com

acimini@taftlaw.com

## ARTICLE 9 EFFECT OF CONFIRMATION OF THE PLAN

### 9.01 Binding Effect of Plan.

Upon the Effective Date, the provisions of the Plan shall bind the Debtor, the Reorganized Debtor, all holders of Claims and Equity Interests in the Debtor, all Persons acquiring property under the Plan, and all other parties in interest in this case, together with their respective agents, attorneys, representatives, heirs, successors, and assigns, to the fullest extent permitted under sections 1141(a) and 1142 of the Bankruptcy Code, whether or not such parties (a) voted to accept or reject the Plan, (b) had a right to vote on the Plan, (c) hold a Claim or Equity Interest that is Impaired or Unimpaired under the Plan, (d) hold a Claim or Equity Interest that is an Allowed Claim, a Contested Claim, or a Claim that has been disallowed in whole or in part, (e) have filed a proof of claim or proof of interest in this case, or (f) are entitled to receive a distribution under the Plan.

### 9.02 Vesting of Assets.

Upon the Effective Date, after payment in full of all Claims, pursuant to section 1141(b) and (c) of the Bankruptcy Code, the Debtor's assets shall be comprised of the Debtor's 100 percent interest in the SPE, all causes of action, including Avoidance claims and all rights, claims, and defenses of the Debtor and

the estate, shall vest in the Reorganized Debtor, free and clear of all liens, claims, charges, encumbrances, and interests of creditors and equity interest holders, except as otherwise expressly provided in the Plan or the Confirmation Order. From and after the Effective Date, the Reorganized Debtor may operate its business and use, acquire, and dispose of property and settle and compromise claims and interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, except as otherwise provided in the Plan or the Confirmation Order. Because all allowed Claims are being paid in full under the Plan, there would be no purpose to pursue any Avoidance Claims. The Debtor intends to file a breach of contract action against Synecdoche, as an offset to the Claim asserted by Synecdoche. Any proceeds of an action against Synecdoche shall be utilized by the Debtor in its general operations.

**9.03 Injunction**

Except as otherwise expressly provided in the Plan or the Confirmation Order, and after payment in full of all Claims on the Effective Date, all Persons who have held, hold, or may hold Claims against or Equity Interests in the Debtor are, pursuant to sections 524 and 1141 of the Bankruptcy Code, permanently enjoined from (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtor, the Reorganized Debtor, or their respective property on account of any such Claim or Equity Interest; (b) enforcing, attaching, collecting, or

recovering by any manner or means any judgment, award, decree, or order against the Debtor, the Reorganized Debtor, or their respective property on account of any such Claim or Equity Interest; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against the Debtor, the Reorganized Debtor, or their respective property on account of any such Claim or Equity Interest; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtor, the Reorganized Debtor, or their respective property on account of any such Claim or Equity Interest; and (e) commencing or continuing in any manner any action or other proceeding of any kind against the Debtor, the Reorganized Debtor, or their respective property in respect of any Claim or Equity Interest that is treated, classified, discharged, or otherwise addressed under the Plan. All such Persons shall be required to pursue satisfaction of their Claims and Equity Interests against the Debtor, the Reorganized Debtor, or their respective property solely through the distribution mechanisms provided under the Plan.

**ARTICLE 10: GENERAL PROVISIONS**

**10.01 Definitions and rules of construction.** The definitions and rules of construction set forth in sections 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan, and they are supplemented by the following definitions:

"Administrative Expenses" means, collectively, the Legal Expenses and the

26-40805-lsg   Doc 171   Filed 08/12/26   Entered 08/12/26 14:09:41   Page 20 of 176

Quarterly Fees.

"Agile" means Agile Solar Group, LLC or its assignee.

"Allowed Claim" means a Claim against the Debtor to the extent such Claim is not a Contested Claim and (a) has been scheduled by the Debtor in its Schedules as neither disputed, contingent, nor unliquidated and as to which no objection has been filed; (b) a proof of claim has been timely filed and no objection thereto has been filed; or (c) has been allowed by a Final Order.

"Allowed Synecdoche Claim" means the allowed amount, if any, of the Claim of Synecdoche.

"Amended Case Management Order" means the Court's *Order Amending Order Establishing Deadlines and Procedures for a Single Asset Real Estate Case* [ECF No. 124].

"Amended Commitment Letter" means the letter of commitment between Agile and the Debtor, entered into on July 16, 2026.

"Second DIP Budget" means the amended budget attached as Exhibit B to the Second DIP Motion.

"Second DIP Motion" means the Debtor's *Motion for Entry of an Order (a) Authorizing the Debtor to Increase the Amount of Its Post-Petition Financing* [ECF No. 132].

"Amended DIP Note" means the *Amended and Restated Promissory Note*

[ECF No. 113], reflecting the amended terms of the DIP Loan included in the Final DIP Financing Order.

"Second DIP Financing Order" means the *Order Granting Debtor's Motion for Authority to Increase the Amount of Its Post-Petition Financing* entered on July 27, 2026 [ECF No. 153].

"Second DIP Loan" means the post-petition multi-draw secured term loan in an amount not to exceed $650,000, provided to the Debtor by the DIP Lender as reflected in the Second Amended DIP Note and approved by the Second DIP Financing Order.

"Second DIP Stipulation" means the *Stipulation to Order Authorizing the Debtor to Increase the Amount of Its Post-Petition Financing* [ECF No. 140].

"Ann Arbor Tax Claim" means the City of Ann Arbor's tax lien claim secured against the Property for unpaid real property tax from year 2025, in the amount of $169,080.67.

"APB" means American Platinum Builders.

"Avoidance Claims" means any Claims pursuant to sections 502(d), 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

"Bankruptcy Court" or the "Court" means the United States Bankruptcy Court

for the Eastern District of Michigan, Southern Division, having jurisdiction over this case.

"Bankruptcy Rule" means the Federal Rules of Bankruptcy Procedure.

"Bar Date" means the date established by the Bankruptcy Court as the deadline for filing proofs of claim in this case which in this case is May 27, 2026 or August 25, 2026 as to claims by any governmental agencies or units.

"BDS" means Building Decommission Services, LLC.

"Blue Phoenix" means Blue Phoenix 19 LLC, a Michigan limited liability company.

"Brownstone" means Brownstone Realty Advisors, LLC.

"CBRE Appraisal" means the July 7, 2023 appraisal of the Property that was performed for CNB, by CBRE Valuation and Advisory Services.

"Claim" means a claim against the Debtor.

"CNB" means County National Bank.

"Colliers" means Colliers International Valuation & Advisory Services, LLC.

"Colliers 2025 Appraisal" means the November 25, 2025 appraisal of the Property performed by Colliers.

"Colliers BOV" means the Broker Opinion of Value of the Property issued on May 20, 2024, by Colliers.

"Commitment Letter" means the commitment letter between Provizia and the

26-40805-lsg    Doc 171    Filed 08/12/26    Entered 08/12/26 14:09:41    Page 23 of 176

Debtor, entered into on July 27, 2026.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"Contested Claim" means a Claim that has not been allowed or disallowed and as to which either: (a) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (b) a proof of claim has not been filed and the Claim is listed on the Debtor's Schedules as disputed, contingent, or unliquidated.

"Contested Claims Reserve" means segregated and escrowed funds in an amount equal to the aggregate distributions that would have been made on account of all Contested Claims had such Contested Claims been Allowed Claims in their full asserted amounts as of the Effective Date.

"Counsel" means Taft Stettinius & Hollister, LLP, counsel to the Debtor.

"Debtor" means South Town by 4M, LLC, debtor and debtor-in-possession in the above-captioned case.

"Development" means the multi-faceted business comprised of the four distinct revenue-driven improvements described in Section II.C of this Plan.

"DIP Budget" means the revised DIP budget filed on April 21, 2026, in support of the DIP Facility [ECF No. 96].

"DIP Budgets" means the DIP Budget and the Second DIP Budget.

24

"DIP Facility" means the financing requested by the Debtor reflected in the Amended and Restated DIP Note and Second Amended and Restated DIP Note, and entered by the Court in the Final DIP Financing Order and the Second DIP Financing Order.

"DIP Financing Orders" means collectively, the Interim DIP Financing Order, the Final DIP Financing Order, and the Second DIP Financing Order.

"DIP Lender" means Ms. Poscher, in her capacity as provider of the DIP Loan.

"DIP Liens" means liens granted to the DIP Lender for providing the DIP Loan which include (i) pursuant to section 364(c)(2) of the Bankruptcy Code, a lien on all property of the Debtor's estate not otherwise subject to a lien, and (ii) pursuant to section 364(c)(3) of the Bankruptcy Code, a junior lien on all property of the Debtor's estate that is subject to a lien, in each case perfected automatically upon entry of the Interim DIP Financing Order without the necessity of filing a financing statement.

"DIP Motion" means the Debtor's *Motion for Entry of an Order (a) Authorizing the Debtor to Obtain Post-Petition Secured Financing; and (b) Granting Liens, Security Interests, and Superpriority Claim* [ECF No. 79].

"Disclosure Statement" means the First Amended Disclosure Statement that begins at *infra*, Section II. of this First Amended Combined Plan and Disclosure Statement.

"DMC" means DMC Real Estate Services.

"Dr. Poscher" means Dr. Margaret Poscher, the original sole member of the Debtor.

"Effective Date" means 20 days after the date the Confirmation Order becomes a Final Order or if not a business day, the next business day. If, however, a stay of the Confirmation Order is in effect on that date, the Effective Date will mean the day after the date on which the stay expires or is otherwise terminated. These periods are calculated as provided in Bankruptcy Rule 9006(a)(1).

"Equity Interest" means equity in the Reorganized Debtor as of the Effective Date of the Plan, unless otherwise specified in the Plan.

"Exit Financing" means the post-confirmation financing arrangement pursuant to the Exit Financing Agreement between the Debtor and the Exit Financing Lender.

"Exit Financing Agreement" means the definitive agreement to be entered into by and between the Debtor and the Exit Financing Lender memorializing the terms and conditions of the Exit Financing.

"Exit Financing Lender" means Provizia.

"Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket, that has not been reversed, stayed, modified, or amended, and as to which (a) the time to appeal, petition for

26

certiorari, or move for reargument or rehearing has expired and no appeal, petition for certiorari, or motion for reargument or rehearing has been timely filed; or (b) any appeal, petition for certiorari, or motion for reargument or rehearing has been finally determined and no further review is available.

"Final DIP Financing Order" means the *Final Order (a) Authorizing the Debtor to Obtain Post-Petition Secured Financing; and (b) Granting Liens, Security Interests, and Superpriority Claim* [ECF No. 125].

"Graybar" means Graybar/Schneider.

"Higley" means The Albert M. Higley Co., LLC.

"Initial DIP Loan" means the post-petition multi-draw secured term loan in an amount not to exceed $400,000, provided to the Debtor by the DIP Lender as reflected in the Amended DIP Note and approved by the Final DIP Financing Order.

"Interest-Only Payees" means, collectively, the City of Ann Arbor, CNB, and Higley, to whom the Debtor elected to make the Interest-Only Payments pursuant to 11 U.S.C. § 362(d)(3).

"Interest-Only Payments" means the interest-only payments made by the Debtor to the Interest-Only Payees under section 362(d)(3) and the terms of the Amended Budget.

"Interim Order Regarding Plan Deadline Extension" means the *Order Regarding Debtor's Motion for Entry of an Order (a) Extending the Deadline to File*

*a Chapter 11 Plan and (b) Extending the Debtor's Exclusivity Period to File a Chapter 11 Plan and Solicit Acceptances thereof Pursuant to 11 U.S.C. § 1121 of the Bankruptcy Code* [ECF No. 106].

"Interim DIP Financing Order" means the *Interim Order (a) Authorizing the Debtor to Obtain Post-Petition Secured Financing; and (b) Granting Liens, Security Interests, and Superpriority Claim* [ECF No. 105].

"Legal Expenses" means the fees and expenses of Counsel.

"MicroGrid" means a power generation system to deliver electrical power to the Property, to be sold to the Property's tenants with a secondary source of revenue generated from the creation of carbon credits.

"Motion to Extend" means the Debtor's *Motion for Entry of an Order (a) Extending the Deadline to File a Chapter 11 Plan and (b) Extending the Debtor's Exclusivity Period to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to 11 U.S.C. § 1121 of the Bankruptcy Code* which was filed on April 9, 2026 [ECF No. 80].

"Ms. Poscher" means the Responsible Person, Heidi Caroline Poscher.

"Operating Agreement" means the Debtor's Amended and Restated Operating Agreement.

"Plan" means this First Amended Combined Chapter 11 Plan of Reorganization and Disclosure Statement, as it may be amended, modified, or

supplemented from time to time.

"Plan Deadline" means July 27, 2026, to the extent modified by the Court.

"Plan Exclusivity Period" means the period in which the Debtor has the exclusive right to file a chapter 11 plan which was extended to July 27, 2026.

"Plan Extension Order" means the Bankruptcy Court's *Order Regarding Debtor's Motion for Entry of an Order (a) Extending the Deadline to File a Chapter 11 Plan and (b) Extending the Debtor's Exclusivity Period to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to 11 U.S.C. §1121 of the Bankruptcy Code* granted on May 20, 2026 [ECF No. 121] in which the Court granted Debtor's Motion to Extend with respect to the deadline to file the Plan thereby extending the deadline to file the Plan until July 27, 2026; extended the exclusivity period for the Debtor to file its Plan to July 27, 2026; and extended the exclusivity period for Debtor to solicit acceptances of its Plan to September 25, 2026.

"Petition Date" means January 27, 2026, 3:22 p.m. E.S.T. which is the date and time on which the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

"Poscher Estate" means the probate estate of Dr. Margaret Poscher (deceased).

"Prentice" means Prentice Partners of Ann Arbor, LLC.

"Property" means the real property owned by the Debtor on which the

Development sits.

"Provizia" means The Provizia Organization Inc.

"Pullins" means Steven Pullins.

"Quarterly Fees" means the quarterly fees payable to the United States Trustee.

"RAM" means Reynolds Asset Mgmt, LLC.

"RAM Term Sheet" means the term sheet executed on April 14, 2026, by Debtor and RAM.

"Reorganized Debtor" means the Debtor, on and after the Effective Date.

"Responsible Person" means Ms. Poscher, personal representative of the Poscher Estate, and the individual authorized to manage the affairs of, and act on behalf of, the Debtor as debtor-in-possession in this bankruptcy case.

"Retainer Deposits" means the retainer deposits advanced by Ms. Poscher on behalf of the Debtor to Counsel, in the amount of $100,000.00.

"Revised DIP Note" means the revised promissory note evidencing the DIP Loan executed by the Debtor in favor of the DIP Lender, as included in the recited terms of the Interim DIP Financing Order.

"Reynolds" means Louis J. Reynolds IV, a principal and owner in RAM.

"SARE" means a single asset real estate case as defined under 11 U.S.C. § 101(51B).

"SARE Motion" means CNB's *Motion to Designate Case as a Single Asset Real Estate Case* [ECF No. 33].

"SARE Objection" means the *Debtor's Objection to County National Bank's Motion to Designate Case as a Single Asset Real Estate Case* [ECF No. 51].

"SARE Order" means the *Order Granting Motion to Designate Case as a Single Asset Real Estate Case* [ECF No. 65].

"SARE Reply" means CNB's reply in support of the SARE Motion [ECF No. 56].

"Second Amended DIP Note" means the Second Amended and Restated DIP Note attached as Exhibit C to the Supplement [ECF No. 152].

"Secured Lenders" means, collectively, CNB, Brownstone, and Prentice.

"Schedules" means the schedules of assets and liabilities filed by the Debtor pursuant to section 521 of the Bankruptcy Code, as have been or may be amended or supplemented from time to time.

"SmithGroup" means SmithGroup, Inc.

"Solicitation Exclusivity Period" means the period in which the Debtor has the exclusive right to solicit acceptances of its chapter 11 plan which was extended to September 25, 2026.

"Sources and Uses" means the sources and uses of the Exit Financing, as set forth on **Exhibit A** hereto.

"South Town" means South Town by 4M, LLC, debtor and debtor-in-possession in the above-captioned case.

"Supplement" means the supplement to the Second DIP Motion filed by the Debtor at [ECF No. 150].

"Synecdoche" means Synecdoche Design Studio, LLC.

"Transferred Assets" means all assets of the Debtor except for the Avoidance Claims.

"UST" means the United States Trustee.

"Vertical Financing" means financing provided for completion of the vertical construction of the Project.

"Vertical Financing Secured Lenders" means the lenders that will ultimately provide the Vertical Financing and who are anticipated to hold secured mortgages against the Development.

"Vohwinkle" means Nathan Vohwinkle.

"WhiteHawk" means WhiteHawk Capital Partners L.P.

"WhiteHawk Term Sheet" means the term sheet executed on May 4, 2026, by the Debtor and WhiteHawk.

**10.02 Severability**. If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**10.03 Captions.** The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

**10.04 Controlling effect.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Michigan govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

**10.05 Retention of Jurisdiction.** The Bankruptcy Court confirming the Plan may exercise jurisdiction to the full extent necessary to administer this case after Plan confirmation and to adjudicate any related adversary proceedings or contested matters, including those relating to the Plan, such as concerning the Plan's construction, implementation, or modification. Neither this provision nor anything in this Plan constitutes a limitation on or an expansion of the jurisdiction authorized by title 28 of the United States Code.

## II. Description and History of the Debtor's Business

### A. South Town by 4M LLC

The Debtor is a Michigan limited liability company formed to realize Dr. Poscher's vision to fund and create a strategic 1.66 acre real estate project for a mixed-use, multi-family development. The Debtor holds title to ten individual lots, comprising a city block in Ann Arbor which is the Property. The Development

encompasses approximately 237,366 square feet, will ultimately feature at least 289 apartment units, has one side fronting South State Street, directly across from the University of Michigan Golf Course, and is kitty-corner to the University of Michigan field hockey stadium, the football practice facilities, Crisler Arena and the University of Michigan football Stadium.

The Development is comprised of four distinct revenue driven improvements: (1) the leasing of 70% of the 289 or greater apartment units to be constructed, to be used as long-term rentals; (2) the operation of a short-term rental business (VRBO, Air BNB, etc.), utilizing 30% of the apartment units; (3) the development and ownership of retail businesses on the first floor of the Development; and (4) the construction and operation of a MicroGrid within the Development, to deliver electrical power to all of the apartment and retail areas, as well as to the common areas, which will be sold to the captive tenants, with a secondary source of revenue generated from the creation of carbon credits. The Debtor has site plan approval for the construction of the Development.

### B. South Town's Principal

The Debtor has just a single member. The member, until mid-October of 2025 had been Dr. Poscher. Dr. Poscher unfortunately passed away at that time and thereafter the Poscher Estate was opened. Dr. Poscher's wife, Ms. Poscher, has been

named as the personal representative of the Poscher Estate and therefore, is acting on behalf of the sole member of the Debtor in this bankruptcy proceeding.

Dr. Poscher was a community leader in Ann Arbor, Michigan, and spearheaded progressive real estate projects in high-potential areas across the city. In 2018, Dr. Poscher focused on development in an underdeveloped Ann Arbor neighborhood, seizing an opportunity to drive impactful urban revitalization. First, and prior to the Development, came a 12-unit, ground-up townhouse complex, creating a residential anchor. Then came Venue by 4M, a visionary 35,000 square foot space encompassing dining, events, and entertainment facilities. Ultimately, Dr. Poscher formed the Debtor to fund and create the Development. Ms. Poscher, as Dr. Poscher's wife and biggest cheerleader, has taken up the mantle to complete the Development.

Ms. Poscher is the Responsible Person for the Poscher Estate, and for the Debtor. Ms. Poscher, in her personal and individual capacity, provided $650,000 in post-petition financing to the Debtor to fund primarily the Interest-Only Payments to the Interest-Only Payees, and other incidental costs should they arise. The details of this post-petition financing, and the hearings and procedures related thereto, are described below. *See infra*, Article III.

Dr. Poscher never earned a salary nor received any compensation for her role as the member of the Debtor; likewise, Ms. Poscher has never earned a salary nor

received compensation at any time prior to or during the pendency of this bankruptcy case.

### C. South Town's Business Model and Events Leading to Bankruptcy

The assemblage of the Development's ten lots occurred during the years 2019 to 2022. Each of the lots was improved with either an individual home or a low-rise apartment building. The acquisition cost of the ten lots was $18,982,170. Fees and closing costs were an additional $5,152,297.

To aid in the Debtor's acquisition of the ten lots, the Debtor obtained financing from two lenders; CNB, which asserts a lien position in the approximate amount of $18,628,131.14; and Brownstone which asserts a lien position subordinate to that of CNB, in the amount of $7,794,566.33. An additional mortgage position, for an additional $8.5 million is held by Prentice. The passing of Dr. Poscher in October of 2025 delayed the ongoing development and funding for the Development. Ms. Poscher, who was very familiar with the Development, primarily assisted the Debtor in the coordination for placement of the MicroGrid. Since Dr. Poscher's passing, Ms. Poscher has had to take on the Debtor's work for the remaining portions of the Development.

Prior to her death, Dr. Poscher, on the Debtor's behalf, modified an existing loan with Brownstone, borrowing additional funds for Development costs, CNB loan-extension fees, and CNB loan interest payments. Following closure of the

Brownstone loan modification in June 2025, Brownstone advanced funds for Development costs but refused to release approximately $1.0 million in funds escrowed for the specific purpose of covering CNB loan-extension and interest payments. As a result, the Debtor found itself behind on its prepetition loan payments with CNB.

### *CNB's Foreclosure Proceeding*

CNB initiated a foreclosure by advertisement in early November of 2025. CNB adjourned the foreclosure sale until early January 2026, based on the transition issues faced by the Debtor. The Debtor brought forward a third party to acquire the participants' interest in CNB's facility, but the participants refused to engage with that third party. As a result, the Debtor's only option was to seek protection under Chapter 11 of the Bankruptcy Code in light of the impending foreclosure by advertisement sale date.

### III. Significant Post-Petition Events

There are four significant post-petition events that have occurred in this Bankruptcy Case. First, upon CNB's motion, the Debtor's case was designated a single asset real estate case. Second, the Debtor sought approval of, and this Court approved, post-petition secured financing from Ms. Poscher. Third, the Debtor filed a motion to extend the Plan-filing deadline, and exclusivity period to file the Plan and solicit ballots on the Plan. Fourth, the Debtor has negotiated two separate

alternative exit transactions, either of which will provide for payment in full of all Claims.

### *The SARE Designation*

On February 13, 2026, CNB filed the SARE Motion and in opposition the Debtor filed its SARE Objection. CNB filed the SARE Reply and the Court held a hearing on the SARE Motion on March 12, 2026. The Court was unpersuaded by the Debtor's arguments in opposition to the SARE Motion and entered the SARE Order. As such, the Debtor was required to either file its Plan within 90 days of the Petition Date or commence making interest-only payments to secured creditors, as required under 11 U.S.C. § 362(d)(3). The Debtor opted to make the Interest-Only Payments to the Interest-Only Payees.[5]

### *DIP Financing*

The Debtor has no business operations and in order to make the Interest-Only Payments to the Interest-Only Payees, the Debtor sought approval of the Initial DIP Loan to be provided to the Debtor by Ms. Poscher as the DIP Lender. After the filing of the DIP Motion and hearings, the Court entered the Interim DIP Financing Order that authorized the Debtor to borrow money on an interim basis from Ms. Poscher,

---

[5] Debtor's other secured creditor entitled to interest-only payments—Brownstone—waived payment. Prentice did not charge interest for its loan.

in an aggregate principal amount of up to $133,000.00 prior to entry of a final order on the First DIP Motion and pursuant to the terms of the Revised DIP Note.

On May 18, 2026, the Court held a final hearing on the DIP Motion. On May 22, 2026, and on stipulation of the parties, the Court entered its Final DIP Financing Order. In addition to the terms of the Interim DIP Financing Order, the Final DIP Financing Order authorized the Debtor to borrow up to an aggregate principal amount of $400,000 from Ms. Poscher under the terms of the Amended DIP Note. The purpose of the Initial DIP Loan was to afford the Debtor the ability to fund its Interest-Only Payments to the Interest-Only Payees, and payment of U.S. Trustee fees as set forth in the DIP Budget. The Debtor elected to make interest-only payments to its secured creditors (other than Brownstone, who waived its right to interest payments) and which became due on the 90th day after the Petition Date pursuant to Section 362(d)(3) of the  Bankruptcy Code in order for the Debtor to maintain the automatic stay, due to its SARE designation.

In exchange for the Initial DIP Loan, Ms. Poscher, as the DIP Lender was granted an allowed superpriority administrative expense claim with priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, but only to the extent of amounts actually borrowed under the Final DIP Financing Order.

As security for amounts borrowed, the DIP Lender was granted (i) pursuant to section 364(c)(2) of the Bankruptcy Code, a lien on all property of the Debtor's estate not otherwise subject to a lien, and (ii) pursuant to section 364(c)(3) of the Bankruptcy Code, a junior lien on all property of the Debtor's estate that is subject to a lien, in each case perfected automatically upon entry of the Interim DIP Financing Order without the necessity of filing a financing statement.

The DIP Liens are in all instances subject to existing mortgage liens in favor of CNB, Prentice, and Brownstone, the construction lien in favor of Higley and Permitted Third Party Liens (i.e., liens that are senior by operation of law, including liens securing the payment of real property taxes).

The DIP Liens and the superpriority claim expressly exclude (i) any Avoidance Claims, (ii) any proceeds or property recovered in connection with the successful prosecution or settlement of any Avoidance Claims, (iii) any intercompany claims, and (iv) any claims against the estate of Dr. Poscher, Prentice, or any entity or estate in which Ms. Poscher has a direct or indirect interest, and no superpriority claim, administrative claim, or other priority claim under the Final DIP Financing Order shall be payable from or have recourse to any of the foregoing.

On July 24, 2026, the Court held a hearing on the Debtor's Second DIP Motion and related Second DIP Stipulation. On July 27, 2026, the Court entered the Second DIP Financing Order which authorized the Debtor to borrow up to an

additional \$250,000 and thus increased the aggregate principal amount of the DIP Facility to \$650,000, under the terms of the Second Amended DIP Note. The resulting DIP Liens of the Second DIP Financing Order retain the same lien priority and exclusions as those set forth above and as reflected in the Final DIP Financing Order.

The purpose of the request to increase the amount of the DIP Facility was to continue making Interest-Only Payments and quarterly U.S. Trustee fees as set forth in the Second DIP Budget.

### *Motion to Extend Plan Deadline and Exclusivity Period*

Concurrent with the DIP Motion, the Debtor filed its Motion to Extend. The Court addressed the Motion to Extend during the Initial DIP Financing Hearing where Debtor indicated to the Court it was holding off on the requests set forth in the Motion to Extend until it could obtain greater clarity as to its plan and the Exit Financing. The Court entered the Interim Order Regarding Plan Deadline Extension which required the Debtor to supplement the Motion to Extend on or before May 12, 2026, provide a detailed update of the Exit Financing lender negotiations, and set the Motion to Extend for hearing on May 18, 2026. On May 12, 2026, the Debtor filed its Supplement to which it attached the RAM Term Sheet and the WhiteHawk[6]

---

[6] WhiteHawk has since declined to proceed under the WhiteHawk Term Sheet, after engaging in further due diligence.

Term Sheet. On May 18, 2026, the Court held a hearing on the Motion to Extend and subsequently on May 20, 2026, entered its Plan Extension Order: (1) extending the Plan Deadline and the Plan Exclusivity Period to July 27, 2026; and (2) extending the Solicitation Exclusivity Period to September 25, 2026.

The Court held a status conference on May 22, 2026, to address the Case Management Order that needed to be amended in light of the Plan Extension Order, and subsequently entered its Amended Case Management Order. In addition to amending other case deadlines and restating the Plan Deadline, the Plan Exclusivity Period and the Solicitation Exclusivity Period, the Amended Case Management Order scheduled the confirmation hearing on the Plan for September 25, 2026, at 1:00 p.m.

The Debtor files this Plan in accordance with the Plan Extension Order and the Amended Case Management Order.

### *The Exit Alternatives*

On April 14, 2026, the Debtor and RAM executed the RAM Term Sheet (**Exhibit B** hereto) wherein the Debtor is to obtain exit takeout financing to: (a) satisfy amounts due to pay all secured and unsecured creditors in full, who will not otherwise convert their existing debt to equity; (b) pay chapter 11 administrative expenses; (c) cover carrying costs to vertical construction; and (d) pay the expenses of the Exit Financing. RAM is to receive, upon confirmation of the Debtor's Plan, a 5%

membership interest in the Debtor, in exchange for which Reynolds, who owns RAM, is to provide the credit enhancement required of the Exit Financing Lender (under Equity Transaction B) and of the Vertical Financing Lender. RAM will also bring to the table extensive construction project management expertise.

RAM is a vertically integrated commercial real estate operator and development firm specializing in core plus, value-added and opportunistic multifamily investing. RAM was founded in 2003 and has engaged in over 100 existing and ground-up transactions. Materials outlining RAM, its principal members and its current portfolio of projects are attached as **Exhibit C.**

On July 16, 2026, the Debtor and Agile executed an Amended Commitment Letter (**Exhibit D** hereto), pursuant to which Agile agreed, on the Effective Date to: (a) enable Newco to acquire 100% of the membership interest in the Debtor held by the Poscher Estate from the Poscher Estate for an amount in a multiple of 7 figures; and (b) provide an additional amount, not to exceed $41,000,000.00, as an equity infusion into Newco and then as an equity infusion by Newco into the Debtor, in an amount sufficient to provide for payment in full of all Allowed Claims and other working capital requirements of the Debtor, post-confirmation.

On August 5, 2026, Agile provided a Memorandum update as to its investment commitment (**Exhibit E** hereto). References to "The Finn" and "The Forge" therein are proposed names for the Development.

Agile is a leading provider of large-scale solar power solutions and EV charging infrastructure. It specializes in solar arrays, power provider services, and EV charging installations through strategic site partnerships with high-usage locations. Agile is specifically interested in the Project, based on the Micro-Grid to be developed and installed. This aligns with Agile past development and management of large-scale solar farms, supplying clean, renewable energy to power grids and key infrastructure, ensuring a sustainable and reliable energy supply. Further, Agile builds new or retrofits buildings with its patented BESS and Shallow Geothermal to enhance a building's energy needs and apply to the grid. Agile has advised the Debtor that Agile has placed approximately $500 million of debt and equity during the preceding 12-month period.

On July 27, 2026, the Debtor and the Exit Financing Lender entered into the Commitment Letter (**Exhibit F** hereto), pursuant to which the Exit Financing Lender has agreed (under Equity Transaction B) to provide to the Debtor Exit Financing on the Effective Date in an amount sufficient to provide for payment in full of all Allowed Claims and other working capital requirements of the Debtor, post-confirmation. The Exit Financing will result in a re-allocation of the equity in the Debtor (under Equity Transaction B), with the Poscher Estate retaining a 59% interest and a 41% membership interest in the Debtor being issued to a combination of parties, the percentage ownership of which is as follows: Prentice, 5% (conversion of its debt

position to equity); Blue Phoenix, 22%; Pullins, 2% (equity exercisable upon completion of vertical construction); APB, 5%; Vohwinkle, 2% (equity exercisable upon completion of vertical construction); and Reynolds, 5%. Blue Phoenix is an affiliate of Ms. Poscher, its members being Ms. Poscher, her family trust and certain friends and family. Prentice is owned fully by the Poscher Estate. Pullins, Vohwinkle, APB and Reynolds are not affiliates of Ms. Poscher, the Poscher Estate or any of their respective affiliates.

The Exit Financing Lender is a private investment company that lends from a debt fund in conjunction with a Sovereign Wealth Fund and two major European Family offices. Over the last decade they have invested in, funded and participated in over $11.75B of real estate projects internationally. The Exit Financing Lender concentrates on funding projects in North, Central and South America, the United Kingdom, the Republic of Ireland, several European countries and Caribbean nations. These projects include hospitality, industrial, senior care, senior residences, and multifamily real estate development.

The Exit Financing Lender is made up of former division presidents from several international banks, the chief operating officer of a boutique investment bank, and individuals with extensive hands-on experience in multifamily, senior care, hospitality, retail, medical, social, and work housing. Historically, the Company has provided both debt and equity into client capital stacks.

At present the Exit Financing Lender is financing two Hyatt Properties in Mexico, a Hilton Luxury Resort in Costa Rica, a Hard Rock Hotel in USA, a Waldorf Astoria in Caribbean, a 600 unit Condominium Property in Ecuador, a Storage Facility in USA, a Mixed Use Property (Hotel, Apartments) in the USA, a unit apartment building also in the USA, Conversion of a Hospital to a Medical Surgical Center in the USA and a High Tech Manufacturing Complex in the USA.

The Exit Financing Lender and its subsidiaries are headquartered in Canada, America, and Brazil, with subsidiaries and affiliates in the United States, Mexico, the United Kingdom, and Brazil.

Equity Transaction A and Equity Transaction B will be brought before the Probate Court for Probate Court Approval prior to the hearing on confirmation of this Plan, to obtain conditional approval of both, subject only to confirmation of this Plan.

The Debtor, through its representative, Ms. Poscher, prefers Equity Transaction A over Equity Transaction B, as there is an interest cost associated with Equity Transaction B, based on the need for Exit Financing, which is not necessary under Equity Transaction A. Further, Equity Transaction A would likely be more attractive to the Poscher Estate, as it monetizes the Poscher's Estate's interest in the Debtor, rather than the Poscher Estate awaiting the completion of the vertical construction and a liquidity event. The Debtor has arranged for Equity Transaction

B and the Exit Financing, if for some reason, Equity Transaction A and Agile's participation therein is somehow revoked or not approved.

Ms. Poscher, on behalf of the Debtor, is working on a parallel path to document Equity Transaction A and Equity Transaction B. Equity Transaction A requires the execution of a proposed Membership Interest Purchase Agreement between Newco and the Poscher Estate, as well as an Operating Agreement for Newco. To the extent prepared, the foregoing, along with this Disclosure Statement and Plan, shall be part of the submission to the Probate Court for approval.

Equity Transaction B will require the execution of an Amended and Restated Operating Agreement of the Debtor, a Guaranty Fee Agreement and the Provizia loan documents. To the extent prepared the foregoing, along with this Disclosure Statement and Plan, shall be part of the submission to the Probate Court.

The Probate Court may or may not approve Equity Transaction A and/or Equity Transaction B. That resolution will be known prior to the hearing on confirmation of the Plan. If both Equity Transaction A and Equity Transaction B are approved by the Probate Court, then Ms. Poscher, on behalf of the Debtor, prior to the hearing on confirmation, will determine which option to present proofs on as to feasibility. The Debtor will provide a supplement to this Disclosure Statement and Plan with respect to: (a) the results of Probate Court Approval; and (b) the Debtor's election between Equity Transaction A and Equity Transaction B. Probate Court

Approval shall also include the Plan's proposed conversion of Prentice's debt to equity and if required under Equity Transaction B, a pledge of the Probate Estate's 59% interest in the Debtor to the Exit Financing Lender.

The transfer of the Transferred Assets to the SPE is based on the Debtor's diligence and understanding from lenders and investors it has spoken with that in a development of this magnitude, the lender will insist that the assets of the borrower be held in an SPE and not in an entity that has undergone a proceeding under chapter 11. Many lenders will not commit to an entity that has previously filed for bankruptcy protection.

The Debtor will be preparing the conveyance agreement between the SPE and the Debtor as well as the single member LLC agreement of the SPE.

**Transfers outside of the ordinary course**

As required under section 362(d)(3) and the terms of the DIP Budgets attached to the DIP Financing Orders, the Debtor has made the Interest-Only Payments to the Interest-Only Payees in the following amounts:[7]

Ann Arbor:  $   1,601.97

---

[7] The April payment to Ann Arbor was $8,009.84 which included a four percent late charge of $6,407.87 calculated from the full amount due and owing under the Ann Arbor Tax Claim. The May payment to CNB was $117,097.98 which included $3,777.36 per diem charge for the additional day in May. A $117,097.98 payment was also made to CNB in June. The amounts listed for the Interest-Only Payments are the regular monthly payments owed to each Payee. The Debtor also paid a $95 service fee for its Chase DIP bank account in June.

CNB: $113,320.62

Higley: $ 4,306.42

The Debtor paid the Quarterly Fees as required, in the amount of $350. To date, the Debtor has made a total of $327,094.62 in transfers outside of the ordinary course in accordance with the terms of the DIP Budgets. The Debtor has made no other transfers outside of the ordinary course. Ms. Poscher, out of her own funds, paid a $150,000 due diligence fee to WhiteHawk and a $60,000 due diligence fee to Provizia, which were gifts to the Debtor.

### A. Summaries of cash collateral, post-petition financing, and adequate protection orders

The details and summaries of the Debtor's DIP Facility, DIP Budgets, and Interest-Only Payments are provided above. *See supra*, Section III of the Disclosure Statement.

### B. Pending litigation

On the Petition Date, the Debtor was party to two creditor enforcement actions. CNB had initiated a foreclosure by advertisement action against the Debtor, and Brownstone had initiated a foreclosure and receivership action against the Debtor—in the Circuit Court for Washtenaw County, Michigan. Both actions were stayed pursuant to section 362 of the Bankruptcy Code upon the filing of the Debtor's bankruptcy petition. Upon payment in full of the allowed amount of the Claims of CNB and Brownstone on the Effective Date, each shall be permanently

enjoined from pursuing or continuing such actions against the Debtor or its assets and such actions shall be discontinued or dismissed, as applicable based on payment in full having been received by CNB and Brownstone under the Plan.

## IV. Liquidation Analysis and Risks

### A. Liquidation Analysis

An appraisal was performed by CBRE Valuation and Advisory Services on July 7, 2023 in connection with CNB's loan. That CBRE Appraisal contained two values. The first value was $15,800,000, described to be the "As Is (Land Value)." The second value, which included the then in place early-stage enhancements to the Development (through site preparation, site plan application, etc.), known as "entitlements" placed the "As Entitled (Land Value)" of the Development at $29,500,000. A second valuation, the Colliers BOV, dated May 20, 2024, placed the value of the Development, with the then in-place entitlements, at $45,800,000. This reflected the additional work which had been undertaken with respect to the Development, including architectural, engineering and site plan approval. A third, and more recent appraisal, the Colliers 2025 Appraisal, was issued on November 25, 2025, and placed the value of the Development, with the then in-place entitlements, at $61,300,000. This reflected the additional development work that had ensued over the 18 months since the Colliers BOV.

The Colliers BOV and Colliers 2025 Appraisal reflect increased value in the Property since the CBRE Appraisal. The increase in valuation is based on the detailed and approved Development plans, and entitlements now attached to the Property, which allow for construction of the various Development components.

The Colliers 2025 Appraisal assessed various risks and conditions upon which the appraisal was based, including accessibility, exposure, flood-zone proximity, presence of easements or encumbrances, hazardous waste detection, et al. The Colliers 2025 Appraisal indicated a good rating for both accessibility and exposure, moderate and minimal flood risk, no adverse easements or encumbrances, and no presence or signs of hazardous waste, and summarized "[o]verall, the [Development's] location is rated as good/excellent . . . there are no known factors that would limit the site's development according to its highest and best use." Colliers 2025 Appraisal, p. 25.

Against these valuations, the Debtor has the secured, unsecured, superpriority and, administrative Claims identified in Section 3 of the Plan, which in the aggregate, are approximately and at least $30,000,000, if allowed in full. The Debtor's Plan provides for the payment in full of all Allowed Claims (other than the conversion of Prentice's secured claim to equity). If the Debtor were to be liquidated, based on the appraisals above noted, it would appear that all creditors of the Debtor would be paid in full. However, it is unknown what value the Property and the other

assets of the Debtor would bring, in relation to the values set forth in the appraisals, in a forced liquidation setting. If the entitlements are deemed to have no value, based on a purchaser's abandonment of the same with respect to the Development (electing instead a different or modified use of the Property), or a lesser value than as appraised, then the value to be obtained in a forced liquidation could approximate the acquisition cost of the Property, which was $18,982,170. This amount would be insufficient to satisfy the creditor Claims in full and would likely only cover the Claims of Ann Arbor and a portion of allowed construction lien claims, and the CNB indebtedness, depending on priorities.

### B. Potential Claims and Causes of Action.

The Debtor has one known cause of action, which the Debtor intends to initiate in this bankruptcy case, through the filing of an adversary proceeding against Synecdoche. Synecdoche claims to hold a construction lien claim against the Property. Synecdoche was retained as an architect for the Development. The Debtor has substantial defenses to the amount claimed by Synecdoche to be due and owing and asserts that the Debtor has overpaid Synecdoche for failed work product and overbillings. The Debtor also asserts that the Debtor's termination of Synecdoche pre-petition, which is undisputed by Synecdoche, excuses the Debtor from having to pay any residual payments to Synecdoche. Per the Plan, the Debtor will place into the

26-40805-lsg    Doc 171    Filed 08/12/26    Entered 08/12/26 14:09:41    Page 52 of 176

Contested Claims Reserve an amount sufficient to pay Synecdoche, should Synecdoche's Claim be allowed in full, as filed.

The Debtor intends to file certain unsecured Claim objections and reserves all other potential Avoidance Claims, whether now existing or hereafter arising, known or unknown, and any claims or causes of action not specifically identified herein are expressly reserved. However, the Debtor does not anticipate pursuing any other Avoidance Claims, for the reason that all Allowed Claims will be paid in full. Further, the Debtor is not aware of any material Avoidance Claims other than the Avoidance Claim against Synecdoche. Conversion of the Prentice Claim to equity includes a discount based on the Debtor's assertion that none or only a portion of the Prentice Claim should be deemed to be debt, but rather, an equity contribution by Dr. Poscher.

Upon entry of the Confirmation Order, all such causes of action shall vest in the Reorganized Debtor, which shall retain full authority to prosecute, settle, or otherwise resolve such claims. The Debtor further reserves the right to investigate, assert, and pursue any and all claims, causes of action, and avoidance actions arising under sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, 553, or any other applicable provision of the Bankruptcy Code, whether or not specifically identified herein. Nothing contained in this Plan, the Confirmation Order, or any other document filed in connection herewith shall be deemed a waiver, release, or

relinquishment of any such claims, causes of action, or avoidance actions, and all such rights are expressly preserved and retained by the Reorganized Debtor. The Debtor is not aware of any other avoidance actions or causes of action available to the estate at this time, other than the action against Synecdoche, but reserves all rights with respect thereto.

### C. Projections

On the Effective Date, the Sources and Uses set forth on **Exhibit A** will be paid. Outlined on **Exhibit G** are the Debtor's projections for the subsequent year, pending receipt of the Vertical Financing, which will then include a new, comprehensive construction and operational budget. That budget will be subject to a multitude of conditions and estimates, based on bids and other deliverables required to fully build out that full budget. Pending closing on the Vertical Financing, the interest reserve provided in the Exit Financing will cover the payments required to be paid to the Exit Financing Lender.

### D. Guarantors

The CNB and Brownstone mortgage loans are both guaranteed by parties related to the Debtor.

The guarantors of the CNB loan are alleged to be: (a) AHFLP, LLC, an affiliate of the Debtor ("AHFLP"); (b) Prentice; (c) Dr. Poscher and Ms. Poscher,

jointly and severally; and (d) the Margaret E. Poscher Revocable Trust dated January 23, 1998. AHFLP and Prentice are wholly owned by Dr. Poscher.

The guarantors of the Brownstone loan are alleged to be: (a) Dr. Poscher; (b) Ms. Poscher; (c) the Margaret E. Poscher Revocable Trust dated January 23, 1998; (d) AHFLP, LLC, an affiliate of the Debtor ("AHFLP"); (e) Prentice; (f) Fourth Ave, LLC, a Michigan limited liability company, an affiliate of the Debtor ("Fourth Avenue"); (g) 815 Brookwood LLC, a Michigan limited liability company, an affiliate of the Debtor ("Brookwood"); (h) 823 Sylvan LLC, a Michigan limited liability company, an affiliate of the Debtor ("Sylvan"); and (i) 1700 Packard LLC, a Michigan limited liability company, an affiliate of the Debtor ("Packard"). The Poscher Estate owns 81% of AHFLP and Ms. Poscher owns 19% of AHFLP. The Poscher Estate is the 100% owner of Prentice and Prentice is the sole member of Fourth Ave, Brookwood, Sylvan, and Packard. The above ownership is diagramed as follows:



Blue Phoenix, LLC is a newly formed entity, owned by Ms. Poscher, a trust controlled by Ms. Poscher and possibly by other friends and family of Dr. Poscher or Ms. Poscher, who are otherwise unaffiliated with the Debtor or any entity of which Dr. Poscher held an equity interest.

Other than as set forth herein, the Debtor is not aware of any other guaranty obligations outstanding as of the Petition Date but reserves the right to amend or supplement this disclosure as additional information becomes available.

## V. Details Regarding Implementation of the Plan

### A. Debtor's financial summaries

<u>2023</u>:

> Income: $545,110
>
> Expenses: $2,047,289
>
> Net: (-$1,502,179)

<u>2024</u>:

> Income: $254,807
>
> Expenses: $5,543,212
>
> Net: (-$5,288,405)

<u>2025</u>:

> Income: $152,785.50

Expenses: $3,303,000

Net: (-$3,150,241.50)

<u>2026 to the Petition Date:</u>

Income: $0

Expenses: $84,921

Net: (-$84,921)

The Debtor's income prior to the Petition Date was derived from residential rental income from the Property, during the completion of the land assemblage and prior to the demolition of the previously occupied structures on the Property. The Debtor's pre-petition expenses were comprised of the costs of rental property management, development and demolition costs including costs for design, permitting, rezoning, site-plan approval, and other costs to facilitate the Development.

The Debtor has had no post-petition operating revenues. The only expenses were the DIP Loan proceeds, used to fund the Interest-Only Payments made to the Interest-Only Payees pursuant to section 362(d)(3) and the Administrative Expenses. All Legal Expenses remain subject to Bankruptcy Court approval and are to be paid pursuant to the Sources and Uses, if not paid from the Retainer Deposits.

Under either Equity Transaction A or Equity Transaction B, coupled with either the equity infusion by Agile under Equity Transaction A or the Exit Financing

by the Exit Financing Lender under Equity Transaction B, all Claims will be fully satisfied on the Effective Date. Therefore, projections are not relevant to Plan confirmation. The Sources and Uses reflect the proceeds being received by the Debtor to fund the Plan payments, either based on the equity infusion by Newco into the Debtor, funded by Agile, or from the Exit Financing obtained by the Debtor from the Exit Financer.

### B. Plan Risks, Conditions and Assumptions.

Ms. Poscher, on behalf of the Debtor has undertaken a remarkable effort, after the passing of her wife and under the stresses of a probate proceeding, family issues and this chapter 11 proceeding, to assemble two alternative options for exit—Equity Transaction A and Equity Transaction B. All are subject to an inherent risk, whether contractually permitted, or otherwise, for the plan support parties to fail to proceed as committed. The Agile commitment is unconditional, and the Debtor has been advised that Agile has a huge amount of liquidity behind its organization. The Debtor has been and continues to work on the constituent documents needed to memorialize and move forward on the Agile transaction.

At the same time, under Equity Transaction B, the Debtor has a conditional commitment from Provizia. However, the details of that conditional commitment have been addressed over a period of months and the conditions to close are being met each day. Definitive documents under the Debtor's control to consummate the

26-40805-lsg    Doc 171    Filed 08/12/26    Entered 08/12/26 14:09:41    Page 58 of 176

Provizia Exit Financing and Equity Alternative B are well under way. The Debtor is awaiting receipt of an initial loan package from Provizia for review and comment.

RAM has been active in all discussions with Provizia, as has its counsel. A form of Guaranty Fee Agreement and Co-Development Agreement have been drafted and shared with RAM and Reynolds. A draft Operating Agreement for Newco has been sent for Agile and its other members' review. An amended and restated operating agreement of the Debtor is being prepared to reflect the equity allocation proposed under Equity Alternative B.

As in any sophisticated commercial transaction in the tens of millions of dollars, there are always moving parts among the various constituents and a risk that Equity Alternative A or Equity Alternative B will not close. However, at this time, the Debtor has every confidence in both and is proceeding on a parallel path as to both.

### C.  Post-confirmation leadership

Ms. Poscher will remain as the responsible person to the Debtor post-confirmation. The acquisition or allocation of the equity of the Debtor is as is set forth under Equity Transaction A or Equity Transaction B described above.

Debtor's operations post-confirmation will involve the continuation of the work necessary to complete the Development.

Ms. Poscher has and will continue to receive no compensation or fringe benefits for her services to the Debtor through the Effective Date.

**Post-confirmation tax ramifications**

The Plan contemplates a conveyance of the Transferred Assets to the SPE, in exchange for a 100% interest in the SPE. The Debtor does not believe that this Property transfer transaction will result in a taxable event to the Debtor. Further, the Debtor will have no debt forgiveness income related to its Plan, as the Plan provides for a 100% payment of all allowed Claims of the Debtor on the Effective Date.

The Debtor recommends that the Creditors consult their tax specialist relative to the tax consequences of the Plan to the Creditors.

No ruling has been sought or obtained from the IRS with respect to any of the tax aspects of the proposed Plan and no opinion of counsel has been obtained by the Debtor with respect thereto. No representations or assurances are being made with respect to the federal income tax consequences as described herein. Certain types of claimants and interest holders may be subject to special rules not addressed in this summary of federal income tax consequences.

## VI. Legal Requirements

### A. Voting Procedures

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a Plan are classes of claims, or equity interest, that are impaired under the

Plan. Accordingly, classes of claims or interests that are not impaired are not entitled to vote on the Plan.

Creditors that hold claims in more than one impaired class are entitled to vote separately in each class. Each such creditor will receive a separate ballot for all of its claims in each class (in accordance with the records of the Clerk of the Court) and should complete and sign each ballot separately. The ballots may be returned via email to acimini@taftlaw.com so that they are received on or prior to the deadline set by the Court. A creditor who asserts a claim in more than one class and who has not been provided with sufficient ballots may photocopy the ballot received and file multiple ballots.

Votes on the Plan will be counted only with respect to claims: (a) that are listed on the Debtor's Schedules of Assets and Liabilities other than as disputed, contingent or unliquidated; or (b) for which a proof of claim was filed on or before the bar date set by the Court for the filing of proofs of claim (except for certain claims expressly excluded from that bar date or which are allowed by Court order). However, any vote by a holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.

Voting on the Plan by each holder of a claim or interest in an impaired class is important. After carefully reviewing the Plan and disclosure statement, each holder of such a claim or interest should vote on the enclosed ballot either to accept or to reject the Plan, and then return the ballot by mail to the Debtor's attorney by the deadline previously established by the Court.

Any ballot that does not appropriately indicate acceptance or rejection of the Plan will not be counted.

A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the Debtor's attorney.

## B.     Acceptance

The Bankruptcy Code defines acceptance of a Plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots. The Bankruptcy Code defines acceptance of a Plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots. If no creditor or interest holder in an impaired class votes, then that class has not accepted the Plan.

## C.     Confirmation

11 U.S.C. § 1129(a) establishes conditions for the confirmation of a Plan. These conditions are too numerous and detailed to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process.

Among the several conditions for confirmation of a Plan under 11 U.S.C. § 1129(a) are these:

1. Each class of impaired creditors and interest must accept the Plan, as described in paragraph VI.B., above.

2. Either each holder of a claim or interest in a class must accept the Plan, or the Plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

**C.    Modification**

The Debtor reserves the right to modify or withdraw the Plan at any time before confirmation.

**D.    Effect of Confirmation**

If the Plan is confirmed by the Court:

1. Its terms are binding on the Debtor, all creditors, members, and other parties in interest, regardless of whether they have accepted the Plan.

2. Except as provided in the Plan:

(a) In the case of a limited liability company that is reorganizing and continuing business:

(1) All claims and interests will be discharged;

(2) Creditors and members will be prohibited from asserting their claims against or interest in the Debtor or its assets.

(b) In the case of a limited liability company that is liquidating and not continuing its business:

(1) Claims and interests will not be discharged.

(2) Creditors and equity interests will not be prohibited from asserting their claims against or interests in the Debtor or its assets.

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

/s/ *Jay L. Welford*
Jay L. Welford (P34471)
Kimberly Ross Clayson (P69804)
Anthony Cimini (P86223)
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
(248) 351-3000
jwelford@taftlaw.com
kclayson@taftlaw.com
acimini@taftlaw.com

*Counsel to the Debtor, South Town by 4M LLC*

By:  */s/Heidi Caroline Poscher*
      Heidi Caroline Poscher

Dated: August 12, 2026      For:  South Town By 4M LLC
                            Its:  Responsible Person

# EXHIBIT A

**FILING DEBT - CHAPTER XI EXIT USES**

| SECURED | | TOTAL | | FILED W/PLAN | |
|---|---|---|---|---|---|
| DEBT | | | | | |
| PROPERTY TAX | $ | 175,000.00 | $ | 175,000.00 | |
| COUNTY NATIONAL BANK | $ | 18,628,131.14 | $ | 18,628,131.14 | |
| BROWNSTONE | $ | 7,794,566.33 | $ | 7,794,566.33 | |
| PRENTICE[1] | $ | - | $ | - | |
| CITY OF AA ADMIN SEC'D | $ | 28,888.29 | $ | 28,888.29 | |
| HIGLEY | $ | 976,084.21 | $ | 976,084.21 | |
| SMITH GROUP | $ | 508,139.00 | $ | 508,139.00 | |
| SYNECDOCHE | $ | 822,140.96 | $ | 822,140.96 | [2] |
| UNSECURED DEBT | | | | | |
| C. POSCHER - ALLOWED DIRECT COSTS | $ | 1,991,937.68 | $ | 1,991,937.68 | |
| SMITH GROUP | $ | 394,587.45 | $ | 394,587.45 | |
| PAYPAL | $ | 105,404.92 | $ | 105,404.92 | |
| G2 | $ | 26,425.00 | $ | 26,425.00 | |
| GRAYBAR/SCHNEIDER | $ | 122,310.24 | $ | 122,310.24 | |
| HIGLEY | $ | 34,267.56 | $ | 34,267.56 | |
| LEARFIELD | $ | 30,000.00 | $ | 30,000.00 | |
| NEWMARK | $ | 10,500.00 | $ | 10,500.00 | |
| CHAP 11 RESTRUCTURING LEGAL FEES | $ | 500,000.00 | $ | 500,000.00 | |
| ESTIMATED DIP LOAN REPAYMENT | $ | 711,375.07 | $ | 711,375.07 | |
| **SUB TOTAL** | | | $ | 32,859,757.85 | |
| | | | | | |
| **RESERVES** | | | | | |
| ENGINEERING AND SOFT COSTS | | | | $1,040,242.15 | |
| INTEREST RESERVE | | | $ | 4,900,000.00 | |
| | | | | | |
| **BORROWING COSTS** | | | | | |
| CONSULTANTS | | | | | |
| LESSER | | | $ | 200,000.00 | |
| MANAV | | | $ | 200,000.00 | |
| CREDIT ENHANCEMENT FEES | | | $ | - | |
| LENDER FEES | | | $ | 400,000.00 | |
| BROKER FEES | | | $ | 400,000.00 | |
| **TOTAL** | | | $ | 40,000,000.00 | |

[1] PRENTICE PARTNERS OF ANN ARBOR $8.5MM SECURED DEBT TO BE CONVERTED TO EQUITY VIA EXIT PLAN

[2] TO BE SET ASIDE IN CONTESTED CLAIMS RESERVE

# EXHIBIT B

# TERM SHEET
## SOUTH TOWN BY 4M, LLC ("SOUTH TOWN")

This Term Sheet is intended to summarize the principal terms of an agreement between South Town and Reynolds Asset Mgmt LLC, a New Jersey limited liability company, or its designee ("RAM") regarding South Town's exit from its pending chapter 11 bankruptcy proceeding. The terms are as follows:

1. South Town to obtain exit financing in an amount not to exceed $41 million ("Exit Financing") sufficient to satisfy the amounts referenced on **Exhibit A** attached. Such amounts include amounts sufficient pay all secured and unsecured debts of South Town (other than the lien claim of Prentice Partners of Ann Arbor, LLC, which shall be subordinated to the Exit Financing), together with all administrative costs of South Town's Chapter 11 proceeding, carrying costs and other actual, out-of-pocket expenses related to the Exit Financing.

2. The Exit Financing commitment letter to be issued on or prior to May 25, 2026 ("Commitment Letter"). The Commitment letter shall contain typical closing conditions (title and survey), but with no remaining due diligence contingencies, with the closing on the Exit Financing to occur upon the order confirming South Town's plan of reorganization becoming a final order (the "Effective Date").

3. RAM to provide all credit enhancement required of the Exit Financing lender to support the $40 million of Exit Financing. If required by lender, Louis J. Reynolds, IV ("LJR") shall provide all loan guarantees (including any customary non-recourse carveout guarantees, completion guarantees and environmental indemnitees) reasonably acceptable to LJR. LJR shall only be required to enter into customary guarantees in a form reasonably acceptable by the LJR and such guarantees shall contain standard "standstill" provisions in the event of a default under any loan documents.

4. RAM to be granted a 12% equity interest in South Town. South Town's Operating Agreement to be amended and restated (the "Amended Operating Agreement") and effective as of Effective Date, conditioned on the closing on the Exit Financing. The Amended Operating Agreement will reflect RAM's 12% equity interest, will provide for RAM to be designated as the Asset and Project Manager of the South Town development and will contain usual and customary rights and controls of the members, including those related to extraordinary actions, financial reporting, capital calls, and indemnification obligations. The Amended Operating Agreement shall also provide for certain "triggering events" in which LJR shall be able to assert certain rights and have priority to available cash of South Town.

5. The grant of the 12% equity interest to RAM to be subject to approval of the probate estate of Margaret E. Poscher ("Poscher Estate"), with such approval to be obtained prior to the hearing on confirmation of South Town's plan of reorganization (the "Plan").

199439187v3

6. Post-bankruptcy-exit ownership of South Town to be further restructured in connection with the closing on the vertical construction loan ("Exit Ownership"). In restructuring the Exit Ownership, the following considerations are to be addressed:

   a. The parties will determine the final ownership percentages to be held by RAM, Caroline Poscher, the Poscher Estate and other equity participants required to secure the vertical construction loan.

   b. Exit Ownership to be undertaken in a manner to preserve all existing net operating loss carryforwards and other possible tax attributes held by South Town ("Tax Attributes").

   c. Exit Ownership participants to determine necessary approaches or methodologies to the Exit Ownership structure, in order to meet expected member returns, subject to preservation of the Tax Attributes.

   d. RAM to provide all credit enhancement required by the vertical construction lender(s), with respect to the vertical construction financing, in the $80 million to $140 million range on terms and conditions satisfactory to RAM in its full and absolute discretion.

7. South Town and RAM shall each bear the expenses incurred by them in connection with the transactions proposed in this Term Sheet, including legal, consulting, accounting, and broker fees.

8. South Town shall fully cooperate with the due diligence requests of RAM and of the Exit Financing lender.

9. This Term Sheet and the Amended Operating Agreement is/shall be governed by the laws of the State of Michigan without regard to its conflicts of laws principles.

10. This Term Sheet reflects the parties' mutual understanding of the matters described in this Term Sheet, but each party acknowledges and agrees that the provisions of this Term Sheet are not intended to create or constitute any legally binding obligation between the parties to this Term Sheet, and no party shall have any liability to the other party with respect to this Term Sheet until a fully integrated Amended Operating Agreement has been executed, the Plan has been approved, the Effective Date has occurred and the closing on the Exit Financing has occurred. If the foregoing conditions have not been met, no party to this Term Sheet shall have any liability to any other party to this Term Sheet.

11. The terms and conditions of this Term Sheet are confidential and are not to be disclosed by either party other than to legal counsel and other professional advisors who need to know such information in connection with the transactions contemplated herein. Subject to the requirements of applicable law, neither party shall make any news releases or any public disclosure with respect to the transactions contemplated herein without the prior consent of the other party; provided, however, the parties shall be permitted to make any disclosure required by law

199439187v3

12. This Term Sheet may be executed in one or more counterparts, each of which will be deemed an original, and all of which together will be one and the same instrument. Facsimile, PDF, and electronic signatures (e.g. DocuSign) to this Term Sheet will be deemed to be originals and may be relied on to the same extent as the originals.

13. No amendment to this Term Sheet or waiver of any right under this Term Sheet will be effective unless it is in writing and signed by each of the parties. This Term Sheet reflects the entire understanding of the parties with respect to its subject matter. Accordingly, this Term Sheet supersedes all prior agreements and understandings, of any nature whatsoever, whether written or oral, concerning the subject matter of this Term Sheet.

The parties have executed this Term Sheet this 14 day of April, 2026.

[Signatures on the following page]

199439187v3

**SOUTH TOWN BY 4M, LLC**

By: Estate of Margaret E. Poscher,
    Sole member

By: _____
    H. Caroline Poscher

Its:   Personal Representative


**REYNOLDS ASSET MGMT LLC**

By: _____

Print Name:  Louis Reynolds

Its:  Managing Member

199439187v3

# EXHIBIT C

# CURRENT PROJECTS



## Cape Coral, FL
## Multifamily Development

**Name:** Embers Lakes
**Location:** Cape Coral, FL
**Deal Type:** New Construction - Multifamily
**Anticipated Construction Start:** April, 2022
**Anticipated Lease-up Start:** December, 2023
**Phase 1:** 690 Units
**Phase 2:** 647 Units



| Proect Video | Let's Chat! |
|---|---|

26-        12/26   Entered 08/12/26 14:09:41   Page 73 of 176

# CANVAS



**Name:** CANVAS
**Location:** Lawrenceville, NJ
**Deal Type:** New Construction - Multifamily and Retail
**Anticipated Start Date :** July, 2024
**Anticipated Construction Completion:** November, 2025
**Units:** 205 & 17,000 Sq Ft of Retail

Canvas Apartments | Lawrenceville, NJ (canvaslawrence.com)

# The Mural Apartments



**Name:** Orange Valley Apartments
**Location:** Orange, NJ
**Deal Type:** New Construction - Multifamily
**Acquisition date:** June, 2021
**Construction Completion:** November, 2023
**Units:** 103

Luxury Apartments in Orange, NJ (themuralnj.com)

# Violet Estates



**Name:** Violet Estates
**Location:** Town of Poughkeepsie, NY
**Deal Type:** New Construction - Multifamily
**Acquisition date:** December, 2020
**Construction Completion:** June, 2022
**Units:** 90

Violet Estates – Apartments for Rent (violetestatesny.com)

# Princeton Pike Office Park



**Name:** Princeton Pike Office Park
**Location:** Lawrenceville, NJ
**Deal Type:** Value Add - Office
**Acquisition Date:** May 2022
**Rentable Square Feet:** 260,000

# Stissing Farm Townhomes



**Name:** Stissing Farm Townhomes
**Location:** Pine Plains, NY
**Deal Type:** New Construction - Condo
**Acquisition date:** March, 2021
**Construction Completion:** November, 2022
**Units:** 48

Stissing Farm Townhomes is a pet-friendly apartment community in Pine Plains, NY

# The Park at Summerhill



**Name:** The Park at Summerhill
**Location:** Texarkana, TX
**Deal Type:** Value Add - Multifamily
**Acquisition date:** February, 2024
**Units:** 184

Apartments for Rent in Texarkana, TX | Park at Summerhill - Home

# Westridge Apartments

**Name:** Westridge Apartments
**Location:** Texarkana, TX
**Deal Type:** Value Add - Multifamily



**Acquisition date:** February, 2024
**Units:** 176

Westridge South Texarkana, TX | Welcome Home
(westridgetexarkana.com)

---

# Preston Place North|South



**Name:** Preston Place North | South
**Location:** Bossier City, LA
**Deal Type:** Value Add - Multifamily
**Acquisition date:** October 2023
**Units:** 272

Preston Place is a pet-friendly apartment community in
Bossier City, LA

---

# Townhomes at South Highlands



**Name:** Townhomes at South Highlands
**Location:** Shreveport, LA
**Deal Type:** Value Add - Multifamily
**Acquisition date:** October 2023
**Units:** 228

Apartments | Lakeville Townhomes | Shreveport (aptsp.com)

---

# Hyde Park

**Name:** Hyde Park
**Location:** Columbus, OH
**Deal Type:** Value Add - Multifamily
**Acquisition date:** April 2024
**Units:** 176



---

# Commons at Waters Edge



**Name:** Commons at Waters Edge
**Location:** Columbus, OH
**Deal Type:** Value Add - Multifamily
**Acquisition date:** February 2025
**Units:** 432

The Commons at Waters Edge | Apartments in Columbus,OH

---

# The Life at Edgewater Landing



**Name:** The Life at Edgewater Landing
**Location:** Columbus, OH
**Deal Type:** Value Add - Multifamily
**Acquisition date:** October 2025
**Units:** 724

Life at Edgewater Landing Columbus OH

---

# Riverside Oaks



**Name:** Riverside Oaks
**Location:** Shreveport, La
**Deal Type:** Value Add - Multifamily
**Acquisition date:** July 2024
**Units:** 185

Riverside Oaks | Apartments in Shreveport, LA

---

26-40805-lsg    Doc 171    Filed 08/12/26    Entered 08/12/26 14:09:41    Page 77 of 176

# Park Place Brook Park



**Name:** Park Place Brook Park
**Location:** Brook Park, OH
**Deal Type:** Value Add - Multifamily
**Acquisition date:** June 2023
**Units:** 125

Park Place Brook Park | Apartments in Brook Park, OH (parkplacebp.com)

# Park Lamont Apartments and Townhomes



**Name:** Park Lamont Apartments and Townhomes
**Location:** Cleveland OH
**Acquisition date:** June 2025
**Units:** 77

Luxury Apartments in Cleveland, OH | (parklamont.com)

# The Lumos Apartments



**Name:** The Lumos Apartments
**Location:** Cleveland OH
**Acquisition date:** June 2025
**Units:** 42

Luxury Apartments in Cleveland, OH | (thelumosapts.com)

26-40805-lsg    Doc 171    Filed 08/12/26    Entered 08/12/26 14:09:41    Page 78 of 176

# Spring Street Commons



**Name:** Spring Street Commons
**Location:** Newark, NJ
**Deal Type:** New Construction - Multifamily
**Acquisition date:** March, 2018
**Construction Completion:** September, 2020
**Units:** 87                          **Occupancy:** 100%

Spring Street Commons (springstreetcommonsnj.com)

# Western PA Portfolio



**Name:** Newberry Apartments & Pinetree Village & Valley View
**Location:** Grove City & West Middlesex & New Wilmington, PA

| REYNOLDS ASSET MANAGEMENT | ABOUT | PROJECTS | NEWS | CONTACT | SEARCH |  |



# Bound Brook, NJ Development

**Name:** The Vibe
**Location:** Bound Brook, NJ
**Deal Type:** New Construction - Mixed Use
**Acquisition date:** March, 2019
**Units:** 28                          **Occupancy:** 100%

Borough of Bound Brook New Jersey



CONTACT US:

Tel: 201-345-3131
Email: info@reynoldsasset.com
Fax: 866-433-3671

45 Eisenhower Drive, Suite 500
Paramus, NJ  07652

| Name | Message |
| Email | |
| Subject | |

SUBMIT

© 2023 by Reynolds Assets Management, LLC.

Tel: 201-345-3131
Email: info@reynoldsasset.com
Fax: 866-433-3671

45 Eisenhower Drive, Suite 500
Paramus, NJ  07652

# EXHIBIT D

**The Finn**
**Ann Arbor, MI**
**Investment Letter of Commitment**

**July 16, 2026**

**From:** Agile Solar Group, LLC ("Agile")
Mr. Philip Ahmadzai, CEO

**To:** Mr. Louis Reynolds IV, CEO, Reynolds Asset Mgmt., LLC ("RAM")
Mr. Matt Breuer, RAM Authorized Counsel
Ms. Heidi Caroline Poscher, Authorized Representative of the Estate of Margaret Poscher (the "Poscher Estate")
Ms. Heidi Caroline Poscher, designated representative of South Town by 4M, LLC ("South Town")

**RE: Investment Commitment, The Finn Group, LLC, Ann Arbor, MI**

**Dear Mr. Reynolds, Mr. Breuer and Ms. Poscher,**

This letter serves as a binding commitment between Agile and an entity to be formed as the Finn Group, LLC ("Finn Group") (the "Parties") to enter into a joint venture (the "JV") for the development of, and for Agile to provide funding for, a residential apartment project to be branded as "The Finn," comprised of the real property located at 1601 S State St., Ann Arbor, MI 48104 (the "Project"), currently titled in the name of South Town.

1.  **Investment Commitment Amount**
    Subject to the terms and conditions outlined herein, Agile commits to a direct investment of **$54,000,000** (the "Investment Amount") into the JV for the purpose of the JV:
    a.  acquiring 100% of the equity held by the Estate of Margaret E. Poscher (the "Estate") in South Town;
    b.  paying in full the allowed claims of creditors in the Chapter 11 bankruptcy proceeding of South Town; and
    c.  providing an equity investment in conjunction with the vertical construction of the Project.

2.  **Syndication**
    The Parties agree that syndication is permissible of a respective Parties' membership interest so long as:
    a.  the syndicating Party remains the lead investor and the equity block's representative in the JV; and
    b.  all other Parties have agreed to the terms of the syndication.

3.  **Equity Ownership & Return Structure**
    In exchange for the Investment Amount, Agile shall receive a **59%** equity ownership interest in the JV and the Finn Group shall hold a **41%** equity ownership interest in the JV. Returns, voting rights and all other material terms of the Parties' agreement shall be set forth in a definitive Development JV/Operating Agreement (the "JV Agreement").

1

300894750v2

4. **Investment Funds and Funding Schedule**
Agile agrees that it will provide proof of funds of the Investment Amount to the Finn Group and to South Town.

5. **Timing, Sequencing and Required Documentation**
The Parties agree to the following timing, formation, sequencing, flow of funds and production of required documentation related to the JV (the "Steps"), in order to achieve timely approval of the Probate Court and of the Bankruptcy Court, as applicable, related to South Town's plan (the "Plan"):

   a. South Town shall convey its interest in the Project to a newly formed special purpose entity (the "SPE") in exchange for 100% of the equity in the SPE on the effective date (the "Effective Date") of the Plan.

   b. The JV Agreement shall be executed not later than August 7, 2026.

   c. A purchase agreement for the acquisition of 100% of the Estate's interest in South Town and therefore, the equity in the SPE (the "Equity Purchase"), by the JV, shall be finalized not later than August 7, 2026 (the "Equity Purchase Agreement").

   d. Probate Court approval of the Equity Purchase Agreement shall be requested by August 10, 2026, with approval to be conditioned upon, and obtained prior to, the hearing on confirmation of the Plan.

   e. A management agreement between the manager of the JV and the JV shall be finalized not later than one week prior to the hearing on confirmation of the Plan.

   f. A credit enhancement agreement between the JV and RAM shall be finalized not later than one week prior to the hearing on confirmation of the Plan, pursuant to which RAM and Louis Reynolds IV shall agree to provide guarantees required by any take-out or vertical lender to the Project (the "Credit Enhancement").

   g. A binding term sheet between Agile and Fourth Purpose Energy, LLC ("Fourth Purpose") for the funding and operation of the on-site energy system at the Project (which will include system production suitable for third party offtake, with the offtake modeling and feasibility analysis to include the on-on-site energy system at the Project as well as other, future projects contemplated by the Finn Group and Fourth Purpose) shall have been entered into not later than one week prior to the hearing on confirmation of the Plan.

   h. Confirmation of the Plan to occur on September 25, 2026, or such later date as the Bankruptcy Court may determine (the "Confirmation Hearing Date").

   i. The uses of the Investment Amount shall be as follows:
      i. Equity Purchase amount: $13,000,000.00.
      ii. Plan exit payments (sufficient to pay all allowed claims in full: $31,000,000.00 (estimate) payable on the Effective Date as a capital contribution from the JV to South Town.
      iii. Post-Plan confirmation development proceeds: $10,000,000.00.

   j. The Investment Amount to be wired to an escrow account of the JV at least one week prior to the Confirmation Hearing Date.

   k. On the Effective Date, all of the above transactions shall be closed.

2

6. **Conditions Precedent**

This commitment is expressly conditioned upon the following:

    a. Each of the Steps shall have been completed within the deadlines above stated or such later dates as the Parties may agree.

    b. Confirmation of the Plan by the Bankruptcy Court and approval of the Equity Purchase by the Probate Court shall have been obtained.

7. **Fees**

The Parties acknowledge and agree that certain fees shall be paid to RAM (or its designee) in connection with the administration and management of the Project, which include the following: (i) an Asset Management Fee of $5,000 per month, (ii) a co-development fee paid monthly during the term of the vertical construction in the total amount of $1,975,000; and (iii) a credit support fee equal to 2% of future borrowed construction funds that are subject to RAM's Credit Enhancement. These fees shall be set forth as "Uses" in the Project's projections and development financials.

8. **Major Decisions**

The Finn Group shall have the right to propose and unilaterally implement all material major decisions related to the Project; however the following decisions (the "Joint Major Decisions") shall require the consent of both Agile and the Finn Group:

    a. Selection of a property manager;

    b. Merging or consolidating with or acquiring any other person or entity;

    c. Modifying the JV Agreement or other documents between the JV and third-parties;

    d. Any sales or refinancings of the Project; and

    e. Making any tax election or decision that would have a disproportionate and material adverse effect on Agile.

Notwithstanding the foregoing, the Finn Group may deviate from the approved budget on any non-discretionary expenses to prevent any default under any loan document (including, but not limited to, any personal guarantees).

9. **Capital Calls**

The JV Agreement shall address future capital calls related to the Project.

10. **Confidentiality and Non-Circumvention**

The terms and conditions of this Term Sheet are confidential and are not to be disclosed by either Party other than to legal counsel and other professional advisors who need to know such information in connection with the transactions contemplated herein. Subject to the requirements of applicable law, neither Party shall make any news releases or any public disclosure with respect to the transactions contemplated herein without the prior consent of the other Party; provided, however, the Parties shall be permitted to make any disclosure required by law, including, but not limited to, those required by the South Town Bankruptcy Court, the Probate Court, the United States Securities and Exchange Commission and/or per applicable securities laws. The legal obligations of confidentiality hereunder do not extend to the U.S. federal or state tax structure or the U.S. federal or state tax treatment of the transactions contemplated hereunder. If any U.S. federal or state tax analyses or materials are provided to any Party, such Party is free to disclose any such analyses or materials without limitation. The Parties may disclose the terms and conditions of this Term Sheet and materials related hereto to its potential joint venture partners, financing sources, legal counsel and other agents and

3

representatives who need to know such information in connection with the transactions contemplated herein. Agile agrees that it shall not and shall cause its affiliates not to: (i) directly or indirectly, participate in the in any transaction with respect to the Project or any similar transaction involving the Project except with the participation of the Finn Group, (ii) or otherwise circumvent the Finn Group's opportunity to engage in the transaction with the Project. The provisions of this Section shall survive the termination of this Term Sheet for any reason and shall be binding on the Parties hereto.

11. **Buy-Sell**

    Standard buy-sell provisions shall be included in the JV Agreement.

12. **Effect of Term Sheet**

    The purpose of this Term Sheet is to set forth the present mutual intent of the Parties for a joint venture for the Project. Both Parties agree that time is of the essence and will work to negotiate and execute the definitive documents as soon as practical and within the time parameters set forth above.

13. **Governing Law**

    This Term Sheet shall be governed by and construed in accordance with the laws of the State of Michigan, without any regard to any conflict of law principles thereof.

14. **Other**

    This document outlines a mutual understanding and constitutes a binding commitment to proceed with the investment, provided the conditions in Section 6 are satisfied, and further agree that this Term Sheet will be binding and enforceable against the Parties. Please indicate your acceptance of these terms by signing and returning a copy of this letter.

**Sincerely,**

**Agile Solar Group, LLC:** _____
**Philip Ahmadzai**
**Title:** CEO
**Date:** July 16, 2026

**Accepted by:**

**Reynolds Asset Mgmt., LLC:** _____
**Louis Reynolds IV**
**Title:** CEO
**Date:** July 16, 2026

**Caroline Poscher:** _____
**Title:** Authorized Representative of the Estate of Margaret Poscher
**Date:** July 16, 2026

**Caroline Poscher:** _____
**Title:** Authorized Representative of South Town
**Date:** July 16, 2026

4

# EXHIBIT E

**Memorandum** re: Investment Commitment and Capital Structure for The Finn (now referred to as The Forge)

**From:** Agile Solar Group, LLC ("Agile")

**To:** Ms. Heidi Caroline Poscher, Authorized Representative of the Estate of Margaret Poscher (the "Poscher Estate") and designated representative of South Town by 4M, LLC ("South Town"); Mr. Matt Breuer, Authorized Counsel to Reynolds Asset Mgmt., LLC and South Town

**Re:** Investment Commitment under the July 16, 2026 Investment Letter of Commitment

**Date:** August 5, 2026

### I. Reservation of Rights Under the July 16, 2026 Letter of Commitment

This memorandum is provided solely as an informational update regarding Agile's investment commitment and capital structure. It does not amend, modify, or waive any term of the Investment Letter of Commitment dated July 16, 2026 (the "LOC") between Agile and the other parties.

All conditions, timelines, exit options, and other rights and obligations set forth in the LOC remain in full force and effect. In the event that key bankruptcy or transaction milestones are not met in a manner that aligns with Agile's funding and syndication schedule, Agile reserves all rights available under the LOC, including any exit or termination rights triggered by missed funding or closing dates.

### II. Purpose of This Memorandum

This memorandum confirms Agile's ongoing investment commitment and clarifies the capital structure and syndication approach referenced in the July 16, 2026 Investment Letter of Commitment (the "Commitment Letter"). It is intended to provide you and your counsel

with a clear, court-ready description of the proposed equity investment supporting South Town's Chapter 11 exit plan.

### III. Confirmed Investment Commitment

Subject to the terms and conditions set forth in the Commitment Letter and related definitive agreements, Agile commits to a direct equity investment of **$54,000,000** (the "Investment Amount") into the joint venture vehicle (the "JV") formed to implement the transaction.

The Investment Amount is designated to support the following components of the restructuring and development plan:

1. **Acquisition of Estate Interest:** Funding the JV's acquisition of 100% of the equity interest currently held by the Estate of Margaret E. Poscher in South Town.

2. **Payment of Creditor Claims:** Paying in full the allowed claims of creditors in the Chapter 11 bankruptcy proceeding of South Town.

3. **Project Construction Equity:** Providing equity capital in conjunction with the vertical construction of the Project.

This commitment is intended to serve as a core component of the exit financing for the bankruptcy case.

### IV. Equity Ownership and Return Structure

In exchange for the Investment Amount, the parties have agreed to the following indicative equity allocation:

- **Agile:** 59% equity ownership interest in the JV.

- **The Finn Group, LLC:** 41% equity ownership interest in the JV.

All returns, voting rights, distributions, and governance matters will be set forth in a definitive Development JV/Operating Agreement (the "JV Agreement"). The indicative

ownership percentages reflect the economic and control framework under which the parties are operating while final documents are prepared.

## V. Syndication Approach and Investor Participation

The Commitment Letter permits syndication of membership interests, subject to agreed conditions. Specifically:

- The syndicating party must remain the lead investor and representative of its equity block in the JV.

- All other parties must agree to the terms of the syndication.

Agile is acting as the lead investor and is assembling a group of co-investor partners to participate in the $54,000,000 commitment. While the overall commitment amount is fixed, the final allocation among individual syndicated participants is still being completed.

This approach is consistent with common practice in larger real estate and development transactions, where a lead investor commits capital and subsequently brings in institutional or high-net-worth co-investors under a single equity block.

## VI. Timing and Process Considerations

The bankruptcy process and related plan milestones are advancing on an accelerated timeline. Agile's investor coordination and final participation documentation are proceeding in parallel but, due to the scale of the commitment and current market conditions, are not yet fully finalized.

Factors affecting the pace of syndication include:

- Broader financing market conditions;

- Global geopolitical events; and

- Energy-sector related uncertainties impacting certain prospective investors.

Agile remains focused on a target exit in **late September 2026** and is actively working to align investor closing mechanics with the bankruptcy timeline. While some interim bankruptcy deadlines have been challenging to meet due to the speed of the process relative to investor documentation cycles, these are timing and process issues, not a reflection of reduced commitment.

## VII. Use of This Memorandum in Support of the Exit Plan

This memorandum is provided so that you and your counsel have a clear, written summary of:

- The existence and size of the equity amount;
- The intended uses of the investment proceeds;
- The lead investor and syndication structure; and
- The current status of investor finalization efforts.

You may share this memorandum with the bankruptcy court, the U.S. Trustee, or other involved parties as a resource demonstrating that the proposed exit plan is supported by a defined, credible equity investment and a viable path to consummation.

In the event these plans do not meet timeframes for funding details which causes the Court to fail the Bankruptcy Exit Plan, Agile will not cause any action in opposition of a successful exit plan unless Agile has already achieved the funding target.

## Contact

For any questions or to coordinate further details, please contact:
Agile Solar Group, LLC

# EXHIBIT F

# Conditional Commitment

**Proposed: The Forge**
**SouthTown by 4M, LLC**
**Michigan Limited Liability Company**
**Summary of Terms and Conditions**
**June 16, 2026 (Revised June 28, 2026) Revised July 27, 2026**

The following is a Conditional Commitment ("Conditional Commitment") outlining certain of the terms and conditions relating to the Borrower (the "Borrower") to provide a $32,629,950.03 Bridge Loan to satisfy the current Chapter XI and a construction loan to build a 300-unit residential development containing Studio, One-, and Two-Bedroom Units, and 72 Parking Spaces. The total square footage of the Development is anticipated to be approximately 237,366 sq. ft., with a total developed Maximum Floor Area of 211,703 sq. ft. It is estimated that the stabilized NOI will be $12,570,678, with a Stabilized Market Value of $290,000,000. The Bridge Loan, which shall not exceed $40,000,000, inclusive of the funds necessary to satisfy the current Chapter XI, will also include funds to pay for updates to pre-construction drawings and for the reorganization of the post-Chapter XI company. The Loan will be phased with Phase One effecting the exit of the Chapter XI and Phase Two funding the pre-development cost and the development of the 300 unit multi-family Project (the "Loan") to be made by an affiliate of The Provizia Organization Inc. (together with such affiliate, collectively, the "Lender") to the borrower designated herein (the "Borrower") with respect to the property identified herein (the "Property"). These terms and conditions are subject to modification or adjustment by Lender at any time up until any closing and are only a summary of certain terms and conditions to be more fully set forth in the documents and/or instruments to be executed in connection with the Loan (collectively, the "Loan Documents"). Any documents, reviews, decisions, approvals, or acceptances to be made or accepted by Lender will be made by and must be acceptable to Lender in its sole and absolute discretion. In the event the Loan is funded, the terms and conditions contained herein shall be superseded by the Loan Documents, and the Loan Documents shall govern the terms and conditions of the Loan without reference to this Conditional Commitment. This Conditional Commitment is not a commitment to lend, either express or implied, and does not impose any obligation on Lender to issue a commitment or to make a loan on the terms set forth herein or on any other terms. With respect to Lender, this Conditional Commitment is solely an agreement of Lender to engage in diligence in connection with the proposed Loan as outlined herein; all diligence conducted by Lender must have results acceptable to Lender in Lender's sole discretion. With the exception of the provisions hereof entitled "Expense Deposit", "Closing", "Brokers", "Governing Law", "Accuracy of Information", "Confidentiality" and "Exclusivity", "Non-Disparagement", "Closing", "Expense Deposit" and "Break Up Fee" which shall be binding upon the parties hereto, this Conditional Commitment constitutes a non-binding proposal, which has been made solely upon our discussions and the information provided to date. This Conditional Commitment may be rescinded or terminated by Lender at any time, for any reason or no reason.

| | |
|---|---|
| **Lead Arranger and Administrative Agent** | THE PROVIZIA ORGANIZATION INC. ("the Lender," "the Capital Provider," the "Lead Manager," "the "Agent"). The Lender intends to provide two loans non-revolving credit facilities: the first to facilitate the exit of the Chapter XI and the second to construct the proposed 300 unit multi-family development described herein ("Mortgage," "Credit Facility") in the amount up to $145,000,000, inclusive of the Short Term Bridge Loan, closing costs, brokerage fees, and interest reserves based on maximum combined leverage of 80% (the non-revolving construction loan leverage is estimated to be a maximum of 60%). In addition, the estimated development cost, including $38,000,000 of pre-bankruptcy equity, is $183,500,000. Upon closing, Lender, or its agent or assign, shall act as the Administrative Agent managing all aspects of funds flow. The Borrower will have the right to approve any assignee, participant, or co-Lenders; however, such approval shall not be unreasonably withheld. |
| **Initial Funding Amount** | An amount to be determined by Lender upon completion of its underwriting and due diligence and based in part on a Lender-approved estimate funding schedule. |
| **Borrower (SPE Structure)** | A newly created special purpose entity ("SPE") or an existing SPE indirectly controlled by the Borrower (defined below), formed exclusively for the purpose of acquiring, constructing, owning, and operating the Property and not for any other business activity. The Borrower would also be directly owned and controlled by the managing member or general partner that is an SPE ("SPE Equity Owner"). The formation and organization documents of the Borrower and the SPE Equity Owner and structure thereof would be |

required to comply with and contain SPE restrictions and limitations and be subject to approval by LENDER, including (without limitation) prohibitions against (a) transfer of interest in the Borrower, SPE Equity Owner or any Guarantor resulting in a change of control of any of them without the prior written consent of ("Impermissible Transfers") (subject to customary permitted transfer provisions including, without limitation, the removal of the Borrower member as administrative member of the SPE Equity Owner); and (b) incurrence by the Borrower or SPE Equity Owner of debt of any kind other than (i) the Loan; (ii) Tax Credits Loans or loans from any other entity; (iii) and customary trade payables, in each case without the prior written consent of Lender, and other Impermissible Transfer or Impermissible Debt to be void ab initio and no force or effect.

| | |
|---|---|
| **Borrower** | TBD |
| **Type** | Construction Loan and a Short-Term Bridge Loan to Facilitate the Bankruptcy Exit and construction of the improvements on the Property. |
| **Funding** | A to-be-determined amount of the Total Loan Amount will be allocated to the Credit Facility, subject to Lender's approval, and will be used for the bankruptcy exit and construction of improvements, horizontal improvements (infrastructure), soft costs, carry costs, and interest payments. The final Credit Facility amount (and the allocation thereof) will be subject to the Lender's underwriting and due diligence. Funds will be advanced to the Borrower not more than once per month subject to satisfaction with the following conditions: |

• 100% advance rate on actual costs incurred until the Credit Facility has been fully drawn (less any applicable retainage).

• $250,000 minimum advance amount for each draw.

• Verification of completed work and completion costs will be performed by Lender's construction consultant (at Borrower's expense) prior to each disbursement.

• Delivery of title updates and title insurance endorsements, certifications from Borrower, the architect, and general contractor, and payment acknowledgments/lien waivers from contractors in compliance with the terms of the Loan Documents and the applicable lien laws for the State of Michigan. In addition to the foregoing, with respect to the final advance under the Credit Facility, Borrower shall deliver a final certificate of occupancy, an "as built" survey, and final lien waivers and other items as required by the Lender.

• All advances shall also be conditioned on the Loan at all times being "in-balance" as determined by Lender and as shall be further provided in the Loan Documents (including, without limitation, with respect to required additional equity to be contributed by or on behalf of Borrower to comply with all loan balancing requirements); and

• Other standard and customary requirements of the Lender.

| | |
|---|---|
| **Property Management Company** | TBD |
| **Maturity** | The Bridge Loan will have a term of 12 months, followed by a 24-month construction loan with two one-year extensions, if required. |
| **Extension Fee** | 50 bps |
| **Credit Facility Amount** | $145,000,000 final cost, based on the appraisal, which includes the senior credit facility and short-term Bridge Loan. |
| **Prepayment** | Borrower will have the right to prepay the entire unpaid principal balance in full, but not in part, without penalty during the Loan term. Prepayment Lockout during the first 18 months of the loan term. |

**Formatted:** Justified

**Formatted:** Justified

| | |
|---|---|
| **Amortization** | Interest is paid only during the construction term and the Short-Term Bridge Loan term from the loan proceeds. |
| **Pricing** | Senior Credit Facility: The estimated interest rate on the Loan will float based on SOFR, currently at 3.60% plus 4.00% ("Spread"), subject to SOFR on the date of Loan closing, with a minimum all-in, per annum interest rate of 7.60% (the "Minimum Interest Rate").

Bridge Loan: The estimated interest rate on the Loan will be fixed based on SOFR plus a Spread of 700 basis points for the term of the Loan, subject to SOFR on the date of the Bridge Loan closing, with a minimum all-in, per annum interest rate of 10.60%. |
| **Loan Allocations** | Lender will require that certain funds be allocated and used to cover specific expenditures including, if applicable, but not limited to: (i) Interest expense ("Interest Allocation"); (ii) Real estate taxes ("Property Tax Allocation"); (iii) Insurance ("Insurance Allocation"); and (iv) Contingencies ("Contingency Allocation"; and together with the aforementioned other allocations, the "Allocations"). The amount of each Allocation is subject to the lender's approval. No interest expense will accrue on the Allocations until (and to the extent that) they are drawn. |
| **Loan Funding** | All Loan funding will be drawn by Borrower only in accordance with a budget approved by Lender; all construction management fees, development fees, or similar payments (if any) shall be paid on a percentage of completion basis (based on completion of the hard construction costs ["Hard Costs"] as determined by Lender utilizing information provided by Lender's inspecting person without regard to soft costs or the Loan Amount. Lender shall specifically approve the timing and amount of any fees or reimbursements paid to related entities or affiliates; provided, however, that the final advance of such fees shall not be made until such time that the Property is complete, a certificate of occupancy for the Property has been issued, and the final construction advance has been made. Borrower represents that there are no fees or other payments to Borrower, or any Borrower-affiliated entities or persons, contained in the budget other than those specifically detailed or discussed herein. Borrower further acknowledges that any such undisclosed fees or payments will be removed from the final budget prior to closing, in conjunction with a direct dollar for dollar reduction of the Loan Amount. |
| **Maximum Loan to Cost** | Senior Construction Loan Facility: 60% (at closing) |
| **Guarantor** | Louis J. Reynolds IV and the entire Forge Group shall be joint and several guarantors under the Loan, subject to the "Recourse" provisions below. |
| **Interest Reserve** | Lender shall receive a minimum of interest (equal to 12 months on the Senior Loan Construction Amount at the Interest Rate as of the closing date of the Loan). The Lender will determine, after a new appraisal is completed, the estimated interest reserves for the Bridge Loan. |
| **Collateral** | The Credit Facility shall be secured by:

a. A first lien security agreement on the Property to include all present and future improvements, all required assignments, and right away.

b. A collateral assignment of all major contracts, which shall include the GMP, architect contract, and engineer's contract, and shall expressly not include any subcontracts.

c. UCC-1 on Property.

d. A Senior Secured First Mortgage granted to Lender and the SPE shall pledge to Lender an interest in 100% ownership of Borrower. The sale, transfer, pledge, or encumbrance of all or any portion of the Property or interest shall be prohibited without prior written consent of Lender or its assignee; provided, however, such pledge cannot be exercised during any standstill period, and Lender acknowledges and agrees that Guarantor will have a pledge in the member of the Borrower that may be exercisable in the Event of Default. |

**Formatted:** Justified

e. Lender will record an assignment of security interest in all current and future leases, rents, tax credits, and other income related to the Property.

f. Unconditional assignment of all approvals, plans, specifications, licenses, permits, and all major contracts throughout the Loan term.

g. Applicable financing statements.

h. Other customary security documentation required by Lender.

| | |
|---|---|
| **Guaranty** | During entire Credit Facility term, the Borrower will indemnify the Lender against any loss from fraud, including intentional misrepresentation of a material statement of fact or any financial statement in any material respect, bankruptcy, misapplication of rents and security deposits, or other intentional physical waste to the Property, and shall indemnify and hold the Lender harmless from any past, present or future environmental issues relating to the Property. |
| **Tax Monitoring** | The Lender and its assigns retain the right to require a real estate tax escrow in the event the real estate taxes become delinquent in the future. |
| **Financial Statements** | The Borrower will be required to submit annual financial statements in form and substance satisfactory to Lender within 120 days of calendar year end; federal tax returns within 60 days of filing. |
| **Interest Reserve (Underwriting)** | An interest reserve will be established during the underwriting of the proposed loan based on the draw schedule. |
| **Appraisal** | The Senior Credit Facility will be subject to a satisfactory appraisal completed by an independent appraiser ordered, reviewed, and approved by the Lender or its assigns. The appraisal shall provide "As Is," "As Completed," and "As Stabilized" values. The Value shall include the value of any tax benefits, approval status, and other enhancements to the Property. |
| **Third Party Expenses** | The cost of (a) appraisal, (b) environmental study if not available or unacceptable, (c) property condition engineering reports, shall be specified and ordered by Lender at the expense of the Borrower. A Property Condition Assessment (or Property Condition Report) is a professional evaluation of a property's physical condition from an engineering and construction standpoint, for real estate due diligence purposes. Property Condition Assessments, also referred to as "PCA Reports," include conclusions and recommendations regarding the site's unforeseeable costs, financial liabilities, and acquisition risks. This paragraph shall be binding on Borrower and shall survive the Conditional Commitment Expiration Date, other termination of this Conditional Commitment, or the closing of the Loan. |
| **Expense Deposit** | Borrower is responsible for the cost of all third-party fees and expenses incurred by Lender in connection with the Loan (including third party reports, legal costs, credit searches, etc.), as well as any other out-of-pocket expenses incurred by Lender, regardless of whether (i) the Loan closes or (ii) the Good Faith Deposit is sufficient for the payment of such costs, fees and expenses. Borrower has made an initial "Good Faith Deposit" of $60,000 to be applied toward such costs. Expenses incurred which are in excess of the Good Faith Deposit ("Excess Expenses") described above will be either (1) withheld from the loan proceeds in the event the proposed Loan closes or (2) paid by Borrower, jointly and severally, to Lender immediately upon demand in the event this Conditional Commitment is terminated or expires, whether or not the proposed Loan closes. If actual expenses are less than the Good Faith Deposit, Borrower shall be credited with the difference at Closing. This paragraph shall be binding on Borrower and shall survive the Conditional Commitment Expiration Date, other termination of this Conditional Commitment, or the closing of the Loan. |
| **Closing** | If the Bridge Loan does not close within one hundred and fifty (150) days from the date the Borrower signs this Conditional Commitment, it will, at Lender's option and without |

Formatted: Justified

Formatted: Justified

notice to any Loan party (unless Lender and Borrower are in active Loan negotiations), be deemed terminated; provided that this Section and the Sections entitled "Expense Deposit", "Closing", "Brokers", "Governing Law", "Accuracy of Information", "Confidentiality" and "Exclusivity", "Non-Disparagement", "Expense Deposit" and "Break Up Fee" shall survive any termination of this Conditional Commitment.

**Opinion of Borrower's Counsel**   A legal opinion from Borrower's counsel confirming that all documentation and other matters pertinent to the Loan are valid, enforceable, and binding in accordance with the terms of the Lender's commitments and corresponding Loan documentation, and do not violate usury laws or any other applicable laws or ordinances; that the Borrower is properly formed and allowed to conduct business in the State of Michigan, and such other matters as Lender may require, in its sole discretion.

Formatted: Justified

**Loan Disbursement**   Prior to the disbursement of Loan proceeds, the Borrower shall submit draw request documents acceptable to the Lender, which shall include: (1) a certified application for payment from the General Contractor and Supervising Architect or Engineer certifying the cost of the work in place, (2) Partial Lien Waivers, (3) a Project Funding Summary outlining funds advanced to date on the subject Property and the current funding request. Prior to advancing funds, the Lender will conduct a document review and site inspection. All disbursements shall be conditioned upon the Loan being in balance and the absence of any material default (monetary or non-monetary) that would materially affect the Project or the Borrower if not cured, and the satisfaction of the other conditions which will be set forth in the Loan Agreement.

Formatted: Justified

**Environmental and Physical Inspection**   The Loan will be subject to a complete and satisfactory review of the current environmental status and a satisfactory physical inspection of the subject Property.

**Payments**   Monthly, on the 1st day of each month.

**Documentation to Close**   a. Credit Reports on the Guarantor (require minimum 720+ FICO). (Bridge Loan and Construction Loan)

b. Personal Financial Statements for each Guarantor (signed, dated, with notes) required for Carveout and Completion Guarantee. (Bridge Loan and Construction Loan)

c. Personal Guarantee of Louis J. Reynolds IV and the business financial statements for the past 3 years for RAM for the Bridge Loan and the Construction Loan. (Bridge Loan and Construction Loan)

d. Co-Development Agreement for The Forge.(Bridge Loan and Construction Loan)

e. Approval of Contractor and final construction costs amounts.(Construction Loan)

f. Market Study. (Construction Loan)

g. Organizational Documents. (Bridge Loan and Construction Loan)

h. Execution and delivery of loan and security documents. (Bridge Loan and Construction Loan)

i. Indication of any outstanding debt. (Bridge Loan (as indicated in Chapter 11 Exit Plan documents) and Construction Loan)

j. - Detailed breakdown of GC fees and GC contingency estimates. (Construction Loan)

k. Environmental Report. (Bridge Loan and Construction Loans)

l. Updated survey reflecting site clearing (Bridge Loan)

m. Approved Site Plan (Bridge Loan and Construction Loan)

n. List of individuals and entities signing for the carve-outs and completion guarantee.

o. Required approvals for all municipal and governmental entities relating to the construction and operation of the Property. (Construction Loan)

p. Final Construction Budget (detailed hard and soft costs). (Construction Loan)

q. Appropriate and required insurance policies. (Bridge Loan and Construction Loan)

r. Current Title Report and title holder name. (Bridge Loan and Construction Loan)

s. Year-to-date expenses paid out. (Bridge Loan and Construction Loan)

t. Title Insurance. (Bridge Loan and Construction Loan)

u. Construction plans, drawings, specifications, construction contracts, budgets, and all related permits and approvals, to be assigned to the Lender. (Construction Loan)

v. Project Renderings (PDF). (Bridge Loan and Construction Loan)

w. Mechanical Drawings (PDF). (Construction Loan)

x. Electrical Drawings (PDF). (Construction Loan)

y. Plumbing Drawings (PDF). (Construction Loan)

z. Civil Drawings (drainage, sewer, curbs) (PDF). (Approved Site Plan Bridge Loan; Final Civil Drawings Construction Loan)

aa. Structural drawings (foundation, vertical – steel, concrete, lumber) (PDF). (Construction Loan)

bb. Tenant Improvement Drawings (PDF). (Construction Loan, as available)

cc. Principal's Resumes. (Bridge Loan and Construction Loan)

dd. Final Sources and Uses of Funds. (Bridge Loan and Construction Loan)

ee. Survey and/or Plat Map & Deed. (Bridge Loan and Construction Loan)

ff. Site Plan for the Proposed Development. (Bridge Loan and Construction Loan)

gg. Current Tax Bill. (Bridge Loan and Construction Loan)

hh. Engineering/Structural Review. (Construction Loan)

ii. Construction Management Agreement. (Construction Loan)

jj. 5-year construction pro forma P&L. (Construction Loan)

kk. Confirmation that no material adverse change has occurred in the financial markets or the Borrower's financial condition. (Bridge Loan and Construction Loan)

ll. Approval from the Lender's Investment Committee. (Bridge Loan and Construction Loan)

mm. Satisfactory completion of Lender's (and its third-party consultants'/advisers') technical, business, financial, legal, and environmental due diligence. (Construction Loan)

nn. Receipt of substantially all items included in the closing checklist, including executed mortgage loan and note agreements, construction schedule, construction draw schedule, and evidence of property insurance. (Bridge Loan and Construction Loan)

oo. Negotiation of satisfactory legal documentation, including financing agreements, assessment lien documents, filings, legal opinions and certificates, in form and substance satisfactory to Lender. (Bridge Loan and Construction Loan)

pp. Receipt of all corporate consents and approvals required in connection with Assessment-related Borrowing. (Bridge Loan and Construction Loan)

qq. Completion of background investigations as may be deemed necessary, satisfactory to the Lender. (Bridge Loan and Construction Loan)

rr. Receipt of appropriate consents and estoppels as reasonably required by Lender. (Bridge Loan and Construction Loan)

ss. Confirmation that all representations and warranties under the financing documents are true and correct as of the financial closing date for each Project. (Bridge Loan and Construction Loan)

tt. Completion of equity commitments. (Bridge Loan and Construction Loan)

uu. Confirmation that Property Owner/Developer has secured any applicable zoning variances permitting the proposed improvements and uses. (Bridge Loan and Construction Loan)

vv. Attorney's Opinion Letter. (Bridge Loan and Construction Loan)

ww. Such other information as is typically required for similar financing requests.

| | |
|---|---|
| **Additional Terms** | Usual and customary for transactions of this type, including without limitation: corporate status, power and authority/enforceability, no violation of law or contracts or organizational documents, no material litigation, correctness of specified financial statements, and no material adverse change — including a global cash flow statement and tax returns for Borrower. In the event the Lender elects to bifurcate the loan, Borrower shall not be required to incur any material costs or expenses arising after the closing date of the Loan, other than expenses of Borrower's counsel, accountants, and consultants. |
| | Lender reserves the right to pre-syndicate the proposed loan, in whole or in part, and may invite financial institutions to participate accordingly. Borrowers will support the syndication. In any syndication, Lender will be the sole point of contact. Lender, as Lead Manager, and a group of financial institutions selected by the Lender would advance the full principal amount into escrow at closing. The Borrower acknowledges and agrees that the Lender may sell, assign, hypothecate, pledge, or otherwise transfer all or any part of the Loan to a third party prior to, at, or after the Loan closing. |
| | Bridge Lender shall require at closing a pledge, properly secured, of specific liquid assets of the guarantor(s) totaling a minimum of $10 million to be maintained at all times (with mutually agreeable rights of substitution), as well as usual and customary constraints on sale of assets during the term of the bridge and/or construction loans. |
| **Bifurcation** | Provided that the initial economic and other material terms of the Loan shall remain the same for Borrower, Lender shall have the right to (i) bifurcate the Loan into one or more (a) participations, (b) component or other notes, such as B-Notes or (c) loans, including mezzanine loans secured by a pledge of 100% direct and indirect ownership interests, and (ii) reallocate the principal amount and interest rate of the Loan among one or more components and/or notes evidencing mortgage loans and mezzanine loans in any manner as determined by Lender. Borrower agrees to cooperate with Lender in connection with the foregoing, which may require the creation of additional borrower entities. Borrower shall not be required to incur any material costs or expenses arising after the closing date of the Loan, other than expenses of Borrower's counsel, accountants, and consultants. |
| **Developers' Fee** | To be paid as set forth in the Co-Development Agreement. A Co-Development Fee not to exceed $4,000,0000 will be paid in 24 monthly installments during the course of the construction loan term and is to be divided equally between Reynolds Asset Management LLC (or its designee) and Blue Phoenix 19 LLC. These fees are listed among the "Uses" in the Development financials. |
| **Additional Fees** | Certain fees shall be paid to Reynolds Asset Mgmt. LLC (or its designee) in connection with the administration and management of the Project, including (i) an Asset Management Fee to Reynolds of $5,000 per month through Certificate of Occupancy. |
| **Construction Loan Draws** | All loan funds (except for interest reserves) would be required to be drawn within the first 24 months of the date of closing. |
| **Construction Contract** | Stipulated Sum contract, subject to Lender's review, based on the final permitted specifications and architectural drawings, or a guaranteed maximum price ("GMP") |

contract where the contractor is compensated for actual costs incurred plus a fixed fee, subject to a ceiling price. The contractor is responsible for any cost overruns unless the GMP has been increased through a formal change order.

**Third Party Completion**  General contractor must enter into a completion commitment or provide a payment performance bond acceptable to Lender.

**Insurance**  Lender, its successor, or any subsequent assignee(s) will be named as an additional Loss Payee on the new insurance policy.

**Title Insurance (Closing)**  At least seven (7) Business Days prior to closing and at its own cost and expense, Borrower shall obtain and deliver to Lender's counsel a title report and commitment for mortgage/credit title insurance in an amount equal to 100% of the combined loan amounts, naming Lender as the insured therein.

**No Further Encumbrance or Indebtedness**  No secondary financing or encumbrance or secured or unsecured indebtedness of any kind other than the Senior Loan and Mezz Loan (if required) shall be permitted, with the exception of trade payables (not more than 60 days outstanding) incurred in the ordinary course of business in an amount not to exceed 2% of the initial principal balance of the Loan and any member loans made to Borrower or its member. No direct or indirect interest in or right to distributions from Borrower may be pledged or encumbered as collateral for any obligation other than the Loan.

**Loan Documents**  In the event of any inconsistencies between the terms hereof and the terms of the Loan Documents, the terms of the Loan Documents shall control. Loan Documents shall include all documents and instruments, together with any renewals, amendments, extensions, and other modifications thereof, necessary to fund and close the loan.

**Third Party Reports**  This - Conditional Commitment is expressly subject to receipt of the following third-party reports related to the Construction Loan (including the reliance language contained therein) from parties acceptable to and in form and substance acceptable to the Lender: (i) engineering reports, (ii) Phase I environmental reports (and Phase II if recommended), (iii) a seismic report (if applicable), including SEL/SUL calculations, (iv) an MAI appraisal, (v) title insurance and survey with such endorsements as lender shall request, (vi) zoning report, (vii) Agreed Upon Procedures Report, and (viii) other reports or inspections that lender may reasonably require.

**Closing Costs**  Borrower agrees to pay or reimburse Lender, upon written demand and whether the Loan is consummated or not, the out-of-pocket expenses incurred by Lender in connection with the proposed Loan, including fees and expenses of Lender's outside legal counsel, third-party due diligence fees, title insurance, insurance review costs, appraisal costs, environmental and engineering reports, zoning reports, survey updating and certification, travel costs, and recordation costs. Expenses in excess of the deposits described above will be withheld from the Loan proceeds to the extent not already paid; if actual expenses are less than the deposits, the difference shall be remitted to Borrower at closing. This paragraph shall survive the Conditional Commitment Expiration Date, other termination of this Conditional Commitment, or the closing of the Loan.

**Patriot Act Compliance**  Lender is required under the USA Patriot Act (Title III of Pub. L. 107-56, signed into law October 26, 2001) to obtain, verify, and record certain information and documentation that identifies the Borrower, including name and address, and such other information as will allow LENDER to identify the Borrower in accordance with the Patriot Act.

**Post-Closing Costs**  During the construction period, lease-up period, stabilization period, or unit sellout period, Borrower shall submit monthly rent rolls, occupancy percentages, or unit sales, as applicable, and quarterly financial statements for the assessed Property, along with quarterly progress reports, to Lender. Upon stabilization, Borrower shall submit quarterly rent rolls or occupancy percentages and annual financial statements, including an income statement and balance sheet.

Delivery of monthly construction completion reports, including notice of any delays, significant cost overruns, or other significant events.

Lender, or its designee or assign, shall be entitled to periodic property inspections during the construction period, as reasonably deemed necessary, and annual property inspections after issuance of a permanent certificate of occupancy. Lender shall provide reasonable notice to Property Owner prior to such inspections.

**Events of Default**

Usual and customary for transactions of this type, including without limitation: failure to make payments when due, breach of covenants, breach of representations and warranties, bankruptcy/insolvency, judgments, and attachments. Any monetary default that results in the acceleration of certain other material indebtedness of the Borrower constitutes a default, subject to customary notice and cure rights.

**Due on Sale**

The Credit Facility shall become due and payable in the event of any sale, conveyance, transfer, or further encumbrance of the property, or material change in the Borrower's ownership structure, without Lender's prior written consent.

**Finance Fee**

Borrower agrees to pay Lender a 1.25% (125 basis points) fee from the gross loan proceeds of the Bridge Loan, the Construction Loan, and any Mezzanine Financing necessary to execute the Project. Lender shall not be responsible for any fees or commissions payable to finders or to financial or other advisors utilized by the Borrower, or to any potential transaction investors or Lenders, and no fee or other compensation payable to any other advisor or person shall reduce or otherwise affect the fees and reimbursements payable to Lender hereunder. This paragraph shall survive the Conditional Commitment Expiration Date, other termination of this Conditional Commitment, or the closing of the Loan.

Formatted: Justified

**Recourse**

The Loan will be non-recourse other than for certain customary carveouts and an environmental indemnity, for which Lender will have recourse to Borrower and Guarantor. Additionally, Guarantor shall enter into a completion guaranty and an interest carry guaranty in favor of Lender.

**Guarantor(s)**

Guarantor shall provide (i) a Completion Guaranty with respect to the completion of the Property; (ii) a Carve-out Guaranty with respect to typical "bad boy" carve-out provisions, including environmental indemnity; throughout the Term of the loans (and any Loan Extension, if applicable) and terminating upon the earlier of (a) repayment in full of the Loan, or (b) Lender obtaining title to the Property. Any guaranty executed by the Guarantor shall contain a customary "standstill" provision that, in the event and continuance of an Event of Default, the Lender shall be precluded from consummating a foreclosure or taking control of the Property or exercising any other remedies for a period of sixty (60) days after written notice has been delivered to the Guarantor. Guarantor will also have a pledge of equity interests and may exercise such pledge to assume control and management of Borrower and/or its member in an Event of Default.

**General Contractor**

Borrower shall engage a general contractor, approved by Lender, who shall provide on or before —closing on the Construction Loan (i) a guaranteed maximum price for construction of the improvements, (ii) performance and payment bonds, each acceptable to Lender, and (iii) standard requirements for retainage acceptable to Lender. Change orders shall be subject to Lender approval. It is anticipated that the General Contractor will be an affiliate of the Borrower.

**Major Subcontractors**

All subcontractors with one or more contracts aggregating more than $1,000,000 must be acceptable to Lender and shall provide satisfactory performance and payment bonds. At closing on the Construction Loan, Borrower shall furnish Lender with evidence that 90% of the value of all trade contracts for the Project have been purchased, including trade contracts for demolition, foundation, superstructure, mechanical, electrical, and plumbing.

**Construction Budget**

The construction budget, the construction schedule, and all matters related thereto shall be satisfactory to Lender and must be approved prior to the Closing Date. Lender will

engage a construction consultant at Borrower's expense to review plans, specifications, and budgets on a monthly basis, inspect the improvements, and provide reports for the benefit and approval of Lender. Prior to the Closing Date on the Construction Loan, the construction consultant will provide a full plan and cost review, which must be acceptable to the Lender in all respects.

**Reserves**

Scheduled reserves throughout the loans, including but not limited to reserves for real property taxes, insurance, and debt service, will be determined by Lender based on its diligence and underwriting. For the avoidance of doubt, these reserves shall be set forth in the budget detailing the loan facility draws and shall accrue interest as drawn.

**Property Manager**

Upon Completion, the property shall be managed by a manager acceptable to Lender in accordance with a management agreement approved by the Lender. The management agreement shall be subordinate to the mortgage, assigned to Lender as additional collateral, and may be terminated by Lender upon an event of default under either the loan or the management agreement.

**Survey**

Borrower shall be required to provide a current ALTA survey (pursuant to the most recent standards and requirements promulgated by the American Land Title Association) of the Property satisfying Lender's requirements.

**Insurance (Property)**

Borrower shall carry builder's risk, general liability, and other insurance covering the Property (with no exclusion for "terrorism" events) and satisfying Lender's requirements.

**Carveouts**

The loan shall be non-recourse to the Borrower and any guarantors except for all actual loss, costs, or expenses incurred by the Lender due to (i) fraud or intentional misrepresentation by the borrower of its financial statements in material respect; (ii) intentional physical waste occurring to or on the mortgaged property; (iii) gross negligence or criminal acts of the borrower that result in the forfeiture of any collateral, fraud, misrepresentation, or breach of the special purpose entity provisions to the extent resulting in substantive consolidation of the Borrower, voluntary bankruptcy filing by the Borrower, environmental matters, waste or damage to the property, failure to pay taxes or other liens with priority over the property, or seizure or loss of any portion of the mortgaged property; (iv) misapplication or misappropriation of rents, insurance proceeds, or condemnation awards received by the borrower after the occurrence and during the continuance of an event of default; and (v) any sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment or transfer of the mortgaged property, or any part thereof, without the prior written consent of the lender. The Borrower and Key Principals for such carve-out exceptions shall be jointly and severally liable.

**Indemnification**

Borrower agrees to indemnify and defend the Lender or its agent against all costs and expenses incurred by Lender or its Agent or assign in connection with the mortgage proposed herein or in connection with any other party claiming a fee, commission, or other compensation by or through Borrower or the broker related to the mortgage. This paragraph shall survive the Conditional Commitment Expiration Date, other termination of this Conditional Commitment, or the closing of the Loan.

**Title Insurance (Lender)**

Lender shall order and obtain, at Borrower's cost, a lender's and mortgagee's title insurance policy in form and substance satisfactory to Lender, to be issued by a title insurance company selected by Lender with a liability limit equal to the amount of the Loan, unless otherwise consented to by Lender.

**Non-Disparagement**

During the Term of this agreement and thereafter, the Parties agree to take no action which is intended, or would reasonably be expected, to harm the Borrower or Lender or its or their reputation or which would reasonably be expected to lead to unwanted or unfavorable publicity. This paragraph shall survive the Conditional Commitment Expiration Date, other termination of this Conditional Commitment, or the closing of the Loan.

Formatted: Justified

Formatted: Justified

| | |
|---|---|
| Confidentiality | This Conditional Commitment is being delivered with the understanding that neither it nor the substance thereof will be disclosed by Borrower or any guarantor or any of their respective affiliates to any third person, except those in confidential relationships to any of them (i.e., Borrower's counsel, accountants, and other retained business advisors) or as may be required by law including to the Federal Bankruptcy Court with jurisdiction over the Property. This paragraph shall survive the expiration date, other termination of this Conditional Commitment, or the closing of the Loan. |
| Accuracy of Information | The issuance of this Conditional Commitment is based upon the assumed accuracy and completeness of all information, books, records, rent rolls, reports, exhibits, representations, statements, and other matters submitted to Lender for its consideration in connection with the Loan (the "Submission Materials"). By execution of this Conditional Commitment, Borrower affirms to Lender that all Submission Materials and all financial projections and conclusions contained therein are based on reasonable and stated assumptions, and that nothing in the Submission Materials knowingly contains any material misstatement of fact or omits to state a material fact. |
| Termination | Under no circumstances, unless agreed to in writing by both parties, shall the Bridge Loan Commitment extend beyond 150 days from the date of signing of this Conditional Commitment by Borrower, unless the proposed loan is in the process of a commitment negotiation between the Borrower, Lender or its agent, in which event the negotiation will continue in full force and effect until either the loan is closed or the Lender declines to close. If the loan has been declined by Lender's Loan Committee in its sole discretion, the Conditional Commitment shall automatically terminate, and all costs and expenses incurred by Lender, including legal fees, shall be paid by the Borrower. If the loan is approved by Lender's Loan Committee and those terms are unacceptable to the Borrower, the Loan Application shall terminate, and all costs and expenses incurred by Lender, including legal fees, shall be paid by the Borrower. Any fees and deposits received by Lender may be used to offset expenses and costs incurred in connection with the processing of the Conditional Commitment. The terms of this paragraph shall survive the Loan Application regardless of the date of termination of same. |
| Governing Law | Any controversy or claim arising out of or relating to this Agreement or the breach thereof that cannot be settled amicably by the Parties shall be settled by binding arbitration in the State of Delaware before a single arbitrator in accordance with the expedited commercial rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. The prevailing party shall be entitled to reasonable attorney's fees, costs, and expenses. The parties waive any objection to venue in said forums and any claim of inconvenient forum and irrevocably agree that any judgment or order by an arbitrator shall be conclusive and binding and may be enforced in any court having jurisdiction. The obligations of Borrower under this paragraph shall be binding on Borrower and shall survive the Conditional Commitment Expiration Date, other termination of this Conditional Commitment, or the closing of the Loan. |
| Brokers | Borrower represents that broker Lori Lesser, representing the Brokers (the "Broker"), is engaged in connection with the Loan, and Borrower shall (i) pay all fees and commissions and (ii) indemnify and defend Lender against all costs and expenses incurred by Lender in connection therewith or in connection with any other party claiming a fee, commission, or other compensation by or through Borrower or the broker related to the loans. Borrower acknowledges that no broker is an agent of Lender, that no broker has any power or authority to bind Lender, and that no fiduciary or other special relationship exists between Lender and Borrower. This paragraph shall survive any termination of this Conditional Commitment. |
| Broker Fee | Borrower agrees to pay a success fee to Lori Lesser and Ali Manav equal to 0.05% each based on the gross loan proceeds at the time the Loan contemplated herein or a similar loan closes and funds, in accordance with their agreement with the Borrower. |
| Break Up | No break-upbreakup fee shall be payable to Lender. |

Formatted: Justified

Formatted: Justified

| | |
|---|---|
| Assignment | Lender may assign its rights and obligations under this Agreement to an entity that succeeds to all or substantially all of the terms and conditions set forth herein, or as negotiated between the parties, without prior written consent of the Borrower. |
| Expiration | If actual expenses exceed the Expense Deposit, Lender, or its assignee, may bill the Property Owner for any deficiency, whether or not there is closing, or include the deficiency in the Loan if the Loan closes. |

By signing below, Borrower provides written authorization to Lender in connection with the proposed credit Facilities to obtain customer, vendor and credit references, tax lien searches, litigation and judgment searches, and background reports on the Borrower and key individuals at or associated with the Borrower (including credit information from one or more national or international credit bureaus), and to obtain any credit investigation for the purpose of considering any update, renewal, extension, amendment, review, or collection of proposed facilities or any additional information.

The Provizia Organization Inc

_Allan Rosen_ 8/3/2026

Allan Rosen
Executive Vice President
The Provizia Organization Inc.

BORROWES' SIGNATURE PAGE

SouthTown by 4M, LLC
THE UNDERSIGNED REPRESENTS AND WARRANTS THAT THEY HAVE FULL POWER AND AUTHORITY TO ENTER INTO THIS CONDITIONAL COMMITMENT ON BEHALF OF THE BORROWER & BORROWER

Sig:

Title: Court Appointed Representative

Print Name: Caroline Poscher

Dated: 6/29/2026

# EXHIBIT G

POST-COMMITMENT FORECAST OF CASH FLOWS

| | 2026 | | 2027 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | November | December | January | February | March | April | May | June | July | August | September | October |
| **SOURCE** | | | | | | | | | | | | |
| RESERVE DRAW (TOTAL RESERVES = $5,969,130.44) | $ 496,595 | $ 506,595 | $ 496,595 | $ 496,595 | $ 496,595 | $ 496,595 | $ 496,595 | $ 496,595 | $ 496,595 | $ 496,595 | $ 496,595 | $ 496,585 |
| | | | | | | | | | | | | |
| **USE** | | | | | | | | | | | | |
| INTEREST PAYMENT | $ 358,333 | $ 358,333 | $ 358,333 | $ 358,333 | $ 358,333 | $ 358,333 | $ 358,333 | $ 358,333 | $ 358,333 | $ 358,333 | $ 358,333 | $ 358,333 |
| ASSET MANAGEMENT FEE | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 |
| GENERAL ADMINISTRATION | $ 7,500 | $ 7,500 | $ 7,500 | $ 7,500 | $ 7,500 | $ 7,500 | $ 7,500 | $ 7,500 | $ 7,500 | $ 7,500 | $ 7,500 | $ 7,500 |
| BUILDERS RISK/OCIP | $ 10,417 | $ 10,417 | $ 10,417 | $ 10,417 | $ 10,417 | $ 10,417 | $ 10,417 | $ 10,417 | $ 10,417 | $ 10,417 | $ 10,417 | $ 10,417 |
| LIABILITY INSURANCE | $ 833 | $ 833 | $ 833 | $ 833 | $ 833 | $ 833 | $ 833 | $ 833 | $ 833 | $ 833 | $ 833 | $ 833 |
| PROFESSIONAL  (LEGAL, OTHER PROF SVCS) | $ 15,000 | $ 15,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 |
| ENGINEERING | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 |
| ARCHITECTURAL | $ 40,000 | $ 65,000 | $ 75,000 | $ 75,000 | $ 75,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 |
| | $ 452,083 | $ 477,083 | $ 477,083 | $ 477,083 | $ 467,083 | $ 407,083 | $ 407,083 | $ 407,083 | $ 407,083 | $ 407,083 | $ 407,083 | $ 407,083 |
| | | | | | | | | | | | | |
| CASH BALANCE/CONTINGENCY | $ 44,512 | $ 74,023 | $ 93,535 | $ 113,047 | $ 142,558 | $ 232,070 | $ 321,582 | $ 411,093 | $ 500,605 | $ 590,117 | $ 679,628 | $ 769,130 |

# REDLINE OF THE COMBINED PLAN AND DISCLOSURE STATEMENT TO THE FIRST AMENDED COMBINED PLAN AND DISCLOSURE STATEMENT

| | |
|---|---|
| In re: | Case No. 26-40805 |
| South Town By 4M, LLC, | Chapter 11 |
| Debtor. | Hon. Lisa S. Gretchko |
| _____/ | |

## FIRST AMENDED
## COMBINED CHAPTER 11 PLAN AND DISCLOSURE STATEMENT

South Town by 4M LLC, debtor and debtor-in-possession in the above captioned case, by and through its attorneys, states as follows for its *First Amended* *Combined Chapter 11 Plan of Reorganization and Disclosure Statement*:

### I. The Plan of Reorganization

### ARTICLE 1: SUMMARY

This Plan allows the Debtor to successfully exit this chapter 11 bankruptcy proceeding and complete the Development.[1] The Plan provides for the full payment of all allowed secured claims[2] and non-priority unsecured claims, super-priority administrative expenses, administrative expenses and priority

---

[1] Please reference Article 10 of the Plan for all defined terms contained in this Plan.

[2] The secured claim of Prentice will be converted to equity.

1

claims.

## ARTICLE 2: CLASSIFICATION OF CLAIMS

**Class 1** consists of the City of Ann Arbor's Claim, secured by a tax lien against the ~~Properties~~<u>Property</u> in the amount of $169,080.67.

**Class 2** consists of CNB's Claim, secured by a mortgage against the ~~Properties~~<u>Property</u> for money loaned in the ~~amount of $16,863,513.64~~<u>approximate amount of $18,628,131.44 which includes postpetition interest and attorneys' fees and other charges and expenses, including appraisal fees</u>.

**Class 3** consists of Brownstone's Claim, secured by a mortgage against the ~~Properties~~<u>Property</u> for money loaned in the amount of $7,794,566.33<u> which includes interest and attorneys' fees and other fees and costs</u>.

**Class 4** consists of Prentice's Claim, secured by a mortgage against the ~~Properties~~<u>Property</u> in the principal amount of $8,500,000.00.

**Class 5** consists of Higley's Claim, secured by a construction lien against the ~~Properties~~<u>Property</u> in the amount of $~~948,115.00~~<u>976,084.21</u>.[3]

**Class 6** consists of SmithGroup's Claim, secured in part, by a construction

---

[3] <u>The total amount of the Higley Claim is $1,010,351.77 and includes the separately filed claim of BDS, which, in addition to the Class 5 Claim, contains a general unsecured Class 9 Claim in the amount of $34,267.56.</u>

lien against the ~~Properties~~Property in the amount of $508,139.00.[34]

**Class 7** consists of BDS's Claim, secured by a construction lien against the ~~Properties~~Property in the amount of $129,898.00.

**Class 8** consists of Synecdoche's Claim, secured by a disputed and unliquidated construction lien against the ~~Properties~~Property in the amount of $822,140.96.

**Class 9** consists of all non-priority, general unsecured Claims.

**Class 10** consists of the Equity Interests of the Debtor, namely the Poscher Estate which holds 100 percent of the equity interest in the Debtor.

**Super-priority administrative expense Claims:** consists of the Claim of the Responsible Person, Ms. Poscher, in an amount equal to all amounts advanced prior to Plan confirmation consistent with the ~~Final~~Second DIP Financing Order, the Second DIP Budget and any amendments thereto.

**Administrative Expenses:** consists of the Legal Expenses owing to Counsel to the Debtor and UST Quarterly Fees of $350. Payment of the Legal Expenses owing to Counsel to the Debtor is subject to court approval of the same. As of the time of filing of this Plan, the Legal Expenses incurred by Counsel to the Debtor were approximately $480,000.00. Additional Legal

---

[34] The total amount of the SmithGroup Claim is $902,726.45 which, in addition to the Class 6 Claim, contains a general unsecured Class 9 Claim in the amount of $394,587.45.

Expenses will be incurred through the Effective Date. Ms. Poscher, on behalf of the Debtor, has personally advanced the Retainer Deposits. The Legal Expenses will be paid in full, upon by the Debtor after Court approval of the same, by the Debtor on or prior to the Payment Disbursement Date. To the extent the Debtor has insufficient funds to pay the Legal Expenses as approvedat the time of their approval by the Court, the Legal Expenses shallmay be paid from the Retainer Deposits, in which case Ms. Poscher shall be subrogated to the rights of Counsel to the Debtor with respect to such amounts and shall be entitled to repayment of the same, on the Payment Disbursement Date.Effective Date. Ms. Poscher's subrogation claim, if it arises, would be in addition to the Claim which she has filed in this proceeding. Any excess Retainer Deposits shall be returned to Ms. Poscher. UST Quarterly Fees are being paid under the FinalSecond DIP Financing Order and the Second DIP Budget, with any remaining balance being paid on the Payment DisbursementEffective Date.

PrioritySecured administrative expense **claims:** consists solely of the unsecured priorityproperty tax Claim of the City of Ann Arbor for unpaid real property taxes represented by the July 1, 2026 tax bill in the amount of $28,888.29, which shall become due and payable on or prior to September 15, 2026.

All creditors and equity security holders should refer to Articles 3 through 6 of this Plan for information regarding the precise treatment of their Claims and

4

interests.

## ARTICLE 3: TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

**3.01 Class 1.** Secured Claim of the City of Ann Arbor.

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim: $ 169,080.67

Estimated Value of Collateral: $ 61,000,000.00

The City of Ann Arbor holds the Ann Arbor Tax Claim, which is secured by a tax lien against the ~~Properties~~Property for unpaid 2025 real property taxes. Under applicable Michigan law, such tax liens are afforded statutory priority and prime all prior recorded liens and encumbrances against the ~~Properties~~Property, regardless of the date of recording. The Ann Arbor Tax Claim will be paid in full on the ~~Payment Disbursement~~Effective Date.

**3.02 Class 2.** Secured Claim of CNB.

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim: $ ~~16,863,513.64~~18,628,131.14

Estimated Value of Collateral: $ 61,000,000.00

CNB holds a Claim secured by a mortgage against the ~~Properties~~Property for money loaned to the Debtor. CNB's lien on the Property and all of its rights and remedies under its mortgage and other loan documents are preserved until its Claim is paid in full on the Effective Date. The allowed amount of this Claim will

5

be paid in full on the ~~Payment Disbursement Date.~~<u>Effective Date. CNB claims that it is owed interest of $1,554,048.07 and fees and expenses of not less than $210,569.43 as of July 29, 2026 (which is included in the amount of claim above) plus fees, charges and expenses incurred after that date with per diem interest thereafter at $5,110.54. The allowed amount of CNB's claim will be determined upon agreement of the Debtor and CNB or per resolution by the Court.</u>

**3.03 Class 3.** Secured Claim of Brownstone.

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim: $ 7,794,566.33

Estimated Value of Collateral: $ 61,000,000.00

Brownstone holds a Claim secured by a mortgage against the ~~Properties~~<u>Property</u> for money loaned to the Debtor. The allowed amount of this Claim will be paid in full on the ~~Payment Disbursement~~<u>Effective</u> Date.

**3.04 Class 4.** Secured Claim of Prentice.

**Impaired. Entitled to vote on the Plan.**

Amount of claim: $ 8,500,000.00

Estimated Value of Collateral: $ 61,000,000.00

Prentice holds a Claim secured by a mortgage against the ~~Properties~~<u>Property</u> for money <u>allegedly</u> loaned to the Debtor. On the ~~Payment Disbursement~~<u>Effective</u> Date, Prentice's Claim shall be converted to a ~~3~~<u>5</u>% equity

interest in the Reorganized Debtor.

**3.05  Class 5.** Secured Claim of Higley.

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim:                    $      ~~948,115.00~~976,084.21

Estimated Value of Collateral:  $  61,000,000.00

Higley holds a construction lien Claim against the ~~Properties~~Property for services performed. The allowed amount of this Claim will be paid in full on the ~~Payment Disbursement~~Effective Date, pursuant to joint checks in the following amounts, based on the Higley Claim including the claims of various subcontractors to Higley;

Higley and BDS                                      $129,898.00

Higley and Blue Star, Inc                                $243,215.00

Higley and Eagle Excavation                  $68,280.58

Higley and Industrial Fence & Landscaping, Inc.  $34,911.00

Balance to Higley                                    $~~471,810.42~~369,881.63

**3.06 Class 6.** Secured Claim of SmithGroup

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim:                    $      508,139.00

Estimated Value of Collateral:  $  61,000,000.00

SmithGroup holds a construction lien Claim against the ~~Properties~~Property

for services performed. The allowed amount of this Claim will be paid in full on the ~~Payment Disbursement~~Effective Date.

### 3.07   Class 7. Secured Claim of BDS

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim:                             $        129,898.00

Estimated Value of Collateral:  $  61,000,000.00

BDS holds a construction lien Claim against the ~~Properties~~Property for services performed. The allowed amount of this Claim will be paid in full on the ~~Payment Disbursement~~Effective Date pursuant to a joint check with Higley, as provided in Section 3.05 hereof.

### 3.08   Class 8. Secured Claim of Synecdoche

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim:                             $        822,140.96

Estimated Value of Collateral:  $  61,000,000.00

Synecdoche asserts a construction lien Claim against the ~~Properties~~Property for services performed. The Synecdoche Claim will be the subject of an adversary proceeding and claim objection seeking disallowance of the Synecdoche Claim and repayment of amounts owing to the Debtor. If the allowed amount of the Synecdoche Claim has not been resolved prior to the ~~Payment Disbursement~~Effective Date, then the gross amount of the Synecdoche Claim will

be escrowed until the amount of the Synecdoche Claim, if any, is determined. Once the allowed amount of the Synecdoche Claim is determined, the Allowed Synecdoche Claim will be paid in full from the Contested Claims Reserve.

**3.09   Class 9**.  All Non-Priority Unsecured Claims Allowed Under Section 502 of the Bankruptcy Code.

**Unimpaired. Not entitled to vote on the Plan.**

Class 9 consists of eight (8) non-priority unsecured Claims, specifically: Graybar/Schneider ($122,310.04); ~~Heidi Caroline~~Ms. Poscher ($1,985,012); Bill Me Later, Inc./PayPal, Inc. ($105,404.92); G2 ($26,425.00); Learfield ($180,000.00); Newmark Valuation Advisory, LLC ($10,500.00); SmithGroup ($394,587.45); and Resilient Solar of East Tennessee LLC ($0). The allowed amount of all Class 9 Claims will be paid in full on the ~~Payment Disbursement~~Effective Date. The BDS Claim will be paid pursuant to a joint check with Higley, as set forth in Section 3.05 hereof. If any of the Class 9 Claims are Contested Claims, they shall be paid in accordance with Article V hereof.

**3.10   Class 10**.  Equity Interests of the Debtor.

**Impaired. Entitled to vote on the Plan.**

On the Effective Date ~~of the Plan~~, contemporaneous with payment in full of all Claims, the Debtor is transferring its ownership interest in ~~all assets of~~ the ~~Debtor's Estate~~Transferred Assets to a Delaware special purpose entity (the

9

"SPE"), in exchange for which the Debtor will receive one hundred percent (100%) of the equity in the SPE, making the Debtor the parent of the SPE. The transfer of the Transferred Assets is subject to all liens securing Claims until the Claims are paid in full. Thereafter, the equity in the Debtor will be addressed in one of two alternative transactions.

This transaction is diagramed as follows:

**Debtor** >Transfer of the Transferred Assets to the **SPE**

**Debtor** <Receipt of 100% of the membership interest in the **SPE**

This results in the Debtor being the holding company of the SPE, with the Debtor in turn being 100% owned by the Poscher Estate, with the equity then reallocated according Equity Transaction A or Equity Transaction B below. This transaction from the Poscher Estate to the SPE is diagramed as:

**Poscher Estate**

100%

**Debtor**

100%

**SPE**

**Equity Transaction A**. Under Equity Transaction A, a newly formed entity ("Newco") will acquire 100% of the equity interests in the Debtor from the Poscher Estate, for a multiple of a seven-figure amount. Equity Transaction A will result in Newco becoming the 100% member of the SPE, with the SPE in turn holding title to all assets of the Debtor.

10

This transaction is diagramed as follows:

**Poscher Estate** >Transfer of 100% of membership interest in Debtor to **Newco**

**Newco** <Receipt of 100% of the membership interest in the **Debtor**

This results in the Debtor being the holding company of the SPE, with the Debtor, in turn being 100% owned by Newco, diagramed as:

**Newco**

100%

**Debtor**

100%

**SPE**

Newco will be owned 59% by Agile Solar Group, LLC, or its affiliate and 41% will be ~~owned by the Finn Group. The Finn Group, in turn, will be~~ owned by a combination of parties, the percentage ownership of which is as follows: Prentice, 5% (conversion of its debt position to equity); Blue Phoenix, 22%; Pullins, 2% (equity exercisable upon completion of vertical construction); APB, 5%; Vohwinkle, 2% (equity exercisable upon completion of vertical construction); and Reynolds, 5%. Blue Phoenix is an affiliate of Ms. Poscher. Prentice is owned fully by ~~Dr.~~the Poscher Estate. Pullins, Vohwinkle, APB and Reynolds are not affiliates of Ms. Poscher, the Poscher Estate or any of their respective affiliates.

11

**Equity Transaction B**. Under Equity Transaction B, 59% of the equity in the Debtor shall continue to be held by the Poscher Estate and the remaining 41% shall be issued ~~to the Finn Group, with the ownership of the Finn Group as above noted.~~ as follows: Prentice, 5% (conversion of its debt position to equity); Blue Phoenix, 22%; Pullins, 2% (equity exercisable upon completion of vertical construction); APB, 5%; Vohwinkle, 2% (equity exercisable upon completion of vertical construction); and Reynolds, 5%. Blue Phoenix is an affiliate of Ms. Poscher. Prentice is owned fully by the Poscher Estate. Pullins, Vohwinkle, APB and Reynolds are not affiliates of Ms. Poscher, the Poscher Estate or any of their respective affiliates.

This results in the Debtor being the holding company of the SPE, with the Debtor, in turn being owed as diagramed below:

**Poscher Estate  Prentice  Blue Phoenix  Pullins  APB  Vohwinkle  Reynolds**

59%          5%          22%          2%        5%  2%          5%

100%

**Debtor**

100%

**SPE**

Equity Transaction A and Equity Transaction B will be brought before the Probate Court with governance over the ~~Posher~~Poscher Estate, prior to the hearing

on confirmation of this Plan (the "Probate Court Approval"), to obtain conditional approval of ~~the same~~both, subject only to confirmation of this Plan. The Debtor will file a supplement to this Plan, to include the submission made to the Probate Court and will file a supplement to this Plan as to any order issued by the Probate Court. Each supplement shall be served on all parties.

## ARTICLE 4: TREATMENT OF ADMINISTRATIVE EXPENSES, PRIORITY TAX CLAIMS AND QUARTERLY FEES

**4.01: Unclassified Claims.** Under section 1123(a)(1) of the Bankruptcy Code, allowed Administrative Expenses and priority tax claims captured under section 507(a) are not classified Claims.

**4.02: Administrative Expense Claims.** Claims for Administrative Expenses allowed under section 503 of the Bankruptcy Code will be paid in full upon the later of court approval of the same and the ~~Payment Disbursement~~Effective Date, in cash, or upon such other terms as may be agreed upon by the holder of the Claim and the Debtor.

**4.03: Priority Tax Claim.** The priority tax Claim consists solely of the unsecured portion of the Claim of the City of Ann Arbor for unpaid real property taxes represented by the July 1, 2026 tax bill in the amount of $28,888.29, which shall become due and payable on or prior to September 15, 2026. This priority tax Claim shall be paid in full on the ~~Payment Disbursement~~Effective Date.

## ARTICLE 5: ALLOWANCE AND DISALLOWANCE OF CLAIMS

**5.01 Delay of Distribution on a Contested Claim.** No distribution will be made on account of a Contested Claim unless and until it is an Allowed Claim.

**5.02: Settlement of Contested Claims.** The Debtor will have the power and authority to settle and compromise any Contested Claim with court approval and compliance with Bankruptcy Rule 9019.

**5.03 Contested Claims Reserve.** On the Effective Date, the Reorganized Debtor shall establish and maintain the Contested Claims Reserve. Funds held in the Contested Claims Reserve shall not be distributed to a creditor holding a Contested Claim until the later of: (a) the date the Contested Claim becomes an Allowed Claim pursuant to a Final Order; or (b) the ~~Payment DisbursementEffective~~Effective Date. Upon the disallowance of a Contested Claim by a Final Order, the amount reserved on account of such Contested Claim shall be released from the Contested Claims Reserve and shall revert to the Reorganized Debtor.

**5.04 Claim Objection Deadline.** The Debtor or Reorganized Debtor shall file any objections to Claims whether by filing an objection to claim or an adversary proceeding on or before the Effective Date, unless such deadline is extended by order of the Bankruptcy Court upon a motion filed before its

expiration.

## ARTICLE 6: PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The Debtor is a party to the following executory contracts: DMC Real Estate Services who provided advisory services for the development of the ~~Properties~~Property; Graybar/Schneider who provided a feasibility study for incorporating the MicroGrid into the Development; Nederveld who provided civil engineering plans and strategies for the site plan approvals; Learfield who provided marketing services; Newmark Valuation Advisory, LLC who provided a market revenue study and valuation guidance; ~~Ressiliant~~Resilient Solar of East Tennessee LLC who provided an energy market analysis; and Higley who provided various construction and advisory services for the Development. To the extent not terminated or concluded prior to the Petition Date, on August 7, 2026 and August 10, 2026 the Debtor ~~rejects~~filed motions to reject each of the foregoing executory contracts ~~on the Payment Disbursement Date~~ pursuant to section 365 of the Bankruptcy Code~~, and each such rejection will be effective upon the Effective Date~~. The Debtor reserves the right to amend this Plan prior to confirmation to assume any of the foregoing executory contracts.

## ARTICLE 7: MEANS FOR IMPLEMENTATION OF THE PLAN

The Plan shall be implemented through the following transactions:

1.      On or prior to the hearing on confirmation, the Debtor shall have obtained the Probate Court Approval.

2.      On the ~~Payment Disbursement Date, the~~Effective Date, contemporaneous with payment in full of all Claims, the Reorganized Debtor shall convey its interest in all of ~~its assets~~the Transferred Assets to the SPE. The transfer of the Transferred Assets is subject to all liens securing Claims until the Claims are paid in full.

3.      On the ~~Payment Disbursement~~Effective Date, the equity in the Debtor shall be sold, as specified in Equity Transaction A, or re-allocated, as specified in Equity Transaction B. If the equity in the Debtor is re-allocated, as specified in Equity Transaction B, then on the ~~Payment Disbursement~~Effective Date, the Debtor shall enter into an Operating Agreement among its members, to reflect the equity allocations set forth in Equity Transaction B.

4.      If the equity of the Debtor is sold, as specified in Equity Transaction A, then on the ~~Payment Disbursement~~Effective Date, Agile shall make a capital contribution into Newco and Newco, in turn, shall make a capital contribution into the Debtor, in an amount sufficient to pay in full the allowed amount of all Claims, with any necessary funds placed in the Contested Claims Reserve.

5.      If the equity of the Debtor is re-allocated, as specified in Equity Transaction B, then on the ~~Payment Disbursement~~Effective Date, the Debtor shall

close on and obtain the Exit Financing from the Exit Financing Lender, in an amount sufficient to pay in full the allowed amount of all Claims, with any necessary funds placed in the Contested Claims Reserve.

6. ~~In~~If applicable, in conjunction with the Exit Financing, Reynolds, on the ~~Payment Disbursement~~Effective Date, shall execute a Guaranty Fee Agreement with the Debtor and the Exit Financing Lender, pursuant to which Reynolds shall provide credit enhancement to the Exit Financing Lender with respect to the Exit Financing, on terms acceptable to Reynolds, the Debtor and the Exit Financing Lender.

7. As security for the Exit Financing, if applicable, the SPE will, contemporaneous with payment in full of all Claims, grant to the Exit Financing Lender, pursuant to the Exit Financing Agreements, a ~~first-priority~~ lien on the assets of the SPE~~.~~, subject to all liens in the Transferred Assets securing the Claims until the Claims are paid in full, and thereafter, will become a first-priority lien in the assets of the SPE including the Transferred Assets. With respect to the Exit Financing, one or more of the members of the Debtor may additionally be required to grant a pledge of their membership interest to the Exit Financing Lender.

8. On the ~~Payment Disbursement~~Effective Date, the Debtor shall make the payments provided for hereunder to all creditors holding Allowed Claims with

any Claims subject to dispute to be paid from the Contested Claims Reserve, to the extent later allowed.

9. Any balance remaining in the Contested Claims Reserve and other cash received by the Debtor not necessary to pay the allowed Claims of the Debtor's creditors shall ~~revert~~be released to the Reorganized Debtor.

10. On the ~~Payment Disbursement~~Effective Date, RAM and Blue Phoenix shall enter into a Co-Development Agreement with the Debtor, pursuant to which RAM and Blue Phoenix shall assume various duties on a post-Effective Date basis with respect to the Development. This Co-Development Agreement would be effective under both Equity Alternative A and Equity Alternative B, as it addresses the steps to be taken post the Effective Date to move the Development to vertical construction and completion. All payments under the Co-Development Agreement would be paid from the Vertical Financing.

**ARTICLE 8 EVENTS OF DEFAULT AND EFFECT THEREOF**

Any creditor remedies allowed by section 1112 of the Bankruptcy Code, including section 1112(b)(4)(N) of the Bankruptcy Code, shall be preserved to the extent otherwise available at law. In addition to any rights specifically provided to a claimant treated pursuant to this Plan, a failure by the Debtor to make a payment to a creditor pursuant to the terms of this Plan shall be an event of default as to such payment not cured within ten (10) days after mailing written notice of

18

default from such creditor to the Debtor. Any default notice, inquiry, or other formal communication pursuant to the Plan shall be mailed by certified mail, return receipt requested to the following:

To:  South Town by 4M, LLC
c/o Heidi Caroline Poscher
27777 Franklin Rd, Suite 2500
Southfield, MI 48034

With a Copy To:  Taft Stettinius & Hollister, LLP
c/o Jay Welford; Kimberly Ross Clayson;
Anthony Cimini
27777 Franklin Rd, Suite 2500
Southfield, MI 48034

(Noticing Requirements Cont'd on Next Page)
jwelford@taftlaw.com
kclayson@taftlaw.com
acimini@taftlaw.com

## ARTICLE 9 EFFECT OF CONFIRMATION OF THE PLAN

### 9.01 Binding Effect of Plan.

Upon the Effective Date, the provisions of the Plan shall bind the Debtor, the Reorganized Debtor, all holders of Claims and Equity Interests in the Debtor, all Persons acquiring property under the Plan, and all other parties in interest in this case, together with their respective agents, attorneys, representatives, heirs, successors, and assigns, to the fullest extent permitted under sections 1141(a) and 1142 of the Bankruptcy Code, whether or not such parties (a) voted to accept or reject the Plan, (b) had a right to vote on the Plan, (c) hold a Claim or Equity

19

Interest that is Impaired or Unimpaired under the Plan, (d) hold a Claim or Equity Interest that is an Allowed Claim, a Contested Claim, or a Claim that has been disallowed in whole or in part, (e) have filed a proof of claim or proof of interest in this case, or (f) are entitled to receive a distribution under the Plan.

**9.02 Vesting of Assets.**

Upon the Effective Date, after payment in full of all Claims, pursuant to section 1141(b) and (c) of the Bankruptcy Code, all propertythe Debtor's assets shall be comprised of the Debtor's estate, including, without limitation, the Properties100 percent interest in the SPE, all causes of action, including Avoidance claims and all rights, claims, and defenses of the Debtor and the estate, shall vest in the Reorganized Debtor, free and clear of all liens, claims, charges, encumbrances, and interests of creditors and equity interest holders, except as otherwise expressly provided in the Plan or the Confirmation Order. From and after the Effective Date, the Reorganized Debtor may operate its business and use, acquire, and dispose of property and settle and compromise claims and interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, except as otherwise provided in the Plan or the Confirmation Order. Because all allowed Claims are being paid in full under the Plan, there would be no purpose to pursue any Avoidance Claims. The Debtor intends to file a breach of contract action against

20

<u>Synecdoche, as an offset to the Claim asserted by Synecdoche. Any proceeds of an action against Synecdoche shall be utilized by the Debtor in its general operations.</u>

**9.03 Injunction**

Except as otherwise expressly provided in the Plan or the Confirmation Order, ~~on~~ and after <u>payment in full of all Claims on</u> the Effective Date, all Persons who have held, hold, or may hold Claims against or Equity Interests in the Debtor are, pursuant to sections 524 and 1141 of the Bankruptcy Code, permanently enjoined from (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtor, the Reorganized Debtor, or their respective property on account of any such Claim or Equity Interest; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Debtor, the Reorganized Debtor, or their respective property on account of any such Claim or Equity Interest; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against the Debtor, the Reorganized Debtor, or their respective property on account of any such Claim or Equity Interest; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtor, the Reorganized Debtor, or their respective property on account of any such Claim or Equity Interest; and (e) commencing or continuing in any manner any action or other proceeding of any kind <u>against the Debtor, the Reorganized Debtor, or their</u>

21

respective property in respect of any Claim or Equity Interest that is treated, classified, discharged, or otherwise addressed under the Plan. All such Persons shall be required to pursue satisfaction of their Claims and Equity Interests against the Debtor, the Reorganized Debtor, or their respective property solely through the distribution mechanisms provided under the Plan.

## ARTICLE 10: GENERAL PROVISIONS

**10.01 Definitions and rules of construction.** The definitions and rules of construction set forth in sections 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan, and they are supplemented by the following definitions:

"Administrative Expenses" means, collectively, the Legal Expenses and the Quarterly Fees.

"Agile" means Agile Solar Group, LLC or its assignee.

"Allowed Claim" means a Claim against the Debtor to the extent such Claim is not a Contested Claim and (a) has been scheduled by the Debtor in its Schedules as neither disputed, contingent, nor unliquidated and as to which no objection has been filed; (b) a proof of claim has been timely filed and no objection thereto has been filed; or (c) has been allowed by a Final Order.

"Allowed Synecdoche Claim" means the allowed amount, if any, of the Claim of Synecdoche.

"Amended Case Management Order" means the Court's *Order Amending Order Establishing Deadlines and Procedures for a Single Asset Real Estate Case* [ECF No. 124].

"Amended Commitment Letter" means the letter of commitment between Agile and the Debtor, entered into on July 16, 2026.

"~~Amended~~Second DIP Budget" means the amended budget attached as Exhibit B to the ~~Amended~~Second DIP Motion.

"~~Amened~~Second DIP Motion" means the Debtor's *Motion for Entry of an Order (a) Authorizing the Debtor to Increase the Amount of Its Post-Petition Financing* [ECF No. 132].

"Amended DIP Note" means the *Amended and Restated Promissory Note* [ECF No. 113], reflecting the amended terms of the DIP Loan included in the Final DIP Financing Order.

"~~Amended~~Second DIP Financing Order" means the *Order Granting Debtor's Motion for Authority to Increase the Amount of Its Post-Petition Financing* entered on July 27, 2026 [ECF No. 153].

"~~Amended~~Second DIP Loan" means the post-petition multi-draw secured term loan in an amount not to exceed $650,000, provided to the Debtor by the DIP Lender as reflected in the Second Amended DIP Note and approved by the ~~Amended~~Second DIP Financing Order.

"~~Amended~~Second DIP Stipulation" means the *Stipulation to Order Authorizing the Debtor to Increase the Amount of Its Post-Petition Financing* [ECF No. 140].

"Ann Arbor Tax Claim" means the City of Ann Arbor's ~~"super-priority"~~ tax lien claim secured against the ~~Properties~~Property for unpaid real property tax from year 2025, in the amount of $169,080.67.

"APB" means American Platinum Builders.

"Avoidance Claims" means any Claims pursuant to sections 502(d), 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

"Bankruptcy Court" or the "Court" means the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division, having jurisdiction over this case.

"Bankruptcy Rule" means the Federal Rules of Bankruptcy Procedure.

"Bar Date" means the date established by the Bankruptcy Court as the deadline for filing proofs of claim in this case which in this case is May 27, 2026 or August 25, 2026 as to claims by any governmental agencies or units.

"BDS" means Building Decommission Services, LLC.

"Blue Phoenix" means Blue Phoenix 19 LLC, a Michigan limited liability

company.

"Brownstone" means Brownstone Realty Advisors, LLC.

"CBRE Appraisal" means the July 7, 2023 appraisal of the ~~Properties~~Property that was performed ~~by~~for CNB, ~~through~~by CBRE Valuation and Advisory Services.

"Claim" means a claim against the Debtor.

"CNB" means County National Bank.

"Colliers" means Colliers International Valuation & Advisory Services, LLC.

"Colliers 2025 Appraisal" means the November 25, 2025 appraisal of the ~~Properties~~Property performed by Colliers.

"Colliers BOV" means the Broker Opinion of Value of the ~~Properties~~Property issued on May 20, 2024, by Colliers.

"Commitment Letter" means the commitment letter between Provizia and the Debtor, entered into on July 27, 2026.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"Contested Claim" means a Claim that has not been allowed or disallowed and as to which either: (a) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (b) a proof of claim

has not been filed and the Claim is listed on the Debtor's Schedules as disputed, contingent, or unliquidated.

"Contested Claims Reserve" means segregated and escrowed funds in an amount equal to the aggregate distributions that would have been made on account of all Contested Claims had such Contested Claims been Allowed Claims in their full asserted amounts as of the Effective Date.

"Counsel" means Taft Stettinius & Hollister, LLP, counsel to the Debtor.

"Debtor" means South Town by 4M, LLC, debtor and debtor-in-possession in the above-captioned case.

"Development" means the multi-faceted business comprised of the four distinct revenue-driven improvements described in Section II.C of this Plan.

"DIP Budget" means the revised DIP budget filed on April 21, 2026, in support of the DIP Facility [ECF No. 96].

"DIP Budgets" means the DIP Budget and the ~~Amended~~Second DIP Budget.

"DIP Facility" means the financing requested by the Debtor reflected in the Amended and Restated DIP Note and Second Amended and Restated DIP Note, and entered by the Court in the Final ~~Initial~~ DIP Financing Order and the ~~Amended~~Second DIP Financing Order.

"DIP Financing Orders" means collectively, the Interim DIP Financing

Order, the Final DIP Financing Order, and the ~~Amended~~Second DIP Financing Order.

"DIP Lender" means Ms. Poscher, in her capacity as provider of the DIP Loan.

"DIP Liens" means liens granted to the DIP Lender for providing the DIP Loan which include (i) pursuant to section 364(c)(2) of the Bankruptcy Code, a lien on all property of the Debtor's estate not otherwise subject to a lien, and (ii) pursuant to section 364(c)(3) of the Bankruptcy Code, a junior lien on all property of the Debtor's estate that is subject to a lien, in each case perfected automatically upon entry of the Interim DIP Financing Order without the necessity of filing a financing statement.

"DIP Motion" means the Debtor's *Motion for Entry of an Order (a) Authorizing the Debtor to Obtain Post-Petition Secured Financing; and (b) Granting Liens, Security Interests, and Superpriority Claim* [ECF No. 79].

"Disclosure Statement" means the First Amended Disclosure Statement that begins at *infra*, Section II. of this First Amended Combined Plan and Disclosure Statement.

"DMC" means DMC Real Estate Services.

"Dr. Poscher" means Dr. Margaret Poscher, the original sole member of the Debtor.

"Effective Date" means ~~the day that is 14~~20 days after the ~~entry of~~date the Confirmation Order <u>becomes a Final Order or if not a business day, the next business day</u>. If, however, a stay of the Confirmation Order is in effect on that date, the Effective Date will mean the day after the date on which the stay expires or is otherwise terminated. These periods are calculated as provided in Bankruptcy Rule 9006(a)(1).

"Equity Interest" means equity in the Reorganized Debtor as of the Effective Date of the Plan, unless otherwise specified in the Plan.

"Exit Financing" means the post-confirmation financing arrangement pursuant to the Exit Financing Agreement between the Debtor and the Exit Financing Lender.

"Exit Financing Agreement" means the definitive agreement to be entered into by and between the Debtor and the Exit Financing Lender memorializing the terms and conditions of the Exit Financing.

"Exit Financing Lender" means Provizia.

"Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket, that has not been reversed, stayed, modified, or amended, and as to which (a) the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and no appeal, petition for certiorari, or motion for reargument or rehearing has been

timely filed; or (b) any appeal, petition for certiorari, or motion for reargument or rehearing has been finally determined and no further review is available.

"Final DIP Financing Order" means the *Final Order (a) Authorizing the Debtor to Obtain Post-Petition Secured Financing; and (b) Granting Liens, Security Interests, and Superpriority Claim* [ECF No. 125].

"Finn Group" means The Finn Development Group, LLC.

"Graybar" means Graybar/Schneider.

"Higley" means The Albert M. Higley Co., LLC.

"Initial DIP Loan" means the post-petition multi-draw secured term loan in an amount not to exceed $400,000, provided to the Debtor by the DIP Lender as reflected in the Amended DIP Note and approved by the Final Initial DIP Financing Order.

"Interest-Only Payees" means, collectively, the City of Ann Arbor, CNB, and Higley, to whom the Debtor elected to make the Interest-Only Payments pursuant to 11 U.S.C. § 362(d)(3).

"Interest-Only Payments" means the interest-only payments made by the Debtor to the Interest-Only Payees under section 362(d)(3) and the terms of the Amended Budget.

"Interim Order Regarding Plan Deadline Extension" means the *Order Regarding Debtor's Motion for Entry of an Order (a) Extending the Deadline to*

29

*File a Chapter 11 Plan and (b) Extending the Debtor's Exclusivity Period to File a Chapter 11 Plan and Solicit Acceptances thereof Pursuant to 11 U.S.C. § 1121 of the Bankruptcy Code* [ECF No. 106].

"Interim DIP Financing Order" means the *Interim Order (a) Authorizing the Debtor to Obtain Post-Petition Secured Financing; and (b) Granting Liens, Security Interests, and Superpriority Claim* [ECF No. 105].

"Legal Expenses" means the fees and expenses of Counsel.

"MicroGrid" means a power generation system to deliver electrical power to the Property, to be sold to the Property's tenants with a secondary source of revenue generated from the creation of carbon credits.

"Motion to Extend" means the Debtor's *Motion for Entry of an Order (a) Extending the Deadline to File a Chapter 11 Plan and (b) Extending the Debtor's Exclusivity Period to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to 11 U.S.C. § 1121 of the Bankruptcy Code* which was filed on April 9, 2026 [ECF No. 80].

"Ms. Poscher" means the Responsible Person, Heidi Caroline Poscher.

"Operating Agreement" means the Debtor's Amended and Restated Operating Agreement.

~~"Payment Disbursement Date" means the date not later than twenty (20) days after the Effective Date.~~

"Plan" means this First Amended Combined Chapter 11 Plan of Reorganization and Disclosure Statement, as it may be amended, modified, or supplemented from time to time.

"Plan Deadline" means July 27, 2026, to the ~~extend~~extent modified by the Court.

"Plan Exclusivity Period" means the period in which the Debtor has the exclusive right to file a chapter 11 plan which was extended to July 27, 2026.

"Plan Extension Order" means the Bankruptcy Court's *Order Regarding Debtor's Motion for Entry of an Order (a) Extending the Deadline to File a Chapter 11 Plan and (b) Extending the Debtor's Exclusivity Period to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to 11 U.S.C. §1121 of the Bankruptcy Code* granted on May 20, 2026 [ECF No. 121] in which the Court granted Debtor's Motion to Extend with respect to the deadline to file the Plan thereby extending the deadline to file the Plan until July 27, 2026; extended the exclusivity period for the Debtor to file its Plan to July 27, 2026; and extended the exclusivity period for Debtor to solicit acceptances of its Plan to September 25, 2026.

"Petition Date" means January 27, 2026, 3:22 p.m. E.S.T. which is the date and time on which the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

"Poscher Estate" means the probate estate of Dr. Margaret Poscher (deceased).

~~"Post-Petition Liens" means certain construction liens recorded against the Property after the Petition Date.~~

"Prentice" means Prentice Partners of Ann Arbor, LLC.

"Property" means the real property owned by the Debtor on which the Development sits.

"Provizia" means The Provizia Organization Inc.

"Pullins" means Steven Pullins.

"Quarterly Fees" means the quarterly fees payable to the United States Trustee.

"RAM" means Reynolds Asset Mgmt, LLC.

"RAM Term Sheet" means the term sheet executed on April 14, 2026, by Debtor and ~~Reynolds~~RAM.

"Reorganized Debtor" means the Debtor, on and after the Effective Date.

"Responsible Person" means Ms. Poscher, personal representative of the Poscher Estate, and the individual authorized to manage the affairs of, and act on behalf of, the Debtor as debtor-in-possession in this bankruptcy case.

"Retainer Deposits" means the retainer deposits advanced by Ms. Poscher on behalf of the Debtor to Counsel, in the amount of $100,000.00.

"Revised DIP Note" means the revised promissory note evidencing the DIP Loan executed by the Debtor in favor of the DIP Lender, as included in the recited terms of the Interim DIP Financing Order.

"Reynolds" means Louis J. Reynolds IV, a principal and owner in RAM.

"SARE" means a single asset real estate case as defined under 11 U.S.C. § 101(51B).

"SARE Motion" means CNB's *Motion to Designate Case as a Single Asset Real Estate Case* [ECF No. 33].

"SARE Objection" means the *Debtor's Objection to County National Bank's Motion to Designate Case as a Single Asset Real Estate Case* [ECF No. 51].

"SARE Order" means the *Order Granting Motion to Designate Case as a Single Asset Real Estate Case* [ECF No. 65].

"SARE Reply" means CNB's reply in support of the SARE Motion [ECF No. 56].

"Second Amended DIP Note" means the Second Amended and Restated DIP Note attached as Exhibit C to ~~Exhibit to~~ the Supplement [ECF No. 152].

"Secured Lenders" means, collectively, CNB, Brownstone, and Prentice.

"Schedules" means the schedules of assets and liabilities filed by the Debtor pursuant to section 521 of the Bankruptcy Code, as have been or may be amended

or supplemented from time to time.

"SmithGroup" means SmithGroup, Inc.

"Solicitation Exclusivity Period" means the period in which the Debtor has the exclusive right to solicit acceptances of its chapter 11 plan which was extended to September 25, 2026.

"Sources and Uses" means the sources and uses of the Exit Financing, as set forth on **Exhibit A** hereto.

"South Town" means South Town by 4M, LLC, debtor and debtor-in-possession in the above-captioned case.

"Supplement" means the supplement to the ~~Amended~~Second DIP Motion filed by the Debtor at [ECF No. 150].

"Synecdoche" means Synecdoche Design Studio, LLC.

"Transferred Assets" means all assets of the Debtor except for the Avoidance Claims.

"UST" means the United States Trustee.

"Vertical Financing" means financing provided for completion of the vertical construction of the Project.

"Vertical Financing Secured Lenders" means the lenders that will ultimately provide the Vertical Financing and who are anticipated to hold secured mortgages against the Development.

"Vohwinkle" means Nathan Vohwinkle.

"WhiteHawk" means WhiteHawk Capital Partners L.P.

"WhiteHawk Term Sheet" means the term sheet executed on May 4, 2026, by the Debtor and WhiteHawk.

**10.02 Severability**. If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**10.03 Captions.** The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

**10.04 Controlling effect.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Michigan govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

**10.05 Retention of Jurisdiction.** The Bankruptcy Court confirming the Plan may exercise jurisdiction to the full extent necessary to administer this case after Plan confirmation and to adjudicate any related adversary proceedings or contested matters, including those relating to the Plan, such as concerning the Plan's construction, implementation, or modification. Neither this provision nor

anything in this Plan constitutes a limitation on or an expansion of the jurisdiction authorized by title 28 of the United States Code.

## II. Description and History of the Debtor's Business

### A.     South Town by 4M LLC

~~South Town~~The Debtor is a Michigan limited liability company formed to realize Dr. Poscher's vision to fund and create a strategic 1.66 acre real estate project for a mixed-use, multi-family development. ~~South Town~~The Debtor holds title to ten individual lots, comprising a city block in Ann Arbor which is the Property. The Development encompasses approximately 237,366 square feet, will ultimately feature ~~300~~at least 289 apartment units, has one side fronting South State Street, directly across from the University of Michigan Golf Course, and is kitty-corner to the University of Michigan field hockey stadium, the football practice facilities, Crisler Arena and the University of Michigan football Stadium.

The Development is comprised of four distinct revenue driven improvements: (1) the leasing of 70% of the ~~300~~289 or greater apartment units to be constructed, to be used as long-term rentals; (2) the operation of a short-term rental business (VRBO, Air BNB, etc.), utilizing 30% of the apartment units; (3) the development and ownership of retail businesses on the first floor of the Development; and (4) the construction and operation of a MicroGrid within the

Development, to deliver electrical power to all of the apartment and retail areas, as well as to the common areas, which will be sold to the captive tenants, with a secondary source of revenue generated from the creation of carbon credits. The Debtor has site plan approval for the construction of the Development.

### B. South Town's Principal

~~South Town~~The Debtor has just a single member. The member, until mid-October of 2025 had been Dr. Poscher. Dr. Poscher unfortunately passed away at that time and thereafter the Poscher Estate was opened. Dr. Poscher's wife, Ms. Poscher, has been named as the personal representative of the Poscher Estate and therefore, is acting on behalf of the sole member of the Debtor in this bankruptcy proceeding.

Dr. Poscher was a community leader in Ann Arbor, Michigan, and spearheaded progressive real estate projects in high-potential areas across the city. In 2018, Dr. Poscher focused on development in an underdeveloped Ann Arbor neighborhood, seizing an opportunity to drive impactful urban revitalization. First, and prior to ~~South Town~~the Development, came a 12-unit, ground-up townhouse complex, creating a residential anchor. Then came Venue by 4M, a visionary 35,000 square foot space encompassing dining, events, and entertainment facilities. Ultimately, Dr. Poscher formed ~~South Town~~the Debtor to

fund and create the Development. Ms. Poscher, as Dr. Poscher's wife and biggest cheerleader, has taken up the mantle to complete the Development.

Ms. Poscher is the Responsible Person for the Poscher Estate, and for the Debtor. Ms. Poscher, in her personal and individual capacity, provided $650,000 in post-petition financing to the Debtor to fund primarily the Interest-Only Payments to the Interest-Only Payees, and other incidental costs should they arise. The details of this post-petition financing, and the hearings and procedures related thereto, are described below. *See infra*, Article III.

Dr. Poscher never earned a salary nor received any compensation for her role as the member of ~~South Town; Likewise~~the Debtor; likewise, Ms. Poscher has never earned a salary nor received compensation at any time prior to or during the pendency of this bankruptcy case.

### C.  South Town's Business Model and Events Leading to Bankruptcy

The assemblage of the Development's ten lots occurred during the years 2019 to 2022. Each of the lots was improved with either an individual home or a low-rise apartment building. The acquisition cost of the ten lots was $18,982,170. Fees and closing costs were an additional $5,152,297.

To aid in the Debtor's acquisition of the ten lots, the Debtor obtained financing from two lenders; CNB, which asserts a lien position in the approximate

amount of $~~16,863,513.64~~18,628,131.14; and Brownstone which asserts a lien position subordinate to that of CNB, in the amount of $7,794,566.33. An additional mortgage position, for an additional $8.5 million is held by Prentice. The passing of Dr. Poscher in October of 2025 delayed the ongoing development and funding for the Development. Ms. Poscher, who was very familiar with the Development, primarily assisted the Debtor in the coordination for placement of the MicroGrid. Since Dr. Poscher's passing, Ms. Poscher has had to take on the Debtor's work for the remaining portions of the Development.

Prior to her death, Dr. Poscher, on the Debtor's behalf, modified an existing loan with Brownstone, borrowing additional funds for Development costs, CNB loan-extension fees, and CNB loan interest payments. Following closure of the Brownstone loan modification in June 2025, Brownstone advanced funds for Development costs but refused to release approximately $1.0 million in funds escrowed for the specific purpose of covering CNB loan-extension and interest payments. As a result, the Debtor found itself behind on its prepetition loan payments with ~~the Secured Lenders~~CNB.

### *CNB's Foreclosure Proceeding*

CNB initiated a foreclosure ~~proceeding~~by advertisement in early November of 2025. CNB adjourned the foreclosure ~~proceeding~~sale until early January 2026, based on the transition issues faced by the Debtor. The Debtor brought forward a

third party to acquire the participants' interest in CNB's facility, but the participants refused to engage with that third party. As a result, the Debtor's only option was to seek protection under Chapter 11 of the Bankruptcy Code in light of ~~an~~the impending foreclosure by advertisement sale date.

### III. Significant Post-Petition Events

There are four significant post-petition events that have occurred in this Bankruptcy Case. First, upon CNB's motion, the Debtor's case was designated a single asset real estate case. Second, the Debtor sought approval of, and this Court approved, post-petition secured financing from Ms. Poscher. Third, the Debtor filed a motion to extend the Plan-filing deadline, and exclusivity period to file the Plan and solicit ballots on the Plan. Fourth, the Debtor has negotiated two separate alternative exit transactions, either of which will provide for payment in full of all Claims.

#### *The SARE Designation*

On February 13, 2026, CNB filed the SARE Motion and in opposition the Debtor filed its SARE Objection. CNB filed the SARE Reply and the Court held a hearing on the SARE Motion on March 12, 2026. The Court was unpersuaded by the Debtor's arguments in opposition to the SARE Motion and entered the SARE Order. As such, the Debtor was required to either file its Plan within 90 days of the Petition Date, or commence making interest-only payments to secured

creditors, as required under 11 U.S.C. § 362(d)(3). The Debtor opted to make the Interest-Only Payments to the Interest-Only Payees.[45]

### *DIP Financing*

The Debtor has no business operations and in order to make the Interest-Only Payments to the Interest-Only Payees, the Debtor sought approval of the Initial DIP Loan to be provided to the Debtor by Ms. Poscher as the DIP Lender. After ~~motion~~the filing of the DIP Motion and hearings, the Court entered the Interim DIP Financing Order that authorized the Debtor to borrow money on an interim basis from Ms. Poscher, in an aggregate principal amount of up to $133,000.00 prior to entry of a final order on the First DIP Motion and pursuant to the terms of the Revised DIP Note.

On May 18, 2026, the Court held a final hearing on the ~~First~~ DIP Motion. On May 22, 2026, and on stipulation of the parties, the Court entered its Final DIP Financing Order. In addition to the terms of the Interim DIP Financing Order, the Final DIP Financing Order authorized the Debtor to borrow up to an aggregate principal amount of $400,000 from Ms. Poscher under the terms of the Amended DIP Note. The purpose of the Initial DIP Loan was to afford the Debtor the ability

---

[45] Debtor's other secured ~~creditors~~creditor entitled to interest-only payments—Brownstone ~~and Prentice~~—waived payment. Prentice did not charge interest for its loan.

to fund its Interest-Only Payments to the Interest-Only Payees, and payment of U.S. Trustee fees as set forth in the DIP Budget. The Debtor ~~was~~ elected to make interest-only payments to its secured creditors (other than Brownstone ~~and Prentice~~, who waived ~~their~~its right to interest payments) and which became due on the 90th day after the Petition Date pursuant to Section 362(d)(3) of the Bankruptcy Code in order for the Debtor to maintain the ~~Automatic Stay~~automatic stay, due to its SARE designation.

In exchange for the Initial DIP Loan, Ms. Poscher, as the DIP Lender was granted an allowed superpriority administrative expense claim with priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, but only to the extent of amounts actually borrowed under the Final DIP Financing Order.

As security for amounts borrowed, the DIP Lender was granted (i) pursuant to section 364(c)(2) of the Bankruptcy Code, a lien on all property of the Debtor's estate not otherwise subject to a lien, and (ii) pursuant to section 364(c)(3) of the Bankruptcy Code, a junior lien on all property of the Debtor's estate that is subject to a lien, in each case perfected automatically upon entry of the Interim DIP Financing Order without the necessity of filing a financing statement.

The DIP Liens are in all instances subject to existing mortgage liens in favor of CNB, Prentice, and Brownstone, the construction lien in favor of Higley,

and Permitted Third Party Liens (i.e., liens that are senior by operation of law, including liens securing the payment of real property taxes).

The DIP Liens and the superpriority claim expressly exclude (i) any Avoidance Claims, (ii) any proceeds or property recovered in connection with the successful prosecution or settlement of any Avoidance Claims, (iii) any intercompany claims, and (iv) any claims against the estate of Dr. Poscher, Prentice, or any entity or estate in which Ms. Poscher has a direct or indirect interest, and no superpriority claim, administrative claim, or other priority claim under the Final DIP Financing Order shall be payable from or have recourse to any of the foregoing.

On July 24, 2026, the Court held a hearing on the Debtor's ~~Amended~~Second DIP Motion and related ~~Amended~~Second DIP Stipulation. On July 27, 2026, the Court entered the ~~Amended~~Second DIP Financing Order which authorized the Debtor to borrow up to an additional $250,000 and thus increased the aggregate principal amount of the DIP Facility to $650,000, under the terms of the Second Amended DIP Note. The resulting DIP Liens of the ~~Amended~~Second DIP Financing Order retain the same lien priority and exclusions as those set forth above and as reflected in the Final DIP Financing Order.

The purpose of the request to increase the amount of the DIP Facility was to continue making Interest-Only Payments and quarterly U.S. Trustee fees as set forth in the ~~Amended~~Second DIP Budget.

### *Motion to Extend Plan Deadline and Exclusivity Period*

Concurrent with the DIP Motion, the Debtor filed its Motion to Extend. The Court addressed the Motion to Extend during the Initial DIP Financing Hearing where Debtor indicated to the Court it was holding off on the requests set forth in the Motion to Extend until it could obtain greater clarity as to its plan and the Exit Financing. The Court entered the Interim Order Regarding Plan Deadline Extension which required the Debtor to supplement the Motion to Extend on or before May 12, 2026, provide a detailed update of the Exit Financing lender negotiations, and set the Motion to Extend for hearing on May 18, 2026.

On May 12, 2026, the Debtor filed its Supplement to which it attached the RAM Term Sheet and the WhiteHawk[56] Term Sheet. On May 18, 2026, the Court held a hearing on the Motion to Extend and subsequently on May 20, 2026, entered its Plan Extension Order: (1) extending the Plan Deadline and the Plan Exclusivity Period to July 27, 2026; and (2) extending the Solicitation Exclusivity Period to September 25, 2026.

---

[56] WhiteHawk has since declined to proceed under the WhiteHawk Term Sheet, after engaging in further due diligence.

26-40805-lsg   Doc 171   Filed 08/12/26   Entered 08/12/26 14:09:41   Page 150 of 176

The Court held a status conference on May 22, 2026, to address the Case Management Order that needed to be amended in light of the Plan Extension Order, and subsequently entered its Amended Case Management Order. In addition to amending other case deadlines and restating the Plan Deadline, the Plan Exclusivity Period and the Solicitation Exclusivity Period, the Amended Case Management Order scheduled the confirmation hearing on the Plan for September 25, 2026, at 1:00 p.m.

The Debtor files this Plan in accordance with the Plan Extension Order and the Amended Case Management Order.

### *The Exit Alternatives*

On April 14, 2026, the Debtor and RAM executed the RAM Term Sheet (**Exhibit B** hereto) wherein the Debtor is to obtain exit takeout financing to: (a) satisfy amounts due to pay all secured and unsecured creditors in full, who will not otherwise convert their existing debt to equity; (b) pay chapter 11 administrative expenses; (c) cover carrying costs to vertical construction; and (d) pay the expenses of the Exit Financing. RAM is to receive, upon confirmation of the Debtor's Plan, a 5% membership interest in the Debtor, in exchange for which Reynolds, who owns RAM, is to provide the credit enhancement required of the Exit Financing Lender (under Equity Transaction B) and of the Vertical Financing Lender. RAM will also bring to the table extensive construction project management expertise.

RAM is a vertically integrated commercial real estate operator and development firm specializing in core plus, value-added and opportunistic multifamily investing. RAM was founded in 2003 and has engaged in over 100 existing and ground-up transactions. Materials outlining RAM, its principal members

and its current portfolio of projects are attached as **Exhibit C.**

On July 16, 2026, the Debtor and Agile executed an Amended Commitment Letter (**Exhibit D** hereto), pursuant to which Agile agreed, on the ~~Payment Disbursement~~Effective Date to: (a) enable Newco to acquire 100% of the membership interest in the Debtor held by the Poscher Estate from the Poscher Estate for an amount in a multiple of 7 figures; and (b) provide an additional amount, not to exceed $41,000,000.00, as an equity infusion into Newco and then as an equity infusion by Newco into the Debtor, in an amount sufficient to provide for payment in full of all ~~allowed~~Allowed Claims and other working capital requirements of the Debtor, post-confirmation.

On August 5, 2026, Agile provided a Memorandum update as to its investment commitment (**Exhibit E** hereto). References to "The Finn" and "The Forge" therein are proposed names for the Development.

Agile is a leading provider of large-scale solar power solutions and EV charging infrastructure. It specializes in solar arrays, power provider services, and

EV charging installations through strategic site partnerships with high-usage locations. Agile is specifically interested in the Project, based on the Micro-Grid to be developed and installed. This aligns with Agile past development and management of large-scale solar farms, supplying clean, renewable energy to power grids and key infrastructure, ensuring a sustainable and reliable energy supply. Further, Agile builds new or retrofits buildings with its patented BESS and Shallow Geothermal to enhance a building's energy needs and apply to the grid. Agile has advised the Debtor that Agile has placed approximately $500 million of debt and equity during the preceding 12-month period.

On July 27, 2026, the Debtor and the Exit Financing Lender entered into ~~a~~the Commitment Letter **(Exhibit F** hereto), pursuant to which the Exit Financing Lender has agreed (under Equity Transaction B) to provide to the Debtor Exit Financing on the ~~Payment Disbursement~~Effective Date in an amount sufficient to provide for payment in full of all ~~allowed~~Allowed Claims and other working capital requirements of the Debtor, post-confirmation. The Exit Financing will result in a re-allocation of the equity in the Debtor (under Equity Transaction B), with the Poscher Estate retaining a 59% interest and ~~the Finn Group being issued~~ a 41% membership interest in the Debtor~~.~~

being issued to ~~The Finn Group, in turn, will be owned by~~ a combination of parties, the percentage ownership of which is as follows: Prentice, 5% (conversion

of its debt position to equity); Blue Phoenix, 22%; Pullins, 2% (equity exercisable upon completion of vertical construction); APB, 5%; Vohwinkle, 2% (equity exercisable upon completion of vertical construction); and Reynolds, 5%. Blue Phoenix is an affiliate of Ms. Poscher, its members being Ms. Poscher, her family trust and certain friends and family. Prentice is owned fully by Dr.the Poscher Estate. Pullins, Vohwinkle, APB and Reynolds are not affiliates of Ms. Poscher, the Poscher Estate or any of their respective affiliates.

The Exit Financing Lender is a private investment company that lends from a debt fund in conjunction with a Sovereign Wealth Fund and two major European Family offices. Over the last decade they have invested in, funded and participated in over $11.75B of real estate projects internationally. The Exit Financing Lender concentrates on funding projects in North, Central and South America, the United Kingdom, the Republic of Ireland, several European countries and Caribbean nations. These projects include hospitality, industrial, senior care, senior residences, and multifamily real estate development.

The Exit Financing Lender is made up of former division presidents from several international banks, the chief operating officer of a boutique investment bank, and individuals with extensive hands-on experience in multifamily, senior care, hospitality, retail, medical, social, and work housing. Historically, the Company has provided both debt and equity into client capital stacks.

At present the Exit Financing Lender is financing  two Hyatt Properties in Mexico, a Hilton Luxury Resort in Costa Rica,  a Hard Rock Hotel in USA,  a Waldorf Astoria in Caribbean, a 600 unit Condominium Property in Ecuador, a Storage Facility in USA, a Mixed Use Property (Hotel, Apartments) in the USA, a unit apartment building also in the USA,  Conversion of a Hospital to a Medical Surgical Center in the USA and a High Tech Manufacturing Complex in the USA.

The Exit Financing Lender and its subsidiaries are headquartered in Canada, America, and Brazil, with subsidiaries and affiliates in the United States, Mexico, the United Kingdom, and Brazil.

Equity Transaction A and Equity Transaction B will be brought before the Probate Court for Probate Court Approval prior to the hearing on confirmation of this Plan, to obtain conditional approval of ~~the same~~both, subject only to confirmation of this Plan.

The Debtor, through its representative, Ms. Poscher, prefers Equity Transaction A over Equity Transaction B, as there is an interest cost associated with Equity Transaction B, based on the need for Exit Financing, which is not necessary under Equity Transaction A. Further, Equity Transaction A would likely be more attractive to the ~~Posher~~Poscher Estate, as it monetizes the Poscher's Estate's interest in the Debtor, rather than the Poscher Estate awaiting the completion of the vertical construction and a liquidity event. The Debtor has

49

arranged for Equity Transaction B and the Exit Financing, if for some reason, Equity Transaction A and Agile's participation therein is somehow revoked or not approved.

Ms. Poscher, on behalf of the Debtor, is working on a parallel path to document Equity Transaction A and Equity Transaction B. Equity Transaction A requires the execution of a proposed Membership Interest Purchase Agreement between Newco and the Poscher Estate, as well as an Operating Agreement for Newco. To the extent prepared, the foregoing, along with this Disclosure Statement and Plan, shall be part of the submission to the Probate Court for approval.

Equity Transaction B will require the execution of an Amended and Restated Operating Agreement of the Debtor, a Guaranty Fee Agreement and the Provizia loan documents. To the extent prepared the foregoing, along with this Disclosure Statement and Plan, shall be part of the submission to the Probate Court.

The Probate Court may or may not approve Equity Transaction A and/or Equity Transaction B. That resolution will be known prior to the hearing on confirmation of the Plan. If both Equity Transaction A and Equity Transaction B are approved by the Probate Court, then Ms. Poscher, on behalf of the Debtor, prior to the hearing on confirmation, will determine which option to present

50

proofs on as to feasibility. The Debtor will provide a supplement to this Disclosure Statement and Plan with respect to: (a) the results of Probate Court Approval; and (b) the Debtor's election between Equity Transaction A and Equity Transaction B. Probate Court Approval shall also include the Plan's proposed conversion of Prentice's debt to equity and if required under Equity Transaction B, a pledge of the Probate Estate's 59% interest in the Debtor to the Exit Financing Lender.

The transfer of the Transferred Assets to the SPE is based on the Debtor's diligence and understanding from lenders and investors it has spoken with that in a development of this magnitude, the lender will insist that the assets of the borrower be held in an SPE and not in an entity that has undergone a proceeding under chapter 11. Many lenders will not commit to an entity that has previously filed for bankruptcy protection.

The Debtor will be preparing the conveyance agreement between the SPE and the Debtor as well as the single member LLC agreement of the SPE.

### Transfers outside of the ordinary course

As required under section 362(d)(3) and the terms of the DIP Budgets attached to the DIP Financing Orders, the Debtor has made the Interest-Only Payments to the Interest-Only Payees in the following amounts:[67]

---

[67] The April payment to Ann Arbor was $8,009.84 which included a four percent late charge of $6,407.87 calculated from the full amount due and owing under the

Ann Arbor: $ 1,601.97

CNB: $113,320.62

Higley: $ 4,306.42

The Debtor paid the Quarterly Fees as required, in the amount of $350. To date, the Debtor has made a total of $327,094.62 in transfers outside of the ordinary course in accordance with the terms of the DIP Budgets. The Debtor has made no other transfers outside of the ordinary course. Ms. Poscher, out of her own funds, paid a $150,000 due diligence fee to WhiteHawk, but and a $60,000 due diligence fee to Provizia, which were gifts to the Debtor has no arrangement with Ms. Poscher for the repayment of this amount.

### A. Summaries of cash collateral, post-petition financing, and adequate protection orders

The details and summaries of the Debtor's DIP Facility, DIP Budgets, and Interest-Only Payments are provided above. *See supra*, Section III of the Disclosure Statement.

### B. Pending litigation

---

late charge of $6,407.87 calculated from the full amount due and owing under the Ann Arbor Tax Claim. The May payment to CNB was $117,097.98 which included $3,777.36 per diem charge for the additional day in May. A $117,097.98 payment was also made to CNB in June. The amounts listed for the Interest-Only Payments are the regular monthly payments owed to each Payee. The Debtor also paid a $95 service fee for its Chase DIP bank account in June.

On the Petition Date, the Debtor was party to two ~~state court litigation matters~~creditor enforcement actions. CNB had initiated a ~~receivership~~foreclosure by advertisement action against the Debtor, and Brownstone had initiated a foreclosure and receivership action against the Debtor ~~both~~ in the Circuit Court for Washtenaw County, Michigan. Both actions were stayed pursuant to section 362 of the Bankruptcy Code upon the filing of the Debtor's bankruptcy petition. Upon ~~entry of the Confirmation Order,~~payment in full of the allowed amount of the Claims of CNB and Brownstone on the Effective Date, each shall be permanently enjoined from pursuing or continuing such actions against the Debtor or its assets and such actions shall be discontinued or dismissed, as applicable based on payment in full having been received by CNB and Brownstone under the Plan.

### IV. Liquidation Analysis and Risks

#### A. Liquidation Analysis

~~B.~~ An appraisal was performed by CBRE Valuation and Advisory Services on July 7, 2023 in connection with CNB's loan. That CBRE Appraisal contained two values. The first value was $15,800,000, described to be the "As Is (Land Value)." The second value, which included the then in place early-stage enhancements to the Development (through site preparation, site plan application, etc.), known as "entitlements" placed the "As Entitled (Land Value)" of the

Development at $29,500,000. A second valuation, the Colliers BOV, dated May 20, 2024, placed the value of the Development, with the then in-place entitlements, at $45,800,000. This reflected the additional work which had been undertaken with respect to the Development, including architectural, engineering and site plan approval. A third, and more recent appraisal, the Colliers 2025 Appraisal, was issued on November 25, 2025, and placed the value of the Development, with the then in-place entitlements, at $61,300,000. This reflected the additional development work that had ensued over the 18 months since the Colliers BOV.

The Colliers BOV and Colliers 2025 Appraisal reflect increased value in the ~~Properties~~Property since the CBRE Appraisal. The increase in valuation is based on the detailed and approved Development plans, and entitlements now attached to the Property, which allow for construction of the various Development components.

The Colliers 2025 Appraisal assessed various risks and conditions upon which the appraisal was based, including accessibility, exposure, flood-zone proximity, presence of easements or encumbrances, hazardous waste detection, et al. The Colliers 2025 Appraisal indicated a good rating for both accessibility and exposure, moderate and minimal flood risk, no adverse easements or encumbrances, and no presence or signs of hazardous waste, and summarized

"[o]verall, the [Development's] location is rated as good/excellent . . . there are no known factors that would limit the site's development according to its highest and best use." Colliers 2025 Appraisal, p. 25.

Against these valuations, the Debtor has the secured, unsecured, superpriority and, administrative Claims identified in Section 3 of the Plan, which in the aggregate, ~~exceed in total~~are approximately and at least $~~34,000,000~~30,000,000, if allowed in full. The Debtor's Plan provides for the payment in full of all ~~allowed~~Allowed Claims (other than the conversion of Prentice's secured claim to equity). If the Debtor were to be liquidated, based on the appraisals above noted, it would appear that all creditors of the Debtor would be paid in full. However, it is unknown what value the Property and the other assets of the Debtor would bring, in relation to the values set forth in the appraisals, in a forced liquidation setting. If the entitlements are deemed to have no value, based on a purchaser's abandonment of the same with respect to the Development (electing instead a different or modified use of the Property), or a lesser value than as appraised, then the value to be obtained in a forced liquidation could approximate the acquisition cost of the Property, which was $18,982,170. This amount would be insufficient to satisfy the creditor Claims in full and would likely only cover the Claims of Ann Arbor~~,~~ and a portion of allowed construction lien claims, and ~~a portion of~~ the CNB indebtedness, depending on priorities.

### ~~C~~**B.** Potential Claims and Causes of Action.

The Debtor has one known cause of action, which the Debtor intends to initiate in this bankruptcy case, through the filing of an adversary proceeding against Synecdoche. Synecdoche claims to hold a construction lien claim against the Property. Synecdoche was retained as an architect for the Development. The Debtor has substantial defenses to the amount claimed by Synecdoche to be due and owing and asserts that the Debtor has overpaid Synecdoche for failed work product and overbillings. The Debtor also asserts that the Debtor's termination of Synecdoche pre-petition, which is undisputed by Synecdoche, excuses the Debtor from having to pay any residual payments to Synecdoche. Per the Plan, the Debtor will place into the ~~Disputed~~Contested Claims Reserve an amount sufficient to pay Synecdoche, should Synecdoche's Claim be allowed in full, as filed.

The Debtor intends to file certain unsecured ~~claim~~Claim objections and reserves all other potential ~~claims, avoidance actions, and causes of action~~Avoidance Claims, whether now existing or hereafter arising, known or unknown, and any claims or causes of action not specifically identified herein are expressly reserved. However, the Debtor does not anticipate pursuing any other Avoidance Claims, for the reason that all Allowed Claims will be paid in full. Further, the Debtor is not aware of any material Avoidance Claims other than the Avoidance Claim against Synecdoche. Conversion of the Prentice Claim to equity

26-40805-lsg    Doc 171    Filed 08/12/26    Entered 08/12/26 14:09:41    Page 162 of 176

includes a discount based on the Debtor's assertion that none or only a portion of the Prentice Claim should be deemed to be debt, but rather, an equity contribution by Dr. Poscher.

Upon entry of the Confirmation Order, all such causes of action shall vest in the Reorganized Debtor, which shall retain full authority to prosecute, settle, or otherwise resolve such claims. The Debtor further reserves the right to investigate, assert, and pursue any and all claims, causes of action, and avoidance actions arising under sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, 553, or any other applicable provision of the Bankruptcy Code, whether or not specifically identified herein. Nothing contained in this Plan, the Confirmation Order, or any other document filed in connection herewith shall be deemed a waiver, release, or relinquishment of any such claims, causes of action, or avoidance actions, and all such rights are expressly preserved and retained by the Debtor and the Reorganized Debtor, as applicable. The Debtor is not aware of any other avoidance actions or causes of action available to the estate at this time, other than the action against Synecdoche, but reserves all rights with respect thereto,.

### C.    Projections

On the Effective Date, the Sources and Uses set forth on **Exhibit A** will be paid. Outlined on **Exhibit G** are the Debtor's projections for the subsequent year,

pending receipt of the Vertical Financing, which will then include a new, comprehensive construction and operational budget. That budget will be subject to a multitude of conditions and estimates, based on bids and other deliverables required to fully build out that full budget. Pending closing on the Vertical Financing, the interest reserve provided in the Exit Financing will cover the payments required to be paid to the Exit Financing Lender.

### D. Guarantors

The CNB and Brownstone mortgage loans are both guaranteed by parties related to the Debtor.

The guarantors of the CNB loan are alleged to be: (a) AHFLP, LLC, an affiliate of the Debtor ("AHFLP"); (b) Prentice; (c) Dr. Poscher and Ms. Poscher, jointly and severally; and (d) the Margaret E. Poscher Revocable Trust dated January 23, 1998. AHFLP and Prentice are wholly owned by Dr. Poscher.

The guarantors of the Brownstone loan are alleged to be: (a) Dr. Poscher; (b) Ms. Poscher; (c) the Margaret E. Poscher Revocable Trust dated January 23, 1998; (d) AHFLP, LLC, an affiliate of the Debtor ("AHFLP"); (e) Prentice; (f) ~~the Debtor; (g)~~ Fourth Ave, LLC, a Michigan limited liability company, an affiliate of the Debtor ("Fourth Avenue"); (~~h~~g) 815 Brookwood LLC, a Michigan limited liability company, an affiliate of the Debtor ("Brookwood"); (~~i~~h) 823 Sylvan LLC, a Michigan limited liability company, an affiliate of the Debtor ("Sylvan"); and

58

(i) 1700 Packard LLC, a Michigan limited liability company, an affiliate of the Debtor ("Packard"). The Poscher Estate owns 81% of AHFLP and Ms. Poscher owns 19% of AHFLP. The Poscher Estate is the 100% owner of Prentice and Prentice is the sole member of Fourth Ave, Brookwood, Sylvan, and Packard. The above ownership is diagramed as follows:

| | |
|---|---|
| **Poscher Estate** | **Ms. Poscher** |
| 81% | 19% |

100% **AHFLP LLC**

**Prentice**
100%

| **Fourth Avenue** | **Brookwood** | **Sylvan** | **Packard** |

Blue Phoenix, LLC is a newly formed entity, owned by Ms. Poscher, a trust controlled by Ms. Poscher and possibly by other friends and family of Dr. Poscher or Ms. Poscher, who are otherwise unaffiliated with the Debtor or any entity of which Dr. Poscher held an equity interest.

Other than as set forth herein, the Debtor is not aware of any other guaranty obligations outstanding as of the Petition Date but reserves the right to amend or supplement this disclosure as additional information becomes available.

---

[7] Prentice is the sole member of Fourth Ave, LLC, 815 Brookwood LLC, 823 Sylvan LLC, and 1700 Packard LLC.

## V. Details Regarding Implementation of the Plan

### A.  Debtor's financial summaries

2023:

Income: $545,110

Expenses: $2,047,289

Net: (-$1,502,179)

2024:

Income: $254,807

Expenses: $5,543,212

Net: (-$5,288,405)

2025:

Income: $152,785.50

Expenses: $3,303,000

Net: (-$3,150,241.50)

2026 to the Petition Date:

Income: $0

Expenses: $84,921

Net: (-$84,921)

The Debtor's income prior to the Petition Date was derived from residential rental income from the Property, during the completion of the land assemblage and prior to the demolition of the previously occupied structures on the Property. The Debtor's pre-petition expenses were comprised of the costs of rental property management, development and demolition costs including costs for design, permitting, rezoning, site-plan approval, and other costs to facilitate the Development.

The Debtor has had no post-petition operating revenues. The only expenses were the DIP Loan proceeds, used to fund the Interest-Only Payments made to the Interest-Only Payees pursuant to section 362(d)(3) and the Administrative Expenses. All Legal Expenses remain subject to Bankruptcy Court approval and are to be paid pursuant to the Sources and Uses, if not paid from the Retainer Deposits.

Under either Equity Transaction A or Equity Transaction B, coupled with either the equity infusion by Agile under Equity Transaction A or the Exit Financing by the Exit Financing Lender under Equity Transaction B, all Claims will be fully satisfied on the ~~Payment Disbursement~~Effective Date. Therefore, projections are not relevant to Plan confirmation. The Sources and Uses reflect the proceeds being received by the Debtor to fund the Plan payments, either based on

61

the equity infusion by Newco into the Debtor, funded by Agile, or from the Exit Financing obtained by the Debtor from the Exit Financer.

### B. Plan Risks, Conditions and Assumptions.

Ms. Poscher, on behalf of the Debtor has undertaken a remarkable effort, after the passing of her wife and under the stresses of a probate proceeding, family issues and this chapter 11 proceeding, to assemble two alternative options for exit– Equity Transaction A and Equity Transaction B. All are subject to an inherent risk, whether contractually permitted, or otherwise, for the plan support parties to fail to proceed as committed. The Agile commitment is unconditional, and the Debtor has been advised that Agile has a huge amount of liquidity behind its organization. The Debtor has been and continues to work on the constituent documents needed to memorialize and move forward on the Agile transaction.

At the same time, under Equity Transaction B, the Debtor has a conditional commitment from Provizia. However, the details of that conditional commitment have been addressed over a period of months and the conditions to close are being met each day. Definitive documents under the Debtor's control to consummate the Provizia Exit Financing and Equity Alternative B are well under way. The Debtor is awaiting receipt of an initial loan package from Provizia for review and comment.

RAM has been active in all discussions with Provizia, as has its counsel. A form of Guaranty Fee Agreement and Co-Development Agreement have been drafted and shared with RAM and Reynolds. A draft Operating Agreement for Newco has been sent for Agile and its other members' review. An amended and restated operating agreement of the Debtor is being prepared to reflect the equity allocation proposed under Equity Alternative B.

As in any sophisticated commercial transaction in the tens of millions of dollars, there are always moving parts among the various constituents and a risk that Equity Alternative A or Equity Alternative B will not close. However, at this time, the Debtor has every confidence in both and is proceeding on a parallel path as to both.

### BC. Post-confirmation leadership

Ms. Poscher will remain as the responsible person to the Debtor post-confirmation. The acquisition or allocation of the equity of the Debtor is as is set forth under Equity Transaction A or Equity Transaction B described above.

Debtor's operations post-confirmation will involve the continuation of the work necessary to complete the Development.

Ms. Poscher has and will continue to receive no compensation or fringe benefits for her services to the Debtor through the Effective Date.

**Post-confirmation tax ramifications**

The Plan contemplates a conveyance of the ~~Property~~Transferred Assets to the SPE, in exchange for a 100% interest in ~~Newco~~the SPE. The Debtor does not believe that this Property transfer transaction will result in a taxable event to the Debtor. Further, the Debtor will have no debt forgiveness income related to its Plan, as the Plan provides for a 100% payment of all allowed Claims of the Debtor on the ~~Payment Disbursement~~Effective Date.

The Debtor recommends that the Creditors consult their tax specialist relative to the tax consequences of the Plan to the Creditors.

No ruling has been sought or obtained from the IRS with respect to any of the tax aspects of the proposed Plan and no opinion of counsel has been obtained by the Debtor with respect thereto. No representations or assurances are being made with respect to the federal income tax consequences as described herein. Certain types of claimants and interest holders may be subject to special rules not addressed in this summary of federal income tax consequences.

## VI. Legal Requirements

### A. Voting Procedures

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a Plan are classes of claims, or equity interest, that are impaired

under the Plan. Accordingly, classes of claims or interests that are not impaired are not entitled to vote on the Plan**.**

Creditors that hold claims in more than one impaired class are entitled to vote separately in each class. Each such creditor will receive a separate ballot for all of its claims in each class (in accordance with the records of the Clerk of the Court) and should complete and sign each ballot separately. The ballots may be returned via email to acimini@taftlaw.com so that they are received on or prior to the deadline set by the Court. A creditor who asserts a claim in more than one class and who has not been provided with sufficient ballots may photocopy the ballot received and file multiple ballots.

Votes on the Plan will be counted only with respect to claims: (a) that are listed on the Debtor's Schedules of Assets and Liabilities other than as disputed, contingent or unliquidated; or (b) for which a proof of claim was filed on or before the bar date set by the Court for the filing of proofs of claim (except for certain claims expressly excluded from that bar date or which are allowed by Court order). However, any vote by a holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.

Voting on the Plan by each holder of a claim or interest in an impaired class is important. After carefully reviewing the Plan and disclosure statement, each holder of such a claim or interest should vote on the enclosed ballot either to accept or to reject the Plan, and then return the ballot by mail to the Debtor's attorney by the deadline previously established by the Court.

Any ballot that does not appropriately indicate acceptance or rejection of the Plan will not be counted.

A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the Debtor's attorney.

### B. Acceptance

The Bankruptcy Code defines acceptance of a Plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots. The Bankruptcy Code defines acceptance of a Plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots. If no creditor or interest holder in an impaired class votes, then that class has not accepted the Plan.

### C. Confirmation

11 U.S.C. § 1129(a) establishes conditions for the confirmation of a Plan. These conditions are too numerous and detailed to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process.

Among the several conditions for confirmation of a Plan under 11 U.S.C. § 1129(a) are these:

1. Each class of impaired creditors and interest must accept the Plan, as described in paragraph VI.B., above.

2. Either each holder of a claim or interest in a class must accept the Plan, or the Plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

### C. Modification

The Debtor reserves the right to modify or withdraw the Plan at any time before confirmation.

### D. Effect of Confirmation

If the Plan is confirmed by the Court:

1. Its terms are binding on the Debtor, all creditors, members, and other parties in interest, regardless of whether they have accepted the Plan.

2. Except as provided in the Plan:

(a) In the case of a limited liability company that is reorganizing and continuing business:

      i. (1) All claims and interests will be discharged;

      ii. (2) Creditors and members will be prohibited from asserting their claims against or interest in the Debtor or its assets.

(b) In the case of a limited liability company that is liquidating and not continuing its business:

(1) Claims and interests will not be discharged.

(2) Creditors and equity interests will not be prohibited from asserting their claims against or interests in the Debtor or its assets.

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

/s/ *Jay L. Welford*
Jay L. Welford (P34471)
Kimberly Ross Clayson (P69804)
Anthony Cimini (P86223)
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
(248) 351-3000
jwelford@taftlaw.com
kclayson@taftlaw.com
acimini@taftlaw.com

*Counsel to the Debtor, South Town by 4M LLC*

By: */s/Heidi Caroline Poscher*
    Heidi Caroline Poscher

Dated: July 27August 12, 2026      For:   South Town By 4M LLC
                          Its:    Responsible Person

69

| Summary report: Litera Compare for Word 11.8.0.56 Document comparison done on 8/12/2026 10:21:28 AM | |
|---|---|
| **Style name:** TaftStandard | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://taftlaw.cloudimanage.com/ACTIVE/200281687/15 | |
| **Modified DMS:** iw://taftlaw.cloudimanage.com/ACTIVE/302253304/1 | |
| **Changes:** | |
| Add | 310 |
| Delete | 200 |
| Move From | 4 |
| Move To | 4 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 518 |