UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re: | Case No. 26-40805-lsg |
| South Town By 4M, LLC, | Chapter 11 |
| Debtor. | Hon. Lisa S. Gretchko |

________________________/

**SUPPLEMENT TO FIRST AMENDED COMBINED**
**CHAPTER 11 PLAN AND DISCLOSURE STATEMENT**

South Town by 4M LLC, the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Debtor"), hereby submits the attached *Personal Representative's Petition for Approval of a Sale and/or Transfer of All or a Portion of the Estate's Interest in South Town by 4M LLC* (the "Petition"), filed in the Probate Court for the County of Washtenaw, State of Michigan (the "Probate Court"), Case No. 2025-1151-DE, *In the Matter of the Estate of Margaret Elizabeth Poscher, Deceased*, as a supplement to the Debtor's *First Amended Combined Chapter 11 Plan and Disclosure Statement* [Doc. No. 171] (the "Plan").

Consistent with the terms of the Plan, the Petition attached hereto seeks approval from the Probate Court of a sale and/or transfer of all or a portion of the Estate of Margaret Elizabeth Poscher's equity interest in the Debtor, in connection with confirmation of the Plan.

[SIGNATURE BLOCK FOLLOWS ON NEXT PAGE]

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

Dated: August 20, 2026

/s/ *Jay L. Welford*

Jay L. Welford (P34471)
Kimberly Ross Clayson (P69804)
Anthony Cimini (P86223)
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
(248) 351-3000
jwelford@taftlaw.com
kclayson@taftlaw.com
acimini@taftlaw.com

**STATE OF MICHIGAN**
**IN THE PROBATE COURT FOR THE COUNTY OF WASHTENAW**

In the Matter of:

THE ESTATE OF MARGARET ELIZABETH POSCHER, DECEASED

Case No. 2025-1151-DE

Hon. Darlene A. O'Brien

---

DIANE SLINGER (P35693)
JAY L. WELFORD (P34471)
TAFT STETTINIUS & HOLLISTER LLP
27777 Franklin Road – Suite #2500
Southfield, MI 48034
(248) 351-3000
*Attorneys for Heidi Poscher*

---

## PERSONAL REPRESENTATIVE'S PETITION FOR APPROVAL OF A SALE AND/OR TRANSFER OF ALL OR A PORTION OF THE ESTATE'S INTEREST IN SOUTH TOWN BY 4M LLC

Heidi Poscher, Personal Representative (the "Personal Representative") of the Estate of Margaret Elizabeth Poscher, Deceased (the "Decedent") by and though her attorneys, Taft, Stettinius & Hollister, LLP moves this Court for the issuance of an order approving a sale and/or transfer of all or a portion of the Estate's equity interest in South Town by 4M LLC and other relief related thereto, and in support thereof, states as follows:

1. The Estate of Margaret Elizabeth Poscher, Deceased (the "Estate") was opened, and Heidi Poscher was appointed as Personal Representative, on October 22, 2025. **(Exhibit 1 – Letters of Authority).**

2. Pursuant to MCR 5.125 (C)(12), the interested persons in this matter are:

| | |
|---|---|
| Heidi Poscher, Personal Representative | 1919 S. Industrial Hwy.<br>Ann Arbor, Michigan 48104 |
| Bank Michigan, creditor | c/o Ralph McDowell, Esq.<br>Bodman PLC |

1901 Saint Antoine Street Floor 6
Ford Field
Detroit, Michigan 48226-2336

| | |
|---|---|
| Brownstone Realty Advisors, LLC, creditor | c/o John R. Canvasser, Esq.<br>Clark Hill PLC<br>500 Woodward Avenue, Suite 3500<br>Detroit, Michigan 48226 |
| County National Bank, creditor | c/o W. Daniel Troyka, Esq.<br>Conlin, McKenny & Philbrick, P.C.<br>350 South Main Street, Suite 400<br>Ann Arbor, Michigan 48104 |
| Maker Design Build, LLC, creditor | c/o Scott E. Munzel, Esq.<br>301 North Main Street, Suite 100<br>Ann Arbor, Michigan 48104 |
| Old National Bank, creditor | c/o Lisa A. Hall, Esq.<br>Plunkett Clooney<br>333 Bridge Street NW, Suite 530<br>Grand Rapids, Michigan 49504 |
| Southern Michigan Bank & Trust, creditor | c/o Elisabeth Marie Von Eitzen, Esq.<br>Warner Norcross & Judd LLP<br>180 Water Street, Suite 7000<br>Kalamazoo, Michigan 49007 |

3. On or about January 21, 2026, an estate Inventory was filed, identifying a 100% interest in South Town by 4M LLC ("South Town") as an asset of the Estate. **(Exhibit 2 – Inventory)**.

4. The purpose of this Petition is to obtain court approval of a sale and/or transfer of all or a portion of the Estate's Interest in South Town, in connection with the confirmation of South Town's chapter 11 proceeding, and other related relief.

***Authority of the Personal Representative and of the Court***

5. Pursuant to the provisions of MCL §700.3415, the personal representative may make this request without full supervision of the Estate.

6. This Court has authority to provide such approval under MCL §700.3711, which provides, in part, that a personal representative "has the same power over title to estate property that an absolute owner would have, in trust, however, for the benefit of creditors or others interested in the estate". In addition, MCL §700.3715(f) specifically provides, in part, that a personal representative may "acquire or dispose of property."

7. This Court has jurisdiction under MCL § 700.1302(a)(ii), which provides that the probate court has exclusive legal and equitable jurisdiction over matters that relate to the settlement of a decedent's estate, including, but not limited to estate administration, settlement and distribution, if the decedent was domiciled in the county at the time of death.

8. Venue is proper in Washtenaw County, Michigan, as MCLA §700.3201(2) provides that venue for a proceeding involving a pending estate is proper in the county where the initial proceeding occurred.

9. The Personal Representative is under a duty to settle the Estate consistent with the best interests of the Estate, pursuant to MCL § 700.3703(1). The relief detailed below is in the best interest of the Estate.

***The Background on South Town***

10. South Town is a real estate development located in the City of Ann Arbor (the "Development"). It comprises a city block that fronts on S. State Street, across from the State Street entrance to the University of Michigan golf course and is essentially kitty corner (across Stadium Blvd) from the University of Michigan Football Stadium, Field Hockey Stadium, training facilities and Crisler Arena.

11. The Development had contained residential units and apartment buildings, used primarily for student housing. At the time of the Decedent's passing the Development was in the

final stages of demolition, to make way for the placement of a major apartment development, comprising at least 289 units, which includes retail space and a Micro-Grid, which is an on-site power generation system designed to provide power to the complete Development. Site Plan Approval have been obtained from the City of Ann Arbor for the Development.

12. Unfortunately, the passing of the Decedent and a lack of funding lead to the declaration of a default by the first secured lender, County National Bank ("CNB"), in November of 2025 and then the initiation of a foreclosure action by CNB. CNB agreed to adjourn the foreclosure sale, which had been scheduled for mid-December, until later January, 2026. Immediately prior to the foreclosure sale hearing, South Town sought relief under chapter 11 of the Bankruptcy Code, in an effort to save the Development and the Estate's 100% membership interest therein and obtain the financing needed for the exit chapter 11 proceeding.

13. In the chapter 11 proceeding, the Personal Representative was appointed as the designated representative for South Town (the "DIP Representative"). The Personal Representative took on this role for no compensation by South Town.

14. Since the appointment of the Personal Representative as the DIP Representative, the Personal Representative has undertaken a herculean effort to search for and obtain exit financing and equity to permit South Town to exit the chapter 11 process and save the Development.

15. Further, apart from the Personal Representative's efforts as the DIP Representative, the Personal Representative has obtained bankruptcy court authority to make a personal loan to South Town, in an amount up to $650,000, to fund required interest payments to the secured lenders. No other source of funding was available to benefit the Estate's interest in South Town,

and without the funding, the Estate's interest in South Town would have been lost through a lift of the automatic stay and a re-initiation of CNB's foreclosure action.

16. Currently, South Town has no source of operating capital and apart from the $650,000 borrowed from the Personal Representative, has debt in the following approximate amounts:

| | |
|---|---|
| CNB | $17 million |
| Brownstone Realty Advisors, LLC | $7.7 million |
| Prentice Partners of Ann Arbor, LLC | $8.5 million |
| Taxes City of Ann Arbor | $169,000 |
| Construction liens | $2.1 million |
| Unsecured claims | $2.5 million |

17. CNB, Brownstone, Prentice and the construction liens, which total in excess of $36 million are all claimed to be secured by the Development. The value of the Development is subject to interpretation. The acquisition of the land, exclusive of closing costs, diligence fees, and legal fees, was approximately $19 million. The closing costs, diligence fees and legal fees were another approximate $5 million.

18. An appraisal was performed by CBRE Valuation and Advisory Services on July 7, 2023 in connection with CNB's loan. That CBRE Appraisal contained two values. The first value was $15,800,000, described to be the "As Is (Land Value)." The second value, which included the then in place early-stage enhancements to the Development (through site preparation, site plan application, etc.), known as "entitlements" placed the "As Entitled (Land Value)" of the Development at $29,500,000.

19. A second valuation, the Colliers Broker Opinion of Value, dated May 20, 2024, placed the value of the Development, with the then in-place entitlements, at $45,800,000. This reflected the additional intangible work which had been undertaken with respect to the Development, including architectural, engineering and site plan approval.

20. A third, and more recent appraisal, the Colliers 2025 Appraisal, was issued on November 25, 2025, and placed the value of the Development, with the then in-place entitlements, at $61,300,000. This reflected the additional intangible development work that had ensued over the 18 months since the Colliers BOV.

21. Each of the appraisals noted various risks and conditions upon which the appraisals were based, including accessibility, exposure, market conditions, flood-zone proximity, presence of easements or encumbrances, hazardous waste detection, approvals and other issues.

***The Chapter 11 Process***

22. The Development ultimately needs to attract a combination and equity and vertical construction financing sufficient to permit the Development to be built, after which a liquidity event (a sale or refinancing) could occur, that would result in a return to the equity holders in South Town.

23. In the short term, in order to exit the chapter 11 proceeding, South Town needs exit financing (as opposed to vertical construction financing) to permit the above noted debt to be properly addressed in the chapter 11 proceeding. Absent a successful chapter 11 exit, the next phase, related to the vertical development, would not be realized.

24. To the direct credit of the Personal Representative, after exhaustive efforts which are still ongoing, South Town filed its chapter 11 plan on July 27, 2026 (the "Plan"). A hearing on confirmation of that Plan is scheduled to be heard on September 25, 2026.

25. A copy of the Plan is attached as **Exhibit 3-Plan**.

26. One of the major obstacles to any reorganization of South Town is to put into place an ownership structure that the lender and investor community will support. Having the personal representative of a decedent's estate continue in that role indefinitely during all phases of the Development's construction and financing is not attractive to any lender or investor. Therefore, the challenge has been two-fold for the Personal Representative—maximize the equity value of the Estate's interest in South Town, while at the same time ensuring that the ownership structure will support the exit financing and further development of the Development.

27. The Personal Representative has been able to achieve both goals, under two alternative structures that the Personal Representative is pursuing per the Plan and for which, approval of this Court is required. Any approval by this Court would be conditioned on a successful confirmation of the Plan and a closing thereunder.

28. A review of Plan indicates that South Town has presented two options to its creditor constituency, with respect to its equity and exit financing requirements.

***Equity Alternative A***

29. Under Equity Alternative A, Agile Solar Group, LLC, through an entity to be formed (the "Newco") has proposed to fund Newco in the amount of $13 million dollars, to enable Newco to acquire 100% of the Estate's membership interest in South Town, as part of the Plan process, in exchange for a cash payment to the Estate of $13 million dollars. Agile has further committed to fund up to an additional $41 million dollars into Newco, as equity, to then have Newco make a capital contribution into South Town, to allow South Town to exit from the chapter 11 proceeding. The Plan describes in greater detail Equity Alternative A. A copy of Agile's commitment letters are attached as Exhibit D and E to the Plan.

30. With respect to Equity Alternative A, Newco's equity would be held 59% by Agile or its affiliate, and 41% will be owned by a combination of parties, the percentage ownership of which is as follows: Prentice Partners of Ann Arbor, LLC, 5% (conversion of its debt position to equity); Blue Phoenix 19, LLC ("Blue Phoenix"), 22%; Steven Pullins ("Pullins"), 2% (equity exercisable upon completion of vertical construction); American Platinum Builders ("APB"), 5%; Nathan Vohwinkle ("Vohwinkle"), 2% (equity exercisable upon completion of vertical construction); and Louis J. Reynolds IV ("Reynolds"), 5% (collectively, the "41% Owners"). Blue Phoenix is an affiliate of Ms. Poscher. Prentice is owned fully by the Estate. Pullins, Vohwinkle, APB and Reynolds are not affiliates of Ms. Poscher. Each of Pullins, Vohwinkle, APS and Reynolds have extensive experience in the residential commercial construction industry.

31. Equity Alternative A provides a remarkable benefit to the estate, as it monetizes today the Estate's interest in South Town and eliminates all risk that the vertical construction does not proceed, is not successful or does not provide a return to the Estate for a multitude of years, as the Development is constructed, leased up and then a liquidity event is able to be realized.

32. It is extremely difficult to "market" the Estate's equity in South Town under the current status of South Town, specifically its complete lack of any physical assets and its presence in a chapter 11 proceeding with very tight time constraints to propose a plan of reorganization.

33. The Personal Representative, on behalf of the Estate, was able to secure this very attractive valuation for the Estate's interest in South Town. However, it is highly unlikely, if not impossible to envision that further marketing of the Estate's interest in South Town would provide a greater benefit to the Estate. First, apart from the purchase price being paid to the Estate, South Town is in need of tens of millions of dollars of equity or financing to support an up-front acquisition of the Estate's equity interest in South Town. Agile has committed to this investment,

in addition to its $13 million acquisition payment, and any competitive bidder would have to match is incredibly material additional term. Second, the Estate and South Town do not have unlimited time to market the Estate's interest in South Town. The Plan was due to be filed by July 27, 2026 (which occurred) and confirmation is set for September 25, 2026.

**34. Accordingly, the Personal Representative is seeking approval of Equity Alternative A, where the Estate will receive $13 million dollars from Newco, in exchange for a transfer of the Estate's 100% interest in South Town to Newco, on the Payment Disbursement Date under the Plan.**

35. If the Plan is not confirmed or if the Payment Disbursement Date does not arise under the Plan, then the transaction with Newco would not close and the Estate would retain its 100% interest in South Town. Likewise, if Agile, for some reason, exits the transaction (rightfully or wrongfully) Equity Alternative A would not occur.

***Equity Alternative B***

36. Alternatively, and as a back-stop to Equity Alternative A, under Equity Alternative B, Agile is not involved. Instead, The Provizia Organization Inc. ("Provizia") has committed to lend the exit financing needed to permit South Town to fund its Plan, in the form of a loan. A copy of the Provizia commitment is attached as Exhibit F to the Plan. Provizia has also committed to fund the vertical construction. *Id.* A condition of the Provizia loan is the receipt of credit enhancement from Reynolds. *Id.* A copy of Reynold's commitment is attached as Exhibit B to the Plan.

37. Under Equity Alternative B, the Estate retains a 59% interest in South Town and the remaining 41% is to be allocated to the 41% Owners, as noted above.

38. This reallocation of the equity under Equity Alternative B is again to place an experienced management team in the equity stack of South Town. The Estate, being only a representative of a deceased individual, does not have the expertise to develop an apartment project on its own and all of the lenders and investors the Personal Representative has spoken with in such capacity and in her capacity as the DIP Representative have made it clear that a management team committed to the Development must be in the ownership stack. Therefore, the 41% Owners are joint venturing with the Estate to bring the Development to fruition under Equity Alternative B.

39. Under Equity Alternative B, the Estate would realize a return upon a liquidity event occurring with respect to the Development (a sale or refinance, upon completion) or absent a liquidity event, from distributions that would be made to the members from profits of the Development, once completed.

40. As an additional backstop to this liquidity event, Blue Phoenix is seeking hereunder an option to purchase the Estate's 59% equity interest in South Town for the same $13 million that Agile proposes to pay, with the option exercisable and with a closing to occur within two years from this Court's approval of this Petition.

41. A proposed Amended and Restated Operating Agreement of South Town, addressing the re-allocation of ownership between the Estate (59%) and the 41% Owners is attached as **Exhibit 4-Amended Operating Agreement.**

**42. Accordingly, and in the alternative, the Personal Representative is seeking approval of Equity Alternative B, where the Estate will retain a 59% interest in South Town under the Plan, with the 41% would be reallocated to the 41% Owners, as noted above. In addition, Blue Phoenix would have an option to purchase the Estate's remaining 59% interest**

**in South Town, for $13 million, exercisable and with a closing to occur within two years from this Court's approval of this Petition.**

43. If the Plan is not confirmed or if the Payment Disbursement Date does not arise under the Plan, then the transaction with Provizia would not close and the Estate would retain its 100% interest in South Town. Likewise, if Provizia, for some reason, exits the transaction (rightfully or wrongfully) Equity Alternative B would not occur.

***Authority to Pledge the Estate's 59% Membership Interest***

44. Under Equity Alternative B, which requires secured lending from Provizia, it is contemplated that Provizia may require a pledge of the membership interests held in South Town by both the Estate and the 41% Owners, as additional collateral security.

**45. Therefore under Equity Alternative B, the Personal Representative is seeking authority, if required and only on equity parity with the 41% Owners, to pledge all or a portion of the Estate's 59% interest in South Town to Provizia, if required by Provizia.**

***Election as to Equity Alternative A and Equity Alternative B***

46. The Personal Representative prefers Equity Alternative A, as it brings certainly to the monetization of the Estate's 100% interest in South Town. Further, in the Personal Representative's capacity as the DIP Representative, Equity Alternative A does not burden South Town with any exit financing, but instead, provides for a $41 million equity infusion into South Town, to fund the Plan and further development of the Development. Equity Alternative B provides a different benefit to the Estate, in ensuring the Estate's interest in South Town is not lost through a failed chapter 11 proceeding and a subsequent foreclosure action by CNB and/or Brownstone.

47. If approval of Equity Alternative A and Equity Alternative B is obtained from this Court, then the Personal Representative will proceed on a dual track as to both, until the Personal Representative has confidence in the alternative that will result in a closing, again with preference to Equity Alternative A.

48. Once a final election is made by the Personal Representative, the Personal Representative intends to file a report with this Court as to the Personal Representative's election and the results of the Plan confirmation process.

***Conversion of Prentice Debt to Equity***

49. Under both Equity Alternative A and under Equity Alternative B, the Estate currently holds a 100% interest in Prentice. Prentice alleges to hold a mortgage on the South Town property in the amount of $8,500,000.

50. It is questionable whether the Prentice mortgage has any value, as it is behind the mortgage debt of CNB and Brownstone, and is also behind all unpaid taxes and all lien claims, which, in the aggregate, exceed $26 million.

51. Further, the debt Prentice claims it is owed is questionable.

52. First, it is based on a one-page document, attached as **Exhibit 5-Prentice Loan**, that was entered into between two related parties, both owned by Margaret Poscher, at the time.

53. Second, it provides for no accrual of interest and does not appear in the form expected of a formal note and mortgage transaction.

54. Third, South Town and Prentice have been unable to provide evidence that this was in fact a loan, versus an equity infusion by Prentice into South Town.

55. Finally, the records of South Town and of Prentice do not reflect direct investments by Prentice into South Town, but instead, debts paid on behalf of South Town or monies infused into South Town by Margaret Poscher or the Personal Representative, not by Prentice.

56. As a result, the compromise being sought hereunder is that the Prentice mortgage interest be converted to equity and the Estate would hold Prentice's 5% membership interest in Newco, under Equity Alternative A, or, Prentice's mortgage interest would be converted to a 5% membership interest in South Town, under Equity Alternative B.

57. WHEREFORE, Heidi Poscher respectfully requests that this Court grant this Petition and enter an order:

A. Granting authority to the Personal Representative to enter into Equity Alternative A or Equity Alternative B; and

B. Under Equity Alternative B, permitting the Personal Representative to pledge all or a portion of the Estate's 59% membership interest to Provizia, but conditioned on an equal parity pledge by the 41% Owners; and

C. Under Equity Alternative B, grant to Blue Phoenix an option to acquire the Estate's 59% membership interest in South Town, exercisable and to close within two years from the date of this Court's approval of this Petition; and

D. Authorizing under Equity Alternative A, a conversion of Prentice's alleged $8,500,000 mortgage debt into a 5% equity interest in Newco or under Equity Alternative B, a conversion of Prentice's alleged $8.5 million mortgage debt into a 5% equity interest in South Town; and

E. Awarding such other and further relief as this Court deems just, equitable, and appropriate.

*I declare under the penalties of perjury that this petition has been examined by me and that its contents are true and accurate to the best of my information, knowledge, and belief.*

*[Signatures on following page]*

HEIDI POSCHER
Personal Representative of the Estate
of Margaret Elizabeth Poscher

Respectfully submitted,

DIANE SLINGER (P35693)
JAY L. WELFORD (P34471)
TAFT STETTINIUS & HOLLISTER LLP
27777 Franklin Road – Suite #2500
Southfield, MI 48034
248-351-3000
*Attorneys for Heidi Poscher*

**Dated:** August 19, 2026



301806378v5

**EXHIBIT 1**

**(Letters of Authority)**

Approved, SCAO

JIS CODE: LET

| STATE OF MICHIGAN<br>PROBATE COURT<br>COUNTY OF WASHTENAW | LETTERS OF AUTHORITY FOR PERSONAL REPRESENTATIVE | FILE NO.<br>25-1151-DE |
|---|---|---|

Estate of Margaret Elizabeth Poscher, Deceased

TO: Name and address

Heidi Poscher
809 Henry St.
Ann Arbor, MI 48104

Telephone no.
(614) 205-2509

You have been appointed and qualified as personal representative of the estate on 10-22-2025.
Date

You are authorized to perform all acts authorized by law unless exceptions are specified below.

[ ] Your authority is limited in the following way:

[ ] You have no authority over the estate's real estate or ownership interests in a business entity that you identified on your acceptance of appointment.

[ ] Other restrictions or limitations are:

[X] These letters expire: 10-22-2026.
Date

10-22-2025
Date

James N. Bauer
)/Register (informal proceedings) P55324 Bar no.

SEE NOTICE OF DUTIES ON SECOND PAGE

James N. Bauer

Taft Stettinius & Hollister LLP
Diane Slinger P35693
Attorney name (type or print) Bar no.
27777 Franklin Road, Ste. 2500
Address
Southfield, MI 48034 (248) 351-3000
City, state, zip Telephone no.

I certify that I have compared this copy with the original on file and that it is a correct copy of the original, and on this date, these letters are in full force and effect.

10/22/2025
Date

Deputy Register

Do not write below this line - For court use only

MCL 700.3103, MCL 700.3307, MCL 700.3414, MCL 700.3504, MCL 700.3601,

PC 572 (2/13) **LETTERS OF AUTHORITY FOR PERSONAL REPRESENTATIVE** MCR 5.202, MCR 5.206, MCR 5.307, MCR 5.310

177033540v1

**The following provisions are mandatory reporting duties specified in Michigan law and Michigan court rules and are not the only duties required of you.** See MCL 700.3701 through MCL 700.3722 for other duties. Your failure to comply may result in the court suspending your powers and appointing a special fiduciary in your place. It may also result in your removal as fiduciary.

**CONTINUED ADMINISTRATION:** If the estate is not settled within 1 year after the first personal representative's appointment, you must file with the court and send to each interested person a notice that the estate remains under administration, specifying the reasons for the continued administration. You must give this notice within 28 days of the first anniversary of the first personal representative's appointment and all subsequent anniversaries during which the administration remains uncompleted. If such a notice is not received, an interested person may petition the court for a hearing on the necessity for continued administration or for closure of the estate. [MCL 700.3703(4), MCL 700.3951(3), MCR 5.144, MCR 5.307, MCR 5.310]

**DUTY TO COMPLETE ADMINISTRATION OF ESTATE:** You must complete the administration of the estate and file appropriate closing papers with the court. Failure to do so may result in personal assessment of costs. [MCR 5.310]

**CHANGE OF ADDRESS:** You are required to inform the court and all interested persons of any change in your address within 7 days of the change.

**Additional Duties for Supervised Administration**

If this is a supervised administration, in addition to the above reporting duties, you are also required to prepare and file with this court the following written reports or information.

**INVENTORY:** You are required to file with the probate court an inventory of the assets of the estate within 91 days of the date your letters of authority are issued or as ordered by the court. You must send a copy of the inventory to all presumptive distributees and all other interested persons who request it. The inventory must list in reasonable detail all the property owned by the decedent at the time of death. Each listed item must indicate the fair market value at the time of the decedent's death and the type and amount of any encumbrance. Where the decedent's date of death is on or after March 28, 2013, the lien amount will be deducted from the value of the real property for purposes of calculating the inventory fee under MCL 600.871(2). If the value of any item has been obtained through an appraiser, the inventory should include the appraiser's name and address with the item or items appraised by that appraiser. You must also provide the name and address of each financial institution listed on your inventory at the time the inventory is presented to the court. The address for a financial institution shall be either that of the institution's main headquarters or the branch used most frequently by the personal representative. [MCL 700.3706, MCR 5.307, MCR 5.310(E)]

**ACCOUNTS:** You are required to file with this court once a year, either on the anniversary date that your letters of authority were issued or on another date you choose (you must notify the court of this date) or more often if the court directs, a complete itemized accounting of your administration of the estate. This itemized accounting must show in detail all income and disbursements and the remaining property, together with the form of the property. Subsequent annual and final accountings must be filed within 56 days following the close of the accounting period. When the estate is ready for closing, you are also required to file a final account with a description of property remaining in the estate. All accounts must be served on the required persons at the same time they are filed with the court, along with proof of service.

**ESTATE (OR INHERITANCE) TAX INFORMATION:** You are required to submit to the court proof that no estate (or inheritance) taxes are due or that the estate (or inheritance) taxes have been paid. **Note:** The estate may be subject to inheritance tax.

**Additional Duties for Unsupervised Administration**

If this is an unsupervised administration, in addition to the above reporting duties, you are also required to prepare and provide to all interested persons the following written reports or information.

**INVENTORY:** You are required to prepare an inventory of the assets of the estate within 91 days from the date your letters of authority are issued and to send a copy of the inventory to all presumptive distributees and all other interested persons who request it. The inventory must list in reasonable detail all the property owned by the decedent at the time of death. Each listed item must indicate the fair market value at the time of the decedent's death and the type and amount of any encumbrance. Where the decedent's date of death is on or after March 28, 2013, the lien amount will be deducted from the value of the real property for purposes of calculating the inventory fee under MCL 600.871(2). You are required within 91 days from the date your letters of authority are issued, to submit to the court the information necessary to calculate the probate inventory fee that you must pay to the probate court. You may use the original inventory for this purpose. [MCL 700.3706, MCR 5.307]

**ESTATE (OR INHERITANCE) TAX INFORMATION:** You may be required to submit to the court proof that no estate (or inheritance) taxes are due or that the estate (or inheritance) taxes have been paid. **Note:** The estate may be subject to inheritance tax.

**EXHIBIT 2**

**(Inventory)**

PCS Code: INV
TCS Code: INVF

| STATE OF MICHIGAN<br>PROBATE COURT<br>WASHTENAW COUNTY | INVENTORY<br>[ ] AMENDED<br>(DECEDENT ESTATE) | CASE NO. and JUDGE<br>2025-001151-DE<br>Darlene A. O'Brien |
|---|---|---|

**Court address**
101 E. Huron, Rm 1104, Ann Arbor, MI 48107

**Court telephone no.**
(734) 222-3072

In the matter of Margaret Elizabeth Poscher, Deceased
First, middle, and last name of decedent

Personal representative's name, address, and telephone no.
Heidi Poscher
809 Henry St.
Ann Arbor, MI 48104
(614) 205-2509

Personal representative's attorney, bar no., address, and telephone no.
Diane Slinger P35693
27777 Franklin Road, Ste. 2500
Southfield, MI 48034
(248) 351-3000

I, Heidi Poscher, personal representative, submit the following as a complete
Name (type or print)
and accurate inventory of all the assets of the estate and the fair market valuations as of 10/10/2025 .
Date of death

**PERSONAL PROPERTY AND REAL PROPERTY DESCRIPTION** If property has been used to secure a loan (including an equity line of credit), show the nature and amount of the lien. Definitions and instructions for completing the inventory are on page 2 of this form. The values of all property are calculated as of the decedent's date of death. *For real property only, if the date of death is on or after March 28, 2013, the gross value of a parcel can be reduced by any lien amount on that parcel; however, the remaining inventory value of that parcel cannot be less than zero. For personal property, the gross value and inventory value are the same. (Attach separate sheet if necessary.)

| Description | Gross value | Lien amount | Inventory value |
|---|---|---|---|
| Legal description of real property | Gross value | Lien amount | Inventory value (less lien)* |
| Legal description of real property | Gross value | Lien amount | Inventory value (less lien)* |
| Description of personal property<br>99% Membership Interest in Prentice Partners of Ann Arbor LLC | Gross value<br>undetermined | Lien amount | Inventory value<br>undetermined |
| Description of personal property<br>100% Membership Interest in Southtown by 4M LLC | Gross value<br>undetermined | Lien amount | Inventory value<br>undetermined |
| Description of personal property<br>99% Membership Interest in Circa 1919 LLC | Gross value<br>undetermined | Lien amount | Inventory value<br>undetermined |
| Description of personal property<br>81% Membership Interest in AHFLP LLC | Gross value<br>undetermined | Lien amount | Inventory value<br>undetermined |
| Description of personal property<br>99% Membership Interest in 4th Purpose Energy LLC | Gross value<br>undetermined | Lien amount | Inventory value<br>undetermined |
| Description of personal property<br>Chase Bank account | Gross value<br>undetermined | Lien amount | Inventory value<br>undetermined |
| Description of personal property<br>Personal property | Gross value<br>undetermined | Lien amount | Inventory value<br>undetermined |
| Totals | Total Gross Value<br>undetermined | | Total Inventory Value<br>undetermined |

I declare under the penalties of perjury that this inventory has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

1-21-26
Date

[signature] 355483 for Diane Slinger P35693
Attorney signature

[signature]
Signature

Approved, SCAO
Form PC 577, Rev. 9/20
MCL 700.3706, MCL 700.3707, MCR 5.307, MCR 5.310, MCR 5.409(B)
Page 1 of 2

196937507v1

**EXHIBIT 3**

**(Chapter 11 Plan)**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re: Case No. 26-40805

South Town By 4M, LLC, Chapter 11

Debtor. Hon. Lisa S. Gretchko

_______________________/

**FIRST AMENDED**
**COMBINED CHAPTER 11 PLAN AND DISCLOSURE STATEMENT**

South Town by 4M LLC, debtor and debtor-in-possession in the above captioned case, by and through its attorneys, states as follows for its *First Amended Combined Chapter 11 Plan of Reorganization and Disclosure Statement*:

## I. The Plan of Reorganization

### ARTICLE 1: SUMMARY

This Plan allows the Debtor to successfully exit this chapter 11 bankruptcy proceeding and complete the Development.[1] The Plan provides for the full payment of all allowed secured claims[2] and non-priority unsecured claims, super-priority administrative expenses, administrative expenses and priority claims.

### ARTICLE 2: CLASSIFICATION OF CLAIMS

**Class 1** consists of the City of Ann Arbor's Claim, secured by a tax lien against

[1] Please reference Article 10 of the Plan for all defined terms contained in this Plan.

[2] The secured claim of Prentice will be converted to equity.

the Property in the amount of $169,080.67.

**Class 2** consists of CNB's Claim, secured by a mortgage against the Property for money loaned in the approximate amount of $18,628,131.44 which includes postpetition interest and attorneys' fees and other charges and expenses, including appraisal fees.

**Class 3** consists of Brownstone's Claim, secured by a mortgage against the Property for money loaned in the amount of $7,794,566.33 which includes interest and attorneys' fees and other fees and costs.

**Class 4** consists of Prentice's Claim, secured by a mortgage against the Property in the principal amount of $8,500,000.00.

**Class 5** consists of Higley's Claim, secured by a construction lien against the Property in the amount of $976,084.21.[3]

**Class 6** consists of SmithGroup's Claim, secured in part, by a construction lien against the Property in the amount of $508,139.00.[4]

**Class 7** consists of BDS's Claim, secured by a construction lien against the Property in the amount of $129,898.00.

---

[3] The total amount of the Higley Claim is $1,010,351.77 and includes the separately filed claim of BDS, which, in addition to the Class 5 Claim, contains a general unsecured Class 9 Claim in the amount of $34,267.56.

[4] The total amount of the SmithGroup Claim is $902,726.45 which, in addition to the Class 6 Claim, contains a general unsecured Class 9 Claim in the amount of $394,587.45.

**Class 8** consists of Synecdoche's Claim, secured by a disputed and unliquidated construction lien against the Property in the amount of $822,140.96.

**Class 9** consists of all non-priority, general unsecured Claims.

**Class 10** consists of the Equity Interests of the Debtor, namely the Poscher Estate which holds 100 percent of the equity interest in the Debtor.

**Super-priority administrative expense Claims:** consists of the Claim of the Responsible Person, Ms. Poscher, in an amount equal to all amounts advanced prior to Plan confirmation consistent with the Second DIP Financing Order, the Second DIP Budget and any amendments thereto.

**Administrative Expenses:** consists of the Legal Expenses owing to Counsel to the Debtor and UST Quarterly Fees of $350. Payment of the Legal Expenses owing to Counsel to the Debtor is subject to court approval of the same. As of the time of filing of this Plan, the Legal Expenses incurred by Counsel to the Debtor were approximately $480,000.00. Additional Legal Expenses will be incurred through the Effective Date. Ms. Poscher, on behalf of the Debtor, has personally advanced the Retainer Deposits. The Legal Expenses will be paid in full by the Debtor after Court approval of the same. To the extent the Debtor has insufficient funds to pay the Legal Expenses at the time of their approval by the Court, the Legal Expenses may be paid from the Retainer Deposits, in which case Ms. Poscher shall be subrogated to the rights of Counsel to the Debtor with respect to such amounts

and shall be entitled to repayment of the same, on the Effective Date. Ms. Poscher's subrogation claim, if it arises, would be in addition to the Claim which she has filed in this proceeding. Any excess Retainer Deposits shall be returned to Ms. Poscher. UST Quarterly Fees are being paid under the Second DIP Financing Order and the Second DIP Budget, with any remaining balance being paid on the Effective Date.

**Secured administrative expense claims:** consists solely of the property tax Claim of the City of Ann Arbor for unpaid real property taxes represented by the July 1, 2026 tax bill in the amount of $28,888.29, which shall become due and payable on or prior to September 15, 2026.

All creditors and equity security holders should refer to Articles 3 through 6 of this Plan for information regarding the precise treatment of their Claims and interests.

## ARTICLE 3: TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

**3.01 Class 1.** Secured Claim of the City of Ann Arbor.

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim: $ 169,080.67

Estimated Value of Collateral: $ 61,000,000.00

The City of Ann Arbor holds the Ann Arbor Tax Claim, which is secured by a tax lien against the Property for unpaid 2025 real property taxes. Under applicable Michigan law, such tax liens are afforded statutory priority and prime all prior recorded

liens and encumbrances against the Property, regardless of the date of recording. The Ann Arbor Tax Claim will be paid in full on the Effective Date.

**3.02 Class 2.** Secured Claim of CNB.

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim: $ 18,628,131.14

Estimated Value of Collateral: $ 61,000,000.00

CNB holds a Claim secured by a mortgage against the Property for money loaned to the Debtor. CNB's lien on the Property and all of its rights and remedies under its mortgage and other loan documents are preserved until its Claim is paid in full on the Effective Date. The allowed amount of this Claim will be paid in full on the Effective Date. CNB claims that it is owed interest of $1,554,048.07 and fees and expenses of not less than $210,569.43 as of July 29, 2026 (which is included in the amount of claim above) plus fees, charges and expenses incurred after that date with per diem interest thereafter at $5,110.54. The allowed amount of CNB's claim will be determined upon agreement of the Debtor and CNB or per resolution by the Court.

**3.03 Class 3.** Secured Claim of Brownstone.

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim: $ 7,794,566.33

Estimated Value of Collateral: $ 61,000,000.00

Brownstone holds a Claim secured by a mortgage against the Property for money loaned to the Debtor. The allowed amount of this Claim will be paid in full on the Effective Date.

**3.04 Class 4.** Secured Claim of Prentice.

**Impaired. Entitled to vote on the Plan.**

Amount of claim: $ 8,500,000.00

Estimated Value of Collateral: $ 61,000,000.00

Prentice holds a Claim secured by a mortgage against the Property for money allegedly loaned to the Debtor. On the Effective Date, Prentice's Claim shall be converted to a 5% equity interest in the Reorganized Debtor.

**3.05 Class 5.** Secured Claim of Higley.

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim: $ 976,084.21

Estimated Value of Collateral: $ 61,000,000.00

Higley holds a construction lien Claim against the Property for services performed. The allowed amount of this Claim will be paid in full on the Effective Date, pursuant to joint checks in the following amounts, based on the Higley Claim including the claims of various subcontractors to Higley;

| | |
|---|---|
| Higley and BDS | $129,898.00 |
| Higley and Blue Star, Inc | $243,215.00 |

| | |
|---|---|
| Higley and Eagle Excavation | $68,280.58 |
| Higley and Industrial Fence & Landscaping, Inc. | $34,911.00 |
| Balance to Higley | $369,881.63 |

**3.06 Class 6.** Secured Claim of SmithGroup

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim: $ 508,139.00

Estimated Value of Collateral: $ 61,000,000.00

SmithGroup holds a construction lien Claim against the Property for services performed. The allowed amount of this Claim will be paid in full on the Effective Date.

**3.07 Class 7.** Secured Claim of BDS

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim: $ 129,898.00

Estimated Value of Collateral: $ 61,000,000.00

BDS holds a construction lien Claim against the Property for services performed. The allowed amount of this Claim will be paid in full on the Effective Date pursuant to a joint check with Higley, as provided in Section 3.05 hereof.

**3.08 Class 8.** Secured Claim of Synecdoche

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim: $ 822,140.96

Estimated Value of Collateral: $ 61,000,000.00

Synecdoche asserts a construction lien Claim against the Property for services performed. The Synecdoche Claim will be the subject of an adversary proceeding and claim objection seeking disallowance of the Synecdoche Claim and repayment of amounts owing to the Debtor. If the allowed amount of the Synecdoche Claim has not been resolved prior to the Effective Date, then the gross amount of the Synecdoche Claim will be escrowed until the amount of the Synecdoche Claim, if any, is determined. Once the allowed amount of the Synecdoche Claim is determined, the Allowed Synecdoche Claim will be paid in full from the Contested Claims Reserve.

**3.09 Class 9**. All Non-Priority Unsecured Claims Allowed Under Section 502 of the Bankruptcy Code.

**Unimpaired. Not entitled to vote on the Plan.**

Class 9 consists of eight (8) non-priority unsecured Claims, specifically: Graybar/Schneider ($122,310.04); Ms. Poscher ($1,985,012); Bill Me Later, Inc./PayPal, Inc. ($105,404.92); G2 ($26,425.00); Learfield ($180,000.00); Newmark Valuation Advisory, LLC ($10,500.00); SmithGroup ($394,587.45); and Resilient Solar of East Tennessee LLC ($0). The allowed amount of all Class 9 Claims will be paid in full on the Effective Date. The BDS Claim will be paid pursuant to a joint check with Higley, as set forth in Section 3.05 hereof. If any of the Class 9 Claims are Contested Claims, they shall be paid in accordance with

Article V hereof.

**3.10 Class 10**. Equity Interests of the Debtor.

**Impaired. Entitled to vote on the Plan.**

On the Effective Date, contemporaneous with payment in full of all Claims, the Debtor is transferring its ownership interest in the Transferred Assets to a Delaware special purpose entity (the "SPE"), in exchange for which the Debtor will receive one hundred percent (100%) of the equity in the SPE, making the Debtor the parent of the SPE. The transfer of the Transferred Assets is subject to all liens securing Claims until the Claims are paid in full. Thereafter, the equity in the Debtor will be addressed in one of two alternative transactions.

This transaction is diagramed as follows:

**Debtor** >Transfer of the Transferred Assets to the **SPE**

**Debtor** <Receipt of 100% of the membership interest in the **SPE**

This results in the Debtor being the holding company of the SPE, with the Debtor in turn being 100% owned by the Poscher Estate, with the equity then reallocated according Equity Transaction A or Equity Transaction B below. This transaction from the Poscher Estate to the SPE is diagramed as:

**Poscher Estate**

|

100%

|

**Debtor**

|

100%

|

**SPE**

**Equity Transaction A.** Under Equity Transaction A, a newly formed entity ("Newco") will acquire 100% of the equity interests in the Debtor from the Poscher Estate, for a multiple of a seven-figure amount.

This transaction is diagramed as follows:

**Poscher Estate** >Transfer of 100% of membership interest in Debtor to **Newco**

**Newco** <Receipt of 100% of the membership interest in the **Debtor**

This results in the Debtor being the holding company of the SPE, with the Debtor, in turn being 100% owned by Newco, diagramed as:

**Newco**
|
100%
|
**Debtor**
|
100%
|
**SPE**

Newco will be owned 59% by Agile Solar Group, LLC, or its affiliate and 41% will be owned by a combination of parties, the percentage ownership of which is as follows: Prentice, 5% (conversion of its debt position to equity); Blue Phoenix, 22%; Pullins, 2% (equity exercisable upon completion of vertical construction); APB, 5%; Vohwinkle, 2% (equity exercisable upon completion of vertical construction); and Reynolds, 5%. Blue Phoenix is an affiliate of Ms. Poscher. Prentice is owned fully by the Poscher Estate. Pullins, Vohwinkle, APB and

Reynolds are not affiliates of Ms. Poscher, the Poscher Estate or any of their respective affiliates.

**Equity Transaction B**. Under Equity Transaction B, 59% of the equity in the Debtor shall continue to be held by the Poscher Estate and the remaining 41% shall be issued as follows: Prentice, 5% (conversion of its debt position to equity); Blue Phoenix, 22%; Pullins, 2% (equity exercisable upon completion of vertical construction); APB, 5%; Vohwinkle, 2% (equity exercisable upon completion of vertical construction); and Reynolds, 5%. Blue Phoenix is an affiliate of Ms. Poscher. Prentice is owned fully by the Poscher Estate. Pullins, Vohwinkle, APB and Reynolds are not affiliates of Ms. Poscher, the Poscher Estate or any of their respective affiliates.

This results in the Debtor being the holding company of the SPE, with the Debtor, in turn being owed as diagramed below:

**Poscher Estate Prentice Blue Phoenix Pullins APB Vohwinkle Reynolds**

59% 5% 22% 2% 5% 2% 5%

100%

**Debtor**

100%

**SPE**

Equity Transaction A and Equity Transaction B will be brought before the

Probate Court with governance over the Poscher Estate, prior to the hearing on confirmation of this Plan (the "Probate Court Approval"), to obtain conditional approval of both, subject only to confirmation of this Plan. The Debtor will file a supplement to this Plan, to include the submission made to the Probate Court and will file a supplement to this Plan as to any order issued by the Probate Court. Each supplement shall be served on all parties.

## ARTICLE 4: TREATMENT OF ADMINISTRATIVE EXPENSES, PRIORITY TAX CLAIMS AND QUARTERLY FEES

**4.01: Unclassified Claims.** Under section 1123(a)(1) of the Bankruptcy Code, allowed Administrative Expenses and priority tax claims captured under section 507(a) are not classified Claims.

**4.02: Administrative Expense Claims.** Claims for Administrative Expenses allowed under section 503 of the Bankruptcy Code will be paid in full upon the later of court approval of the same and the Effective Date, in cash, or upon such other terms as may be agreed upon by the holder of the Claim and the Debtor.

**4.03: Priority Tax Claim.** The priority tax Claim consists solely of the unsecured portion of the Claim of the City of Ann Arbor for unpaid real property taxes represented by the July 1, 2026 tax bill in the amount of $28,888.29, which shall become due and payable on or prior to September 15, 2026. This priority tax Claim shall be paid in full on the Effective Date.

## ARTICLE 5: ALLOWANCE AND DISALLOWANCE OF CLAIMS

**5.01 Delay of Distribution on a Contested Claim.** No distribution will be made on account of a Contested Claim unless and until it is an Allowed Claim.

**5.02: Settlement of Contested Claims.** The Debtor will have the power and authority to settle and compromise any Contested Claim with court approval and compliance with Bankruptcy Rule 9019.

**5.03 Contested Claims Reserve.** On the Effective Date, the Reorganized Debtor shall establish and maintain the Contested Claims Reserve. Funds held in the Contested Claims Reserve shall not be distributed to a creditor holding a Contested Claim until the later of: (a) the date the Contested Claim becomes an Allowed Claim pursuant to a Final Order; or (b) the Effective Date. Upon the disallowance of a Contested Claim by a Final Order, the amount reserved on account of such Contested Claim shall be released from the Contested Claims Reserve and shall revert to the Reorganized Debtor.

**5.04 Claim Objection Deadline.** The Debtor or Reorganized Debtor shall file any objections to Claims whether by filing an objection to claim or an adversary proceeding on or before the Effective Date, unless such deadline is extended by order of the Bankruptcy Court upon a motion filed before its expiration.

## ARTICLE 6: PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The Debtor is a party to the following executory contracts: DMC Real Estate Services who provided advisory services for the development of the Property; Graybar/Schneider who provided a feasibility study for incorporating the MicroGrid into the Development; Nederveld who provided civil engineering plans and strategies for the site plan approvals; Learfield who provided marketing services; Newmark Valuation Advisory, LLC who provided a market revenue study and valuation guidance; Resilient Solar of East Tennessee LLC who provided an energy market analysis; and Higley who provided various construction and advisory services for the Development. To the extent not terminated or concluded prior to the Petition Date, on August 7, 2026 and August 10, 2026 the Debtor filed motions to reject each of the foregoing executory contracts pursuant to section 365 of the Bankruptcy Code. The Debtor reserves the right to amend this Plan prior to confirmation to assume any of the foregoing executory contracts.

## ARTICLE 7: MEANS FOR IMPLEMENTATION OF THE PLAN

The Plan shall be implemented through the following transactions:

1. On or prior to the hearing on confirmation, the Debtor shall have obtained the Probate Court Approval.

2. On the Effective Date, contemporaneous with payment in full of all Claims, the Reorganized Debtor shall convey its interest in all of the Transferred Assets to the SPE. The transfer of the Transferred Assets is subject to all liens

securing Claims until the Claims are paid in full.

3. On the Effective Date, the equity in the Debtor shall be sold, as specified in Equity Transaction A, or re-allocated, as specified in Equity Transaction B. If the equity in the Debtor is re-allocated, as specified in Equity Transaction B, then on the Effective Date, the Debtor shall enter into an Operating Agreement among its members, to reflect the equity allocations set forth in Equity Transaction B.

4. If the equity of the Debtor is sold, as specified in Equity Transaction A, then on the Effective Date, Agile shall make a capital contribution into Newco and Newco, in turn, shall make a capital contribution into the Debtor, in an amount sufficient to pay in full the allowed amount of all Claims, with any necessary funds placed in the Contested Claims Reserve.

5. If the equity of the Debtor is re-allocated, as specified in Equity Transaction B, then on the Effective Date, the Debtor shall close on and obtain the Exit Financing from the Exit Financing Lender, in an amount sufficient to pay in full the allowed amount of all Claims, with any necessary funds placed in the Contested Claims Reserve.

6. If applicable, in conjunction with the Exit Financing, Reynolds, on the Effective Date, shall execute a Guaranty Fee Agreement with the Debtor and the Exit Financing Lender, pursuant to which Reynolds shall provide credit

enhancement to the Exit Financing Lender with respect to the Exit Financing, on terms acceptable to Reynolds, the Debtor and the Exit Financing Lender.

7. As security for the Exit Financing, if applicable, the SPE will, contemporaneous with payment in full of all Claims, grant to the Exit Financing Lender, pursuant to the Exit Financing Agreements, a lien on the assets of the SPE, subject to all liens in the Transferred Assets securing the Claims until the Claims are paid in full, and thereafter, will become a first-priority lien in the assets of the SPE including the Transferred Assets. With respect to the Exit Financing, one or more of the members of the Debtor may additionally be required to grant a pledge of their membership interest to the Exit Financing Lender.

8. On the Effective Date, the Debtor shall make the payments provided for hereunder to all creditors holding Allowed Claims with any Claims subject to dispute to be paid from the Contested Claims Reserve, to the extent later allowed.

9. Any balance remaining in the Contested Claims Reserve and other cash received by the Debtor not necessary to pay the allowed Claims of the Debtor's creditors shall be released to the Reorganized Debtor.

10. On the Effective Date, RAM and Blue Phoenix shall enter into a Co-Development Agreement with the Debtor, pursuant to which RAM and Blue Phoenix shall assume various duties on a post-Effective Date basis with respect to the Development. This Co-Development Agreement would be effective under both

Equity Alternative A and Equity Alternative B, as it addresses the steps to be taken post the Effective Date to move the Development to vertical construction and completion. All payments under the Co-Development Agreement would be paid from the Vertical Financing.

## ARTICLE 8 EVENTS OF DEFAULT AND EFFECT THEREOF

Any creditor remedies allowed by section 1112 of the Bankruptcy Code, including section 1112(b)(4)(N) of the Bankruptcy Code, shall be preserved to the extent otherwise available at law. In addition to any rights specifically provided to a claimant treated pursuant to this Plan, a failure by the Debtor to make a payment to a creditor pursuant to the terms of this Plan shall be an event of default as to such payment not cured within ten (10) days after mailing written notice of default from such creditor to the Debtor. Any default notice, inquiry, or other formal communication pursuant to the Plan shall be mailed by certified mail, return receipt requested to the following:

To: South Town by 4M, LLC
c/o Heidi Caroline Poscher
27777 Franklin Rd, Suite 2500
Southfield, MI 48034

With a Copy To: Taft Stettinius & Hollister, LLP
c/o Jay Welford; Kimberly Ross Clayson;
Anthony Cimini
27777 Franklin Rd, Suite 2500
Southfield, MI 48034

(Noticing Requirements Cont'd on Next Page)

jwelford@taftlaw.com
kclayson@taftlaw.com
acimini@taftlaw.com

## ARTICLE 9 EFFECT OF CONFIRMATION OF THE PLAN

### 9.01 Binding Effect of Plan.

Upon the Effective Date, the provisions of the Plan shall bind the Debtor, the Reorganized Debtor, all holders of Claims and Equity Interests in the Debtor, all Persons acquiring property under the Plan, and all other parties in interest in this case, together with their respective agents, attorneys, representatives, heirs, successors, and assigns, to the fullest extent permitted under sections 1141(a) and 1142 of the Bankruptcy Code, whether or not such parties (a) voted to accept or reject the Plan, (b) had a right to vote on the Plan, (c) hold a Claim or Equity Interest that is Impaired or Unimpaired under the Plan, (d) hold a Claim or Equity Interest that is an Allowed Claim, a Contested Claim, or a Claim that has been disallowed in whole or in part, (e) have filed a proof of claim or proof of interest in this case, or (f) are entitled to receive a distribution under the Plan.

### 9.02 Vesting of Assets.

Upon the Effective Date, after payment in full of all Claims, pursuant to section 1141(b) and (c) of the Bankruptcy Code, the Debtor's assets shall be comprised of the Debtor's 100 percent interest in the SPE, all causes of action, including Avoidance claims and all rights, claims, and defenses of the Debtor and

the estate, shall vest in the Reorganized Debtor, free and clear of all liens, claims, charges, encumbrances, and interests of creditors and equity interest holders, except as otherwise expressly provided in the Plan or the Confirmation Order. From and after the Effective Date, the Reorganized Debtor may operate its business and use, acquire, and dispose of property and settle and compromise claims and interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, except as otherwise provided in the Plan or the Confirmation Order. Because all allowed Claims are being paid in full under the Plan, there would be no purpose to pursue any Avoidance Claims. The Debtor intends to file a breach of contract action against Synecdoche, as an offset to the Claim asserted by Synecdoche. Any proceeds of an action against Synecdoche shall be utilized by the Debtor in its general operations.

**9.03 Injunction**

Except as otherwise expressly provided in the Plan or the Confirmation Order, and after payment in full of all Claims on the Effective Date, all Persons who have held, hold, or may hold Claims against or Equity Interests in the Debtor are, pursuant to sections 524 and 1141 of the Bankruptcy Code, permanently enjoined from (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtor, the Reorganized Debtor, or their respective property on account of any such Claim or Equity Interest; (b) enforcing, attaching, collecting, or

recovering by any manner or means any judgment, award, decree, or order against the Debtor, the Reorganized Debtor, or their respective property on account of any such Claim or Equity Interest; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against the Debtor, the Reorganized Debtor, or their respective property on account of any such Claim or Equity Interest; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtor, the Reorganized Debtor, or their respective property on account of any such Claim or Equity Interest; and (e) commencing or continuing in any manner any action or other proceeding of any kind against the Debtor, the Reorganized Debtor, or their respective property in respect of any Claim or Equity Interest that is treated, classified, discharged, or otherwise addressed under the Plan. All such Persons shall be required to pursue satisfaction of their Claims and Equity Interests against the Debtor, the Reorganized Debtor, or their respective property solely through the distribution mechanisms provided under the Plan.

**ARTICLE 10: GENERAL PROVISIONS**

**10.01 Definitions and rules of construction.** The definitions and rules of construction set forth in sections 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan, and they are supplemented by the following definitions:

"Administrative Expenses" means, collectively, the Legal Expenses and the

Quarterly Fees.

"Agile" means Agile Solar Group, LLC or its assignee.

"Allowed Claim" means a Claim against the Debtor to the extent such Claim is not a Contested Claim and (a) has been scheduled by the Debtor in its Schedules as neither disputed, contingent, nor unliquidated and as to which no objection has been filed; (b) a proof of claim has been timely filed and no objection thereto has been filed; or (c) has been allowed by a Final Order.

"Allowed Synecdoche Claim" means the allowed amount, if any, of the Claim of Synecdoche.

"Amended Case Management Order" means the Court's *Order Amending Order Establishing Deadlines and Procedures for a Single Asset Real Estate Case* [ECF No. 124].

"Amended Commitment Letter" means the letter of commitment between Agile and the Debtor, entered into on July 16, 2026.

"Second DIP Budget" means the amended budget attached as Exhibit B to the Second DIP Motion.

"Second DIP Motion" means the Debtor's *Motion for Entry of an Order (a) Authorizing the Debtor to Increase the Amount of Its Post-Petition Financing* [ECF No. 132].

"Amended DIP Note" means the *Amended and Restated Promissory Note*

[ECF No. 113], reflecting the amended terms of the DIP Loan included in the Final DIP Financing Order.

"Second DIP Financing Order" means the *Order Granting Debtor's Motion for Authority to Increase the Amount of Its Post-Petition Financing* entered on July 27, 2026 [ECF No. 153].

"Second DIP Loan" means the post-petition multi-draw secured term loan in an amount not to exceed $650,000, provided to the Debtor by the DIP Lender as reflected in the Second Amended DIP Note and approved by the Second DIP Financing Order.

"Second DIP Stipulation" means the *Stipulation to Order Authorizing the Debtor to Increase the Amount of Its Post-Petition Financing* [ECF No. 140].

"Ann Arbor Tax Claim" means the City of Ann Arbor's tax lien claim secured against the Property for unpaid real property tax from year 2025, in the amount of $169,080.67.

"APB" means American Platinum Builders.

"Avoidance Claims" means any Claims pursuant to sections 502(d), 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

"Bankruptcy Court" or the "Court" means the United States Bankruptcy Court

for the Eastern District of Michigan, Southern Division, having jurisdiction over this case.

"Bankruptcy Rule" means the Federal Rules of Bankruptcy Procedure.

"Bar Date" means the date established by the Bankruptcy Court as the deadline for filing proofs of claim in this case which in this case is May 27, 2026 or August 25, 2026 as to claims by any governmental agencies or units.

"BDS" means Building Decommission Services, LLC.

"Blue Phoenix" means Blue Phoenix 19 LLC, a Michigan limited liability company.

"Brownstone" means Brownstone Realty Advisors, LLC.

"CBRE Appraisal" means the July 7, 2023 appraisal of the Property that was performed for CNB, by CBRE Valuation and Advisory Services.

"Claim" means a claim against the Debtor.

"CNB" means County National Bank.

"Colliers" means Colliers International Valuation & Advisory Services, LLC.

"Colliers 2025 Appraisal" means the November 25, 2025 appraisal of the Property performed by Colliers.

"Colliers BOV" means the Broker Opinion of Value of the Property issued on May 20, 2024, by Colliers.

"Commitment Letter" means the commitment letter between Provizia and the

Debtor, entered into on July 27, 2026.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"Contested Claim" means a Claim that has not been allowed or disallowed and as to which either: (a) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (b) a proof of claim has not been filed and the Claim is listed on the Debtor's Schedules as disputed, contingent, or unliquidated.

"Contested Claims Reserve" means segregated and escrowed funds in an amount equal to the aggregate distributions that would have been made on account of all Contested Claims had such Contested Claims been Allowed Claims in their full asserted amounts as of the Effective Date.

"Counsel" means Taft Stettinius & Hollister, LLP, counsel to the Debtor.

"Debtor" means South Town by 4M, LLC, debtor and debtor-in-possession in the above-captioned case.

"Development" means the multi-faceted business comprised of the four distinct revenue-driven improvements described in Section II.C of this Plan.

"DIP Budget" means the revised DIP budget filed on April 21, 2026, in support of the DIP Facility [ECF No. 96].

"DIP Budgets" means the DIP Budget and the Second DIP Budget.

"DIP Facility" means the financing requested by the Debtor reflected in the Amended and Restated DIP Note and Second Amended and Restated DIP Note, and entered by the Court in the Final DIP Financing Order and the Second DIP Financing Order.

"DIP Financing Orders" means collectively, the Interim DIP Financing Order, the Final DIP Financing Order, and the Second DIP Financing Order.

"DIP Lender" means Ms. Poscher, in her capacity as provider of the DIP Loan.

"DIP Liens" means liens granted to the DIP Lender for providing the DIP Loan which include (i) pursuant to section 364(c)(2) of the Bankruptcy Code, a lien on all property of the Debtor's estate not otherwise subject to a lien, and (ii) pursuant to section 364(c)(3) of the Bankruptcy Code, a junior lien on all property of the Debtor's estate that is subject to a lien, in each case perfected automatically upon entry of the Interim DIP Financing Order without the necessity of filing a financing statement.

"DIP Motion" means the Debtor's *Motion for Entry of an Order (a) Authorizing the Debtor to Obtain Post-Petition Secured Financing; and (b) Granting Liens, Security Interests, and Superpriority Claim* [ECF No. 79].

"Disclosure Statement" means the First Amended Disclosure Statement that begins at *infra*, Section II. of this First Amended Combined Plan and Disclosure Statement.

"DMC" means DMC Real Estate Services.

"Dr. Poscher" means Dr. Margaret Poscher, the original sole member of the Debtor.

"Effective Date" means 20 days after the date the Confirmation Order becomes a Final Order or if not a business day, the next business day. If, however, a stay of the Confirmation Order is in effect on that date, the Effective Date will mean the day after the date on which the stay expires or is otherwise terminated. These periods are calculated as provided in Bankruptcy Rule 9006(a)(1).

"Equity Interest" means equity in the Reorganized Debtor as of the Effective Date of the Plan, unless otherwise specified in the Plan.

"Exit Financing" means the post-confirmation financing arrangement pursuant to the Exit Financing Agreement between the Debtor and the Exit Financing Lender.

"Exit Financing Agreement" means the definitive agreement to be entered into by and between the Debtor and the Exit Financing Lender memorializing the terms and conditions of the Exit Financing.

"Exit Financing Lender" means Provizia.

"Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket, that has not been reversed, stayed, modified, or amended, and as to which (a) the time to appeal, petition for

certiorari, or move for reargument or rehearing has expired and no appeal, petition for certiorari, or motion for reargument or rehearing has been timely filed; or (b) any appeal, petition for certiorari, or motion for reargument or rehearing has been finally determined and no further review is available.

"Final DIP Financing Order" means the *Final Order (a) Authorizing the Debtor to Obtain Post-Petition Secured Financing; and (b) Granting Liens, Security Interests, and Superpriority Claim* [ECF No. 125].

"Graybar" means Graybar/Schneider.

"Higley" means The Albert M. Higley Co., LLC.

"Initial DIP Loan" means the post-petition multi-draw secured term loan in an amount not to exceed $400,000, provided to the Debtor by the DIP Lender as reflected in the Amended DIP Note and approved by the Final DIP Financing Order.

"Interest-Only Payees" means, collectively, the City of Ann Arbor, CNB, and Higley, to whom the Debtor elected to make the Interest-Only Payments pursuant to 11 U.S.C. § 362(d)(3).

"Interest-Only Payments" means the interest-only payments made by the Debtor to the Interest-Only Payees under section 362(d)(3) and the terms of the Amended Budget.

"Interim Order Regarding Plan Deadline Extension" means the *Order Regarding Debtor's Motion for Entry of an Order (a) Extending the Deadline to File*

*a Chapter 11 Plan and (b) Extending the Debtor's Exclusivity Period to File a Chapter 11 Plan and Solicit Acceptances thereof Pursuant to 11 U.S.C. § 1121 of the Bankruptcy Code* [ECF No. 106].

"Interim DIP Financing Order" means the *Interim Order (a) Authorizing the Debtor to Obtain Post-Petition Secured Financing; and (b) Granting Liens, Security Interests, and Superpriority Claim* [ECF No. 105].

"Legal Expenses" means the fees and expenses of Counsel.

"MicroGrid" means a power generation system to deliver electrical power to the Property, to be sold to the Property's tenants with a secondary source of revenue generated from the creation of carbon credits.

"Motion to Extend" means the Debtor's *Motion for Entry of an Order (a) Extending the Deadline to File a Chapter 11 Plan and (b) Extending the Debtor's Exclusivity Period to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to 11 U.S.C. § 1121 of the Bankruptcy Code* which was filed on April 9, 2026 [ECF No. 80].

"Ms. Poscher" means the Responsible Person, Heidi Caroline Poscher.

"Operating Agreement" means the Debtor's Amended and Restated Operating Agreement.

"Plan" means this First Amended Combined Chapter 11 Plan of Reorganization and Disclosure Statement, as it may be amended, modified, or

supplemented from time to time.

"Plan Deadline" means July 27, 2026, to the extent modified by the Court.

"Plan Exclusivity Period" means the period in which the Debtor has the exclusive right to file a chapter 11 plan which was extended to July 27, 2026.

"Plan Extension Order" means the Bankruptcy Court's *Order Regarding Debtor's Motion for Entry of an Order (a) Extending the Deadline to File a Chapter 11 Plan and (b) Extending the Debtor's Exclusivity Period to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to 11 U.S.C. §1121 of the Bankruptcy Code* granted on May 20, 2026 [ECF No. 121] in which the Court granted Debtor's Motion to Extend with respect to the deadline to file the Plan thereby extending the deadline to file the Plan until July 27, 2026; extended the exclusivity period for the Debtor to file its Plan to July 27, 2026; and extended the exclusivity period for Debtor to solicit acceptances of its Plan to September 25, 2026.

"Petition Date" means January 27, 2026, 3:22 p.m. E.S.T. which is the date and time on which the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

"Poscher Estate" means the probate estate of Dr. Margaret Poscher (deceased).

"Prentice" means Prentice Partners of Ann Arbor, LLC.

"Property" means the real property owned by the Debtor on which the

Development sits.

"Provizia" means The Provizia Organization Inc.

"Pullins" means Steven Pullins.

"Quarterly Fees" means the quarterly fees payable to the United States Trustee.

"RAM" means Reynolds Asset Mgmt, LLC.

"RAM Term Sheet" means the term sheet executed on April 14, 2026, by Debtor and RAM.

"Reorganized Debtor" means the Debtor, on and after the Effective Date.

"Responsible Person" means Ms. Poscher, personal representative of the Poscher Estate, and the individual authorized to manage the affairs of, and act on behalf of, the Debtor as debtor-in-possession in this bankruptcy case.

"Retainer Deposits" means the retainer deposits advanced by Ms. Poscher on behalf of the Debtor to Counsel, in the amount of $100,000.00.

"Revised DIP Note" means the revised promissory note evidencing the DIP Loan executed by the Debtor in favor of the DIP Lender, as included in the recited terms of the Interim DIP Financing Order.

"Reynolds" means Louis J. Reynolds IV, a principal and owner in RAM.

"SARE" means a single asset real estate case as defined under 11 U.S.C. § 101(51B).

"SARE Motion" means CNB's *Motion to Designate Case as a Single Asset Real Estate Case* [ECF No. 33].

"SARE Objection" means the *Debtor's Objection to County National Bank's Motion to Designate Case as a Single Asset Real Estate Case* [ECF No. 51].

"SARE Order" means the *Order Granting Motion to Designate Case as a Single Asset Real Estate Case* [ECF No. 65].

"SARE Reply" means CNB's reply in support of the SARE Motion [ECF No. 56].

"Second Amended DIP Note" means the Second Amended and Restated DIP Note attached as Exhibit C to the Supplement [ECF No. 152].

"Secured Lenders" means, collectively, CNB, Brownstone, and Prentice.

"Schedules" means the schedules of assets and liabilities filed by the Debtor pursuant to section 521 of the Bankruptcy Code, as have been or may be amended or supplemented from time to time.

"SmithGroup" means SmithGroup, Inc.

"Solicitation Exclusivity Period" means the period in which the Debtor has the exclusive right to solicit acceptances of its chapter 11 plan which was extended to September 25, 2026.

"Sources and Uses" means the sources and uses of the Exit Financing, as set forth on **Exhibit A** hereto.

"South Town" means South Town by 4M, LLC, debtor and debtor-in-possession in the above-captioned case.

"Supplement" means the supplement to the Second DIP Motion filed by the Debtor at [ECF No. 150].

"Synecdoche" means Synecdoche Design Studio, LLC.

"Transferred Assets" means all assets of the Debtor except for the Avoidance Claims.

"UST" means the United States Trustee.

"Vertical Financing" means financing provided for completion of the vertical construction of the Project.

"Vertical Financing Secured Lenders" means the lenders that will ultimately provide the Vertical Financing and who are anticipated to hold secured mortgages against the Development.

"Vohwinkle" means Nathan Vohwinkle.

"WhiteHawk" means WhiteHawk Capital Partners L.P.

"WhiteHawk Term Sheet" means the term sheet executed on May 4, 2026, by the Debtor and WhiteHawk.

**10.02 Severability**. If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**10.03 Captions.** The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

**10.04 Controlling effect.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Michigan govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

**10.05 Retention of Jurisdiction.** The Bankruptcy Court confirming the Plan may exercise jurisdiction to the full extent necessary to administer this case after Plan confirmation and to adjudicate any related adversary proceedings or contested matters, including those relating to the Plan, such as concerning the Plan's construction, implementation, or modification. Neither this provision nor anything in this Plan constitutes a limitation on or an expansion of the jurisdiction authorized by title 28 of the United States Code.

## II. Description and History of the Debtor's Business

### A. South Town by 4M LLC

The Debtor is a Michigan limited liability company formed to realize Dr. Poscher's vision to fund and create a strategic 1.66 acre real estate project for a mixed-use, multi-family development. The Debtor holds title to ten individual lots, comprising a city block in Ann Arbor which is the Property. The Development

encompasses approximately 237,366 square feet, will ultimately feature at least 289 apartment units, has one side fronting South State Street, directly across from the University of Michigan Golf Course, and is kitty-corner to the University of Michigan field hockey stadium, the football practice facilities, Crisler Arena and the University of Michigan football Stadium.

The Development is comprised of four distinct revenue driven improvements: (1) the leasing of 70% of the 289 or greater apartment units to be constructed, to be used as long-term rentals; (2) the operation of a short-term rental business (VRBO, Air BNB, etc.), utilizing 30% of the apartment units; (3) the development and ownership of retail businesses on the first floor of the Development; and (4) the construction and operation of a MicroGrid within the Development, to deliver electrical power to all of the apartment and retail areas, as well as to the common areas, which will be sold to the captive tenants, with a secondary source of revenue generated from the creation of carbon credits. The Debtor has site plan approval for the construction of the Development.

### B. South Town's Principal

The Debtor has just a single member. The member, until mid-October of 2025 had been Dr. Poscher. Dr. Poscher unfortunately passed away at that time and thereafter the Poscher Estate was opened. Dr. Poscher's wife, Ms. Poscher, has been

named as the personal representative of the Poscher Estate and therefore, is acting on behalf of the sole member of the Debtor in this bankruptcy proceeding.

Dr. Poscher was a community leader in Ann Arbor, Michigan, and spearheaded progressive real estate projects in high-potential areas across the city. In 2018, Dr. Poscher focused on development in an underdeveloped Ann Arbor neighborhood, seizing an opportunity to drive impactful urban revitalization. First, and prior to the Development, came a 12-unit, ground-up townhouse complex, creating a residential anchor. Then came Venue by 4M, a visionary 35,000 square foot space encompassing dining, events, and entertainment facilities. Ultimately, Dr. Poscher formed the Debtor to fund and create the Development. Ms. Poscher, as Dr. Poscher's wife and biggest cheerleader, has taken up the mantle to complete the Development.

Ms. Poscher is the Responsible Person for the Poscher Estate, and for the Debtor. Ms. Poscher, in her personal and individual capacity, provided $650,000 in post-petition financing to the Debtor to fund primarily the Interest-Only Payments to the Interest-Only Payees, and other incidental costs should they arise. The details of this post-petition financing, and the hearings and procedures related thereto, are described below. *See infra*, Article III.

Dr. Poscher never earned a salary nor received any compensation for her role as the member of the Debtor; likewise, Ms. Poscher has never earned a salary nor

received compensation at any time prior to or during the pendency of this bankruptcy case.

### C. South Town's Business Model and Events Leading to Bankruptcy

The assemblage of the Development's ten lots occurred during the years 2019 to 2022. Each of the lots was improved with either an individual home or a low-rise apartment building. The acquisition cost of the ten lots was $18,982,170. Fees and closing costs were an additional $5,152,297.

To aid in the Debtor's acquisition of the ten lots, the Debtor obtained financing from two lenders; CNB, which asserts a lien position in the approximate amount of $18,628,131.14; and Brownstone which asserts a lien position subordinate to that of CNB, in the amount of $7,794,566.33. An additional mortgage position, for an additional $8.5 million is held by Prentice. The passing of Dr. Poscher in October of 2025 delayed the ongoing development and funding for the Development. Ms. Poscher, who was very familiar with the Development, primarily assisted the Debtor in the coordination for placement of the MicroGrid. Since Dr. Poscher's passing, Ms. Poscher has had to take on the Debtor's work for the remaining portions of the Development.

Prior to her death, Dr. Poscher, on the Debtor's behalf, modified an existing loan with Brownstone, borrowing additional funds for Development costs, CNB loan-extension fees, and CNB loan interest payments. Following closure of the

Brownstone loan modification in June 2025, Brownstone advanced funds for Development costs but refused to release approximately $1.0 million in funds escrowed for the specific purpose of covering CNB loan-extension and interest payments. As a result, the Debtor found itself behind on its prepetition loan payments with CNB.

### ***CNB's Foreclosure Proceeding***

CNB initiated a foreclosure by advertisement in early November of 2025. CNB adjourned the foreclosure sale until early January 2026, based on the transition issues faced by the Debtor. The Debtor brought forward a third party to acquire the participants' interest in CNB's facility, but the participants refused to engage with that third party. As a result, the Debtor's only option was to seek protection under Chapter 11 of the Bankruptcy Code in light of the impending foreclosure by advertisement sale date.

## III. Significant Post-Petition Events

There are four significant post-petition events that have occurred in this Bankruptcy Case. First, upon CNB's motion, the Debtor's case was designated a single asset real estate case. Second, the Debtor sought approval of, and this Court approved, post-petition secured financing from Ms. Poscher. Third, the Debtor filed a motion to extend the Plan-filing deadline, and exclusivity period to file the Plan and solicit ballots on the Plan. Fourth, the Debtor has negotiated two separate

alternative exit transactions, either of which will provide for payment in full of all Claims.

***The SARE Designation***

On February 13, 2026, CNB filed the SARE Motion and in opposition the Debtor filed its SARE Objection. CNB filed the SARE Reply and the Court held a hearing on the SARE Motion on March 12, 2026. The Court was unpersuaded by the Debtor's arguments in opposition to the SARE Motion and entered the SARE Order. As such, the Debtor was required to either file its Plan within 90 days of the Petition Date or commence making interest-only payments to secured creditors, as required under 11 U.S.C. § 362(d)(3). The Debtor opted to make the Interest-Only Payments to the Interest-Only Payees.[5]

***DIP Financing***

The Debtor has no business operations and in order to make the Interest-Only Payments to the Interest-Only Payees, the Debtor sought approval of the Initial DIP Loan to be provided to the Debtor by Ms. Poscher as the DIP Lender. After the filing of the DIP Motion and hearings, the Court entered the Interim DIP Financing Order that authorized the Debtor to borrow money on an interim basis from Ms. Poscher,

[5] Debtor's other secured creditor entitled to interest-only payments—Brownstone—waived payment. Prentice did not charge interest for its loan.

in an aggregate principal amount of up to $133,000.00 prior to entry of a final order on the First DIP Motion and pursuant to the terms of the Revised DIP Note.

On May 18, 2026, the Court held a final hearing on the DIP Motion. On May 22, 2026, and on stipulation of the parties, the Court entered its Final DIP Financing Order. In addition to the terms of the Interim DIP Financing Order, the Final DIP Financing Order authorized the Debtor to borrow up to an aggregate principal amount of $400,000 from Ms. Poscher under the terms of the Amended DIP Note. The purpose of the Initial DIP Loan was to afford the Debtor the ability to fund its Interest-Only Payments to the Interest-Only Payees, and payment of U.S. Trustee fees as set forth in the DIP Budget. The Debtor elected to make interest-only payments to its secured creditors (other than Brownstone, who waived its right to interest payments) and which became due on the 90th day after the Petition Date pursuant to Section 362(d)(3) of the Bankruptcy Code in order for the Debtor to maintain the automatic stay, due to its SARE designation.

In exchange for the Initial DIP Loan, Ms. Poscher, as the DIP Lender was granted an allowed superpriority administrative expense claim with priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, but only to the extent of amounts actually borrowed under the Final DIP Financing Order.

As security for amounts borrowed, the DIP Lender was granted (i) pursuant to section 364(c)(2) of the Bankruptcy Code, a lien on all property of the Debtor's estate not otherwise subject to a lien, and (ii) pursuant to section 364(c)(3) of the Bankruptcy Code, a junior lien on all property of the Debtor's estate that is subject to a lien, in each case perfected automatically upon entry of the Interim DIP Financing Order without the necessity of filing a financing statement.

The DIP Liens are in all instances subject to existing mortgage liens in favor of CNB, Prentice, and Brownstone, the construction lien in favor of Higley and Permitted Third Party Liens (i.e., liens that are senior by operation of law, including liens securing the payment of real property taxes).

The DIP Liens and the superpriority claim expressly exclude (i) any Avoidance Claims, (ii) any proceeds or property recovered in connection with the successful prosecution or settlement of any Avoidance Claims, (iii) any intercompany claims, and (iv) any claims against the estate of Dr. Poscher, Prentice, or any entity or estate in which Ms. Poscher has a direct or indirect interest, and no superpriority claim, administrative claim, or other priority claim under the Final DIP Financing Order shall be payable from or have recourse to any of the foregoing.

On July 24, 2026, the Court held a hearing on the Debtor's Second DIP Motion and related Second DIP Stipulation. On July 27, 2026, the Court entered the Second DIP Financing Order which authorized the Debtor to borrow up to an

additional $250,000 and thus increased the aggregate principal amount of the DIP Facility to $650,000, under the terms of the Second Amended DIP Note. The resulting DIP Liens of the Second DIP Financing Order retain the same lien priority and exclusions as those set forth above and as reflected in the Final DIP Financing Order.

The purpose of the request to increase the amount of the DIP Facility was to continue making Interest-Only Payments and quarterly U.S. Trustee fees as set forth in the Second DIP Budget.

***Motion to Extend Plan Deadline and Exclusivity Period***

Concurrent with the DIP Motion, the Debtor filed its Motion to Extend. The Court addressed the Motion to Extend during the Initial DIP Financing Hearing where Debtor indicated to the Court it was holding off on the requests set forth in the Motion to Extend until it could obtain greater clarity as to its plan and the Exit Financing. The Court entered the Interim Order Regarding Plan Deadline Extension which required the Debtor to supplement the Motion to Extend on or before May 12, 2026, provide a detailed update of the Exit Financing lender negotiations, and set the Motion to Extend for hearing on May 18, 2026. On May 12, 2026, the Debtor filed its Supplement to which it attached the RAM Term Sheet and the WhiteHawk[6]

---

[6] WhiteHawk has since declined to proceed under the WhiteHawk Term Sheet, after engaging in further due diligence.

Term Sheet. On May 18, 2026, the Court held a hearing on the Motion to Extend and subsequently on May 20, 2026, entered its Plan Extension Order: (1) extending the Plan Deadline and the Plan Exclusivity Period to July 27, 2026; and (2) extending the Solicitation Exclusivity Period to September 25, 2026.

The Court held a status conference on May 22, 2026, to address the Case Management Order that needed to be amended in light of the Plan Extension Order, and subsequently entered its Amended Case Management Order. In addition to amending other case deadlines and restating the Plan Deadline, the Plan Exclusivity Period and the Solicitation Exclusivity Period, the Amended Case Management Order scheduled the confirmation hearing on the Plan for September 25, 2026, at 1:00 p.m.

The Debtor files this Plan in accordance with the Plan Extension Order and the Amended Case Management Order.

***The Exit Alternatives***

On April 14, 2026, the Debtor and RAM executed the RAM Term Sheet (**Exhibit B** hereto) wherein the Debtor is to obtain exit takeout financing to: (a) satisfy amounts due to pay all secured and unsecured creditors in full, who will not otherwise convert their existing debt to equity; (b) pay chapter 11 administrative expenses; (c) cover carrying costs to vertical construction; and (d) pay the expenses of the Exit Financing. RAM is to receive, upon confirmation of the Debtor's Plan, a 5%

membership interest in the Debtor, in exchange for which Reynolds, who owns RAM, is to provide the credit enhancement required of the Exit Financing Lender (under Equity Transaction B) and of the Vertical Financing Lender. RAM will also bring to the table extensive construction project management expertise.

RAM is a vertically integrated commercial real estate operator and development firm specializing in core plus, value-added and opportunistic multifamily investing. RAM was founded in 2003 and has engaged in over 100 existing and ground-up transactions. Materials outlining RAM, its principal members and its current portfolio of projects are attached as **Exhibit C.**

On July 16, 2026, the Debtor and Agile executed an Amended Commitment Letter (**Exhibit D** hereto), pursuant to which Agile agreed, on the Effective Date to: (a) enable Newco to acquire 100% of the membership interest in the Debtor held by the Poscher Estate from the Poscher Estate for an amount in a multiple of 7 figures; and (b) provide an additional amount, not to exceed $41,000,000.00, as an equity infusion into Newco and then as an equity infusion by Newco into the Debtor, in an amount sufficient to provide for payment in full of all Allowed Claims and other working capital requirements of the Debtor, post-confirmation.

On August 5, 2026, Agile provided a Memorandum update as to its investment commitment (**Exhibit E** hereto). References to "The Finn" and "The Forge" therein are proposed names for the Development.

Agile is a leading provider of large-scale solar power solutions and EV charging infrastructure. It specializes in solar arrays, power provider services, and EV charging installations through strategic site partnerships with high-usage locations. Agile is specifically interested in the Project, based on the Micro-Grid to be developed and installed. This aligns with Agile past development and management of large-scale solar farms, supplying clean, renewable energy to power grids and key infrastructure, ensuring a sustainable and reliable energy supply. Further, Agile builds new or retrofits buildings with its patented BESS and Shallow Geothermal to enhance a building's energy needs and apply to the grid. Agile has advised the Debtor that Agile has placed approximately $500 million of debt and equity during the preceding 12-month period.

On July 27, 2026, the Debtor and the Exit Financing Lender entered into the Commitment Letter (**Exhibit F** hereto), pursuant to which the Exit Financing Lender has agreed (under Equity Transaction B) to provide to the Debtor Exit Financing on the Effective Date in an amount sufficient to provide for payment in full of all Allowed Claims and other working capital requirements of the Debtor, post-confirmation. The Exit Financing will result in a re-allocation of the equity in the Debtor (under Equity Transaction B), with the Poscher Estate retaining a 59% interest and a 41% membership interest in the Debtor being issued to a combination of parties, the percentage ownership of which is as follows: Prentice, 5% (conversion of its debt

position to equity); Blue Phoenix, 22%; Pullins, 2% (equity exercisable upon completion of vertical construction); APB, 5%; Vohwinkle, 2% (equity exercisable upon completion of vertical construction); and Reynolds, 5%. Blue Phoenix is an affiliate of Ms. Poscher, its members being Ms. Poscher, her family trust and certain friends and family. Prentice is owned fully by the Poscher Estate. Pullins, Vohwinkle, APB and Reynolds are not affiliates of Ms. Poscher, the Poscher Estate or any of their respective affiliates.

The Exit Financing Lender is a private investment company that lends from a debt fund in conjunction with a Sovereign Wealth Fund and two major European Family offices. Over the last decade they have invested in, funded and participated in over $11.75B of real estate projects internationally. The Exit Financing Lender concentrates on funding projects in North, Central and South America, the United Kingdom, the Republic of Ireland, several European countries and Caribbean nations. These projects include hospitality, industrial, senior care, senior residences, and multifamily real estate development.

The Exit Financing Lender is made up of former division presidents from several international banks, the chief operating officer of a boutique investment bank, and individuals with extensive hands-on experience in multifamily, senior care, hospitality, retail, medical, social, and work housing. Historically, the Company has provided both debt and equity into client capital stacks.

At present the Exit Financing Lender is financing two Hyatt Properties in Mexico, a Hilton Luxury Resort in Costa Rica, a Hard Rock Hotel in USA, a Waldorf Astoria in Caribbean, a 600 unit Condominium Property in Ecuador, a Storage Facility in USA, a Mixed Use Property (Hotel, Apartments) in the USA, a unit apartment building also in the USA, Conversion of a Hospital to a Medical Surgical Center in the USA and a High Tech Manufacturing Complex in the USA.

The Exit Financing Lender and its subsidiaries are headquartered in Canada, America, and Brazil, with subsidiaries and affiliates in the United States, Mexico, the United Kingdom, and Brazil.

Equity Transaction A and Equity Transaction B will be brought before the Probate Court for Probate Court Approval prior to the hearing on confirmation of this Plan, to obtain conditional approval of both, subject only to confirmation of this Plan.

The Debtor, through its representative, Ms. Poscher, prefers Equity Transaction A over Equity Transaction B, as there is an interest cost associated with Equity Transaction B, based on the need for Exit Financing, which is not necessary under Equity Transaction A. Further, Equity Transaction A would likely be more attractive to the Poscher Estate, as it monetizes the Poscher's Estate's interest in the Debtor, rather than the Poscher Estate awaiting the completion of the vertical construction and a liquidity event. The Debtor has arranged for Equity Transaction

B and the Exit Financing, if for some reason, Equity Transaction A and Agile's participation therein is somehow revoked or not approved.

Ms. Poscher, on behalf of the Debtor, is working on a parallel path to document Equity Transaction A and Equity Transaction B. Equity Transaction A requires the execution of a proposed Membership Interest Purchase Agreement between Newco and the Poscher Estate, as well as an Operating Agreement for Newco. To the extent prepared, the foregoing, along with this Disclosure Statement and Plan, shall be part of the submission to the Probate Court for approval.

Equity Transaction B will require the execution of an Amended and Restated Operating Agreement of the Debtor, a Guaranty Fee Agreement and the Provizia loan documents. To the extent prepared the foregoing, along with this Disclosure Statement and Plan, shall be part of the submission to the Probate Court.

The Probate Court may or may not approve Equity Transaction A and/or Equity Transaction B. That resolution will be known prior to the hearing on confirmation of the Plan. If both Equity Transaction A and Equity Transaction B are approved by the Probate Court, then Ms. Poscher, on behalf of the Debtor, prior to the hearing on confirmation, will determine which option to present proofs on as to feasibility. The Debtor will provide a supplement to this Disclosure Statement and Plan with respect to: (a) the results of Probate Court Approval; and (b) the Debtor's election between Equity Transaction A and Equity Transaction B. Probate Court

Approval shall also include the Plan's proposed conversion of Prentice's debt to equity and if required under Equity Transaction B, a pledge of the Probate Estate's 59% interest in the Debtor to the Exit Financing Lender.

The transfer of the Transferred Assets to the SPE is based on the Debtor's diligence and understanding from lenders and investors it has spoken with that in a development of this magnitude, the lender will insist that the assets of the borrower be held in an SPE and not in an entity that has undergone a proceeding under chapter 11. Many lenders will not commit to an entity that has previously filed for bankruptcy protection.

The Debtor will be preparing the conveyance agreement between the SPE and the Debtor as well as the single member LLC agreement of the SPE.

**Transfers outside of the ordinary course**

As required under section 362(d)(3) and the terms of the DIP Budgets attached to the DIP Financing Orders, the Debtor has made the Interest-Only Payments to the Interest-Only Payees in the following amounts:[7]

Ann Arbor: $ 1,601.97

[7] The April payment to Ann Arbor was $8,009.84 which included a four percent late charge of $6,407.87 calculated from the full amount due and owing under the Ann Arbor Tax Claim. The May payment to CNB was $117,097.98 which included $3,777.36 per diem charge for the additional day in May. A $117,097.98 payment was also made to CNB in June. The amounts listed for the Interest-Only Payments are the regular monthly payments owed to each Payee. The Debtor also paid a $95 service fee for its Chase DIP bank account in June.

CNB: $113,320.62

Higley: $ 4,306.42

The Debtor paid the Quarterly Fees as required, in the amount of $350. To date, the Debtor has made a total of $327,094.62 in transfers outside of the ordinary course in accordance with the terms of the DIP Budgets. The Debtor has made no other transfers outside of the ordinary course. Ms. Poscher, out of her own funds, paid a $150,000 due diligence fee to WhiteHawk and a $60,000 due diligence fee to Provizia, which were gifts to the Debtor.

### A. Summaries of cash collateral, post-petition financing, and adequate protection orders

The details and summaries of the Debtor's DIP Facility, DIP Budgets, and Interest-Only Payments are provided above. *See supra*, Section III of the Disclosure Statement.

### B. Pending litigation

On the Petition Date, the Debtor was party to two creditor enforcement actions. CNB had initiated a foreclosure by advertisement action against the Debtor, and Brownstone had initiated a foreclosure and receivership action against the Debtor—in the Circuit Court for Washtenaw County, Michigan. Both actions were stayed pursuant to section 362 of the Bankruptcy Code upon the filing of the Debtor's bankruptcy petition. Upon payment in full of the allowed amount of the Claims of CNB and Brownstone on the Effective Date, each shall be permanently

enjoined from pursuing or continuing such actions against the Debtor or its assets and such actions shall be discontinued or dismissed, as applicable based on payment in full having been received by CNB and Brownstone under the Plan.

## IV. Liquidation Analysis and Risks

### A. Liquidation Analysis

An appraisal was performed by CBRE Valuation and Advisory Services on July 7, 2023 in connection with CNB's loan. That CBRE Appraisal contained two values. The first value was $15,800,000, described to be the "As Is (Land Value)." The second value, which included the then in place early-stage enhancements to the Development (through site preparation, site plan application, etc.), known as "entitlements" placed the "As Entitled (Land Value)" of the Development at $29,500,000. A second valuation, the Colliers BOV, dated May 20, 2024, placed the value of the Development, with the then in-place entitlements, at $45,800,000. This reflected the additional work which had been undertaken with respect to the Development, including architectural, engineering and site plan approval. A third, and more recent appraisal, the Colliers 2025 Appraisal, was issued on November 25, 2025, and placed the value of the Development, with the then in-place entitlements, at $61,300,000. This reflected the additional development work that had ensued over the 18 months since the Colliers BOV.

The Colliers BOV and Colliers 2025 Appraisal reflect increased value in the Property since the CBRE Appraisal. The increase in valuation is based on the detailed and approved Development plans, and entitlements now attached to the Property, which allow for construction of the various Development components.

The Colliers 2025 Appraisal assessed various risks and conditions upon which the appraisal was based, including accessibility, exposure, flood-zone proximity, presence of easements or encumbrances, hazardous waste detection, et al. The Colliers 2025 Appraisal indicated a good rating for both accessibility and exposure, moderate and minimal flood risk, no adverse easements or encumbrances, and no presence or signs of hazardous waste, and summarized "[o]verall, the [Development's] location is rated as good/excellent . . . there are no known factors that would limit the site's development according to its highest and best use." Colliers 2025 Appraisal, p. 25.

Against these valuations, the Debtor has the secured, unsecured, superpriority and, administrative Claims identified in Section 3 of the Plan, which in the aggregate, are approximately and at least $30,000,000, if allowed in full. The Debtor's Plan provides for the payment in full of all Allowed Claims (other than the conversion of Prentice's secured claim to equity). If the Debtor were to be liquidated, based on the appraisals above noted, it would appear that all creditors of the Debtor would be paid in full. However, it is unknown what value the Property and the other

assets of the Debtor would bring, in relation to the values set forth in the appraisals, in a forced liquidation setting. If the entitlements are deemed to have no value, based on a purchaser's abandonment of the same with respect to the Development (electing instead a different or modified use of the Property), or a lesser value than as appraised, then the value to be obtained in a forced liquidation could approximate the acquisition cost of the Property, which was $18,982,170. This amount would be insufficient to satisfy the creditor Claims in full and would likely only cover the Claims of Ann Arbor and a portion of allowed construction lien claims, and the CNB indebtedness, depending on priorities.

**B. Potential Claims and Causes of Action.**

The Debtor has one known cause of action, which the Debtor intends to initiate in this bankruptcy case, through the filing of an adversary proceeding against Synecdoche. Synecdoche claims to hold a construction lien claim against the Property. Synecdoche was retained as an architect for the Development. The Debtor has substantial defenses to the amount claimed by Synecdoche to be due and owing and asserts that the Debtor has overpaid Synecdoche for failed work product and overbillings. The Debtor also asserts that the Debtor's termination of Synecdoche pre-petition, which is undisputed by Synecdoche, excuses the Debtor from having to pay any residual payments to Synecdoche. Per the Plan, the Debtor will place into the

Contested Claims Reserve an amount sufficient to pay Synecdoche, should Synecdoche's Claim be allowed in full, as filed.

The Debtor intends to file certain unsecured Claim objections and reserves all other potential Avoidance Claims, whether now existing or hereafter arising, known or unknown, and any claims or causes of action not specifically identified herein are expressly reserved. However, the Debtor does not anticipate pursuing any other Avoidance Claims, for the reason that all Allowed Claims will be paid in full. Further, the Debtor is not aware of any material Avoidance Claims other than the Avoidance Claim against Synecdoche. Conversion of the Prentice Claim to equity includes a discount based on the Debtor's assertion that none or only a portion of the Prentice Claim should be deemed to be debt, but rather, an equity contribution by Dr. Poscher.

Upon entry of the Confirmation Order, all such causes of action shall vest in the Reorganized Debtor, which shall retain full authority to prosecute, settle, or otherwise resolve such claims. The Debtor further reserves the right to investigate, assert, and pursue any and all claims, causes of action, and avoidance actions arising under sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, 553, or any other applicable provision of the Bankruptcy Code, whether or not specifically identified herein. Nothing contained in this Plan, the Confirmation Order, or any other document filed in connection herewith shall be deemed a waiver, release, or

relinquishment of any such claims, causes of action, or avoidance actions, and all such rights are expressly preserved and retained by the Reorganized Debtor. The Debtor is not aware of any other avoidance actions or causes of action available to the estate at this time, other than the action against Synecdoche, but reserves all rights with respect thereto.

### C. Projections

On the Effective Date, the Sources and Uses set forth on **Exhibit A** will be paid. Outlined on **Exhibit G** are the Debtor's projections for the subsequent year, pending receipt of the Vertical Financing, which will then include a new, comprehensive construction and operational budget. That budget will be subject to a multitude of conditions and estimates, based on bids and other deliverables required to fully build out that full budget. Pending closing on the Vertical Financing, the interest reserve provided in the Exit Financing will cover the payments required to be paid to the Exit Financing Lender.

### D. Guarantors

The CNB and Brownstone mortgage loans are both guaranteed by parties related to the Debtor.

The guarantors of the CNB loan are alleged to be: (a) AHFLP, LLC, an affiliate of the Debtor ("AHFLP"); (b) Prentice; (c) Dr. Poscher and Ms. Poscher,

jointly and severally; and (d) the Margaret E. Poscher Revocable Trust dated January 23, 1998. AHFLP and Prentice are wholly owned by Dr. Poscher.

The guarantors of the Brownstone loan are alleged to be: (a) Dr. Poscher; (b) Ms. Poscher; (c) the Margaret E. Poscher Revocable Trust dated January 23, 1998; (d) AHFLP, LLC, an affiliate of the Debtor ("AHFLP"); (e) Prentice; (f) Fourth Ave, LLC, a Michigan limited liability company, an affiliate of the Debtor ("Fourth Avenue"); (g) 815 Brookwood LLC, a Michigan limited liability company, an affiliate of the Debtor ("Brookwood"); (h) 823 Sylvan LLC, a Michigan limited liability company, an affiliate of the Debtor ("Sylvan"); and (i) 1700 Packard LLC, a Michigan limited liability company, an affiliate of the Debtor ("Packard"). The Poscher Estate owns 81% of AHFLP and Ms. Poscher owns 19% of AHFLP. The Poscher Estate is the 100% owner of Prentice and Prentice is the sole member of Fourth Ave, Brookwood, Sylvan, and Packard. The above ownership is diagramed as follows:



Blue Phoenix, LLC is a newly formed entity, owned by Ms. Poscher, a trust controlled by Ms. Poscher and possibly by other friends and family of Dr. Poscher or Ms. Poscher, who are otherwise unaffiliated with the Debtor or any entity of which Dr. Poscher held an equity interest.

Other than as set forth herein, the Debtor is not aware of any other guaranty obligations outstanding as of the Petition Date but reserves the right to amend or supplement this disclosure as additional information becomes available.

## V. Details Regarding Implementation of the Plan

### A. Debtor's financial summaries

2023:

Income: $545,110

Expenses: $2,047,289

Net: (-$1,502,179)

2024:

Income: $254,807

Expenses: $5,543,212

Net: (-$5,288,405)

2025:

Income: $152,785.50

Expenses: $3,303,000

Net: (-$3,150,241.50)

2026 to the Petition Date:

Income: $0

Expenses: $84,921

Net: (-$84,921)

The Debtor's income prior to the Petition Date was derived from residential rental income from the Property, during the completion of the land assemblage and prior to the demolition of the previously occupied structures on the Property. The Debtor's pre-petition expenses were comprised of the costs of rental property management, development and demolition costs including costs for design, permitting, rezoning, site-plan approval, and other costs to facilitate the Development.

The Debtor has had no post-petition operating revenues. The only expenses were the DIP Loan proceeds, used to fund the Interest-Only Payments made to the Interest-Only Payees pursuant to section 362(d)(3) and the Administrative Expenses. All Legal Expenses remain subject to Bankruptcy Court approval and are to be paid pursuant to the Sources and Uses, if not paid from the Retainer Deposits.

Under either Equity Transaction A or Equity Transaction B, coupled with either the equity infusion by Agile under Equity Transaction A or the Exit Financing

by the Exit Financing Lender under Equity Transaction B, all Claims will be fully satisfied on the Effective Date. Therefore, projections are not relevant to Plan confirmation. The Sources and Uses reflect the proceeds being received by the Debtor to fund the Plan payments, either based on the equity infusion by Newco into the Debtor, funded by Agile, or from the Exit Financing obtained by the Debtor from the Exit Financer.

**B. Plan Risks, Conditions and Assumptions.**

Ms. Poscher, on behalf of the Debtor has undertaken a remarkable effort, after the passing of her wife and under the stresses of a probate proceeding, family issues and this chapter 11 proceeding, to assemble two alternative options for exit—Equity Transaction A and Equity Transaction B. All are subject to an inherent risk, whether contractually permitted, or otherwise, for the plan support parties to fail to proceed as committed. The Agile commitment is unconditional, and the Debtor has been advised that Agile has a huge amount of liquidity behind its organization. The Debtor has been and continues to work on the constituent documents needed to memorialize and move forward on the Agile transaction.

At the same time, under Equity Transaction B, the Debtor has a conditional commitment from Provizia. However, the details of that conditional commitment have been addressed over a period of months and the conditions to close are being met each day. Definitive documents under the Debtor's control to consummate the

Provizia Exit Financing and Equity Alternative B are well under way. The Debtor is awaiting receipt of an initial loan package from Provizia for review and comment.

RAM has been active in all discussions with Provizia, as has its counsel. A form of Guaranty Fee Agreement and Co-Development Agreement have been drafted and shared with RAM and Reynolds. A draft Operating Agreement for Newco has been sent for Agile and its other members' review. An amended and restated operating agreement of the Debtor is being prepared to reflect the equity allocation proposed under Equity Alternative B.

As in any sophisticated commercial transaction in the tens of millions of dollars, there are always moving parts among the various constituents and a risk that Equity Alternative A or Equity Alternative B will not close. However, at this time, the Debtor has every confidence in both and is proceeding on a parallel path as to both.

### C. Post-confirmation leadership

Ms. Poscher will remain as the responsible person to the Debtor post-confirmation. The acquisition or allocation of the equity of the Debtor is as is set forth under Equity Transaction A or Equity Transaction B described above.

Debtor's operations post-confirmation will involve the continuation of the work necessary to complete the Development.

Ms. Poscher has and will continue to receive no compensation or fringe benefits for her services to the Debtor through the Effective Date.

**Post-confirmation tax ramifications**

The Plan contemplates a conveyance of the Transferred Assets to the SPE, in exchange for a 100% interest in the SPE. The Debtor does not believe that this Property transfer transaction will result in a taxable event to the Debtor. Further, the Debtor will have no debt forgiveness income related to its Plan, as the Plan provides for a 100% payment of all allowed Claims of the Debtor on the Effective Date.

The Debtor recommends that the Creditors consult their tax specialist relative to the tax consequences of the Plan to the Creditors.

No ruling has been sought or obtained from the IRS with respect to any of the tax aspects of the proposed Plan and no opinion of counsel has been obtained by the Debtor with respect thereto. No representations or assurances are being made with respect to the federal income tax consequences as described herein. Certain types of claimants and interest holders may be subject to special rules not addressed in this summary of federal income tax consequences.

## VI. Legal Requirements

### A. Voting Procedures

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a Plan are classes of claims, or equity interest, that are impaired under the

Plan. Accordingly, classes of claims or interests that are not impaired are not entitled to vote on the Plan.

Creditors that hold claims in more than one impaired class are entitled to vote separately in each class. Each such creditor will receive a separate ballot for all of its claims in each class (in accordance with the records of the Clerk of the Court) and should complete and sign each ballot separately. The ballots may be returned via email to acimini@taftlaw.com so that they are received on or prior to the deadline set by the Court. A creditor who asserts a claim in more than one class and who has not been provided with sufficient ballots may photocopy the ballot received and file multiple ballots.

Votes on the Plan will be counted only with respect to claims: (a) that are listed on the Debtor's Schedules of Assets and Liabilities other than as disputed, contingent or unliquidated; or (b) for which a proof of claim was filed on or before the bar date set by the Court for the filing of proofs of claim (except for certain claims expressly excluded from that bar date or which are allowed by Court order). However, any vote by a holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.

Voting on the Plan by each holder of a claim or interest in an impaired class is important. After carefully reviewing the Plan and disclosure statement, each holder of such a claim or interest should vote on the enclosed ballot either to accept or to reject the Plan, and then return the ballot by mail to the Debtor's attorney by the deadline previously established by the Court.

Any ballot that does not appropriately indicate acceptance or rejection of the Plan will not be counted.

A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the Debtor's attorney.

### B. Acceptance

The Bankruptcy Code defines acceptance of a Plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots. The Bankruptcy Code defines acceptance of a Plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots. If no creditor or interest holder in an impaired class votes, then that class has not accepted the Plan.

### C. Confirmation

11 U.S.C. § 1129(a) establishes conditions for the confirmation of a Plan. These conditions are too numerous and detailed to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process.

Among the several conditions for confirmation of a Plan under 11 U.S.C. § 1129(a) are these:

1. Each class of impaired creditors and interest must accept the Plan, as described in paragraph VI.B., above.

2. Either each holder of a claim or interest in a class must accept the Plan, or the Plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

### C. Modification

The Debtor reserves the right to modify or withdraw the Plan at any time before confirmation.

### D. Effect of Confirmation

If the Plan is confirmed by the Court:

1. Its terms are binding on the Debtor, all creditors, members, and other parties in interest, regardless of whether they have accepted the Plan.

2. Except as provided in the Plan:

(a) In the case of a limited liability company that is reorganizing and continuing business:

(1) All claims and interests will be discharged;

(2) Creditors and members will be prohibited from asserting their claims against or interest in the Debtor or its assets.

(b) In the case of a limited liability company that is liquidating and not continuing its business:

(1) Claims and interests will not be discharged.

(2) Creditors and equity interests will not be prohibited from asserting their claims against or interests in the Debtor or its assets.

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

/s/ *Jay L. Welford*
Jay L. Welford (P34471)
Kimberly Ross Clayson (P69804)
Anthony Cimini (P86223)
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
(248) 351-3000
jwelford@taftlaw.com
kclayson@taftlaw.com
acimini@taftlaw.com

*Counsel to the Debtor, South Town by 4M LLC*

By: /s/*Heidi Caroline Poscher*
Heidi Caroline Poscher

Dated: August 12, 2026

For: South Town By 4M LLC
Its: Responsible Person

# EXHIBIT A

**FILING DEBT - CHAPTER XI EXIT USES**

| **SECURED** | TOTAL | FILED W/PLAN |
|---|---|---|
| DEBT | | |
| PROPERTY TAX | $ 175,000.00 | $ 175,000.00 |
| COUNTY NATIONAL BANK | $ 18,628,131.14 | $ 18,628,131.14 |
| BROWNSTONE | $ 7,794,566.33 | $ 7,794,566.33 |
| PRENTICE[1] | $ - | $ - |
| CITY OF AA ADMIN SEC'D | $ 28,888.29 | $ 28,888.29 |
| HIGLEY | $ 976,084.21 | $ 976,084.21 |
| SMITH GROUP | $ 508,139.00 | $ 508,139.00 |
| SYNECDOCHE | $ 822,140.96 | $ 822,140.96 [2] |
| UNSECURED DEBT | | |
| C. POSCHER - ALLOWED DIRECT COSTS | $ 1,991,937.68 | $ 1,991,937.68 |
| SMITH GROUP | $ 394,587.45 | $ 394,587.45 |
| PAYPAL | $ 105,404.92 | $ 105,404.92 |
| G2 | $ 26,425.00 | $ 26,425.00 |
| GRAYBAR/SCHNEIDER | $ 122,310.24 | $ 122,310.24 |
| HIGLEY | $ 34,267.56 | $ 34,267.56 |
| LEARFIELD | $ 30,000.00 | $ 30,000.00 |
| NEWMARK | $ 10,500.00 | $ 10,500.00 |
| CHAP 11 RESTRUCTURING LEGAL FEES | $ 500,000.00 | $ 500,000.00 |
| ESTIMATED DIP LOAN REPAYMENT | $ 711,375.07 | $ 711,375.07 |
| **SUB TOTAL** | | $ 32,859,757.85 |
| | | |
| **RESERVES** | | |
| ENGINEERING AND SOFT COSTS | | $1,040,242.15 |
| INTEREST RESERVE | | $ 4,900,000.00 |
| | | |
| **BORROWING COSTS** | | |
| CONSULTANTS | | |
| LESSER | | $ 200,000.00 |
| MANAV | | $ 200,000.00 |
| CREDIT ENHANCEMENT FEES | | $ - |
| LENDER FEES | | $ 400,000.00 |
| BROKER FEES | | $ 400,000.00 |
| **TOTAL** | | $ 40,000,000.00 |

[1] PRENTICE PARTNERS OF ANN ARBOR $8.5MM SECURED DEBT TO BE CONVERTED TO EQUITY VIA EXIT PLAN

[2] TO BE SET ASIDE IN CONTESTED CLAIMS RESERVE

# EXHIBIT B

**TERM SHEET**
**SOUTH TOWN BY 4M, LLC ("SOUTH TOWN")**

This Term Sheet is intended to summarize the principal terms of an agreement between South Town and Reynolds Asset Mgmt LLC, a New Jersey limited liability company, or its designee ("RAM") regarding South Town's exit from its pending chapter 11 bankruptcy proceeding. The terms arc as follows:

1. South Town to obtain exit financing in an amount not to exceed $41 million ("Exit Financing") sufficient to satisfy the amounts referenced on **Exhibit A** attached. Such amounts include amounts sufficient pay all secured and unsecured debts of South Town (other than the lien claim of Prentice Partners of Ann Arbor, LLC, which shall be subordinated to the Exit Financing), together with all administrative costs of South Town's Chapter 11 proceeding, carrying costs and other actual, out-of-pocket expenses related to the Exit Financing.

2. The Exit Financing commitment letter to be issued on or prior to May 25, 2026 ("Commitment Letter"). The Commitment letter shall contain typical closing conditions (title and survey), but with no remaining due diligence contingencies, with the closing on the Exit Financing to occur upon the order confirming South Town's plan of reorganization becoming a final order (the "Effective Date").

3. RAM to provide all credit enhancement required of the Exit Financing lender to support the $40 million of Exit Financing. If required by lender, Louis J. Reynolds, IV ("LJR") shall provide all loan guarantees (including any customary non-recourse carveout guarantees, completion guarantees and environmental indemnitees) reasonably acceptable to LJR. LJR shall only be required to enter into customary guarantees in a form reasonably acceptable by the LJR and such guarantees shall contain standard "standstill" provisions in the event of a default under any loan documents.

4. RAM to be granted a 12% equity interest in South Town. South Town's Operating Agreement to be amended and restated (the "Amended Operating Agreement") and effective as of Effective Date, conditioned on the closing on the Exit Financing. The Amended Operating Agreement will reflect RAM's 12% equity interest, will provide for RAM to be designated as the Asset and Project Manager of the South Town development and will contain usual and customary rights and controls of the members, including those related to extraordinary actions, financial reporting, capital calls, and indemnification obligations. The Amended Operating Agreement shall also provide for certain "triggering events" in which LJR shall be able to assert certain rights and have priority to available cash of South Town.

5. The grant of the 12% equity interest to RAM to be subject to approval of the probate estate of Margaret E. Poscher ("Poscher Estate"), with such approval to be obtained prior to the hearing on confirmation of South Town's plan of reorganization (the "Plan").

6. Post-bankruptcy-exit ownership of South Town to be further restructured in connection with the closing on the vertical construction loan ("Exit Ownership"). In restructuring the Exit Ownership, the following considerations are to be addressed:

   a. The parties will determine the final ownership percentages to be held by RAM, Caroline Poscher, the Poscher Estate and other equity participants required to secure the vertical construction loan.

   b. Exit Ownership to be undertaken in a manner to preserve all existing net operating loss carryforwards and other possible tax attributes held by South Town ("Tax Attributes").

   c. Exit Ownership participants to determine necessary approaches or methodologies to the Exit Ownership structure, in order to meet expected member returns, subject to preservation of the Tax Attributes.

   d. RAM to provide all credit enhancement required by the vertical construction lender(s), with respect to the vertical construction financing, in the $80 million to $140 million range on terms and conditions satisfactory to RAM in its full and absolute discretion.

7. South Town and RAM shall each bear the expenses incurred by them in connection with the transactions proposed in this Term Sheet, including legal, consulting, accounting, and broker fees.

8. South Town shall fully cooperate with the due diligence requests of RAM and of the Exit Financing lender.

9. This Term Sheet and the Amended Operating Agreement is/shall be governed by the laws of the State of Michigan without regard to its conflicts of laws principles.

10. This Term Sheet reflects the parties' mutual understanding of the matters described in this Term Sheet, but each party acknowledges and agrees that the provisions of this Term Sheet are not intended to create or constitute any legally binding obligation between the parties to this Term Sheet, and no party shall have any liability to the other party with respect to this Term Sheet until a fully integrated Amended Operating Agreement has been executed, the Plan has been approved, the Effective Date has occurred and the closing on the Exit Financing has occurred. If the foregoing conditions have not been met, no party to this Term Sheet shall have any liability to any other party to this Term Sheet.

11. The terms and conditions of this Term Sheet are confidential and are not to be disclosed by either party other than to legal counsel and other professional advisors who need to know such information in connection with the transactions contemplated herein. Subject to the requirements of applicable law, neither party shall make any news releases or any public disclosure with respect to the transactions contemplated herein without the prior consent of the other party; provided, however, the parties shall be permitted to make any disclosure required by law

12. This Term Sheet may be executed in one or more counterparts, each of which will be deemed an original, and all of which together will be one and the same instrument. Facsimile, PDF, and electronic signatures (e.g. DocuSign) to this Term Sheet will be deemed to be originals and may be relied on to the same extent as the originals.

13. No amendment to this Term Sheet or waiver of any right under this Term Sheet will be effective unless it is in writing and signed by each of the parties. This Term Sheet reflects the entire understanding of the parties with respect to its subject matter. Accordingly, this Term Sheet supersedes all prior agreements and understandings, of any nature whatsoever, whether written or oral, concerning the subject matter of this Term Sheet.

The parties have executed this Term Sheet this 14 day of April, 2026.

[Signatures on the following page]

**SOUTH TOWN BY 4M, LLC**

By: Estate of Margaret E. Poscher,
Sole member

By: ______________________
H. Caroline Poscher

Its: Personal Representative

**REYNOLDS ASSET MGMT LLC**

By: ______________________

Print Name: Louis Reynolds

Its: Managing Member

199439187v3

# EXHIBIT C

# CURRENT PROJECTS



## Cape Coral, FL
## Multifamily Development



**Name:** Embers Lakes
**Location:** Cape Coral, FL
**Deal Type:** New Construction - Multifamily
**Anticipated Construction Start:** April, 2022
**Anticipated Lease-up Start:** December, 2023
**Phase 1:** 690 Units
**Phase 2:** 647 Units

Proect Video

Let's Chat!

## CANVAS



**Name:** CANVAS
**Location:** Lawrenceville, NJ
**Deal Type:** New Construction - Multifamily and Retail
**Anticipated Start Date :** July, 2024
**Anticipated Construction Completion:** November, 2025
**Units:** 205 & 17,000 Sq Ft of Retail

Canvas Apartments | Lawrenceville, NJ (canvaslawrence.com)

## The Mural Apartments



**Name:** Orange Valley Apartments
**Location:** Orange, NJ
**Deal Type:** New Construction - Multifamily
**Acquisition date:** June, 2021
**Construction Completion:** November, 2023
**Units:** 103

Luxury Apartments in Orange, NJ (themuralnj.com)

## Violet Estates



**Name:** Violet Estates
**Location:** Town of Poughkeepsie, NY
**Deal Type:** New Construction - Multifamily
**Acquisition date:** December, 2020
**Construction Completion:** June, 2022
**Units:** 90

Violet Estates – Apartments for Rent (violetestatesny.com)

## Princeton Pike Office Park



**Name:** Princeton Pike Office Park
**Location:** Lawrenceville, NJ
**Deal Type:** Value Add - Office
**Acquisition Date:** May 2022
**Rentable Square Feet:** 260,000

---

## Stissing Farm Townhomes



**Name:** Stissing Farm Townhomes
**Location:** Pine Plains, NY
**Deal Type:** New Construction - Condo
**Acquisition date:** March, 2021
**Construction Completion:** November, 2022
**Units:** 48

Stissing Farm Townhomes is a pet-friendly apartment community in Pine Plains, NY

---

## The Park at Summerhill



**Name:** The Park at Summerhill
**Location:** Texarkana, TX
**Deal Type:** Value Add - Multifamily
**Acquisition date:** February, 2024
**Units:** 184

Apartments for Rent In Texarkana, TX | Park at Summerhill - Home

---

## Westridge Apartments

**Name:** Westridge Apartments
**Location:** Texarkana, TX
**Deal Type:** Value Add - Multifamily



**Acquisition date:** February, 2024
**Units:** 176

Westridge South Texarkana, TX | Welcome Home (westridgetexarkana.com)

---

## Preston Place North|South



**Name:** Preston Place North | South
**Location:** Bossier City, LA
**Deal Type:** Value Add - Multifamily
**Acquisition date:** October 2023
**Units:** 272

Preston Place is a pet-friendly apartment community in Bossier City, LA

---

## Townhomes at South Highlands



**Name:** Townhomes at South Highlands
**Location:** Shreveport, LA
**Deal Type:** Value Add - Multifamily
**Acquisition date:** October 2023
**Units:** 228

Apartments | Lakeville Townhomes | Shreveport (aptsp.com)

---

## Hyde Park

**Name:** Hyde Park
**Location:** Columbus, OH
**Deal Type:** Value Add - Multifamily
**Acquisition date:** April 2024
**Units:** 176



Hyde Park | Apartments in Columbus, OH (hydeparkcolumbus.com)

## Commons at Waters Edge



**Name:** Commons at Waters Edge
**Location:** Columbus, OH
**Deal Type:** Value Add - Multifamily
**Acquisition date:** February 2025
**Units:** 432

The Commons at Waters Edge | Apartments in Columbus,OH

## The Life at Edgewater Landing



**Name:** The Life at Edgewater Landing
**Location:** Columbus, OH
**Deal Type:** Value Add - Multifamily
**Acquisition date:** October 2025
**Units:** 724

Life at Edgewater Landing Columbus OH

## Riverside Oaks



**Name:** Riverside Oaks
**Location:** Shreveport, La
**Deal Type:** Value Add - Multifamily
**Acquisition date:** July 2024
**Units:** 185

Riverside Oaks | Apartments in Shreveport, LA




# Park Place Brook Park

**Name:** Park Place Brook Park
**Location:** Brook Park, OH
**Deal Type:** Value Add - Multifamily
**Acquisition date:** June 2023
**Units:** 125

Park Place Brook Park | Apartments in Brook Park, OH (parkplacebp.com)



# Park Lamont Apartments and Townhomes

**Name:** Park Lamont Apartments and Townhomes
**Location:** Cleveland OH
**Acquisition date:** June 2025
**Units:** 77

Luxury Apartments in Cleveland, OH | (parklamont.com)



# The Lumos Apartments

**Name:** The Lumos Apartments
**Location:** Cleveland OH
**Acquisition date:** June 2025
**Units:** 42

Luxury Apartments in Cleveland, OH | (thelumosapts.com)

## Spring Street Commons



**Name:** Spring Street Commons
**Location:** Newark, NJ
**Deal Type:** New Construction - Multifamily
**Acquisition date:** March, 2018
**Construction Completion:** September, 2020
**Units:** 87 **Occupancy:** 100%

Spring Street Commons (springstreetcommonsnj.com)

---

## Western PA Portfolio



**Name:** Newberry Apartments & Pinetree Village & Valley View
**Location:** Grove City & West Middlesex & New Wilmington, PA

REYNOLDS ASSET MANAGEMENT ABOUT PROJECTS NEWS CONTACT SEARCH



---

## Bound Brook, NJ Development

**Name:** The Vibe
**Location:** Bound Brook, NJ
**Deal Type:** New Construction - Mixed Use
**Acquisition date:** March, 2019
**Units:** 28 **Occupancy:** 100%

Borough of Bound Brook New Jersey

CONTACT US:

Tel: 201-345-3131
Email: info@reynoldsasset.com
Fax: 866-433-3671

45 Eisenhower Drive, Suite 500
Paramus, NJ 07652

Name

Email

Subject

Message

SUBMIT

© 2023 by Reynolds Assets Management, LLC.

# EXHIBIT D

**The Finn**
**Ann Arbor, MI**
**Investment Letter of Commitment**

**July 16, 2026**

**From:** Agile Solar Group, LLC ("Agile")
Mr. Philip Ahmadzai, CEO

**To:** Mr. Louis Reynolds IV, CEO, Reynolds Asset Mgmt., LLC ("RAM")
Mr. Matt Breuer, RAM Authorized Counsel
Ms. Heidi Caroline Poscher, Authorized Representative of the Estate of Margaret Poscher (the "Poscher Estate")
Ms. Heidi Caroline Poscher, designated representative of South Town by 4M, LLC ("South Town")

**RE: Investment Commitment, The Finn Group, LLC, Ann Arbor, MI**

**Dear Mr. Reynolds, Mr. Breuer and Ms. Poscher,**

This letter serves as a binding commitment between Agile and an entity to be formed as the Finn Group, LLC ("Finn Group") (the "Parties") to enter into a joint venture (the "JV") for the development of, and for Agile to provide funding for, a residential apartment project to be branded as "The Finn," comprised of the real property located at 1601 S State St., Ann Arbor, MI 48104 (the "Project"), currently titled in the name of South Town.

1. **Investment Commitment Amount**
   Subject to the terms and conditions outlined herein, Agile commits to a direct investment of **$54,000,000** (the "Investment Amount") into the JV for the purpose of the JV:
   a. acquiring 100% of the equity held by the Estate of Margaret E. Poscher (the "Estate") in South Town;
   b. paying in full the allowed claims of creditors in the Chapter 11 bankruptcy proceeding of South Town; and
   c. providing an equity investment in conjunction with the vertical construction of the Project.
2. **Syndication**
   The Parties agree that syndication is permissible of a respective Parties' membership interest so long as:
   a. the syndicating Party remains the lead investor and the equity block's representative in the JV; and
   b. all other Parties have agreed to the terms of the syndication.
3. **Equity Ownership & Return Structure**
   In exchange for the Investment Amount, Agile shall receive a **59%** equity ownership interest in the JV and the Finn Group shall hold a **41%** equity ownership interest in the JV. Returns, voting rights and all other material terms of the Parties' agreement shall be set forth in a definitive Development JV/Operating Agreement (the "JV Agreement").

4. **Investment Funds and Funding Schedule**
Agile agrees that it will provide proof of funds of the Investment Amount to the Finn Group and to South Town.
5. **Timing, Sequencing and Required Documentation**
The Parties agree to the following timing, formation, sequencing, flow of funds and production of required documentation related to the JV (the "Steps"), in order to achieve timely approval of the Probate Court and of the Bankruptcy Court, as applicable, related to South Town's plan (the "Plan"):
   a. South Town shall convey its interest in the Project to a newly formed special purpose entity (the "SPE") in exchange for 100% of the equity in the SPE on the effective date (the "Effective Date") of the Plan.
   b. The JV Agreement shall be executed not later than August 7, 2026.
   c. A purchase agreement for the acquisition of 100% of the Estate's interest in South Town and therefore, the equity in the SPE (the "Equity Purchase"), by the JV, shall be finalized not later than August 7, 2026 (the "Equity Purchase Agreement").
   d. Probate Court approval of the Equity Purchase Agreement shall be requested by August 10, 2026, with approval to be conditioned upon, and obtained prior to, the hearing on confirmation of the Plan.
   e. A management agreement between the manager of the JV and the JV shall be finalized not later than one week prior to the hearing on confirmation of the Plan.
   f. A credit enhancement agreement between the JV and RAM shall be finalized not later than one week prior to the hearing on confirmation of the Plan, pursuant to which RAM and Louis Reynolds IV shall agree to provide guarantees required by any take-out or vertical lender to the Project (the "Credit Enhancement").
   g. A binding term sheet between Agile and Fourth Purpose Energy, LLC ("Fourth Purpose") for the funding and operation of the on-site energy system at the Project (which will include system production suitable for third party offtake, with the offtake modeling and feasibility analysis to include the on-on-site energy system at the Project as well as other, future projects contemplated by the Finn Group and Fourth Purpose) shall have been entered into not later than one week prior to the hearing on confirmation of the Plan.
   h. Confirmation of the Plan to occur on September 25, 2026, or such later date as the Bankruptcy Court may determine (the "Confirmation Hearing Date").
   i. The uses of the Investment Amount shall be as follows:
      i. Equity Purchase amount: $13,000,000.00.
      ii. Plan exit payments (sufficient to pay all allowed claims in full: $31,000,000.00 (estimate) payable on the Effective Date as a capital contribution from the JV to South Town.
      iii. Post-Plan confirmation development proceeds: $10,000,000.00.
   j. The Investment Amount to be wired to an escrow account of the JV at least one week prior to the Confirmation Hearing Date.
   k. On the Effective Date, all of the above transactions shall be closed.

6. **Conditions Precedent**

This commitment is expressly conditioned upon the following:

a. Each of the Steps shall have been completed within the deadlines above stated or such later dates as the Parties may agree.

b. Confirmation of the Plan by the Bankruptcy Court and approval of the Equity Purchase by the Probate Court shall have been obtained.

7. **Fees**

The Parties acknowledge and agree that certain fees shall be paid to RAM (or its designee) in connection with the administration and management of the Project, which include the following: (i) an Asset Management Fee of $5,000 per month, (ii) a co-development fee paid monthly during the term of the vertical construction in the total amount of $1,975,000; and (iii) a credit support fee equal to 2% of future borrowed construction funds that are subject to RAM's Credit Enhancement. These fees shall be set forth as "Uses" in the Project's projections and development financials.

8. **Major Decisions**

The Finn Group shall have the right to propose and unilaterally implement all material major decisions related to the Project; however the following decisions (the "Joint Major Decisions") shall require the consent of both Agile and the Finn Group:

a. Selection of a property manager;
b. Merging or consolidating with or acquiring any other person or entity;
c. Modifying the JV Agreement or other documents between the JV and third-parties;
d. Any sales or refinancings of the Project; and
e. Making any tax election or decision that would have a disproportionate and material adverse effect on Agile.

Notwithstanding the foregoing, the Finn Group may deviate from the approved budget on any non-discretionary expenses to prevent any default under any loan document (including, but not limited to, any personal guarantees).

9. **Capital Calls**

The JV Agreement shall address future capital calls related to the Project.

10. **Confidentiality and Non-Circumvention**

The terms and conditions of this Term Sheet are confidential and are not to be disclosed by either Party other than to legal counsel and other professional advisors who need to know such information in connection with the transactions contemplated herein. Subject to the requirements of applicable law, neither Party shall make any news releases or any public disclosure with respect to the transactions contemplated herein without the prior consent of the other Party; provided, however, the Parties shall be permitted to make any disclosure required by law, including, but not limited to, those required by the South Town Bankruptcy Court, the Probate Court, the United States Securities and Exchange Commission and/or per applicable securities laws. The legal obligations of confidentiality hereunder do not extend to the U.S. federal or state tax structure or the U.S. federal or state tax treatment of the transactions contemplated hereunder. If any U.S. federal or state tax analyses or materials are provided to any Party, such Party is free to disclose any such analyses or materials without limitation. The Parties may disclose the terms and conditions of this Term Sheet and materials related hereto to its potential joint venture partners, financing sources, legal counsel and other agents and

representatives who need to know such information in connection with the transactions contemplated herein. Agile agrees that it shall not and shall cause its affiliates not to: (i) directly or indirectly, participate in the in any transaction with respect to the Project or any similar transaction involving the Project except with the participation of the Finn Group, (ii) or otherwise circumvent the Finn Group's opportunity to engage in the transaction with the Project. The provisions of this Section shall survive the termination of this Term Sheet for any reason and shall be binding on the Parties hereto.

11. **Buy-Sell**
    Standard buy-sell provisions shall be included in the JV Agreement.
12. **Effect of Term Sheet**
    The purpose of this Term Sheet is to set forth the present mutual intent of the Parties for a joint venture for the Project. Both Parties agree that time is of the essence and will work to negotiate and execute the definitive documents as soon as practical and within the time parameters set forth above.
13. **Governing Law**
    This Term Sheet shall be governed by and construed in accordance with the laws of the State of Michigan, without any regard to any conflict of law principles thereof.
14. **Other**
    This document outlines a mutual understanding and constitutes a binding commitment to proceed with the investment, provided the conditions in Section 6 are satisfied, and further agree that this Term Sheet will be binding and enforceable against the Parties. Please indicate your acceptance of these terms by signing and returning a copy of this letter.

**Sincerely,**

**Agile Solar Group, LLC:** ____________________
**Philip Ahmadzai**
**Title:** CEO
**Date:** July 16, 2026

**Accepted by:**

**Reynolds Asset Mgmt., LLC:** ____________________
**Louis Reynolds IV**
**Title:** CEO
**Date:** July 16, 2026

**Caroline Poscher:** ____________________
**Title:** Authorized Representative of the Estate of Margaret Poscher
**Date:** July 16, 2026

**Caroline Poscher:** ____________________
**Title:** Authorized Representative of South Town
**Date:** July 16, 2026

# EXHIBIT E

**Memorandum** re: Investment Commitment and Capital Structure for The Finn (now referred to as The Forge)

**From:** Agile Solar Group, LLC ("Agile")

**To:** Ms. Heidi Caroline Poscher, Authorized Representative of the Estate of Margaret Poscher (the "Poscher Estate") and designated representative of South Town by 4M, LLC ("South Town"); Mr. Matt Breuer, Authorized Counsel to Reynolds Asset Mgmt., LLC and South Town

**Re:** Investment Commitment under the July 16, 2026 Investment Letter of Commitment

**Date:** August 5, 2026

## I. Reservation of Rights Under the July 16, 2026 Letter of Commitment

This memorandum is provided solely as an informational update regarding Agile's investment commitment and capital structure. It does not amend, modify, or waive any term of the Investment Letter of Commitment dated July 16, 2026 (the "LOC") between Agile and the other parties.

All conditions, timelines, exit options, and other rights and obligations set forth in the LOC remain in full force and effect. In the event that key bankruptcy or transaction milestones are not met in a manner that aligns with Agile's funding and syndication schedule, Agile reserves all rights available under the LOC, including any exit or termination rights triggered by missed funding or closing dates.

## II. Purpose of This Memorandum

This memorandum confirms Agile's ongoing investment commitment and clarifies the capital structure and syndication approach referenced in the July 16, 2026 Investment Letter of Commitment (the "Commitment Letter"). It is intended to provide you and your counsel

with a clear, court-ready description of the proposed equity investment supporting South Town's Chapter 11 exit plan.

### III. Confirmed Investment Commitment

Subject to the terms and conditions set forth in the Commitment Letter and related definitive agreements, Agile commits to a direct equity investment of **$54,000,000** (the "Investment Amount") into the joint venture vehicle (the "JV") formed to implement the transaction.

The Investment Amount is designated to support the following components of the restructuring and development plan:

1. **Acquisition of Estate Interest:** Funding the JV's acquisition of 100% of the equity interest currently held by the Estate of Margaret E. Poscher in South Town.
2. **Payment of Creditor Claims:** Paying in full the allowed claims of creditors in the Chapter 11 bankruptcy proceeding of South Town.
3. **Project Construction Equity:** Providing equity capital in conjunction with the vertical construction of the Project.

This commitment is intended to serve as a core component of the exit financing for the bankruptcy case.

### IV. Equity Ownership and Return Structure

In exchange for the Investment Amount, the parties have agreed to the following indicative equity allocation:

- **Agile:** 59% equity ownership interest in the JV.
- **The Finn Group, LLC:** 41% equity ownership interest in the JV.

All returns, voting rights, distributions, and governance matters will be set forth in a definitive Development JV/Operating Agreement (the "JV Agreement"). The indicative

ownership percentages reflect the economic and control framework under which the parties are operating while final documents are prepared.

### V. Syndication Approach and Investor Participation

The Commitment Letter permits syndication of membership interests, subject to agreed conditions. Specifically:

- The syndicating party must remain the lead investor and representative of its equity block in the JV.
- All other parties must agree to the terms of the syndication.

Agile is acting as the lead investor and is assembling a group of co-investor partners to participate in the $54,000,000 commitment. While the overall commitment amount is fixed, the final allocation among individual syndicated participants is still being completed.

This approach is consistent with common practice in larger real estate and development transactions, where a lead investor commits capital and subsequently brings in institutional or high-net-worth co-investors under a single equity block.

### VI. Timing and Process Considerations

The bankruptcy process and related plan milestones are advancing on an accelerated timeline. Agile's investor coordination and final participation documentation are proceeding in parallel but, due to the scale of the commitment and current market conditions, are not yet fully finalized.

Factors affecting the pace of syndication include:

- Broader financing market conditions;
- Global geopolitical events; and
- Energy-sector.related uncertainties impacting certain prospective investors.

Agile remains focused on a target exit in **late September 2026** and is actively working to align investor closing mechanics with the bankruptcy timeline. While some interim bankruptcy deadlines have been challenging to meet due to the speed of the process relative to investor documentation cycles, these are timing and process issues, not a reflection of reduced commitment.

### VII. Use of This Memorandum in Support of the Exit Plan

This memorandum is provided so that you and your counsel have a clear, written summary of:

- The existence and size of the equity amount;
- The intended uses of the investment proceeds;
- The lead investor and syndication structure; and
- The current status of investor finalization efforts.

You may share this memorandum with the bankruptcy court, the U.S. Trustee, or other involved parties as a resource demonstrating that the proposed exit plan is supported by a defined, credible equity investment and a viable path to consummation.

In the event these plans do not meet timeframes for funding details which causes the Court to fail the Bankruptcy Exit Plan, Agile will not cause any action in opposition of a successful exit plan unless Agile has already achieved the funding target.

### Contact

For any questions or to coordinate further details, please contact:
Agile Solar Group, LLC

# EXHIBIT F

# Conditional Commitment

**Proposed: The Forge**
**SouthTown by 4M, LLC**
**Michigan Limited Liability Company**
**Summary of Terms and Conditions**
**June 16, 2026 (Revised June 28, 2026) Revised July 27, 2026**

The following is a Conditional Commitment ("Conditional Commitment") outlining certain of the terms and conditions relating to the Borrower (the "Borrower") to provide a $32,629,950.03 Bridge Loan to satisfy the current Chapter XI and a construction loan to build a 300-unit residential development containing Studio, One-, and Two-Bedroom Units, and 72 Parking Spaces. The total square footage of the Development is anticipated to be approximately 237,366 sq. ft., with a total developed Maximum Floor Area of 211,703 sq. ft. It is estimated that the stabilized NOI will be $12,570,678, with a Stabilized Market Value of $290,000,000. The Bridge Loan, which shall not exceed $40,000,000, inclusive of the funds necessary to satisfy the current Chapter XI, will also include funds to pay for updates to pre-construction drawings and for the reorganization of the post-Chapter XI company. The Loan will be phased with Phase One effecting the exit of the Chapter XI and Phase Two funding the pre-development cost and the development of the 300 unit multi-family Project (the "Loan") to be made by an affiliate of The Provizia Organization Inc. (together with such affiliate, collectively, the "Lender") to the borrower designated herein (the "Borrower") with respect to the property identified herein (the "Property"). These terms and conditions are subject to modification or adjustment by Lender at any time up until any closing and are only a summary of certain terms and conditions to be more fully set forth in the documents and/or instruments to be executed in connection with the Loan (collectively, the "Loan Documents"). Any documents, reviews, decisions, approvals, or acceptances to be made or accepted by Lender will be made by and must be acceptable to Lender in its sole and absolute discretion. In the event the Loan is funded, the terms and conditions contained herein shall be superseded by the Loan Documents, and the Loan Documents shall govern the terms and conditions of the Loan without reference to this Conditional Commitment. This Conditional Commitment is not a commitment to lend, either express or implied, and does not impose any obligation on Lender to issue a commitment or to make a loan on the terms set forth herein or on any other terms. With respect to Lender, this Conditional Commitment is solely an agreement of Lender to engage in diligence in connection with the proposed Loan as outlined herein; all diligence conducted by Lender must have results acceptable to Lender in Lender's sole discretion. With the exception of the provisions hereof entitled "Expense Deposit", "Closing", "Brokers", "Governing Law", "Accuracy of Information", "Confidentiality" and "Exclusivity", "Non-Disparagement", "Closing", "Expense Deposit" and "Break Up Fee" which shall be binding upon the parties hereto, this Conditional Commitment constitutes a non-binding proposal, which has been made solely upon our discussions and the information provided to date. This Conditional Commitment may be rescinded or terminated by Lender at any time, for any reason or no reason.

Formatted: Justified

| | |
|---|---|
| **Lead Arranger and Administrative Agent** | THE PROVIZIA ORGANIZATION INC. ("the Lender," "the Capital Provider," the "Lead Manager," "the "Agent"). The Lender intends to provide two loans non-revolving credit facilities: the first to facilitate the exit of the Chapter XI and the second to construct the proposed 300 unit multi-family development described herein ("Mortgage," "Credit Facility") in the amount up to $145,000,000, inclusive of the Short Term Bridge Loan, closing costs, brokerage fees, and interest reserves based on maximum combined leverage of 80% (the non-revolving construction loan leverage is estimated to be a maximum of 60%). In addition, the estimated development cost, including $38,000,000 of pre-bankruptcy equity, is $183,500,000. Upon closing, Lender, or its agent or assign, shall act as the Administrative Agent managing all aspects of funds flow. The Borrower will have the right to approve any assignee, participant, or co-Lenders; however, such approval shall not be unreasonably withheld. |
| **Initial Funding Amount** | An amount to be determined by Lender upon completion of its underwriting and due diligence and based in part on a Lender-approved estimate funding schedule. |
| **Borrower (SPE Structure)** | A newly created special purpose entity ("SPE") or an existing SPE indirectly controlled by the Borrower (defined below), formed exclusively for the purpose of acquiring, constructing, owning, and operating the Property and not for any other business activity. The Borrower would also be directly owned and controlled by the managing member or general partner that is an SPE ("SPE Equity Owner"). The formation and organization documents of the Borrower and the SPE Equity Owner and structure thereof would be |

Formatted: Justified

Formatted: Justified

required to comply with and contain SPE restrictions and limitations and be subject to approval by LENDER, including (without limitation) prohibitions against (a) transfer of interest in the Borrower, SPE Equity Owner or any Guarantor resulting in a change of control of any of them without the prior written consent of ("Impermissible Transfers") (subject to customary permitted transfer provisions including, without limitation, the removal of the Borrower member as administrative member of the SPE Equity Owner); and (b) incurrence by the Borrower or SPE Equity Owner of debt of any kind other than (i) the Loan; (ii) Tax Credits Loans or loans from any other entity; (iii) and customary trade payables, in each case without the prior written consent of Lender, and other Impermissible Transfer or Impermissible Debt to be void ab initio and no force or effect.

| | |
|---|---|
| **Borrower** | TBD |
| **Type** | Construction Loan and a Short-Term Bridge Loan to Facilitate the Bankruptcy Exit and construction of the improvements on the Property. |
| **Funding** | A to-be-determined amount of the Total Loan Amount will be allocated to the Credit Facility, subject to Lender's approval, and will be used for the bankruptcy exit and construction of improvements, horizontal improvements (infrastructure), soft costs, carry costs, and interest payments. The final Credit Facility amount (and the allocation thereof) will be subject to the Lender's underwriting and due diligence. Funds will be advanced to the Borrower not more than once per month subject to satisfaction with the following conditions:<br>• 100% advance rate on actual costs incurred until the Credit Facility has been fully drawn (less any applicable retainage).<br>• $250,000 minimum advance amount for each draw.<br>• Verification of completed work and completion costs will be performed by Lender's construction consultant (at Borrower's expense) prior to each disbursement.<br>• Delivery of title updates and title insurance endorsements, certifications from Borrower, the architect, and general contractor, and payment acknowledgments/lien waivers from contractors in compliance with the terms of the Loan Documents and the applicable lien laws for the State of Michigan. In addition to the foregoing, with respect to the final advance under the Credit Facility, Borrower shall deliver a final certificate of occupancy, an "as built" survey, and final lien waivers and other items as required by the Lender.<br>• All advances shall also be conditioned on the Loan at all times being "in-balance" as determined by Lender and as shall be further provided in the Loan Documents (including, without limitation, with respect to required additional equity to be contributed by or on behalf of Borrower to comply with all loan balancing requirements); and<br>• Other standard and customary requirements of the Lender. |
| **Property Management Company** | TBD |
| **Maturity** | The Bridge Loan will have a term of 12 months, followed by a 24-month construction loan with two one-year extensions, if required. |
| **Extension Fee** | 50 bps |
| **Credit Facility Amount** | $145,000,000 final cost, based on the appraisal, which includes the senior credit facility and short-term Bridge Loan. |
| **Prepayment** | Borrower will have the right to prepay the entire unpaid principal balance in full, but not in part, without penalty during the Loan term. Prepayment Lockout during the first 18 months of the loan term. |

Formatted: Justified

Formatted: Justified

| | |
|---|---|
| **Amortization** | Interest is paid only during the construction term and the Short-Term Bridge Loan term from the loan proceeds. |
| **Pricing** | Senior Credit Facility: The estimated interest rate on the Loan will float based on SOFR, currently at 3.60% plus 4.00% ("Spread"), subject to SOFR on the date of Loan closing, with a minimum all-in, per annum interest rate of 7.60% (the "Minimum Interest Rate").<br><br>Bridge Loan: The estimated interest rate on the Loan will be fixed based on SOFR plus a Spread of 700 basis points for the term of the Loan, subject to SOFR on the date of the Bridge Loan closing, with a minimum all-in, per annum interest rate of 10.60%. |
| **Loan Allocations** | Lender will require that certain funds be allocated and used to cover specific expenditures including, if applicable, but not limited to: (i) Interest expense ("Interest Allocation"); (ii) Real estate taxes ("Property Tax Allocation"); (iii) Insurance ("Insurance Allocation"); and (iv) Contingencies ("Contingency Allocation"; and together with the aforementioned other allocations, the "Allocations"). The amount of each Allocation is subject to the lender's approval. No interest expense will accrue on the Allocations until (and to the extent that) they are drawn. |
| **Loan Funding** | All Loan funding will be drawn by Borrower only in accordance with a budget approved by Lender; all construction management fees, development fees, or similar payments (if any) shall be paid on a percentage of completion basis (based on completion of the hard construction costs ["Hard Costs"] as determined by Lender utilizing information provided by Lender's inspecting person without regard to soft costs or the Loan Amount. Lender shall specifically approve the timing and amount of any fees or reimbursements paid to related entities or affiliates; provided, however, that the final advance of such fees shall not be made until such time that the Property is complete, a certificate of occupancy for the Property has been issued, and the final construction advance has been made. Borrower represents that there are no fees or other payments to Borrower, or any Borrower-affiliated entities or persons, contained in the budget other than those specifically detailed or discussed herein. Borrower further acknowledges that any such undisclosed fees or payments will be removed from the final budget prior to closing, in conjunction with a direct dollar for dollar reduction of the Loan Amount. |
| **Maximum Loan to Cost** | Senior Construction Loan Facility: 60% (at closing) |
| **Guarantor** | Louis J. Reynolds IV and the entire Forge Group shall be joint and several guarantors under the Loan, subject to the "Recourse" provisions below. |
| **Interest Reserve** | Lender shall receive a minimum of interest (equal to 12 months on the Senior Loan Construction Amount at the Interest Rate as of the closing date of the Loan). The Lender will determine, after a new appraisal is completed, the estimated interest reserves for the Bridge Loan. |
| **Collateral** | The Credit Facility shall be secured by:<br><br>a. A first lien security agreement on the Property to include all present and future improvements, all required assignments, and right away.<br><br>b. A collateral assignment of all major contracts, which shall include the GMP, architect contract, and engineer's contract, and shall expressly not include any subcontracts.<br><br>c. UCC-1 on Property.<br><br>d. A Senior Secured First Mortgage granted to Lender and the SPE shall pledge to Lender an interest in 100% ownership of Borrower. The sale, transfer, pledge, or encumbrance of all or any portion of the Property or interest shall be prohibited without prior written consent of Lender or its assignee; provided, however, such pledge cannot be exercised during any standstill period, and Lender acknowledges and agrees that Guarantor will have a pledge in the member of the Borrower that may be exercisable in the Event of Default. |

Formatted: Justified

e. Lender will record an assignment of security interest in all current and future leases, rents, tax credits, and other income related to the Property.

f. Unconditional assignment of all approvals, plans, specifications, licenses, permits, and all major contracts throughout the Loan term.

g. Applicable financing statements.

h. Other customary security documentation required by Lender.

**Guaranty** During entire Credit Facility term, the Borrower will indemnify the Lender against any loss from fraud, including intentional misrepresentation of a material statement of fact or any financial statement in any material respect, bankruptcy, misapplication of rents and security deposits, or other intentional physical waste to the Property, and shall indemnify and hold the Lender harmless from any past, present or future environmental issues relating to the Property.

**Tax Monitoring** The Lender and its assigns retain the right to require a real estate tax escrow in the event the real estate taxes become delinquent in the future.

**Financial Statements** The Borrower will be required to submit annual financial statements in form and substance satisfactory to Lender within 120 days of calendar year end; federal tax returns within 60 days of filing.

**Interest Reserve (Underwriting)** An interest reserve will be established during the underwriting of the proposed loan based on the draw schedule.

**Appraisal** The Senior Credit Facility will be subject to a satisfactory appraisal completed by an independent appraiser ordered, reviewed, and approved by the Lender or its assigns. The appraisal shall provide "As Is," "As Completed," and "As Stabilized" values. The Value shall include the value of any tax benefits, approval status, and other enhancements to the Property.

**Third Party Expenses** The cost of (a) appraisal, (b) environmental study if not available or unacceptable, (c) property condition engineering reports, shall be specified and ordered by Lender at the expense of the Borrower. A Property Condition Assessment (or Property Condition Report) is a professional evaluation of a property's physical condition from an engineering and construction standpoint, for real estate due diligence purposes. Property Condition Assessments, also referred to as "PCA Reports," include conclusions and recommendations regarding the site's unforeseeable costs, financial liabilities, and acquisition risks. This paragraph shall be binding on Borrower and shall survive the Conditional Commitment Expiration Date, other termination of this Conditional Commitment, or the closing of the Loan.

Formatted: Justified

**Expense Deposit** Borrower is responsible for the cost of all third-party fees and expenses incurred by Lender in connection with the Loan (including third party reports, legal costs, credit searches, etc.), as well as any other out-of-pocket expenses incurred by Lender, regardless of whether (i) the Loan closes or (ii) the Good Faith Deposit is sufficient for the payment of such costs, fees and expenses. Borrower has made an initial "Good Faith Deposit" of $60,000 to be applied toward such costs. Expenses incurred which are in excess of the Good Faith Deposit ("Excess Expenses") described above will be either (1) withheld from the loan proceeds in the event the proposed Loan closes or (2) paid by Borrower, jointly and severally, to Lender immediately upon demand in the event this Conditional Commitment is terminated or expires, whether or not the proposed Loan closes. If actual expenses are less than the Good Faith Deposit, Borrower shall be credited with the difference at Closing. This paragraph shall be binding on Borrower and shall survive the Conditional Commitment Expiration Date, other termination of this Conditional Commitment, or the closing of the Loan.

**Closing** If the Bridge Loan does not close within one hundred and fifty (150) days from the date the Borrower signs this Conditional Commitment, it will, at Lender's option and without

Formatted: Justified

notice to any Loan party (unless Lender and Borrower are in active Loan negotiations), be deemed terminated; provided that this Section and the Sections entitled "Expense Deposit", "Closing", "Brokers", "Governing Law", "Accuracy of Information", "Confidentiality" and "Exclusivity", "Non-Disparagement", "Expense Deposit" and "Break Up Fee" shall survive any termination of this Conditional Commitment.

Formatted: Justified

**Opinion of Borrower's Counsel** A legal opinion from Borrower's counsel confirming that all documentation and other matters pertinent to the Loan are valid, enforceable, and binding in accordance with the terms of the Lender's commitments and corresponding Loan documentation, and do not violate usury laws or any other applicable laws or ordinances; that the Borrower is properly formed and allowed to conduct business in the State of Michigan, and such other matters as Lender may require, in its sole discretion.

Formatted: Justified

**Loan Disbursement** Prior to the disbursement of Loan proceeds, the Borrower shall submit draw request documents acceptable to the Lender, which shall include: (1) a certified application for payment from the General Contractor and Supervising Architect or Engineer certifying the cost of the work in place, (2) Partial Lien Waivers, (3) a Project Funding Summary outlining funds advanced to date on the subject Property and the current funding request. Prior to advancing funds, the Lender will conduct a document review and site inspection. All disbursements shall be conditioned upon the Loan being in balance and the absence of any material default (monetary or non-monetary) that would materially affect the Project or the Borrower if not cured, and the satisfaction of the other conditions which will be set forth in the Loan Agreement.

**Environmental and Physical Inspection** The Loan will be subject to a complete and satisfactory review of the current environmental status and a satisfactory physical inspection of the subject Property.

**Payments** Monthly, on the 1st day of each month.

**Documentation to Close**

a. Credit Reports on the Guarantor (require minimum 720+ FICO). (Bridge Loan and Construction Loan)

b. Personal Financial Statements for each Guarantor (signed, dated, with notes) required for Carveout and Completion Guarantee. (Bridge Loan and Construction Loan)

c. Personal Guarantee of Louis J. Reynolds IV and the business financial statements for the past 3 years for RAM for the Bridge Loan and the Construction Loan. (Bridge Loan and Construction Loan)

d. Co-Development Agreement for The Forge.(Bridge Loan and Construction Loan)

e. Approval of Contractor and final construction costs amounts.(Construction Loan)

f. Market Study. (Construction Loan)

g. Organizational Documents. (Bridge Loan and Construction Loan)

h. Execution and delivery of loan and security documents. (Bridge Loan and Construction Loan)

i. Indication of any outstanding debt. (Bridge Loan (as indicated in Chapter 11 Exit Plan documents) and Construction Loan)

j. - Detailed breakdown of GC fees and GC contingency estimates. (Construction Loan)

k. Environmental Report. (Bridge Loan and Construction Loans)

l. Updated survey reflecting site clearing (Bridge Loan)

m. Approved Site Plan (Bridge Loan and Construction Loan)

n. List of individuals and entities signing for the carve-outs and completion guarantee.

o. Required approvals for all municipal and governmental entities relating to the construction and operation of the Property. (Construction Loan)

p. Final Construction Budget (detailed hard and soft costs). (Construction Loan)

q. Appropriate and required insurance policies. (Bridge Loan and Construction Loan)

r. Current Title Report and title holder name. (Bridge Loan and Construction Loan)

s. Year-to-date expenses paid out. (Bridge Loan and Construction Loan)

t. Title Insurance. (Bridge Loan and Construction Loan)

u. Construction plans, drawings, specifications, construction contracts, budgets, and all related permits and approvals, to be assigned to the Lender. (Construction Loan)

v. Project Renderings (PDF). (Bridge Loan and Construction Loan)

w. Mechanical Drawings (PDF). (Construction Loan)

x. Electrical Drawings (PDF). (Construction Loan)

y. Plumbing Drawings (PDF). (Construction Loan)

z. Civil Drawings (drainage, sewer, curbs) (PDF). (Approved Site Plan Bridge Loan; Final Civil Drawings Construction Loan)

aa. Structural drawings (foundation, vertical – steel, concrete, lumber) (PDF). (Construction Loan)

bb. Tenant Improvement Drawings (PDF). (Construction Loan, as available)

cc. Principal's Resumes. (Bridge Loan and Construction Loan)

dd. Final Sources and Uses of Funds. (Bridge Loan and Construction Loan)

ee. Survey and/or Plat Map & Deed. (Bridge Loan and Construction Loan)

ff. Site Plan for the Proposed Development. (Bridge Loan and Construction Loan)

gg. Current Tax Bill. (Bridge Loan and Construction Loan)

hh. Engineering/Structural Review. (Construction Loan)

ii. Construction Management Agreement. (Construction Loan)

jj. 5-year construction pro forma P&L. (Construction Loan)

kk. Confirmation that no material adverse change has occurred in the financial markets or the Borrower's financial condition. (Bridge Loan and Construction Loan)

ll. Approval from the Lender's Investment Committee. (Bridge Loan and Construction Loan)

mm. Satisfactory completion of Lender's (and its third-party consultants'/advisers') technical, business, financial, legal, and environmental due diligence. (Construction Loan)

nn. Receipt of substantially all items included in the closing checklist, including executed mortgage loan and note agreements, construction schedule, construction draw schedule, and evidence of property insurance. (Bridge Loan and Construction Loan)

oo. Negotiation of satisfactory legal documentation, including financing agreements, assessment lien documents, filings, legal opinions and certificates, in form and substance satisfactory to Lender. (Bridge Loan and Construction Loan)

pp. Receipt of all corporate consents and approvals required in connection with Assessment-related Borrowing. (Bridge Loan and Construction Loan)

qq. Completion of background investigations as may be deemed necessary, satisfactory to the Lender. (Bridge Loan and Construction Loan)

rr. Receipt of appropriate consents and estoppels as reasonably required by Lender. (Bridge Loan and Construction Loan)

ss. Confirmation that all representations and warranties under the financing documents are true and correct as of the financial closing date for each Project. (Bridge Loan and Construction Loan)

tt. Completion of equity commitments. (Bridge Loan and Construction Loan)

uu. Confirmation that Property Owner/Developer has secured any applicable zoning variances permitting the proposed improvements and uses. (Bridge Loan and Construction Loan)

vv. Attorney's Opinion Letter. (Bridge Loan and Construction Loan)

ww. Such other information as is typically required for similar financing requests.

| | |
|---|---|
| **Additional Terms** | Usual and customary for transactions of this type, including without limitation: corporate status, power and authority/enforceability, no violation of law or contracts or organizational documents, no material litigation, correctness of specified financial statements, and no material adverse change — including a global cash flow statement and tax returns for Borrower. In the event the Lender elects to bifurcate the loan, Borrower shall not be required to incur any material costs or expenses arising after the closing date of the Loan, other than expenses of Borrower's counsel, accountants, and consultants.<br><br>Lender reserves the right to pre-syndicate the proposed loan, in whole or in part, and may invite financial institutions to participate accordingly. Borrowers will support the syndication. In any syndication, Lender will be the sole point of contact. Lender, as Lead Manager, and a group of financial institutions selected by the Lender would advance the full principal amount into escrow at closing. The Borrower acknowledges and agrees that the Lender may sell, assign, hypothecate, pledge, or otherwise transfer all or any part of the Loan to a third party prior to, at, or after the Loan closing.<br><br>Bridge Lender shall require at closing a pledge, properly secured, of specific liquid assets of the guarantor(s) totaling a minimum of $10 million to be maintained at all times (with mutually agreeable rights of substitution), as well as usual and customary constraints on sale of assets during the term of the bridge and/or construction loans. |
| **Bifurcation** | Provided that the initial economic and other material terms of the Loan shall remain the same for Borrower, Lender shall have the right to (i) bifurcate the Loan into one or more (a) participations, (b) component or other notes, such as B-Notes or (c) loans, including mezzanine loans secured by a pledge of 100% direct and indirect ownership interests, and (ii) reallocate the principal amount and interest rate of the Loan among one or more components and/or notes evidencing mortgage loans and mezzanine loans in any manner as determined by Lender. Borrower agrees to cooperate with Lender in connection with the foregoing, which may require the creation of additional borrower entities. Borrower shall not be required to incur any material costs or expenses arising after the closing date of the Loan, other than expenses of Borrower's counsel, accountants, and consultants. |
| **Developers' Fee** | To be paid as set forth in the Co-Development Agreement. A Co-Development Fee not to exceed $4,000,0000 will be paid in 24 monthly installments during the course of the construction loan term and is to be divided equally between Reynolds Asset Management LLC (or its designee) and Blue Phoenix 19 LLC. These fees are listed among the "Uses" in the Development financials. |
| **Additional Fees** | Certain fees shall be paid to Reynolds Asset Mgmt. LLC (or its designee) in connection with the administration and management of the Project, including (i) an Asset Management Fee to Reynolds of $5,000 per month through Certificate of Occupancy. |
| **Construction Loan Draws** | All loan funds (except for interest reserves) would be required to be drawn within the first 24 months of the date of closing. |
| **Construction Contract** | Stipulated Sum contract, subject to Lender's review, based on the final permitted specifications and architectural drawings, or a guaranteed maximum price ("GMP") |

contract where the contractor is compensated for actual costs incurred plus a fixed fee, subject to a ceiling price. The contractor is responsible for any cost overruns unless the GMP has been increased through a formal change order.

**Third Party Completion** General contractor must enter into a completion commitment or provide a payment performance bond acceptable to Lender.

**Insurance** Lender, its successor, or any subsequent assignee(s) will be named as an additional Loss Payee on the new insurance policy.

**Title Insurance (Closing)** At least seven (7) Business Days prior to closing and at its own cost and expense, Borrower shall obtain and deliver to Lender's counsel a title report and commitment for mortgage/credit title insurance in an amount equal to 100% of the combined loan amounts, naming Lender as the insured therein.

**No Further Encumbrance or Indebtedness** No secondary financing or encumbrance or secured or unsecured indebtedness of any kind other than the Senior Loan and Mezz Loan (if required) shall be permitted, with the exception of trade payables (not more than 60 days outstanding) incurred in the ordinary course of business in an amount not to exceed 2% of the initial principal balance of the Loan and any member loans made to Borrower or its member. No direct or indirect interest in or right to distributions from Borrower may be pledged or encumbered as collateral for any obligation other than the Loan.

**Loan Documents** In the event of any inconsistencies between the terms hereof and the terms of the Loan Documents, the terms of the Loan Documents shall control. Loan Documents shall include all documents and instruments, together with any renewals, amendments, extensions, and other modifications thereof, necessary to fund and close the loan.

**Third Party Reports** This - Conditional Commitment is expressly subject to receipt of the following third-party reports related to the Construction Loan (including the reliance language contained therein) from parties acceptable to and in form and substance acceptable to the Lender: (i) engineering reports, (ii) Phase I environmental reports (and Phase II if recommended), (iii) a seismic report (if applicable), including SEL/SUL calculations, (iv) an MAI appraisal, (v) title insurance and survey with such endorsements as lender shall request, (vi) zoning report, (vii) Agreed Upon Procedures Report, and (viii) other reports or inspections that lender may reasonably require.

**Closing Costs** Borrower agrees to pay or reimburse Lender, upon written demand and whether the Loan is consummated or not, the out-of-pocket expenses incurred by Lender in connection with the proposed Loan, including fees and expenses of Lender's outside legal counsel, third-party due diligence fees, title insurance, insurance review costs, appraisal costs, environmental and engineering reports, zoning reports, survey updating and certification, travel costs, and recordation costs. Expenses in excess of the deposits described above will be withheld from the Loan proceeds to the extent not already paid; if actual expenses are less than the deposits, the difference shall be remitted to Borrower at closing. This paragraph shall survive the Conditional Commitment Expiration Date, other termination of this Conditional Commitment, or the closing of the Loan.

**Patriot Act Compliance** Lender is required under the USA Patriot Act (Title III of Pub. L. 107-56, signed into law October 26, 2001) to obtain, verify, and record certain information and documentation that identifies the Borrower, including name and address, and such other information as will allow LENDER to identify the Borrower in accordance with the Patriot Act.

**Post-Closing Costs** During the construction period, lease-up period, stabilization period, or unit sellout period, Borrower shall submit monthly rent rolls, occupancy percentages, or unit sales, as applicable, and quarterly financial statements for the assessed Property, along with quarterly progress reports, to Lender. Upon stabilization, Borrower shall submit quarterly rent rolls or occupancy percentages and annual financial statements, including an income statement and balance sheet.

Delivery of monthly construction completion reports, including notice of any delays, significant cost overruns, or other significant events.

Lender, or its designee or assign, shall be entitled to periodic property inspections during the construction period, as reasonably deemed necessary, and annual property inspections after issuance of a permanent certificate of occupancy. Lender shall provide reasonable notice to Property Owner prior to such inspections.

**Events of Default** Usual and customary for transactions of this type, including without limitation: failure to make payments when due, breach of covenants, breach of representations and warranties, bankruptcy/insolvency, judgments, and attachments. Any monetary default that results in the acceleration of certain other material indebtedness of the Borrower constitutes a default, subject to customary notice and cure rights.

**Due on Sale** The Credit Facility shall become due and payable in the event of any sale, conveyance, transfer, or further encumbrance of the property, or material change in the Borrower's ownership structure, without Lender's prior written consent.

**Finance Fee** Borrower agrees to pay Lender a 1.25% (125 basis points) fee from the gross loan proceeds of the Bridge Loan, the Construction Loan and any Mezzanine Financing necessary to execute the Project. Lender shall not be responsible for any fees or commissions payable to finders or to financial or other advisors utilized by the Borrower, or to any potential transaction investors or Lenders, and no fee or other compensation payable to any other advisor or person shall reduce or otherwise affect the fees and reimbursements payable to Lender hereunder. This paragraph shall survive the Conditional Commitment Expiration Date, other termination of this Conditional Commitment, or the closing of the Loan.

Formatted: Justified

**Recourse** The Loan will be non-recourse other than for certain customary carveouts and an environmental indemnity, for which Lender will have recourse to Borrower and Guarantor. Additionally, Guarantor shall enter into a completion guaranty and an interest carry guaranty in favor of Lender.

**Guarantor(s)** Guarantor shall provide (i) a Completion Guaranty with respect to the completion of the Property; (ii) a Carve-out Guaranty with respect to typical "bad boy" carve-out provisions, including environmental indemnity; throughout the Term of the loans (and any Loan Extension, if applicable) and terminating upon the earlier of (a) repayment in full of the Loan, or (b) Lender obtaining title to the Property. Any guaranty executed by the Guarantor shall contain a customary "standstill" provision that, in the event and continuance of an Event of Default, the Lender shall be precluded from consummating a foreclosure or taking control of the Property or exercising any other remedies for a period of sixty (60) days after written notice has been delivered to the Guarantor. Guarantor will also have a pledge of equity interests and may exercise such pledge to assume control and management of Borrower and/or its member in an Event of Default.

**General Contractor** Borrower shall engage a general contractor, approved by Lender, who shall provide on or before—closing on the Construction Loan (i) a guaranteed maximum price for construction of the improvements, (ii) performance and payment bonds, each acceptable to Lender, and (iii) standard requirements for retainage acceptable to Lender. Change orders shall be subject to Lender approval. It is anticipated that the General Contractor will be an affiliate of the Borrower.

**Major Subcontractors** All subcontractors with one or more contracts aggregating more than $1,000,000 must be acceptable to Lender and shall provide satisfactory performance and payment bonds. At closing on the Construction Loan, Borrower shall furnish Lender with evidence that 90% of the value of all trade contracts for the Project have been purchased, including trade contracts for demolition, foundation, superstructure, mechanical, electrical, and plumbing.

**Construction Budget** The construction budget, the construction schedule, and all matters related thereto shall be satisfactory to Lender and must be approved prior to the Closing Date. Lender will

engage a construction consultant at Borrower's expense to review plans, specifications, and budgets on a monthly basis, inspect the improvements, and provide reports for the benefit and approval of Lender. Prior to the Closing Date on the Construction Loan, the construction consultant will provide a full plan and cost review, which must be acceptable to the Lender in all respects.

| | |
|---|---|
| **Reserves** | Scheduled reserves throughout the loans, including but not limited to reserves for real property taxes, insurance, and debt service, will be determined by Lender based on its diligence and underwriting. For the avoidance of doubt, these reserves shall be set forth in the budget detailing the loan facility draws and shall accrue interest as drawn. |
| **Property Manager** | Upon Completion, the property shall be managed by a manager acceptable to Lender in accordance with a management agreement approved by the Lender. The management agreement shall be subordinate to the mortgage, assigned to Lender as additional collateral, and may be terminated by Lender upon an event of default under either the loan or the management agreement. |
| **Survey** | Borrower shall be required to provide a current ALTA survey (pursuant to the most recent standards and requirements promulgated by the American Land Title Association) of the Property satisfying Lender's requirements. |
| **Insurance (Property)** | Borrower shall carry builder's risk, general liability, and other insurance covering the Property (with no exclusion for "terrorism" events) and satisfying Lender's requirements. |
| **Carveouts** | The loan shall be non-recourse to the Borrower and any guarantors except for all actual loss, costs, or expenses incurred by the Lender due to (i) fraud or intentional misrepresentation by the borrower of its financial statements in material respect; (ii) intentional physical waste occurring to or on the mortgaged property; (iii) gross negligence or criminal acts of the borrower that result in the forfeiture of any collateral, fraud, misrepresentation, or breach of the special purpose entity provisions to the extent resulting in substantive consolidation of the Borrower, voluntary bankruptcy filing by the Borrower, environmental matters, waste or damage to the property, failure to pay taxes or other liens with priority over the property, or seizure or loss of any portion of the mortgaged property; (iv) misapplication or misappropriation of rents, insurance proceeds, or condemnation awards received by the borrower after the occurrence and during the continuance of an event of default; and (v) any sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment or transfer of the mortgaged property, or any part thereof, without the prior written consent of the lender. The Borrower and Key Principals for such carve-out exceptions shall be jointly and severally liable. |
| **Indemnification** | Borrower agrees to indemnify and defend the Lender or its agent against all costs and expenses incurred by Lender or its Agent or assign in connection with the mortgage proposed herein or in connection with any other party claiming a fee, commission, or other compensation by or through Borrower or the broker related to the mortgage. This paragraph shall survive the Conditional Commitment Expiration Date, other termination of this Conditional Commitment, or the closing of the Loan. |
| **Title Insurance (Lender)** | Lender shall order and obtain, at Borrower's cost, a lender's and mortgagee's title insurance policy in form and substance satisfactory to Lender, to be issued by a title insurance company selected by Lender with a liability limit equal to the amount of the Loan, unless otherwise consented to by Lender. |
| **Non-Disparagement** | During the Term of this agreement and thereafter, the Parties agree to take no action which is intended, or would reasonably be expected, to harm the Borrower or Lender or its or their reputation or which would reasonably be expected to lead to unwanted or unfavorable publicity. This paragraph shall survive the Conditional Commitment Expiration Date, other termination of this Conditional Commitment, or the closing of the Loan. |

Formatted: Justified

Formatted: Justified

| | |
|---|---|
| **Confidentiality** | This Conditional Commitment is being delivered with the understanding that neither it nor the substance thereof will be disclosed by Borrower or any guarantor or any of their respective affiliates to any third person, except those in confidential relationships to any of them (i.e., Borrower's counsel, accountants, and other retained business advisors) or as may be required by law including to the Federal Bankruptcy Court with jurisdiction over the Property. This paragraph shall survive the expiration date, other termination of this Conditional Commitment, or the closing of the Loan. |
| **Accuracy of Information** | The issuance of this Conditional Commitment is based upon the assumed accuracy and completeness of all information, books, records, rent rolls, reports, exhibits, representations, statements, and other matters submitted to Lender for its consideration in connection with the Loan (the "Submission Materials"). By execution of this Conditional Commitment, Borrower affirms to Lender that all Submission Materials and all financial projections and conclusions contained therein are based on reasonable and stated assumptions, and that nothing in the Submission Materials knowingly contains any material misstatement of fact or omits to state a material fact. |
| **Termination** | Under no circumstances, unless agreed to in writing by both parties, shall the Bridge Loan Commitment extend beyond 150 days from the date of signing of this Conditional Commitment by Borrower, unless the proposed loan is in the process of a commitment negotiation between the Borrower, Lender or its agent, in which event the negotiation will continue in full force and effect until either the loan is closed or the Lender declines to close. If the loan has been declined by Lender's Loan Committee in its sole discretion, the Conditional Commitment shall automatically terminate, and all costs and expenses incurred by Lender, including legal fees, shall be paid by the Borrower. If the loan is approved by Lender's Loan Committee and those terms are unacceptable to the Borrower, the Loan Application shall terminate, and all costs and expenses incurred by Lender, including legal fees, shall be paid by the Borrower. Any fees and deposits received by Lender may be used to offset expenses and costs incurred in connection with the processing of the Conditional Commitment. The terms of this paragraph shall survive the Loan Application regardless of the date of termination of same. |
| **Governing Law** | Any controversy or claim arising out of or relating to this Agreement or the breach thereof that cannot be settled amicably by the Parties shall be settled by binding arbitration in the State of Delaware before a single arbitrator in accordance with the expedited commercial rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. The prevailing party shall be entitled to reasonable attorney's fees, costs, and expenses. The parties waive any objection to venue in said forums and any claim of inconvenient forum and irrevocably agree that any judgment or order by an arbitrator shall be conclusive and binding and may be enforced in any court having jurisdiction. The obligations of Borrower under this paragraph shall be binding on Borrower and shall survive the Conditional Commitment Expiration Date, other termination of this Conditional Commitment, or the closing of the Loan. |
| **Brokers** | Borrower represents that broker Lori Lesser, representing the Brokers (the "Broker"), is engaged in connection with the Loan, and Borrower shall (i) pay all fees and commissions and (ii) indemnify and defend Lender against all costs and expenses incurred by Lender in connection therewith or in connection with any other party claiming a fee, commission, or other compensation by or through Borrower or the broker related to the loans. Borrower acknowledges that no broker is an agent of Lender, that no broker has any power or authority to bind Lender, and that no fiduciary or other special relationship exists between Lender and Borrower. This paragraph shall survive any termination of this Conditional Commitment. |
| **Broker Fee** | Borrower agrees to pay a success fee to Lori Lesser and Ali Manav equal to 0.05% each based on the gross loan proceeds at the time the Loan contemplated herein or a similar loan closes and funds, in accordance with their agreement with the Borrower. |
| **Break Up** | No ~~break-up~~breakup fee shall be payable to Lender. |

Formatted: Justified

Formatted: Justified

**Assignment** Lender may assign its rights and obligations under this Agreement to an entity that succeeds to all or substantially all of the terms and conditions set forth herein, or as negotiated between the parties, without prior written consent of the Borrower.

**Expiration** If actual expenses exceed the Expense Deposit, Lender, or its assignee, may bill the Property Owner for any deficiency, whether or not there is closing, or include the deficiency in the Loan if the Loan closes.

By signing below, Borrower provides written authorization to Lender in connection with the proposed credit Facilities to obtain customer, vendor and credit references, tax lien searches, litigation and judgment searches, and background reports on the Borrower and key individuals at or associated with the Borrower (including credit information from one or more national or international credit bureaus), and to obtain any credit investigation for the purpose of considering any update, renewal, extension, amendment, review, or collection of proposed facilities or any additional information.

Formatted: Font: Rage Italic

The Provizia Organization Inc

8/3/2026

Formatted: Font: Rage Italic, 18 pt, Bold

Allan Rosen
Executive Vice President
The Provizia Organization Inc.

~~BORROWES' SIGNATURE PAGE~~

SouthTown by 4M, LLC
THE UNDERSIGNED REPRESENTS AND WARRANTS THAT THEY HAVE FULL POWER AND AUTHORITY TO ENTER INTO THIS CONDITIONAL COMMITMENT ON BEHALF OF THE BORROWER & BORROWER

Sig:

Title: Court Appointed Representative

Print Name: Caroline Poscher

Dated: 6/29/2026

# EXHIBIT G

POST-COMMITMENT FORECAST OF CASH FLOWS

| | 2026 | | 2027 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | November | December | January | February | March | April | May | June | July | August | September | October |
| SOURCE | | | | | | | | | | | | |
| RESERVE DRAW (TOTAL RESERVES = $5,969,130.44) | $ 496,595 | $ 506,595 | $ 496,595 | $ 496,595 | $ 496,595 | $ 496,595 | $ 496,595 | $ 496,595 | $ 496,595 | $ 496,595 | $ 496,595 | $ 496,585 |
| USE | | | | | | | | | | | | |
| INTEREST PAYMENT | $ 358,333 | $ 358,333 | $ 358,333 | $ 358,333 | $ 358,333 | $ 358,333 | $ 358,333 | $ 358,333 | $ 358,333 | $ 358,333 | $ 358,333 | $ 358,333 |
| ASSET MANAGEMENT FEE | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 |
| GENERAL ADMINISTRATION | $ 7,500 | $ 7,500 | $ 7,500 | $ 7,500 | $ 7,500 | $ 7,500 | $ 7,500 | $ 7,500 | $ 7,500 | $ 7,500 | $ 7,500 | $ 7,500 |
| BUILDERS RISK/OCIP | $ 10,417 | $ 10,417 | $ 10,417 | $ 10,417 | $ 10,417 | $ 10,417 | $ 10,417 | $ 10,417 | $ 10,417 | $ 10,417 | $ 10,417 | $ 10,417 |
| LIABILITY INSURANCE | $ 833 | $ 833 | $ 833 | $ 833 | $ 833 | $ 833 | $ 833 | $ 833 | $ 833 | $ 833 | $ 833 | $ 833 |
| PROFESSIONAL (LEGAL, OTHER PROF SVCS) | $ 15,000 | $ 15,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 |
| ENGINEERING | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 |
| ARCHITECTURAL | $ 40,000 | $ 65,000 | $ 75,000 | $ 75,000 | $ 75,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 |
| | $ 452,083 | $ 477,083 | $ 477,083 | $ 477,083 | $ 467,083 | $ 407,083 | $ 407,083 | $ 407,083 | $ 407,083 | $ 407,083 | $ 407,083 | $ 407,083 |
| CASH BALANCE/CONTINGENCY | $ 44,512 | $ 74,023 | $ 93,535 | $ 113,047 | $ 142,558 | $ 232,070 | $ 321,582 | $ 411,093 | $ 500,605 | $ 590,117 | $ 679,628 | $ 769,130 |

# REDLINE OF THE COMBINED PLAN AND DISCLOSURE STATEMENT TO THE FIRST AMENDED COMBINED PLAN AND DISCLOSURE STATEMENT

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re: | Case No. 26-40805 |
| South Town By 4M, LLC, | Chapter 11 |
| Debtor. | Hon. Lisa S. Gretchko |

______________________/

**FIRST AMENDED**
**COMBINED CHAPTER 11 PLAN AND DISCLOSURE STATEMENT**

South Town by 4M LLC, debtor and debtor-in-possession in the above captioned case, by and through its attorneys, states as follows for its *First Amended Combined Chapter 11 Plan of Reorganization and Disclosure Statement*:

## I. The Plan of Reorganization

## ARTICLE 1: SUMMARY

This Plan allows the Debtor to successfully exit this chapter 11 bankruptcy proceeding and complete the Development.[1] The Plan provides for the full payment of all allowed secured claims[2] and non-priority unsecured claims, super-priority administrative expenses, administrative expenses and priority

[1] Please reference Article 10 of the Plan for all defined terms contained in this Plan.

[2] The secured claim of Prentice will be converted to equity.

claims.

## ARTICLE 2: CLASSIFICATION OF CLAIMS

**Class 1** consists of the City of Ann Arbor's Claim, secured by a tax lien against the ~~Properties~~Property in the amount of $169,080.67.

**Class 2** consists of CNB's Claim, secured by a mortgage against the ~~Properties~~Property for money loaned in the ~~amount of $16,863,513.64~~approximate amount of $18,628,131.44 which includes postpetition interest and attorneys' fees and other charges and expenses, including appraisal fees.

**Class 3** consists of Brownstone's Claim, secured by a mortgage against the ~~Properties~~Property for money loaned in the amount of $7,794,566.33 which includes interest and attorneys' fees and other fees and costs.

**Class 4** consists of Prentice's Claim, secured by a mortgage against the ~~Properties~~Property in the principal amount of $8,500,000.00.

**Class 5** consists of Higley's Claim, secured by a construction lien against the ~~Properties~~Property in the amount of $~~948,115.00~~976,084.21.[3]

**Class 6** consists of SmithGroup's Claim, secured in part, by a construction

[3] The total amount of the Higley Claim is $1,010,351.77 and includes the separately filed claim of BDS, which, in addition to the Class 5 Claim, contains a general unsecured Class 9 Claim in the amount of $34,267.56.

lien against the PropertiesProperty in the amount of $508,139.00.[34]

**Class 7** consists of BDS's Claim, secured by a construction lien against the PropertiesProperty in the amount of $129,898.00.

**Class 8** consists of Synecdoche's Claim, secured by a disputed and unliquidated construction lien against the PropertiesProperty in the amount of $822,140.96.

**Class 9** consists of all non-priority, general unsecured Claims.

**Class 10** consists of the Equity Interests of the Debtor, namely the Poscher Estate which holds 100 percent of the equity interest in the Debtor.

**Super-priority administrative expense Claims:** consists of the Claim of the Responsible Person, Ms. Poscher, in an amount equal to all amounts advanced prior to Plan confirmation consistent with the FinalSecond DIP Financing Order, the Second DIP Budget and any amendments thereto.

**Administrative Expenses:** consists of the Legal Expenses owing to Counsel to the Debtor and UST Quarterly Fees of $350. Payment of the Legal Expenses owing to Counsel to the Debtor is subject to court approval of the same. As of the time of filing of this Plan, the Legal Expenses incurred by Counsel to the Debtor were approximately $480,000.00. Additional Legal

[34] The total amount of the SmithGroup Claim is $902,726.45 which, in addition to the Class 6 Claim, contains a general unsecured Class 9 Claim in the amount of $394,587.45.

Expenses will be incurred through the Effective Date. Ms. Poscher, on behalf of the Debtor, has personally advanced the Retainer Deposits. The Legal Expenses will be paid in full~~, upon~~ by the Debtor after Court approval of the same~~, by the Debtor on or prior to the Payment Disbursement Date~~. To the extent the Debtor has insufficient funds to pay the Legal Expenses ~~as approved~~at the time of their approval by the Court, the Legal Expenses ~~shall~~may be paid from the Retainer Deposits, in which case Ms. Poscher shall be subrogated to the rights of Counsel to the Debtor with respect to such amounts and shall be entitled to repayment of the same, on the ~~Payment Disbursement Date.~~Effective Date. Ms. Poscher's subrogation claim, if it arises, would be in addition to the Claim which she has filed in this proceeding. Any excess Retainer Deposits shall be returned to Ms. Poscher. UST Quarterly Fees are being paid under the ~~Final~~Second DIP Financing Order and the Second DIP Budget, with any remaining balance being paid on the ~~Payment Disbursement~~Effective Date.

**~~Priority~~Secured administrative expense claims:** consists solely of the ~~unsecured priority~~property tax Claim of the City of Ann Arbor for unpaid real property taxes represented by the July 1, 2026 tax bill in the amount of $28,888.29, which shall become due and payable on or prior to September 15, 2026.

All creditors and equity security holders should refer to Articles 3 through 6 of this Plan for information regarding the precise treatment of their Claims and

interests.

## ARTICLE 3: TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

**3.01 Class 1.** Secured Claim of the City of Ann Arbor.

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim: $ 169,080.67

Estimated Value of Collateral: $ 61,000,000.00

The City of Ann Arbor holds the Ann Arbor Tax Claim, which is secured by a tax lien against the ~~Properties~~Property for unpaid 2025 real property taxes. Under applicable Michigan law, such tax liens are afforded statutory priority and prime all prior recorded liens and encumbrances against the ~~Properties~~Property, regardless of the date of recording. The Ann Arbor Tax Claim will be paid in full on the ~~Payment Disbursement~~Effective Date.

**3.02 Class 2.** Secured Claim of CNB.

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim: $ ~~16,863,513.64~~18,628,131.14

Estimated Value of Collateral: $ 61,000,000.00

CNB holds a Claim secured by a mortgage against the ~~Properties~~Property for money loaned to the Debtor. CNB's lien on the Property and all of its rights and remedies under its mortgage and other loan documents are preserved until its Claim is paid in full on the Effective Date. The allowed amount of this Claim will

be paid in full on the ~~Payment Disbursement Date.~~Effective Date. CNB claims that it is owed interest of $1,554,048.07 and fees and expenses of not less than $210,569.43 as of July 29, 2026 (which is included in the amount of claim above) plus fees, charges and expenses incurred after that date with per diem interest thereafter at $5,110.54. The allowed amount of CNB's claim will be determined upon agreement of the Debtor and CNB or per resolution by the Court.

**3.03 Class 3.** Secured Claim of Brownstone.

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim: $ 7,794,566.33

Estimated Value of Collateral: $ 61,000,000.00

Brownstone holds a Claim secured by a mortgage against the ~~Properties~~Property for money loaned to the Debtor. The allowed amount of this Claim will be paid in full on the ~~Payment Disbursement~~Effective Date.

**3.04 Class 4.** Secured Claim of Prentice.

**Impaired. Entitled to vote on the Plan.**

Amount of claim: $ 8,500,000.00

Estimated Value of Collateral: $ 61,000,000.00

Prentice holds a Claim secured by a mortgage against the ~~Properties~~Property for money allegedly loaned to the Debtor. On the ~~Payment Disbursement~~Effective Date, Prentice's Claim shall be converted to a ~~3~~5% equity

interest in the Reorganized Debtor.

**3.05 Class 5.** Secured Claim of Higley.

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim: $ ~~948,115.00~~976,084.21

Estimated Value of Collateral: $ 61,000,000.00

Higley holds a construction lien Claim against the ~~Properties~~Property for services performed. The allowed amount of this Claim will be paid in full on the ~~Payment Disbursement~~Effective Date, pursuant to joint checks in the following amounts, based on the Higley Claim including the claims of various subcontractors to Higley;

| | |
|---|---|
| Higley and BDS | $129,898.00 |
| Higley and Blue Star, Inc | $243,215.00 |
| Higley and Eagle Excavation | $68,280.58 |
| Higley and Industrial Fence & Landscaping, Inc. | $34,911.00 |
| Balance to Higley | $~~471,810.42~~369,881.63 |

**3.06 Class 6.** Secured Claim of SmithGroup

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim: $ 508,139.00

Estimated Value of Collateral: $ 61,000,000.00

SmithGroup holds a construction lien Claim against the ~~Properties~~Property

for services performed. The allowed amount of this Claim will be paid in full on the ~~Payment Disbursement~~Effective Date.

**3.07 Class 7.** Secured Claim of BDS

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim: $ 129,898.00

Estimated Value of Collateral: $ 61,000,000.00

BDS holds a construction lien Claim against the ~~Properties~~Property for services performed. The allowed amount of this Claim will be paid in full on the ~~Payment Disbursement~~Effective Date pursuant to a joint check with Higley, as provided in Section 3.05 hereof.

**3.08 Class 8.** Secured Claim of Synecdoche

**Unimpaired. Not entitled to vote on the Plan.**

Amount of claim: $ 822,140.96

Estimated Value of Collateral: $ 61,000,000.00

Synecdoche asserts a construction lien Claim against the ~~Properties~~Property for services performed. The Synecdoche Claim will be the subject of an adversary proceeding and claim objection seeking disallowance of the Synecdoche Claim and repayment of amounts owing to the Debtor. If the allowed amount of the Synecdoche Claim has not been resolved prior to the ~~Payment Disbursement~~Effective Date, then the gross amount of the Synecdoche Claim will

be escrowed until the amount of the Synecdoche Claim, if any, is determined. Once the allowed amount of the Synecdoche Claim is determined, the Allowed Synecdoche Claim will be paid in full from the Contested Claims Reserve.

**3.09 Class 9**. All Non-Priority Unsecured Claims Allowed Under Section 502 of the Bankruptcy Code.

**Unimpaired. Not entitled to vote on the Plan.**

Class 9 consists of eight (8) non-priority unsecured Claims, specifically: Graybar/Schneider ($122,310.04); ~~Heidi Caroline~~Ms. Poscher ($1,985,012); Bill Me Later, Inc./PayPal, Inc. ($105,404.92); G2 ($26,425.00); Learfield ($180,000.00); Newmark Valuation Advisory, LLC ($10,500.00); SmithGroup ($394,587.45); and Resilient Solar of East Tennessee LLC ($0). The allowed amount of all Class 9 Claims will be paid in full on the ~~Payment Disbursement~~Effective Date. The BDS Claim will be paid pursuant to a joint check with Higley, as set forth in Section 3.05 hereof. If any of the Class 9 Claims are Contested Claims, they shall be paid in accordance with Article V hereof.

**3.10 Class 10**. Equity Interests of the Debtor.

**Impaired. Entitled to vote on the Plan.**

On the Effective Date~~ of the Plan~~, contemporaneous with payment in full of all Claims, the Debtor is transferring its ownership interest in ~~all assets of~~ the ~~Debtor's Estate~~Transferred Assets to a Delaware special purpose entity (the

"SPE"), in exchange for which the Debtor will receive one hundred percent (100%) of the equity in the SPE, making the Debtor the parent of the SPE. The transfer of the Transferred Assets is subject to all liens securing Claims until the Claims are paid in full. Thereafter, the equity in the Debtor will be addressed in one of two alternative transactions.

This transaction is diagramed as follows:

**Debtor** >Transfer of the Transferred Assets to the **SPE**

**Debtor** <Receipt of 100% of the membership interest in the **SPE**

This results in the Debtor being the holding company of the SPE, with the Debtor in turn being 100% owned by the Poscher Estate, with the equity then reallocated according Equity Transaction A or Equity Transaction B below. This transaction from the Poscher Estate to the SPE is diagramed as:

**Poscher Estate**

100%

↓

**Debtor**

↓

100%

↓

**SPE**

**Equity Transaction A**. Under Equity Transaction A, a newly formed entity ("Newco") will acquire 100% of the equity interests in the Debtor from the Poscher Estate, for a multiple of a seven-figure amount. ~~Equity Transaction A will result in Newco becoming the 100% member of the SPE, with the SPE in turn holding title to all assets of the Debtor.~~

This transaction is diagramed as follows:

**Poscher Estate** >Transfer of 100% of membership interest in Debtor to **Newco**

**Newco** <Receipt of 100% of the membership interest in the **Debtor**

This results in the Debtor being the holding company of the SPE, with the Debtor, in turn being 100% owned by Newco, diagramed as:

**Newco**
↓
100%
↓
**Debtor**
↓
100%
↓
**SPE**

Newco will be owned 59% by Agile Solar Group, LLC, or its affiliate and 41% will be ~~owned by the Finn Group. The Finn Group, in turn, will be~~ owned by a combination of parties, the percentage ownership of which is as follows: Prentice, 5% (conversion of its debt position to equity); Blue Phoenix, 22%; Pullins, 2% (equity exercisable upon completion of vertical construction); APB, 5%; Vohwinkle, 2% (equity exercisable upon completion of vertical construction); and Reynolds, 5%. Blue Phoenix is an affiliate of Ms. Poscher. Prentice is owned fully by ~~Dr.~~the Poscher Estate. Pullins, Vohwinkle, APB and Reynolds are not affiliates of Ms. Poscher, the Poscher Estate or any of their respective affiliates.

**Equity Transaction B.** Under Equity Transaction B, 59% of the equity in the Debtor shall continue to be held by the Poscher Estate and the remaining 41% shall be issued ~~to the Finn Group, with the ownership of the Finn Group as above noted.~~ as follows: Prentice, 5% (conversion of its debt position to equity); Blue Phoenix, 22%; Pullins, 2% (equity exercisable upon completion of vertical construction); APB, 5%; Vohwinkle, 2% (equity exercisable upon completion of vertical construction); and Reynolds, 5%. Blue Phoenix is an affiliate of Ms. Poscher. Prentice is owned fully by the Poscher Estate. Pullins, Vohwinkle, APB and Reynolds are not affiliates of Ms. Poscher, the Poscher Estate or any of their respective affiliates.

This results in the Debtor being the holding company of the SPE, with the Debtor, in turn being owed as diagramed below:

**Poscher Estate Prentice Blue Phoenix Pullins APB Vohwinkle Reynolds**

59% 5% 22% 2% 5% 2% 5%

↓

100%

↓

**Debtor**

↓

100%

↓

**SPE**

Equity Transaction A and Equity Transaction B will be brought before the Probate Court with governance over the ~~Posher~~Poscher Estate, prior to the hearing

on confirmation of this Plan (the "Probate Court Approval"), to obtain conditional approval of the samebothboth, subject only to confirmation of this Plan. The Debtor will file a supplement to this Plan, to include the submission made to the Probate Court and will file a supplement to this Plan as to any order issued by the Probate Court. Each supplement shall be served on all parties.

## ARTICLE 4: TREATMENT OF ADMINISTRATIVE EXPENSES, PRIORITY TAX CLAIMS AND QUARTERLY FEES

**4.01: Unclassified Claims.** Under section 1123(a)(1) of the Bankruptcy Code, allowed Administrative Expenses and priority tax claims captured under section 507(a) are not classified Claims.

**4.02: Administrative Expense Claims.** Claims for Administrative Expenses allowed under section 503 of the Bankruptcy Code will be paid in full upon the later of court approval of the same and the Payment DisbursementEffective Date, in cash, or upon such other terms as may be agreed upon by the holder of the Claim and the Debtor.

**4.03: Priority Tax Claim.** The priority tax Claim consists solely of the unsecured portion of the Claim of the City of Ann Arbor for unpaid real property taxes represented by the July 1, 2026 tax bill in the amount of $28,888.29, which shall become due and payable on or prior to September 15, 2026. This priority tax Claim shall be paid in full on the Payment DisbursementEffective Date.

## ARTICLE 5: ALLOWANCE AND DISALLOWANCE OF CLAIMS

**5.01 Delay of Distribution on a Contested Claim.** No distribution will be made on account of a Contested Claim unless and until it is an Allowed Claim.

**5.02: Settlement of Contested Claims.** The Debtor will have the power and authority to settle and compromise any Contested Claim with court approval and compliance with Bankruptcy Rule 9019.

**5.03 Contested Claims Reserve.** On the Effective Date, the Reorganized Debtor shall establish and maintain the Contested Claims Reserve. Funds held in the Contested Claims Reserve shall not be distributed to a creditor holding a Contested Claim until the later of: (a) the date the Contested Claim becomes an Allowed Claim pursuant to a Final Order; or (b) the ~~Payment Disbursement~~Effective Date. Upon the disallowance of a Contested Claim by a Final Order, the amount reserved on account of such Contested Claim shall be released from the Contested Claims Reserve and shall revert to the Reorganized Debtor.

**5.04 Claim Objection Deadline.** The Debtor or Reorganized Debtor shall file any objections to Claims whether by filing an objection to claim or an adversary proceeding on or before the Effective Date, unless such deadline is extended by order of the Bankruptcy Court upon a motion filed before its

expiration.

## ARTICLE 6: PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The Debtor is a party to the following executory contracts: DMC Real Estate Services who provided advisory services for the development of the ~~Properties~~Property; Graybar/Schneider who provided a feasibility study for incorporating the MicroGrid into the Development; Nederveld who provided civil engineering plans and strategies for the site plan approvals; Learfield who provided marketing services; Newmark Valuation Advisory, LLC who provided a market revenue study and valuation guidance; ~~Ressiliant~~Resilient Solar of East Tennessee LLC who provided an energy market analysis; and Higley who provided various construction and advisory services for the Development. To the extent not terminated or concluded prior to the Petition Date, on August 7, 2026 and August 10, 2026 the Debtor ~~rejects~~filed motions to reject each of the foregoing executory contracts ~~on the Payment Disbursement Date~~ pursuant to section 365 of the Bankruptcy Code~~, and each such rejection will be effective upon the Effective Date~~. The Debtor reserves the right to amend this Plan prior to confirmation to assume any of the foregoing executory contracts.

## ARTICLE 7: MEANS FOR IMPLEMENTATION OF THE PLAN

The Plan shall be implemented through the following transactions:

1. On or prior to the hearing on confirmation, the Debtor shall have obtained the Probate Court Approval.

2. On the ~~Payment Disbursement Date, the~~Effective Date, contemporaneous with payment in full of all Claims, the Reorganized Debtor shall convey its interest in all of ~~its assets~~the Transferred Assets to the SPE. The transfer of the Transferred Assets is subject to all liens securing Claims until the Claims are paid in full.

3. On the ~~Payment Disbursement~~Effective Date, the equity in the Debtor shall be sold, as specified in Equity Transaction A, or re-allocated, as specified in Equity Transaction B. If the equity in the Debtor is re-allocated, as specified in Equity Transaction B, then on the ~~Payment Disbursement~~Effective Date, the Debtor shall enter into an Operating Agreement among its members, to reflect the equity allocations set forth in Equity Transaction B.

4. If the equity of the Debtor is sold, as specified in Equity Transaction A, then on the ~~Payment Disbursement~~Effective Date, Agile shall make a capital contribution into Newco and Newco, in turn, shall make a capital contribution into the Debtor, in an amount sufficient to pay in full the allowed amount of all Claims, with any necessary funds placed in the Contested Claims Reserve.

5. If the equity of the Debtor is re-allocated, as specified in Equity Transaction B, then on the ~~Payment Disbursement~~Effective Date, the Debtor shall

close on and obtain the Exit Financing from the Exit Financing Lender, in an amount sufficient to pay in full the allowed amount of all Claims, with any necessary funds placed in the Contested Claims Reserve.

6. ~~In~~If applicable, in conjunction with the Exit Financing, Reynolds, on the ~~Payment Disbursement~~Effective Date, shall execute a Guaranty Fee Agreement with the Debtor and the Exit Financing Lender, pursuant to which Reynolds shall provide credit enhancement to the Exit Financing Lender with respect to the Exit Financing, on terms acceptable to Reynolds, the Debtor and the Exit Financing Lender.

7. As security for the Exit Financing, if applicable, the SPE will, contemporaneous with payment in full of all Claims, grant to the Exit Financing Lender, pursuant to the Exit Financing Agreements, a ~~first-priority~~ lien on the assets of the SPE~~.~~, subject to all liens in the Transferred Assets securing the Claims until the Claims are paid in full, and thereafter, will become a first-priority lien in the assets of the SPE including the Transferred Assets. With respect to the Exit Financing, one or more of the members of the Debtor may additionally be required to grant a pledge of their membership interest to the Exit Financing Lender.

8. On the ~~Payment Disbursement~~Effective Date, the Debtor shall make the payments provided for hereunder to all creditors holding Allowed Claims with

any Claims subject to dispute to be paid from the Contested Claims Reserve, to the extent later allowed.

9. Any balance remaining in the Contested Claims Reserve and other cash received by the Debtor not necessary to pay the allowed Claims of the Debtor's creditors shall ~~revert~~be released to the Reorganized Debtor.

10. On the ~~Payment Disbursement~~Effective Date, RAM and Blue Phoenix shall enter into a Co-Development Agreement with the Debtor, pursuant to which RAM and Blue Phoenix shall assume various duties on a post-Effective Date basis with respect to the Development. This Co-Development Agreement would be effective under both Equity Alternative A and Equity Alternative B, as it addresses the steps to be taken post the Effective Date to move the Development to vertical construction and completion. All payments under the Co-Development Agreement would be paid from the Vertical Financing.

## ARTICLE 8 EVENTS OF DEFAULT AND EFFECT THEREOF

Any creditor remedies allowed by section 1112 of the Bankruptcy Code, including section 1112(b)(4)(N) of the Bankruptcy Code, shall be preserved to the extent otherwise available at law. In addition to any rights specifically provided to a claimant treated pursuant to this Plan, a failure by the Debtor to make a payment to a creditor pursuant to the terms of this Plan shall be an event of default as to such payment not cured within ten (10) days after mailing written notice of

default from such creditor to the Debtor. Any default notice, inquiry, or other formal communication pursuant to the Plan shall be mailed by certified mail, return receipt requested to the following:

| | |
|---|---|
| To: | South Town by 4M, LLC<br>c/o Heidi Caroline Poscher<br>27777 Franklin Rd, Suite 2500<br>Southfield, MI 48034 |
| With a Copy To: | Taft Stettinius & Hollister, LLP<br>c/o Jay Welford; Kimberly Ross Clayson;<br>Anthony Cimini<br>27777 Franklin Rd, Suite 2500<br>Southfield, MI 48034 |

~~(Noticing Requirements Cont'd on Next Page)~~

jwelford@taftlaw.com
kclayson@taftlaw.com
acimini@taftlaw.com

**ARTICLE 9 EFFECT OF CONFIRMATION OF THE PLAN**

**9.01 Binding Effect of Plan.**

Upon the Effective Date, the provisions of the Plan shall bind the Debtor, the Reorganized Debtor, all holders of Claims and Equity Interests in the Debtor, all Persons acquiring property under the Plan, and all other parties in interest in this case, together with their respective agents, attorneys, representatives, heirs, successors, and assigns, to the fullest extent permitted under sections 1141(a) and 1142 of the Bankruptcy Code, whether or not such parties (a) voted to accept or reject the Plan, (b) had a right to vote on the Plan, (c) hold a Claim or Equity

Interest that is Impaired or Unimpaired under the Plan, (d) hold a Claim or Equity Interest that is an Allowed Claim, a Contested Claim, or a Claim that has been disallowed in whole or in part, (e) have filed a proof of claim or proof of interest in this case, or (f) are entitled to receive a distribution under the Plan.

**9.02 Vesting of Assets.**

Upon the Effective Date, after payment in full of all Claims, pursuant to section 1141(b) and (c) of the Bankruptcy Code, all propertythe Debtor's assets shall be comprised of the Debtor's estate, including, without limitation, the Properties100 percent interest in the SPE, all causes of action, including Avoidance claims and all rights, claims, and defenses of the Debtor and the estate, shall vest in the Reorganized Debtor, free and clear of all liens, claims, charges, encumbrances, and interests of creditors and equity interest holders, except as otherwise expressly provided in the Plan or the Confirmation Order. From and after the Effective Date, the Reorganized Debtor may operate its business and use, acquire, and dispose of property and settle and compromise claims and interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, except as otherwise provided in the Plan or the Confirmation Order. Because all allowed Claims are being paid in full under the Plan, there would be no purpose to pursue any Avoidance Claims. The Debtor intends to file a breach of contract action against

Synecdoche, as an offset to the Claim asserted by Synecdoche. Any proceeds of an action against Synecdoche shall be utilized by the Debtor in its general operations.

**9.03 Injunction**

Except as otherwise expressly provided in the Plan or the Confirmation Order, ~~on~~ and after payment in full of all Claims on the Effective Date, all Persons who have held, hold, or may hold Claims against or Equity Interests in the Debtor are, pursuant to sections 524 and 1141 of the Bankruptcy Code, permanently enjoined from (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtor, the Reorganized Debtor, or their respective property on account of any such Claim or Equity Interest; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Debtor, the Reorganized Debtor, or their respective property on account of any such Claim or Equity Interest; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against the Debtor, the Reorganized Debtor, or their respective property on account of any such Claim or Equity Interest; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtor, the Reorganized Debtor, or their respective property on account of any such Claim or Equity Interest; and (e) commencing or continuing in any manner any action or other proceeding of any kind against the Debtor, the Reorganized Debtor, or their

respective property in respect of any Claim or Equity Interest that is treated, classified, discharged, or otherwise addressed under the Plan. All such Persons shall be required to pursue satisfaction of their Claims and Equity Interests against the Debtor, the Reorganized Debtor, or their respective property solely through the distribution mechanisms provided under the Plan.

## ARTICLE 10: GENERAL PROVISIONS

**10.01 Definitions and rules of construction.** The definitions and rules of construction set forth in sections 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan, and they are supplemented by the following definitions:

"Administrative Expenses" means, collectively, the Legal Expenses and the Quarterly Fees.

"Agile" means Agile Solar Group, LLC or its assignee.

"Allowed Claim" means a Claim against the Debtor to the extent such Claim is not a Contested Claim and (a) has been scheduled by the Debtor in its Schedules as neither disputed, contingent, nor unliquidated and as to which no objection has been filed; (b) a proof of claim has been timely filed and no objection thereto has been filed; or (c) has been allowed by a Final Order.

"Allowed Synecdoche Claim" means the allowed amount, if any, of the Claim of Synecdoche.

"Amended Case Management Order" means the Court's *Order Amending Order Establishing Deadlines and Procedures for a Single Asset Real Estate Case* [ECF No. 124].

"Amended Commitment Letter" means the letter of commitment between Agile and the Debtor, entered into on July 16, 2026.

"~~Amended~~Second DIP Budget" means the amended budget attached as Exhibit B to the ~~Amended~~Second DIP Motion.

"~~Amened~~Second DIP Motion" means the Debtor's *Motion for Entry of an Order (a) Authorizing the Debtor to Increase the Amount of Its Post-Petition Financing* [ECF No. 132].

"Amended DIP Note" means the *Amended and Restated Promissory Note* [ECF No. 113], reflecting the amended terms of the DIP Loan included in the Final DIP Financing Order.

"~~Amended~~Second DIP Financing Order" means the *Order Granting Debtor's Motion for Authority to Increase the Amount of Its Post-Petition Financing* entered on July 27, 2026 [ECF No. 153].

"~~Amended~~Second DIP Loan" means the post-petition multi-draw secured term loan in an amount not to exceed $650,000, provided to the Debtor by the DIP Lender as reflected in the Second Amended DIP Note and approved by the ~~Amended~~Second DIP Financing Order.

"~~Amended~~Second DIP Stipulation" means the *Stipulation to Order Authorizing the Debtor to Increase the Amount of Its Post-Petition Financing* [ECF No. 140].

"Ann Arbor Tax Claim" means the City of Ann Arbor's ~~"super-priority"~~ tax lien claim secured against the ~~Properties~~Property for unpaid real property tax from year 2025, in the amount of $169,080.67.

"APB" means American Platinum Builders.

"Avoidance Claims" means any Claims pursuant to sections 502(d), 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

"Bankruptcy Court" or the "Court" means the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division, having jurisdiction over this case.

"Bankruptcy Rule" means the Federal Rules of Bankruptcy Procedure.

"Bar Date" means the date established by the Bankruptcy Court as the deadline for filing proofs of claim in this case which in this case is May 27, 2026 or August 25, 2026 as to claims by any governmental agencies or units.

"BDS" means Building Decommission Services, LLC.

"Blue Phoenix" means Blue Phoenix 19 LLC, a Michigan limited liability

company.

"Brownstone" means Brownstone Realty Advisors, LLC.

"CBRE Appraisal" means the July 7, 2023 appraisal of the ~~Properties~~Property that was performed ~~by~~for CNB, ~~through~~by CBRE Valuation and Advisory Services.

"Claim" means a claim against the Debtor.

"CNB" means County National Bank.

"Colliers" means Colliers International Valuation & Advisory Services, LLC.

"Colliers 2025 Appraisal" means the November 25, 2025 appraisal of the ~~Properties~~Property performed by Colliers.

"Colliers BOV" means the Broker Opinion of Value of the ~~Properties~~Property issued on May 20, 2024, by Colliers.

"Commitment Letter" means the commitment letter between Provizia and the Debtor, entered into on July 27, 2026.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"Contested Claim" means a Claim that has not been allowed or disallowed and as to which either: (a) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (b) a proof of claim

has not been filed and the Claim is listed on the Debtor's Schedules as disputed, contingent, or unliquidated.

"Contested Claims Reserve" means segregated and escrowed funds in an amount equal to the aggregate distributions that would have been made on account of all Contested Claims had such Contested Claims been Allowed Claims in their full asserted amounts as of the Effective Date.

"Counsel" means Taft Stettinius & Hollister, LLP, counsel to the Debtor.

"Debtor" means South Town by 4M, LLC, debtor and debtor-in-possession in the above-captioned case.

"Development" means the multi-faceted business comprised of the four distinct revenue-driven improvements described in Section II.C of this Plan.

"DIP Budget" means the revised DIP budget filed on April 21, 2026, in support of the DIP Facility [ECF No. 96].

"DIP Budgets" means the DIP Budget and the ~~Amended~~Second DIP Budget.

"DIP Facility" means the financing requested by the Debtor reflected in the Amended and Restated DIP Note and Second Amended and Restated DIP Note, and entered by the Court in the Final ~~Initial~~ DIP Financing Order and the ~~Amended~~Second DIP Financing Order.

"DIP Financing Orders" means collectively, the Interim DIP Financing

Order, the Final DIP Financing Order, and the ~~Amended~~Second DIP Financing Order.

"DIP Lender" means Ms. Poscher, in her capacity as provider of the DIP Loan.

"DIP Liens" means liens granted to the DIP Lender for providing the DIP Loan which include (i) pursuant to section 364(c)(2) of the Bankruptcy Code, a lien on all property of the Debtor's estate not otherwise subject to a lien, and (ii) pursuant to section 364(c)(3) of the Bankruptcy Code, a junior lien on all property of the Debtor's estate that is subject to a lien, in each case perfected automatically upon entry of the Interim DIP Financing Order without the necessity of filing a financing statement.

"DIP Motion" means the Debtor's *Motion for Entry of an Order (a) Authorizing the Debtor to Obtain Post-Petition Secured Financing; and (b) Granting Liens, Security Interests, and Superpriority Claim* [ECF No. 79].

"Disclosure Statement" means the First Amended Disclosure Statement that begins at *infra*, Section II. of this First Amended Combined Plan and Disclosure Statement.

"DMC" means DMC Real Estate Services.

"Dr. Poscher" means Dr. Margaret Poscher, the original sole member of the Debtor.

"Effective Date" means ~~the day that is 14~~20 days after the ~~entry of~~date the Confirmation Order becomes a Final Order or if not a business day, the next business day. If, however, a stay of the Confirmation Order is in effect on that date, the Effective Date will mean the day after the date on which the stay expires or is otherwise terminated. These periods are calculated as provided in Bankruptcy Rule 9006(a)(1).

"Equity Interest" means equity in the Reorganized Debtor as of the Effective Date of the Plan, unless otherwise specified in the Plan.

"Exit Financing" means the post-confirmation financing arrangement pursuant to the Exit Financing Agreement between the Debtor and the Exit Financing Lender.

"Exit Financing Agreement" means the definitive agreement to be entered into by and between the Debtor and the Exit Financing Lender memorializing the terms and conditions of the Exit Financing.

"Exit Financing Lender" means Provizia.

"Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket, that has not been reversed, stayed, modified, or amended, and as to which (a) the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and no appeal, petition for certiorari, or motion for reargument or rehearing has been

timely filed; or (b) any appeal, petition for certiorari, or motion for reargument or rehearing has been finally determined and no further review is available.

"Final DIP Financing Order" means the *Final Order (a) Authorizing the Debtor to Obtain Post-Petition Secured Financing; and (b) Granting Liens, Security Interests, and Superpriority Claim* [ECF No. 125].

~~"Finn Group" means The Finn Development Group, LLC.~~

"Graybar" means Graybar/Schneider.

"Higley" means The Albert M. Higley Co., LLC.

"Initial DIP Loan" means the post-petition multi-draw secured term loan in an amount not to exceed $400,000, provided to the Debtor by the DIP Lender as reflected in the Amended DIP Note and approved by the Final ~~Initial~~ DIP Financing Order.

"Interest-Only Payees" means, collectively, the City of Ann Arbor, CNB, and Higley, to whom the Debtor elected to make the Interest-Only Payments pursuant to 11 U.S.C. § 362(d)(3).

"Interest-Only Payments" means the interest-only payments made by the Debtor to the Interest-Only Payees under section 362(d)(3) and the terms of the Amended Budget.

"Interim Order Regarding Plan Deadline Extension" means the *Order Regarding Debtor's Motion for Entry of an Order (a) Extending the Deadline to*

*File a Chapter 11 Plan and (b) Extending the Debtor's Exclusivity Period to File a Chapter 11 Plan and Solicit Acceptances thereof Pursuant to 11 U.S.C. § 1121 of the Bankruptcy Code* [ECF No. 106].

"Interim DIP Financing Order" means the *Interim Order (a) Authorizing the Debtor to Obtain Post-Petition Secured Financing; and (b) Granting Liens, Security Interests, and Superpriority Claim* [ECF No. 105].

"Legal Expenses" means the fees and expenses of Counsel.

"MicroGrid" means a power generation system to deliver electrical power to the Property, to be sold to the Property's tenants with a secondary source of revenue generated from the creation of carbon credits.

"Motion to Extend" means the Debtor's *Motion for Entry of an Order (a) Extending the Deadline to File a Chapter 11 Plan and (b) Extending the Debtor's Exclusivity Period to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to 11 U.S.C. § 1121 of the Bankruptcy Code* which was filed on April 9, 2026 [ECF No. 80].

"Ms. Poscher" means the Responsible Person, Heidi Caroline Poscher.

"Operating Agreement" means the Debtor's Amended and Restated Operating Agreement.

~~"Payment Disbursement Date" means the date not later than twenty (20) days after the Effective Date.~~

"Plan" means this First Amended Combined Chapter 11 Plan of Reorganization and Disclosure Statement, as it may be amended, modified, or supplemented from time to time.

"Plan Deadline" means July 27, 2026, to the ~~extend~~extent modified by the Court.

"Plan Exclusivity Period" means the period in which the Debtor has the exclusive right to file a chapter 11 plan which was extended to July 27, 2026.

"Plan Extension Order" means the Bankruptcy Court's *Order Regarding Debtor's Motion for Entry of an Order (a) Extending the Deadline to File a Chapter 11 Plan and (b) Extending the Debtor's Exclusivity Period to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to 11 U.S.C. §1121 of the Bankruptcy Code* granted on May 20, 2026 [ECF No. 121] in which the Court granted Debtor's Motion to Extend with respect to the deadline to file the Plan thereby extending the deadline to file the Plan until July 27, 2026; extended the exclusivity period for the Debtor to file its Plan to July 27, 2026; and extended the exclusivity period for Debtor to solicit acceptances of its Plan to September 25, 2026.

"Petition Date" means January 27, 2026, 3:22 p.m. E.S.T. which is the date and time on which the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

"Poscher Estate" means the probate estate of Dr. Margaret Poscher (deceased).

~~"Post-Petition Liens" means certain construction liens recorded against the Property after the Petition Date.~~

"Prentice" means Prentice Partners of Ann Arbor, LLC.

"Property" means the real property owned by the Debtor on which the Development sits.

"Provizia" means The Provizia Organization Inc.

"Pullins" means Steven Pullins.

"Quarterly Fees" means the quarterly fees payable to the United States Trustee.

"RAM" means Reynolds Asset Mgmt, LLC.

"RAM Term Sheet" means the term sheet executed on April 14, 2026, by Debtor and ~~Reynolds~~RAM.

"Reorganized Debtor" means the Debtor, on and after the Effective Date.

"Responsible Person" means Ms. Poscher, personal representative of the Poscher Estate, and the individual authorized to manage the affairs of, and act on behalf of, the Debtor as debtor-in-possession in this bankruptcy case.

"Retainer Deposits" means the retainer deposits advanced by Ms. Poscher on behalf of the Debtor to Counsel, in the amount of $100,000.00.

"Revised DIP Note" means the revised promissory note evidencing the DIP Loan executed by the Debtor in favor of the DIP Lender, as included in the recited terms of the Interim DIP Financing Order.

"Reynolds" means Louis J. Reynolds IV, a principal and owner in RAM.

"SARE" means a single asset real estate case as defined under 11 U.S.C. § 101(51B).

"SARE Motion" means CNB's *Motion to Designate Case as a Single Asset Real Estate Case* [ECF No. 33].

"SARE Objection" means the *Debtor's Objection to County National Bank's Motion to Designate Case as a Single Asset Real Estate Case* [ECF No. 51].

"SARE Order" means the *Order Granting Motion to Designate Case as a Single Asset Real Estate Case* [ECF No. 65].

"SARE Reply" means CNB's reply in support of the SARE Motion [ECF No. 56].

"Second Amended DIP Note" means the Second Amended and Restated DIP Note attached as Exhibit C to ~~Exhibit to~~ the Supplement [ECF No. 152].

"Secured Lenders" means, collectively, CNB, Brownstone, and Prentice.

"Schedules" means the schedules of assets and liabilities filed by the Debtor pursuant to section 521 of the Bankruptcy Code, as have been or may be amended

or supplemented from time to time.

"SmithGroup" means SmithGroup, Inc.

"Solicitation Exclusivity Period" means the period in which the Debtor has the exclusive right to solicit acceptances of its chapter 11 plan which was extended to September 25, 2026.

"Sources and Uses" means the sources and uses of the Exit Financing, as set forth on **Exhibit A** hereto.

"South Town" means South Town by 4M, LLC, debtor and debtor-in-possession in the above-captioned case.

"Supplement" means the supplement to the ~~Amended~~Second DIP Motion filed by the Debtor at [ECF No. 150].

"Synecdoche" means Synecdoche Design Studio, LLC.

"Transferred Assets" means all assets of the Debtor except for the Avoidance Claims.

"UST" means the United States Trustee.

"Vertical Financing" means financing provided for completion of the vertical construction of the Project.

"Vertical Financing Secured Lenders" means the lenders that will ultimately provide the Vertical Financing and who are anticipated to hold secured mortgages against the Development.

"Vohwinkle" means Nathan Vohwinkle.

"WhiteHawk" means WhiteHawk Capital Partners L.P.

"WhiteHawk Term Sheet" means the term sheet executed on May 4, 2026, by the Debtor and WhiteHawk.

**10.02 Severability**. If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**10.03 Captions.** The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

**10.04 Controlling effect.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Michigan govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

**10.05 Retention of Jurisdiction.** The Bankruptcy Court confirming the Plan may exercise jurisdiction to the full extent necessary to administer this case after Plan confirmation and to adjudicate any related adversary proceedings or contested matters, including those relating to the Plan, such as concerning the Plan's construction, implementation, or modification. Neither this provision nor

anything in this Plan constitutes a limitation on or an expansion of the jurisdiction authorized by title 28 of the United States Code.

## II. Description and History of the Debtor's Business

### A. South Town by 4M LLC

~~South Town~~The Debtor is a Michigan limited liability company formed to realize Dr. Poscher's vision to fund and create a strategic 1.66 acre real estate project for a mixed-use, multi-family development. ~~South Town~~The Debtor holds title to ten individual lots, comprising a city block in Ann Arbor which is the Property. The Development encompasses approximately 237,366 square feet, will ultimately feature ~~300~~at least 289 apartment units, has one side fronting South State Street, directly across from the University of Michigan Golf Course, and is kitty-corner to the University of Michigan field hockey stadium, the football practice facilities, Crisler Arena and the University of Michigan football Stadium.

The Development is comprised of four distinct revenue driven improvements: (1) the leasing of 70% of the ~~300~~289 or greater apartment units to be constructed, to be used as long-term rentals; (2) the operation of a short-term rental business (VRBO, Air BNB, etc.), utilizing 30% of the apartment units; (3) the development and ownership of retail businesses on the first floor of the Development; and (4) the construction and operation of a MicroGrid within the

Development, to deliver electrical power to all of the apartment and retail areas, as well as to the common areas, which will be sold to the captive tenants, with a secondary source of revenue generated from the creation of carbon credits. The Debtor has site plan approval for the construction of the Development.

### B. South Town's Principal

~~South Town~~The Debtor has just a single member. The member, until mid-October of 2025 had been Dr. Poscher. Dr. Poscher unfortunately passed away at that time and thereafter the Poscher Estate was opened. Dr. Poscher's wife, Ms. Poscher, has been named as the personal representative of the Poscher Estate and therefore, is acting on behalf of the sole member of the Debtor in this bankruptcy proceeding.

Dr. Poscher was a community leader in Ann Arbor, Michigan, and spearheaded progressive real estate projects in high-potential areas across the city. In 2018, Dr. Poscher focused on development in an underdeveloped Ann Arbor neighborhood, seizing an opportunity to drive impactful urban revitalization. First, and prior to ~~South Town~~the Development, came a 12-unit, ground-up townhouse complex, creating a residential anchor. Then came Venue by 4M, a visionary 35,000 square foot space encompassing dining, events, and entertainment facilities. Ultimately, Dr. Poscher formed ~~South Town~~the Debtor to

fund and create the Development. Ms. Poscher, as Dr. Poscher's wife and biggest cheerleader, has taken up the mantle to complete the Development.

Ms. Poscher is the Responsible Person for the Poscher Estate, and for the Debtor. Ms. Poscher, in her personal and individual capacity, provided $650,000 in post-petition financing to the Debtor to fund primarily the Interest-Only Payments to the Interest-Only Payees, and other incidental costs should they arise. The details of this post-petition financing, and the hearings and procedures related thereto, are described below. *See infra*, Article III.

Dr. Poscher never earned a salary nor received any compensation for her role as the member of ~~South Town; Likewise~~the Debtor; likewise, Ms. Poscher has never earned a salary nor received compensation at any time prior to or during the pendency of this bankruptcy case.

### C. South Town's Business Model and Events Leading to Bankruptcy

The assemblage of the Development's ten lots occurred during the years 2019 to 2022. Each of the lots was improved with either an individual home or a low-rise apartment building. The acquisition cost of the ten lots was $18,982,170. Fees and closing costs were an additional $5,152,297.

To aid in the Debtor's acquisition of the ten lots, the Debtor obtained financing from two lenders; CNB, which asserts a lien position in the approximate

amount of $~~16,863,513.64~~18,628,131.14; and Brownstone which asserts a lien position subordinate to that of CNB, in the amount of $7,794,566.33. An additional mortgage position, for an additional $8.5 million is held by Prentice. The passing of Dr. Poscher in October of 2025 delayed the ongoing development and funding for the Development. Ms. Poscher, who was very familiar with the Development, primarily assisted the Debtor in the coordination for placement of the MicroGrid. Since Dr. Poscher's passing, Ms. Poscher has had to take on the Debtor's work for the remaining portions of the Development.

Prior to her death, Dr. Poscher, on the Debtor's behalf, modified an existing loan with Brownstone, borrowing additional funds for Development costs, CNB loan-extension fees, and CNB loan interest payments. Following closure of the Brownstone loan modification in June 2025, Brownstone advanced funds for Development costs but refused to release approximately $1.0 million in funds escrowed for the specific purpose of covering CNB loan-extension and interest payments. As a result, the Debtor found itself behind on its prepetition loan payments with ~~the Secured Lenders~~CNB.

***CNB's Foreclosure Proceeding***

CNB initiated a foreclosure ~~proceeding~~by advertisement in early November of 2025. CNB adjourned the foreclosure ~~proceeding~~sale until early January 2026, based on the transition issues faced by the Debtor. The Debtor brought forward a

third party to acquire the participants' interest in CNB's facility, but the participants refused to engage with that third party. As a result, the Debtor's only option was to seek protection under Chapter 11 of the Bankruptcy Code in light of anthe impending foreclosure by advertisement sale date.

## III. Significant Post-Petition Events

There are four significant post-petition events that have occurred in this Bankruptcy Case. First, upon CNB's motion, the Debtor's case was designated a single asset real estate case. Second, the Debtor sought approval of, and this Court approved, post-petition secured financing from Ms. Poscher. Third, the Debtor filed a motion to extend the Plan-filing deadline, and exclusivity period to file the Plan and solicit ballots on the Plan. Fourth, the Debtor has negotiated two separate alternative exit transactions, either of which will provide for payment in full of all Claims.

### *The SARE Designation*

On February 13, 2026, CNB filed the SARE Motion and in opposition the Debtor filed its SARE Objection. CNB filed the SARE Reply and the Court held a hearing on the SARE Motion on March 12, 2026. The Court was unpersuaded by the Debtor's arguments in opposition to the SARE Motion and entered the SARE Order. As such, the Debtor was required to either file its Plan within 90 days of the Petition Date, – or commence making interest-only payments to secured

creditors, as required under 11 U.S.C. § 362(d)(3). The Debtor opted to make the Interest-Only Payments to the Interest-Only Payees.[45]

***DIP Financing***

The Debtor has no business operations and in order to make the Interest-Only Payments to the Interest-Only Payees, the Debtor sought approval of the Initial DIP Loan to be provided to the Debtor by Ms. Poscher as the DIP Lender. After motionthe filing of the DIP Motion and hearings, the Court entered the Interim DIP Financing Order that authorized the Debtor to borrow money on an interim basis from Ms. Poscher, in an aggregate principal amount of up to $133,000.00 prior to entry of a final order on the First DIP Motion and pursuant to the terms of the Revised DIP Note.

On May 18, 2026, the Court held a final hearing on the First DIP Motion. On May 22, 2026, and on stipulation of the parties, the Court entered its Final DIP Financing Order. In addition to the terms of the Interim DIP Financing Order, the Final DIP Financing Order authorized the Debtor to borrow up to an aggregate principal amount of $400,000 from Ms. Poscher under the terms of the Amended DIP Note. The purpose of the Initial DIP Loan was to afford the Debtor the ability

[45] Debtor's other secured creditorscreditor entitled to interest-only payments—Brownstone and Prentice—waived payment. Prentice did not charge interest for its loan.

to fund its Interest-Only Payments to the Interest-Only Payees, and payment of U.S. Trustee fees as set forth in the DIP Budget. The Debtor ~~was~~ elected to make interest-only payments to its secured creditors (other than Brownstone ~~and Prentice~~, who waived ~~their~~its right to interest payments) and which became due on the 90th day after the Petition Date pursuant to Section 362(d)(3) of the Bankruptcy Code in order for the Debtor to maintain the ~~Automatic Stay~~automatic stay, due to its SARE designation.

In exchange for the Initial DIP Loan, Ms. Poscher, as the DIP Lender was granted an allowed superpriority administrative expense claim with priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, but only to the extent of amounts actually borrowed under the Final DIP Financing Order.

As security for amounts borrowed, the DIP Lender was granted (i) pursuant to section 364(c)(2) of the Bankruptcy Code, a lien on all property of the Debtor's estate not otherwise subject to a lien, and (ii) pursuant to section 364(c)(3) of the Bankruptcy Code, a junior lien on all property of the Debtor's estate that is subject to a lien, in each case perfected automatically upon entry of the Interim DIP Financing Order without the necessity of filing a financing statement.

The DIP Liens are in all instances subject to existing mortgage liens in favor of CNB, Prentice, and Brownstone, the construction lien in favor of Higley~~,~~

and Permitted Third Party Liens (i.e., liens that are senior by operation of law, including liens securing the payment of real property taxes).

The DIP Liens and the superpriority claim expressly exclude (i) any Avoidance Claims, (ii) any proceeds or property recovered in connection with the successful prosecution or settlement of any Avoidance Claims, (iii) any intercompany claims, and (iv) any claims against the estate of Dr. Poscher, Prentice, or any entity or estate in which Ms. Poscher has a direct or indirect interest, and no superpriority claim, administrative claim, or other priority claim under the Final DIP Financing Order shall be payable from or have recourse to any of the foregoing.

On July 24, 2026, the Court held a hearing on the Debtor's ~~Amended~~Second DIP Motion and related ~~Amended~~Second DIP Stipulation. On July 27, 2026, the Court entered the ~~Amended~~Second DIP Financing Order which authorized the Debtor to borrow up to an additional $250,000 and thus increased the aggregate principal amount of the DIP Facility to $650,000, under the terms of the Second Amended DIP Note. The resulting DIP Liens of the ~~Amended~~Second DIP Financing Order retain the same lien priority and exclusions as those set forth above and as reflected in the Final DIP Financing Order.

The purpose of the request to increase the amount of the DIP Facility was to continue making Interest-Only Payments and quarterly U.S. Trustee fees as set forth in the ~~Amended~~Second DIP Budget.

***Motion to Extend Plan Deadline and Exclusivity Period***

Concurrent with the DIP Motion, the Debtor filed its Motion to Extend. The Court addressed the Motion to Extend during the Initial DIP Financing Hearing where Debtor indicated to the Court it was holding off on the requests set forth in the Motion to Extend until it could obtain greater clarity as to its plan and the Exit Financing. The Court entered the Interim Order Regarding Plan Deadline Extension which required the Debtor to supplement the Motion to Extend on or before May 12, 2026, provide a detailed update of the Exit Financing lender negotiations, and set the Motion to Extend for hearing on May 18, 2026.

On May 12, 2026, the Debtor filed its Supplement to which it attached the RAM Term Sheet and the WhiteHawk[56] Term Sheet. On May 18, 2026, the Court held a hearing on the Motion to Extend and subsequently on May 20, 2026, entered its Plan Extension Order: (1) extending the Plan Deadline and the Plan Exclusivity Period to July 27, 2026; and (2) extending the Solicitation Exclusivity Period to September 25, 2026.

[56] WhiteHawk has since declined to proceed under the WhiteHawk Term Sheet, after engaging in further due diligence.

The Court held a status conference on May 22, 2026, to address the Case Management Order that needed to be amended in light of the Plan Extension Order, and subsequently entered its Amended Case Management Order. In addition to amending other case deadlines and restating the Plan Deadline, the Plan Exclusivity Period and the Solicitation Exclusivity Period, the Amended Case Management Order scheduled the confirmation hearing on the Plan for September 25, 2026, at 1:00 p.m.

The Debtor files this Plan in accordance with the Plan Extension Order and the Amended Case Management Order.

***The Exit Alternatives***

On April, 14, 2026, the Debtor and RAM executed the RAM Term Sheet (**Exhibit B** hereto) wherein the Debtor is to obtain exit takeout financing to: (a) satisfy amounts due to pay all secured and unsecured creditors in full, who will not otherwise convert their existing debt to equity; (b) pay chapter 11 administrative expenses; (c) cover carrying costs to vertical construction; and (d) pay the expenses of the Exit Financing. RAM is to receive, upon confirmation of the Debtor's Plan, a 5% membership interest in the Debtor, in exchange for which Reynolds, who owns RAM, is to provide the credit enhancement required of the Exit Financing Lender (under Equity Transaction B) and of the Vertical Financing Lender. RAM will also bring to the table extensive construction project management expertise.

RAM is a vertically integrated commercial real estate operator and development firm specializing in core plus, value-added and opportunistic multifamily investing. RAM was founded in 2003 and has engaged in over 100 existing and ground-up transactions. Materials outlining RAM, its principal members

and its current portfolio of projects are attached as **Exhibit C.**

On July 16, 2026, the Debtor and Agile executed an Amended Commitment Letter (**Exhibit D** hereto), pursuant to which Agile agreed, on the ~~Payment Disbursement~~Effective Date to: (a) enable Newco to acquire 100% of the membership interest in the Debtor held by the Poscher Estate from the Poscher Estate for an amount in a multiple of 7 figures; and (b) provide an additional amount, not to exceed $41,000,000.00, as an equity infusion into Newco and then as an equity infusion by Newco into the Debtor, in an amount sufficient to provide for payment in full of all ~~allowed~~Allowed Claims and other working capital requirements of the Debtor, post-confirmation.

On August 5, 2026, Agile provided a Memorandum update as to its investment commitment (**Exhibit E** hereto). References to "The Finn" and "The Forge" therein are proposed names for the Development.

Agile is a leading provider of large-scale solar power solutions and EV charging infrastructure. It specializes in solar arrays, power provider services, and

EV charging installations through strategic site partnerships with high-usage locations. Agile is specifically interested in the Project, based on the Micro-Grid to be developed and installed. This aligns with Agile past development and management of large-scale solar farms, supplying clean, renewable energy to power grids and key infrastructure, ensuring a sustainable and reliable energy supply. Further, Agile builds new or retrofits buildings with its patented BESS and Shallow Geothermal to enhance a building's energy needs and apply to the grid. Agile has advised the Debtor that Agile has placed approximately $500 million of debt and equity during the preceding 12-month period.

On July 27, 2026, the Debtor and the Exit Financing Lender entered into athe Commitment Letter (**Exhibit F** hereto), pursuant to which the Exit Financing Lender has agreed (under Equity Transaction B) to provide to the Debtor Exit Financing on the Payment DisbursementEffective Date in an amount sufficient to provide for payment in full of all allowedAllowed Claims and other working capital requirements of the Debtor, post-confirmation. The Exit Financing will result in a re-allocation of the equity in the Debtor (under Equity Transaction B), with the Poscher Estate retaining a 59% interest and the Finn Group being issued a 41% membership interest in the Debtor.

being issued to The Finn Group, in turn, will be owned by a combination of parties, the percentage ownership of which is as follows: Prentice, 5% (conversion

of its debt position to equity); Blue Phoenix, 22%; Pullins, 2% (equity exercisable upon completion of vertical construction); APB, 5%; Vohwinkle, 2% (equity exercisable upon completion of vertical construction); and Reynolds, 5%. Blue Phoenix is an affiliate of Ms. Poscher, its members being Ms. Poscher, her family trust and certain friends and family. Prentice is owned fully by ~~Dr.~~the Poscher Estate. Pullins, Vohwinkle, APB and Reynolds are not affiliates of Ms. Poscher, the Poscher Estate or any of their respective affiliates.

The Exit Financing Lender is a private investment company that lends from a debt fund in conjunction with a Sovereign Wealth Fund and two major European Family offices. Over the last decade they have invested in, funded and participated in over $11.75B of real estate projects internationally. The Exit Financing Lender concentrates on funding projects in North, Central and South America, the United Kingdom, the Republic of Ireland, several European countries and Caribbean nations. These projects include hospitality, industrial, senior care, senior residences, and multifamily real estate development.

The Exit Financing Lender is made up of former division presidents from several international banks, the chief operating officer of a boutique investment bank, and individuals with extensive hands-on experience in multifamily, senior care, hospitality, retail, medical, social, and work housing. Historically, the Company has provided both debt and equity into client capital stacks.

At present the Exit Financing Lender is financing two Hyatt Properties in Mexico, a Hilton Luxury Resort in Costa Rica, a Hard Rock Hotel in USA, a Waldorf Astoria in Caribbean, a 600 unit Condominium Property in Ecuador, a Storage Facility in USA, a Mixed Use Property (Hotel, Apartments) in the USA, a unit apartment building also in the USA, Conversion of a Hospital to a Medical Surgical Center in the USA and a High Tech Manufacturing Complex in the USA.

The Exit Financing Lender and its subsidiaries are headquartered in Canada, America, and Brazil, with subsidiaries and affiliates in the United States, Mexico, the United Kingdom, and Brazil.

Equity Transaction A and Equity Transaction B will be brought before the Probate Court for Probate Court Approval prior to the hearing on confirmation of this Plan, to obtain conditional approval of the sameboth, subject only to confirmation of this Plan.

The Debtor, through its representative, Ms. Poscher, prefers Equity Transaction A over Equity Transaction B, as there is an interest cost associated with Equity Transaction B, based on the need for Exit Financing, which is not necessary under Equity Transaction A. Further, Equity Transaction A would likely be more attractive to the PosherPoscher Estate, as it monetizes the Poscher's Estate's interest in the Debtor, rather than the Poscher Estate awaiting the completion of the vertical construction and a liquidity event. The Debtor has

arranged for Equity Transaction B and the Exit Financing, if for some reason, Equity Transaction A and Agile's participation therein is somehow revoked or not approved.

Ms. Poscher, on behalf of the Debtor, is working on a parallel path to document Equity Transaction A and Equity Transaction B. Equity Transaction A requires the execution of a proposed Membership Interest Purchase Agreement between Newco and the Poscher Estate, as well as an Operating Agreement for Newco. To the extent prepared, the foregoing, along with this Disclosure Statement and Plan, shall be part of the submission to the Probate Court for approval.

Equity Transaction B will require the execution of an Amended and Restated Operating Agreement of the Debtor, a Guaranty Fee Agreement and the Provizia loan documents. To the extent prepared the foregoing, along with this Disclosure Statement and Plan, shall be part of the submission to the Probate Court.

The Probate Court may or may not approve Equity Transaction A and/or Equity Transaction B. That resolution will be known prior to the hearing on confirmation of the Plan. If both Equity Transaction A and Equity Transaction B are approved by the Probate Court, then Ms. Poscher, on behalf of the Debtor, prior to the hearing on confirmation, will determine which option to present

proofs on as to feasibility. The Debtor will provide a supplement to this Disclosure Statement and Plan with respect to: (a) the results of Probate Court Approval; and (b) the Debtor's election between Equity Transaction A and Equity Transaction B. Probate Court Approval shall also include the Plan's proposed conversion of Prentice's debt to equity and if required under Equity Transaction B, a pledge of the Probate Estate's 59% interest in the Debtor to the Exit Financing Lender.

The transfer of the Transferred Assets to the SPE is based on the Debtor's diligence and understanding from lenders and investors it has spoken with that in a development of this magnitude, the lender will insist that the assets of the borrower be held in an SPE and not in an entity that has undergone a proceeding under chapter 11. Many lenders will not commit to an entity that has previously filed for bankruptcy protection.

The Debtor will be preparing the conveyance agreement between the SPE and the Debtor as well as the single member LLC agreement of the SPE.

**Transfers outside of the ordinary course**

As required under section 362(d)(3) and the terms of the DIP Budgets attached to the DIP Financing Orders, the Debtor has made the Interest-Only Payments to the Interest-Only Payees in the following amounts:[67]

[67] The April payment to Ann Arbor was $8,009.84 which included a four percent late charge of $6,407.87 calculated from the full amount due and owing under the

| | |
|---|---|
| Ann Arbor: | $ 1,601.97 |
| CNB: | $113,320.62 |
| Higley: | $ 4,306.42 |

The Debtor paid the Quarterly Fees as required, in the amount of $350. To date, the Debtor has made a total of $327,094.62 in transfers outside of the ordinary course in accordance with the terms of the DIP Budgets. The Debtor has made no other transfers outside of the ordinary course. Ms. Poscher, out of her own funds, paid a $150,000 due diligence fee to WhiteHawk, but and a $60,000 due diligence fee to Provizia, which were gifts to the Debtor has no arrangement with Ms. Poscher for the repayment of this amount.

### A. Summaries of cash collateral, post-petition financing, and adequate protection orders

The details and summaries of the Debtor's DIP Facility, DIP Budgets, and Interest-Only Payments are provided above. *See supra*, Section III of the Disclosure Statement.

### B. Pending litigation

late charge of $6,407.87 calculated from the full amount due and owing under the Ann Arbor Tax Claim. The May payment to CNB was $117,097.98 which included $3,777.36 per diem charge for the additional day in May. A $117,097.98 payment was also made to CNB in June. The amounts listed for the Interest-Only Payments are the regular monthly payments owed to each Payee. The Debtor also paid a $95 service fee for its Chase DIP bank account in June.

On the Petition Date, the Debtor was party to two state court litigation matterscreditor enforcement actions. CNB had initiated a receivershipforeclosure by advertisement action against the Debtor, and Brownstone had initiated a foreclosure and receivership action against the Debtor—both in the Circuit Court for Washtenaw County, Michigan. Both actions were stayed pursuant to section 362 of the Bankruptcy Code upon the filing of the Debtor's bankruptcy petition. Upon entry of the Confirmation Order,payment in full of the allowed amount of the Claims of CNB and Brownstone on the Effective Date, each shall be permanently enjoined from pursuing or continuing such actions against the Debtor or its assets and such actions shall be discontinued or dismissed, as applicable based on payment in full having been received by CNB and Brownstone under the Plan.

## IV. Liquidation Analysis and Risks

### A. Liquidation Analysis

B. An appraisal was performed by CBRE Valuation and Advisory Services on July 7, 2023 in connection with CNB's loan. That CBRE Appraisal contained two values. The first value was $15,800,000, described to be the "As Is (Land Value)." The second value, which included the then in place early-stage enhancements to the Development (through site preparation, site plan application, etc.), known as "entitlements" placed the "As Entitled (Land Value)" of the

Development at $29,500,000. A second valuation, the Colliers BOV, dated May 20, 2024, placed the value of the Development, with the then in-place entitlements, at $45,800,000. This reflected the additional work which had been undertaken with respect to the Development, including architectural, engineering and site plan approval. A third, and more recent appraisal, the Colliers 2025 Appraisal, was issued on November 25, 2025, and placed the value of the Development, with the then in-place entitlements, at $61,300,000. This reflected the additional development work that had ensued over the 18 months since the Colliers BOV.

The Colliers BOV and Colliers 2025 Appraisal reflect increased value in the ~~Properties~~Property since the CBRE Appraisal. The increase in valuation is based on the detailed and approved Development plans, and entitlements now attached to the Property, which allow for construction of the various Development components.

The Colliers 2025 Appraisal assessed various risks and conditions upon which the appraisal was based, including accessibility, exposure, flood-zone proximity, presence of easements or encumbrances, hazardous waste detection, et al. The Colliers 2025 Appraisal indicated a good rating for both accessibility and exposure, moderate and minimal flood risk, no adverse easements or encumbrances, and no presence or signs of hazardous waste, and summarized

"[o]verall, the [Development's] location is rated as good/excellent . . . there are no known factors that would limit the site's development according to its highest and best use." Colliers 2025 Appraisal, p. 25.

Against these valuations, the Debtor has the secured, unsecured, superpriority and, administrative Claims identified in Section 3 of the Plan, which in the aggregate, ~~exceed in total~~are approximately and at least $~~34,000,000~~30,000,000, if allowed in full. The Debtor's Plan provides for the payment in full of all ~~allowed~~Allowed Claims (other than the conversion of Prentice's secured claim to equity). If the Debtor were to be liquidated, based on the appraisals above noted, it would appear that all creditors of the Debtor would be paid in full. However, it is unknown what value the Property and the other assets of the Debtor would bring, in relation to the values set forth in the appraisals, in a forced liquidation setting. If the entitlements are deemed to have no value, based on a purchaser's abandonment of the same with respect to the Development (electing instead a different or modified use of the Property), or a lesser value than as appraised, then the value to be obtained in a forced liquidation could approximate the acquisition cost of the Property, which was $18,982,170. This amount would be insufficient to satisfy the creditor Claims in full and would likely only cover the Claims of Ann Arbor~~,~~ and a portion of allowed construction lien claims, and ~~a portion of~~ the CNB indebtedness, depending on priorities.

### ~~C~~B. Potential Claims and Causes of Action.

The Debtor has one known cause of action, which the Debtor intends to initiate in this bankruptcy case, through the filing of an adversary proceeding against Synecdoche. Synecdoche claims to hold a construction lien claim against the Property. Synecdoche was retained as an architect for the Development. The Debtor has substantial defenses to the amount claimed by Synecdoche to be due and owing and asserts that the Debtor has overpaid Synecdoche for failed work product and overbillings. The Debtor also asserts that the Debtor's termination of Synecdoche pre-petition, which is undisputed by Synecdoche, excuses the Debtor from having to pay any residual payments to Synecdoche. Per the Plan, the Debtor will place into the ~~Disputed~~Contested Claims Reserve an amount sufficient to pay Synecdoche, should Synecdoche's Claim be allowed in full, as filed.

The Debtor intends to file certain unsecured ~~claim~~Claim objections and reserves all other potential ~~claims, avoidance actions, and causes of action~~Avoidance Claims, whether now existing or hereafter arising, known or unknown, and any claims or causes of action not specifically identified herein are expressly reserved. However, the Debtor does not anticipate pursuing any other Avoidance Claims, for the reason that all Allowed Claims will be paid in full. Further, the Debtor is not aware of any material Avoidance Claims other than the Avoidance Claim against Synecdoche. Conversion of the Prentice Claim to equity

includes a discount based on the Debtor's assertion that none or only a portion of the Prentice Claim should be deemed to be debt, but rather, an equity contribution by Dr. Poscher.

Upon entry of the Confirmation Order, all such causes of action shall vest in the Reorganized Debtor, which shall retain full authority to prosecute, settle, or otherwise resolve such claims. The Debtor further reserves the right to investigate, assert, and pursue any and all claims, causes of action, and avoidance actions arising under sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, 553, or any other applicable provision of the Bankruptcy Code, whether or not specifically identified herein. Nothing contained in this Plan, the Confirmation Order, or any other document filed in connection herewith shall be deemed a waiver, release, or relinquishment of any such claims, causes of action, or avoidance actions, and all such rights are expressly preserved and retained by the Debtor and the Reorganized Debtor, as applicable. The Debtor is not aware of any other avoidance actions or causes of action available to the estate at this time, other than the action against Synecdoche, but reserves all rights with respect thereto,.

## C. Projections

On the Effective Date, the Sources and Uses set forth on **Exhibit A** will be paid. Outlined on **Exhibit G** are the Debtor's projections for the subsequent year,

pending receipt of the Vertical Financing, which will then include a new, comprehensive construction and operational budget. That budget will be subject to a multitude of conditions and estimates, based on bids and other deliverables required to fully build out that full budget. Pending closing on the Vertical Financing, the interest reserve provided in the Exit Financing will cover the payments required to be paid to the Exit Financing Lender.

### D. Guarantors

The CNB and Brownstone mortgage loans are both guaranteed by parties related to the Debtor.

The guarantors of the CNB loan are alleged to be: (a) AHFLP, LLC, an affiliate of the Debtor ("AHFLP"); (b) Prentice; (c) Dr. Poscher and Ms. Poscher, jointly and severally; and (d) the Margaret E. Poscher Revocable Trust dated January 23, 1998. AHFLP and Prentice are wholly owned by Dr. Poscher.

The guarantors of the Brownstone loan are alleged to be: (a) Dr. Poscher; (b) Ms. Poscher; (c) the Margaret E. Poscher Revocable Trust dated January 23, 1998; (d) AHFLP, LLC, an affiliate of the Debtor ("AHFLP"); (e) Prentice; (f) ~~the Debtor; (g)~~ Fourth Ave, LLC, a Michigan limited liability company, an affiliate of the Debtor ("Fourth Avenue"); (~~h~~g) 815 Brookwood LLC, a Michigan limited liability company, an affiliate of the Debtor ("Brookwood"); (~~i~~h) 823 Sylvan LLC, a Michigan limited liability company, an affiliate of the Debtor ("Sylvan"); and

(ii) 1700 Packard LLC, a Michigan limited liability company, an affiliate of the Debtor.[7] ("Packard"). The Poscher Estate owns 81% of AHFLP and Ms. Poscher owns 19% of AHFLP. The Poscher Estate is the 100% owner of Prentice and Prentice is the sole member of Fourth Ave, Brookwood, Sylvan, and Packard. The above ownership is diagramed as follows:

**Poscher Estate** — 81%

**Ms. Poscher** — 19%

**AHFLP LLC**

100%

**Prentice**

100%

**Fourth Avenue** | **Brookwood** | **Sylvan** | **Packard**

Blue Phoenix, LLC is a newly formed entity, owned by Ms. Poscher, a trust controlled by Ms. Poscher and possibly by other friends and family of Dr. Poscher or Ms. Poscher, who are otherwise unaffiliated with the Debtor or any entity of which Dr. Poscher held an equity interest.

Other than as set forth herein, the Debtor is not aware of any other guaranty obligations outstanding as of the Petition Date but reserves the right to amend or supplement this disclosure as additional information becomes available.

[7] ~~Prentice is the sole member of Fourth Ave, LLC, 815 Brookwood LLC, 823 Sylvan LLC, and 1700 Packard LLC.~~

## V. Details Regarding Implementation of the Plan

### A. Debtor's financial summaries

2023:

Income: $545,110

Expenses: $2,047,289

Net: (-$1,502,179)

2024:

Income: $254,807

Expenses: $5,543,212

Net: (-$5,288,405)

2025:

Income: $152,785.50

Expenses: $3,303,000

Net: (-$3,150,241.50)

2026 to the Petition Date:

Income: $0

Expenses: $84,921

Net: (-$84,921)

The Debtor's income prior to the Petition Date was derived from residential rental income from the Property, during the completion of the land assemblage and prior to the demolition of the previously occupied structures on the Property. The Debtor's pre-petition expenses were comprised of the costs of rental property management, development and demolition costs including costs for design, permitting, rezoning, site-plan approval, and other costs to facilitate the Development.

The Debtor has had no post-petition operating revenues. The only expenses were the DIP Loan proceeds, used to fund the Interest-Only Payments made to the Interest-Only Payees pursuant to section 362(d)(3) and the Administrative Expenses. All Legal Expenses remain subject to Bankruptcy Court approval and are to be paid pursuant to the Sources and Uses, if not paid from the Retainer Deposits.

Under either Equity Transaction A or Equity Transaction B, coupled with either the equity infusion by Agile under Equity Transaction A or the Exit Financing by the Exit Financing Lender under Equity Transaction B, all Claims will be fully satisfied on the ~~Payment Disbursement~~Effective Date. Therefore, projections are not relevant to Plan confirmation. The Sources and Uses reflect the proceeds being received by the Debtor to fund the Plan payments, either based on

the equity infusion by Newco into the Debtor, funded by Agile, or from the Exit Financing obtained by the Debtor from the Exit Financer.

### B. Plan Risks, Conditions and Assumptions.

Ms. Poscher, on behalf of the Debtor has undertaken a remarkable effort, after the passing of her wife and under the stresses of a probate proceeding, family issues and this chapter 11 proceeding, to assemble two alternative options for exit– Equity Transaction A and Equity Transaction B. All are subject to an inherent risk, whether contractually permitted, or otherwise, for the plan support parties to fail to proceed as committed. The Agile commitment is unconditional, and the Debtor has been advised that Agile has a huge amount of liquidity behind its organization. The Debtor has been and continues to work on the constituent documents needed to memorialize and move forward on the Agile transaction.

At the same time, under Equity Transaction B, the Debtor has a conditional commitment from Provizia. However, the details of that conditional commitment have been addressed over a period of months and the conditions to close are being met each day. Definitive documents under the Debtor's control to consummate the Provizia Exit Financing and Equity Alternative B are well under way. The Debtor is awaiting receipt of an initial loan package from Provizia for review and comment.

RAM has been active in all discussions with Provizia, as has its counsel. A form of Guaranty Fee Agreement and Co-Development Agreement have been drafted and shared with RAM and Reynolds. A draft Operating Agreement for Newco has been sent for Agile and its other members' review. An amended and restated operating agreement of the Debtor is being prepared to reflect the equity allocation proposed under Equity Alternative B.

As in any sophisticated commercial transaction in the tens of millions of dollars, there are always moving parts among the various constituents and a risk that Equity Alternative A or Equity Alternative B will not close. However, at this time, the Debtor has every confidence in both and is proceeding on a parallel path as to both.

### BC. Post-confirmation leadership

Ms. Poscher will remain as the responsible person to the Debtor post-confirmation. The acquisition or allocation of the equity of the Debtor is as is set forth under Equity Transaction A or Equity Transaction B described above.

Debtor's operations post-confirmation will involve the continuation of the work necessary to complete the Development.

Ms. Poscher has and will continue to receive no compensation or fringe benefits for her services to the Debtor through the Effective Date.

**Post-confirmation tax ramifications**

The Plan contemplates a conveyance of the ~~Property~~Transferred Assets to the SPE, in exchange for a 100% interest in ~~Newco~~the SPE. The Debtor does not believe that this Property transfer transaction will result in a taxable event to the Debtor. Further, the Debtor will have no debt forgiveness income related to its Plan, as the Plan provides for a 100% payment of all allowed Claims of the Debtor on the ~~Payment Disbursement~~Effective Date.

The Debtor recommends that the Creditors consult their tax specialist relative to the tax consequences of the Plan to the Creditors.

No ruling has been sought or obtained from the IRS with respect to any of the tax aspects of the proposed Plan and no opinion of counsel has been obtained by the Debtor with respect thereto. No representations or assurances are being made with respect to the federal income tax consequences as described herein. Certain types of claimants and interest holders may be subject to special rules not addressed in this summary of federal income tax consequences.

## VI. Legal Requirements

### A. Voting Procedures

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a Plan are classes of claims, or equity interest, that are impaired

under the Plan. Accordingly, classes of claims or interests that are not impaired are not entitled to vote on the Plan.

Creditors that hold claims in more than one impaired class are entitled to vote separately in each class. Each such creditor will receive a separate ballot for all of its claims in each class (in accordance with the records of the Clerk of the Court) and should complete and sign each ballot separately. The ballots may be returned via email to acimini@taftlaw.com so that they are received on or prior to the deadline set by the Court. A creditor who asserts a claim in more than one class and who has not been provided with sufficient ballots may photocopy the ballot received and file multiple ballots.

Votes on the Plan will be counted only with respect to claims: (a) that are listed on the Debtor's Schedules of Assets and Liabilities other than as disputed, contingent or unliquidated; or (b) for which a proof of claim was filed on or before the bar date set by the Court for the filing of proofs of claim (except for certain claims expressly excluded from that bar date or which are allowed by Court order). However, any vote by a holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.

Voting on the Plan by each holder of a claim or interest in an impaired class is important. After carefully reviewing the Plan and disclosure statement, each holder of such a claim or interest should vote on the enclosed ballot either to accept or to reject the Plan, and then return the ballot by mail to the Debtor's attorney by the deadline previously established by the Court.

Any ballot that does not appropriately indicate acceptance or rejection of the Plan will not be counted.

A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the Debtor's attorney.

**B. Acceptance**

The Bankruptcy Code defines acceptance of a Plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots. The Bankruptcy Code defines acceptance of a Plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots. If no creditor or interest holder in an impaired class votes, then that class has not accepted the Plan.

**C. Confirmation**

11 U.S.C. § 1129(a) establishes conditions for the confirmation of a Plan. These conditions are too numerous and detailed to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process.

Among the several conditions for confirmation of a Plan under 11 U.S.C. § 1129(a) are these:

1. Each class of impaired creditors and interest must accept the Plan, as described in paragraph VI.B., above.

2. Either each holder of a claim or interest in a class must accept the Plan, or the Plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

### C. Modification

The Debtor reserves the right to modify or withdraw the Plan at any time before confirmation.

### D. Effect of Confirmation

If the Plan is confirmed by the Court:

1. Its terms are binding on the Debtor, all creditors, members, and other parties in interest, regardless of whether they have accepted the Plan.

2. Except as provided in the Plan:

(a) In the case of a limited liability company that is reorganizing and continuing business:

i. (1) All claims and interests will be discharged;

ii. (2) Creditors and members will be prohibited from asserting their claims against or interest in the Debtor or its assets.

(b) In the case of a limited liability company that is liquidating and not continuing its business:

(1) Claims and interests will not be discharged.

(2) Creditors and equity interests will not be prohibited from asserting their claims against or interests in the Debtor or its assets.

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

*/s/ Jay L. Welford*
Jay L. Welford (P34471)
Kimberly Ross Clayson (P69804)
Anthony Cimini (P86223)
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
(248) 351-3000
jwelford@taftlaw.com
kclayson@taftlaw.com
acimini@taftlaw.com

*Counsel to the Debtor, South Town by 4M LLC*

By: */s/Heidi Caroline Poscher*
Heidi Caroline Poscher

Dated: July 27August 12, 2026 For: South Town By 4M LLC
Its: Responsible Person

| Summary report: Litera Compare for Word 11.8.0.56 Document comparison done on 8/12/2026 10:21:28 AM | |
|---|---|
| **Style name:** TaftStandard | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://taftlaw.cloudimanage.com/ACTIVE/200281687/15 | |
| **Modified DMS:** iw://taftlaw.cloudimanage.com/ACTIVE/302253304/1 | |
| **Changes:** | |
| Add | 310 |
| ~~Delete~~ | 200 |
| ~~Move From~~ | 4 |
| Move To | 4 |
| Table Insert | 0 |
| ~~Table Delete~~ | 0 |
| Table moves to | 0 |
| ~~Table moves from~~ | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 518 |

**EXHIBIT 4**

**(Amended Operating Agreement)**

**AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**SOUTH TOWN BY 4M LLC**

THE UNITS DESCRIBED IN THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY APPLICABLE STATE OR OTHER FEDERAL SECURITIES LAWS. SUCH UNITS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

## TABLE OF CONTENTS

**Page**


**Article I GENERAL PROVISIONS; DEFINITIONS** ........ **1**
Section 1.1 Formation of the Company; Term ........ 1
Section 1.2 Limited Liability Company Agreement ........ 1
Section 1.3 Name ........ 1
Section 1.4 Purpose and Powers ........ 1
Section 1.5 Principal Office; Registered Office and Agent ........ 1
Section 1.6 Tax Characterization ........ 2
Section 1.7 Definitions ........ 2

**Article II CAPITAL CONTRIBUTIONS AND ACCOUNTS** ........ **8**
Section 2.1 Capital Contributions and Issuance of Units ........ 8
Section 2.2 Capital Accounts ........ 8
Section 2.3 Negative Capital Accounts ........ 9
Section 2.4 No Interest ........ 9
Section 2.5 No Withdrawal ........ 9
Section 2.6 Safe Harbor Election ........ 10

**Article III DISTRIBUTIONS AND ALLOCATIONS** ........ **10**
Section 3.1 Distributions ........ 10
Section 3.2 Allocations ........ 11
Section 3.3 Special Allocations ........ 11
Section 3.4 Tax Allocations ........ 12

**Article IV CERTAIN TRANSACTIONS** ........ **13**
Section 4.1 Transactions with Interested Persons ........ 13

**Article V MANAGEMENT** ........ **13**
Section 5.1 Management Authority ........ 13
Section 5.2 Delegation of Authority ........ 13
Section 5.3 Composition; Actions ........ 13
Section 5.4 Limitation of Liability; Indemnification of Members, Managers, Officers, and Others ........ 14
Section 5.5 Compensation and Reimbursement ........ 15
Section 5.6 Devotion of Time to the Company ........ 16
Section 5.7 Asset and Property Management ........ 16

**Article VI MEMBERS** ........ **17**
Section 6.1 Limitation of Liability ........ 17
Section 6.2 Lack of Authority of Individual Members ........ 17
Section 6.3 No Right of Partition ........ 17
Section 6.4 Indemnification and Reimbursement for Payments on Behalf of a Member ........ 17
Section 6.5 Voting Rights ........ 17
Section 6.6 Confidentiality ........ 19
Section 6.7 Annual Budget and Business Plan ........ 20
Section 6.8 Exit Financing and Vertical Financing ........ 20

**Article VII TRANSFERS OF UNITS** ........ **21**
Section 7.1 Transfers by Members ........ 21
Section 7.2 Assignments Generally; Substituted Member ........ 22
Section 7.3 Sale of the Company ........ 23

## TABLE OF CONTENTS

**Page**


Section 7.4 Tag Along Rights. .... 24
Section 7.5 Buy/Sell Rights .... 25
Section 7.6 Void Assignment .... 25

**Article VIII DISSOLUTION AND LIQUIDATION AND VALUATION .... 29**
Section 8.1 Dissolution .... 29
Section 8.2 Liquidation of Company Interests .... 29

**Article IX BOOKS OF ACCOUNT .... 30**
Section 9.1 Records and Accounting .... 30
Section 9.2 Bank Accounts .... 30
Section 9.3 Fiscal Year .... 30
Section 9.4 Tax Elections .... 30
Section 9.5 Reports .... 30
Section 9.6 Tax Controversies .... 30

**Article X MISCELLANEOUS .... 32**
Section 10.1 Further Action .... 32
Section 10.2 Title to Company Assets .... 32
Section 10.3 Creditors .... 32
Section 10.4 Amendments, Modifications, or Waivers .... 32
Section 10.5 Successors and Assigns .... 32
Section 10.6 Cumulative Remedies .... 32
Section 10.7 Equitable Remedies .... 32
Section 10.8 Governing Law .... 32
Section 10.9 Compliance with Laws .... 33
Section 10.10 Severability .... 33
Section 10.11 Counterparts .... 33
Section 10.12 Descriptive Headings; Interpretation .... 33
Section 10.13 Notices .... 33
Section 10.14 Complete Agreement .... 34
Section 10.15 Business Days .... 34
Section 10.16 Delivery by Facsimile or other Electronic Means .... 34
Section 10.17 Acknowledgment re: Taft Stettinius & Hollister LLP. .... 34

**Schedule A**

**AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**SOUTH TOWN BY 4M LLC**

This Amended and Restated Limited Liability Company Agreement (as amended from time to time hereafter pursuant to its terms, this "Agreement") is effective as of [•], 2026 (the "Effective Date"), pursuant to the provisions of the Michigan Limited Liability Company Act, as amended (the "Act"), and the undersigned do hereby agree as follows:

**ARTICLE I**
**GENERAL PROVISIONS; DEFINITIONS**

Section 1.1 Formation of the Company; Term. South Town By 4M LLC (the "Company") was formed on [*], by the execution and filing of a certificate of formation of the Company with the Michigan Secretary of State setting forth the information required by the Act (the "Certificate"). The term of the Company commenced upon the filing of the Certificate and shall continue in perpetuity until the dissolution and termination of the Company in accordance with the provisions of Article VIII hereof.

Section 1.2 Limited Liability Company Agreement. The Members have entered into this Agreement for the purpose of establishing the affairs of the Company and the conduct of its business in accordance with the provisions of the Act. The Members hereby agree that during the term of the Company set forth in Section 1.1, the rights, powers and obligations of the Members with respect to the Company will be determined solely in accordance with the terms and conditions of this Agreement and, except where the Act provides that such rights, powers and obligations specified in the Act shall apply "unless otherwise provided in a limited liability company agreement" or words of similar effect and such rights, powers and obligations are set forth in this Agreement.

Section 1.3 Name. The name of the Company shall be "South Town By 4M LLC" or such other name or names as may from time to time be designated by the Manager. The Company's business may be conducted under its name and/or any other name or names as the Manager may deem advisable.

Section 1.4 Purpose and Powers. The Company is organized for the object and purpose of: (a) acquiring, owning, holding, managing, maintaining, selling, exchanging and otherwise using the issued and outstanding limited liability company interests in the Subsidiary, (b) acquiring, owning, holding, managing, maintaining, operating, improving, developing, constructing, selling, exchanging, leasing and otherwise using the Property for profit, directly or indirectly through the Subsidiary, (c) borrowing money and issue evidence of indebtedness to finance the activities set forth in clauses (a) and (b) above, either directly or indirectly through the Subsidiary. The Company shall have any and all powers necessary or desirable to carry out the purposes and business of the Company, to the extent that the same may be lawfully exercised by limited liability companies under the Act.

Section 1.5 Principal Office; Registered Office and Agent. The principal office of the Company shall be located at such place (whether inside or outside the State of Michigan) as the Manager may from time to time designate. The Company may have such other offices (whether inside or outside the State of Michigan) as the Manager may from time to time designate. The registered office of the Company in the State of Michigan is located at [•]. The registered agent of the Company for service of process at such address is [•]. The Manager may, in its discretion, change the registered office and/or registered agent from time to time by (i) filing the address of the new registered office and/or the name of the new registered agent pursuant to the Act and (ii) giving notice of such change to each of the Members. The Manager has the authority to cause the Company to be qualified, formed or registered under its name or under any assumed or fictitious name statutes or similar laws in any jurisdiction in which the Company

conducts business and in which such qualification, formation or registration is required by law or deemed advisable by the Manager. The Manager shall execute, deliver and file any certificates (and amendments or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to do business.

Section 1.6 Tax Characterization. The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state or local income tax purposes, and the Company and each Member shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment.

Section 1.7 Definitions. Capitalized terms used but not otherwise defined in this Agreement shall have the following meanings:

"Adjusted Capital Account Deficit" means with respect to any Capital Account as of the end of any Taxable Year, the amount by which the balance in such Capital Account is less than zero. For this purpose, such Person's Capital Account balance shall be:

(i) reduced for any items described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5), and (6), and

(ii) increased for any amount such Person is obligated to contribute or is treated as being obligated to contribute to the Company pursuant to Treasury Regulation Section 1.704-1(b)(2)(ii)(c) (relating to partner liabilities to a partnership) or 1.704-2(g)(1) and 1.704-2(i) (relating to minimum gain).

"Affiliate" of any particular Person means (i) any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by contract or otherwise, and (ii) if such Person (other than the Company) is a general partnership, any partner thereof.

"Bankruptcy Act" means an act that occurs under Title 11 of U.S.C. §§ 101-1532, as amended.

"Blue Phoenix" means Blue Phoenix 19, LLC.

"Book Value" means, with respect to any Company property, the value of the property for "book" or Capital Account purposes pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv). Without limiting the generality of the preceding sentence: (a) the initial Book Value of any property contributed by a Member to the Company will be the Fair Market Value of the property on the date of the contribution, as reasonably determined by the Manager; and (b) the Book Value of all Company properties shall be adjusted to equal their respective Fair Market Values (as determined by the Manager), in accordance with the rules set forth in Treasury Regulations Section 1.704-1(b)(2)(iv)(f), immediately prior to: (i) the date of the acquisition of any additional interest in the Company by any additional or existing Member in exchange for more than a *de minimis* Capital Contribution, (ii) the date of the distribution of more than a *de minimis* amount of Company property to a Member and (iii) in connection with the grant of any Units or any other interest in the Company (other than a *de minimis* interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member, or by a new Member acting in a Member capacity or in anticipation of being a Member; provided that adjustments pursuant to clauses (i) and (ii) above shall be made only if the Manager reasonably determines that the adjustments are necessary or appropriate to reflect the relative economic interests of the Members. The Book Value of any Company property that is

distributed to any Member shall be adjusted immediately prior to the distribution to equal its Fair Market Value. If any asset has a Book Value that differs from its adjusted tax basis, then the Book Value shall be adjusted by the amount of depreciation calculated for purposes of the definition of "Profits" and "Losses" rather than the amount of depreciation determined for United States federal income tax purposes.

"Capital Contributions" means the amount of any cash or cash equivalents and the Fair Market Value of any property that a Member contributes to the Company with respect to the issuance of any Unit pursuant to Section 2.1.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Credit Enhancement" means any guaranty, indemnity, letter of credit, cash collateral, pledge, keepwell, completion support, or other credit support required by the Exit Financing and Vertical Financing lender(s) as a condition to closing or funding.

"Defaulting Member" means any Member who makes any act or omission constituting an Excluded Act.

"Distribution" means each distribution made by the Company to a Member, whether in cash, property or securities of the Company and whether by liquidating distribution, redemption, repurchase or otherwise; provided that a Distribution shall not include any: (i) payments to employees or other service providers as compensation or any recapitalization or exchange of securities of the Company, or any subdivision (by Unit split or otherwise) or any combination (by reverse Unit split or otherwise) of any outstanding Units; and (ii) the fees provided for in Section 5.5.

"Effective Date" shall have the meaning set forth in the opening paragraph of this Agreement.

"Emergency Condition" shall be deemed to exist if: (a) in the reasonable opinion of the Manager or the Co-Developers, immediate action for the protection of the Property or its guests, tenants, or other persons is required to remedy a condition presenting imminent risk of injury to persons or material damage to property; (b) repairs or payment of premiums are necessary to avoid the suspension of insurance with respect to the Company or the Property or to comply with applicable law, a violation of which would expose the Company or a Member to criminal liability; (c) real estate or other taxes of Company are more than thirty (30) days past due; (d) payments due to a mortgage lender or mezzanine lender are past due and within three (3) business days shall accrue at a default or penalty rate; or (e) an event of default or breach under any Loan Documents (including, but not limited to, any guaranty provided by Reynolds) would occur prior to the time period required for additional Capital Contributions Section 2.1.

"Escrow Agent" means a nationally recognized title insurance company or such company's authorized agent.

"Event of Withdrawal" means the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event that terminates the continued membership of a Member in the Company.

"Excess Cash" means, at any time, that portion of the cash and cash equivalent assets of the Company that the Manager determines, in its sole discretion, exceeds the amount of cash needed by the Company to (i) remain "solvent," (ii) maintain adequate working capital and reserves, and (iii) conduct its business and carry out its purposes. In making this determination, the Manager shall take into account the Company's then current and foreseeable sources of, and needs for, cash. For the purposes of this definition,

the Company is "solvent" if it is capable of paying its debts as they become due in the usual course of business or the value of its assets are equal to or greater than the sum of its liabilities. This definition of the term "solvent" is intended to override, to the extent permitted under the Act, any inconsistent provisions of the Act.

"Excluded Act" means (i) any material breach by a Member or the Manager of any provision of this Agreement, or (ii) any grossly negligent or reckless conduct or intentional misconduct, or a knowing violation of law by a Member or the Manager.

"Exit Financing" means one or more debt facilities obtained by the Subsidiary in an aggregate principal amount not to exceed $41,000,000, the proceeds of which shall be used solely to satisfy, refinance, repay, or otherwise discharge the debts, obligations, fees, costs, and expenses required to be paid in connection with the Company's emergence from bankruptcy and consummation of the confirmed plan (including, as applicable, allowed claims, professional fees, and transaction costs).

"Fair Market Value" means, with respect to any asset, its fair market value as determined by the Manager.

"Final Completion" means the satisfaction of all the following conditions: (a) the Project has achieved completion in accordance with all governmental regulations and all non-conforming work has been fully completed to the satisfaction of the architect of record, (b) the general contractor has delivered to the Subsidiary all required guarantees, warranties, affidavits, releases, bonds and lien waivers, and the Manager has secured, marked and indexed all keys, manuals, record drawings, maintenance stocks and operation manuals for all equipment, appliances and other components of the Project; (C) all contractors and subcontractors that remain unpaid have delivered to the Subsidiary a final affidavit and unconditional release of lien complying with applicable state statutes, and otherwise in form and substance required by the Manager any Lender, and the Subsidiary's title insurer with respect to the Project; (D) the general contractor has delivered to the Subsidiary satisfactions of lien for any claims of lien filed on account of the Project (unless transferred to a statutory bond that is obtained by the general contractor and that is approved by the GP), and such other affidavits, waivers and releases from subcontractors that have issued a written notice to the Subsidiary, or otherwise as the Subsidiary, any Lender, or Subsidiary's title insurer may require in order to assure lien-free completion of work (including any equitable lien claims); (E) the Subsidiary has received an updated owner's title insurance policy, effective as of the date on or after the date the Project has been substantially completed, in such form and substance acceptable to the GP; and (F) the general contractor and Subsidiary have fulfilled all requirements for the close out of all permits and approvals required from Governmental Authorities with jurisdiction over the Project.

"Fiscal Period" means any interim accounting period that is within a Taxable Year established by the Manager and is permitted or required by Code Section 706.

"Fiscal Year" means the Company's annual accounting period established pursuant to Section 9.3.

"Governmental Authority" shall mean any court, agency, board, bureau, commission, department, office or other authority of any nature whatsoever of any governmental unit (foreign, federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"Government List" shall mean, collectively, (i) the Specially Designated Nationals and Blocked Persons Lists maintained by OFAC, (ii) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC, and (iii) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other Governmental Authority or pursuant to any Executive Order.

"Initial Capital Contributions" shall be as set forth on Schedule A hereto.

"Loans" means, collectively, any loans made in connection with the Exit Financing and Vertical Financing.

"Loan Documents" means, collectively, the Senior Loan Documents and any subsequent loan documents executed by the Subsidiary, Guarantor, or any of their Affiliates in connection with the Vertical Financing.

"Majority Interest" means Member(s) holding more than fifty percent (50%) of the Units as of the date of determination.

"Manager" means each Person initially named or duly elected as a Manager, as provided in Section 5.3.

"Member" means each of the Persons listed on the signature pages hereto as Members and each Person who is admitted to the Company as a Member pursuant to Section 2.1, or 7.2, in each case so long as such Person continues to hold any Units.

"Minimum Gain" means the partnership minimum gain determined pursuant to Treasury Regulation Section 1.704-2(d).

"Net Capital Transaction Proceeds" means the available net proceeds (after making required payments of Loans and closing costs) from (1) any financing or refinancing of the Property or any part thereof other than the Loans, which is in place as of the Effective Date, and (2) any sale, disposition, taking or loss (including the proceeds from any conveyance in lieu thereof or title or casualty insurance policies, other than rental income insurance) of the Property or any part thereof, less payment of all costs and other expenses related thereto, any amounts expended to repair or replace any part of the Property taken or destroyed and any other obligations of the Company or the Subsidiary then due.

"Percentage Interest" means, with respect to any Member as of any date, the number of Units held by such Member on such date *divided by* the total number of Units outstanding on such date, expressed as a percentage.

"Permitted Transferee" means, with respect to (i) any Member who is an individual, (a) any trust that has been established for the primary benefit of such Member or such Member's lineal descendants, spouse or siblings and of which such Member is the trustee, (b) any family limited partnership, limited liability company or corporation which at the time is, and at all times thereafter shall be, controlled by such Member, provided that in each case such Member retains sole voting control over and decision-making authority under this Agreement with respect to the Units transferred to such entity and (c) such Member's lineal descendants, spouse or siblings, and (ii) any Member that is an entity, any Affiliate of such Member. Notwithstanding the foregoing, no Permitted Transferee shall be or owned or managed by a Prohibited Person.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

"Prohibited Person" shall mean any Person: (A) listed in the Annex to, or is otherwise subject to the prohibitions of, Executive Order No. 13224 on Terrorist Financing, effective

September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism or any other similar prohibitions contained in the rules and regulations of OFAC or in any enabling legislation or other Executive Orders; (B) that is owned or controlled by, or acting for or on behalf of, any Person that is listed in the Annex to, or is otherwise subject to the prohibitions of, Executive Order No. 13224; (C) is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including Executive Order No. 13224; (D) who commits, threatens, conspires to commit or supports "terrorism" as defined in Executive Order No. 13224; (E) that is named as a "specially designated national and blocked person" on the most current list published by OFAC at its official website or at any replacement website or other replacement official publication of such list; (F) that is subject to trade restrictions under United States law, including, without limitation, the Patriot Act, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder; (G) that is listed on any Government List; (H) that has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense within the last 15 years; or (I) that is currently under indictment by any Governmental Authority for alleged criminal activity.

"Project" means the improvements and personal property located now or hereafter at the Property, being acquired by the Subsidiary, which includes a student housing development consisting of approximately three hundred (300) residential units.

"Property" means that certain real property at the address commonly known as 1601 South State Street, Ann Arbor, Michigan

"RAM" means Reynolds Asset Mgmt LLC, a New Jersey limited liability company.

"Reynolds" means Louis J. Reynolds, IV, an individual.

"Senior Loan Documents" means each note, mortgage, deed of trust, loan agreement, pledge agreement, assignment of rents or membership units and all other documents evidencing or securing any required Exit Financing or the Vertical Financing or required by the Senior Lender to be executed by the Company and/or the Subsidiary in connection with the issuance or funding of any required Exit Financing or the Vertical Financing.

"Subsidiary" means [SPE], LLC, a Delaware limited liability company.

"Subsidiary LLC Agreement" means that certain Limited Liability Company Agreement of the Subsidiary dated [*], as amended and restated from time to time.

"Taxable Year" means the Company's annual accounting period for federal income tax purposes determined pursuant to Section 9.4(a).

"Treasury Regulations" means the income tax regulations promulgated under the Code.

"Uncontrollable Expenses" shall mean, the following expenditures to the extent necessary to preserve the Property: (1) taxes, (2) utility charges, (3) insurance, and (4) payments due under any Loans, including any fees, costs or other charges and including establishing any reserves required by the Loan (or payment of any other scheduled payment under such Loans, including without limitation, the entire amount of the Loans at maturity).

"Unit" means a Member's interest in the Profits, Losses and Distributions of the Company representing a fractional part of the aggregate interests in the Profits, Losses, and Distributions of the Company of all Members; provided that any class or group of Units issued shall have the relative rights, powers, duties, and obligations specified with respect to such class or group of Units in this Agreement, and the interest of such class or group of Units in the Profits, Losses, and Distributions of the Company shall be determined in accordance with such relative rights, powers, duties, and obligations.

"Unrecovered Capital Contributions" means, with respect to each Member, the aggregate Capital Contributions actually made by such Member to the Company, less all Distributions made to such Member pursuant to Section 3.1 below.

"Vertical Financing" means the vertical construction loan or loans to be obtained after emergence to finance vertical construction for the Project.

Other Definitions. The following terms shall have the meanings defined for such terms in the sections set forth below:

| Term | Section |
|---|---|
| Act | Preamble |
| Agreement | Preamble |
| Asset Management Agreement | 5.3(a)(ii) |
| Asset Manager | 5.3(a)(ii) |
| Capital Account | 2.2(a) |
| Certificate | 1.1 |
| Company | 1.1 |
| Company Sale | 7.3(a) |
| Company Sale Notice | 7.3(a) |
| Confidential Information | 6.6 |
| Co-Development Agreement | 5.5(b) |
| Co-Developer Fees | 5.5(b) |
| Equity Owners | 9.6(d) |
| Former Member | 9.6(c) |
| Guaranty Fee Agreement | 5.3(a)(i) |
| Indemnified Person | 5.4(b) |
| Losses | 2.2(b) |
| Other Business | 5.6 |
| Poscher Group | 10.17 |
| PR | 9.6(a) |
| Profits | 2.2(b) |
| Co-Developers | 5.3(a) |
| Regulatory Allocations | 3.3(e) |
| Sale Documentation | 7.3(a) |
| Tag-Along Notice | 7.4(a) |
| Tag-Along Period | 7.4(a) |
| Transfer | 7.1(a) |
| Transferee | 7.2(a)(i) |
| Transferor | 7.2(a)(i) |
| Underpayment Share | 9.6(d) |

## ARTICLE II
## CAPITAL CONTRIBUTIONS, ACCOUNTS, AND FINANCING

Section 2.1 Capital Contributions and Issuance of Units.

(a) *Issuance of Units*. The Company shall have one (1) class of Units, which shall be designated as Units. The class and number of Units issued to such Member, is set forth opposite such Member's name on the attached Schedule A. The Members have contributed, shall contribute, or shall be deemed to have contributed their Initial Capital Contributions.

(b) *Additional Capital Contributions*. The Members shall not be required to make any other Capital Contributions. The Manager may accept additional Capital Contributions for the issuance of Units or other equity interests, to existing Members or other Persons who become Members, in compliance with Section 7.1. If the Manager determines that the Company requires additional funds, over and above the initial Capital Contributions of the Members and the proceeds of other borrowings of the Company, in order to meet its obligations in a timely fashion, to maintain sufficient working capital, to pay the obligations of the Company as they become due, to make any other expenditures necessary or desirable to carry out its objectives, or for any other reasons that Manager may reasonably determine is necessary for the continued operations of the Company and/or Subsidiary (in each case, "Required Funds"), the Manager may call upon all of the Members to contribute the Required Funds in proportion to their respective Percentage Interests. Each Member's "Share" of the Required Funds shall equal the product of the Required Funds and such Member's Percentage Interest. If any Member (a "Non-Contributing Member") fails to advance all or any portion of his, her or its Share of any Required Funds within ten (10) days after notice and demand by the Manager, another Member (a "Contributing Member") may contribute all of the amount which such Non-Contributing Member failed to advance, which shall be treated as a demand loan (a "Shortfall Loan").

(i) Such Shortfall Loan shall, to the fullest extent permitted by applicable law, bear interest at an annual rate equal to ten percent (10%) and shall be subordinated to all other financing of the Company. Each Shortfall Loan, and all interest accrued thereon, shall be repaid in full prior to any Distributions of Excess Cash. If one or more Shortfall Loans are made before all prior Shortfall Loans have been repaid, the Company shall repay all Shortfall Loans in reverse chronological order, beginning with the most recent Shortfall Loans.

Notwithstanding anything to the contrary in this Agreement, nothing provided in this Section 2.2 shall preclude the Manager from making a payment pursuant to Section 6.7(b) for an Emergency Condition in accordance with the terms thereof. The Manager shall automatically be permitted to contribute any such funds necessary without the requirements set forth above, and the contribution shall be treated as a Shortfall Loan in accordance with Section 2.1(b)(ii) above.

Section 2.2 Capital Accounts.

(a) The Company shall establish and maintain a separate capital account for each Member according to the rules of Treasury Regulation Section 1.704-1(b)(2)(iv) (a "Capital Account").

(b) "Profits" and "Losses" means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Section 703(a) of the Code (including all items required to be stated separately) with the following adjustments:

(i) The computation of all items of income, gain, loss and deduction shall include those items described in Code Section 705(a)(l)(B) or Code Section 705(a)(2)(B) and Treasury Regulation Section 1.704-1(b)(2)(iv)(*i*), without regard to the fact that such items are not includable in gross income or are not deductible for federal income tax purposes.

(ii) If the Book Value of any Company property is adjusted pursuant to clause (b) of the definition of "Book Value," the amount of such adjustment shall be taken into account as gain or loss from the disposition of such property.

(iii) Items of income, gain, loss or deduction attributable to the disposition of Company property having a Book Value that differs from its adjusted basis for tax purposes shall be computed by reference to the Book Value of such property.

(iv) Items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted basis for tax purposes shall be computed by reference to the property's Book Value in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(*g*).

(v) To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sections 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(*m*), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

(vi) Items of income, gain, loss and deduction of the Company shall be computed as if the Company had sold any property distributed to a Member on the date of such Distribution at a price equal to its Fair Market Value at that date.

(vii) Any items that are specially allocated pursuant to Section 3.3, or which are allocated solely for tax purposes pursuant to Section 3.4, shall be disregarded and not taken into account in the computation of Profits and Losses.

Section 2.3 Negative Capital Accounts. No Member shall be required to pay to any other Member or the Company any deficit or negative balance that may exist from time to time in such Member's Capital Account (including upon and after dissolution of the Company). No allocation to any Member of any loss or deduction, whether attributable to depreciation or otherwise, shall create any obligation of that Member to the Company or any other Member, even if the allocation reduces such Member's Capital Account or creates or increases a deficit in its Capital Account.

Section 2.4 No Interest. Except as otherwise expressly provided in this Agreement, no Member shall be entitled to receive interest from the Company in respect of any positive balance in its Capital Account, and no Member shall be liable to pay interest to the Company in respect of any negative balance in its Capital Account.

Section 2.5 No Withdrawal. No Person shall be entitled to withdraw any part of such Person's Capital Contributions or Capital Account or to receive any Distribution from the Company, except as expressly provided in this Agreement.

Section 2.6 Safe Harbor Election. The Manager is hereby authorized and directed (a) to add the provisions described in proposed Treasury Regulation Section 1.704-1(b)(4)(xii) regarding the making of "forfeiture allocations" and the provisions described in proposed Treasury Regulation Section 1.83-3(l) necessary for the Company to make the "safe harbor election" if such proposed Treasury Regulations are issued in final form, in accordance with such final Treasury Regulations, and (b) to make such election. The Members hereby provide their consent to, and agreement with, such additional provisions and the making of such election.

Section 2.7 No Contingency for Capital Contributions. Each Member expressly agrees and acknowledges that its obligations to pay the Capital Contributions in Section 2.1 and otherwise consummate the transactions contemplated hereby are not in any way conditioned on a Member's ability to obtain financing of any type or nature whatsoever, whether by way of debt financing or equity investment, or otherwise.

## ARTICLE III
## DISTRIBUTIONS AND ALLOCATIONS

Section 3.1 Distributions of Excess Cash and Net Capital Transaction Proceeds.

(a) Distributions shall be made to the Members only after the Company and the Subsidiary have paid all operating costs then due and made all required reserves as determined in the reasonable discretion of the Manager. Distributions of Available Cash from Operations shall be made on a quarterly basis or as the Manager otherwise reasonably deems appropriate. Distributions of Net Capital Transaction Proceeds shall be made promptly after the Company receives such Net Capital Transaction Proceeds.

(b) The Company shall make Distributions of Excess Cash and from Net Capital Transaction Proceeds to the Members, as determined by the Manager in its sole discretion, as follows:

(i) First, principal and interest to those Members or the Manager who have made Shortfall Loans pursuant to Section 2.1 in proportion to the outstanding balances of such Shortfall Loans, subject to the order of priority set forth in Section 2.1, until the outstanding balances on all Shortfall Loans have been reduced to zero;

(ii) Second, to pay any accrued and unpaid Asset Management Fee, Co-Development Fees, and Credit Enhancement Fees due as more fully set forth in Section 5.5 herein;

(iii) Third, 100% to the Members, allocated among them in proportion to their respective Unrecovered Capital Contributions, until their respective Unrecovered Capital Contributions are reduced to zero; and

(iv) Thereafter, any excess amounts to the Members allocated among them pro rata in accordance with their respective Percentage Interests.

(c) The Members shall look solely to the assets of the Company for any and all Distributions. If the assets of the Company remaining after the payment or discharge, or the provision for payment or discharge, of the debts, obligations, and other liabilities of the Company are insufficient to make any Distributions, no Member shall have any recourse against the separate assets of any other Member (except as otherwise expressly provided in this Agreement). Further, each Member acknowledges and agrees that, notwithstanding the foregoing, the Company's Excess Cash is derived from the distributions

that the Company receives from the Subsidiary pursuant to the terms and conditions of the Subsidiary LLC Agreement.

Section 3.2 Allocations. Except as otherwise provided in Section 3.3, Profits and Losses for any Fiscal Year shall be allocated among the Members in such a manner that, as of the end of such Fiscal Year, the sum of (a) the Capital Account of each Member, (b) such Member's share of Minimum Gain (as determined according to Treasury Regulation Section 1.704-2(g)), and (c) such Member's partner nonrecourse debt minimum gain (as defined in Treasury Regulation Section 1.704-2(i)(3)) shall be equal to the respective net amounts, positive or negative, that would be distributed to such Member or for which such Member would be liable to the Company under the Act, determined as if the Company were to (x) liquidate the assets of the Company for an amount equal to their aggregate Book Value (without making any adjustment thereto under clause (b) of the definition of "Book Value" for such liquidation) and (y) distribute the proceeds of such liquidation pursuant to Section 8.2.

Section 3.3 Special Allocations.

(a) Items of loss and deduction attributable to partner nonrecourse debt (as defined in Treasury Regulation Section 1.704-2(b)(4)) shall be allocated in the manner required by Treasury Regulation Section 1.704-2(i). If there is a net decrease during a Taxable Year in partner nonrecourse debt minimum gain (as defined in Treasury Regulation Section 1.704-2(i)(3)), items of income and gain for such Taxable Year (and, if necessary, for subsequent Taxable Years) shall be allocated to the Members in the amounts and of such character as determined according to Treasury Regulation Section 1.704-2(i)(4). This Section 3.3(a) is intended to be a minimum gain chargeback provision that complies with the requirements of Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted in a manner consistent therewith.

(b) Nonrecourse deductions (as determined according to Treasury Regulation Section 1.704-2(b)(1)) for any Taxable Year shall be allocated to the Members in accordance with their Percentage Interests. If there is a net decrease in the Minimum Gain during any Taxable Year, each Member shall be allocated items of income and gain for such Taxable Year (and, if necessary, for subsequent Taxable Years) in the amounts and of such character as determined according to Treasury Regulation Section 1.704-2(f). This Section 3.3(b) is intended to be a minimum gain chargeback provision that complies with the requirements of Treasury Regulation Section 1.704-2(f), and shall be interpreted in a manner consistent therewith.

(c) If any Member that unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) has an Adjusted Capital Account Deficit as of the end of any Taxable Year, computed after the application of Sections 3.3(a) and 3.3(b) but before the application of any other provision of this Article III, then items of income and gain for such Taxable Year shall be allocated to such Member in proportion to, and to the extent of, such Adjusted Capital Account Deficit. This Section 3.3(c) is intended to be a qualified income offset provision as described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted in a manner consistent therewith.

(d) If, and to the extent that, any Member is deemed to recognize any item of income, gain, loss, deduction or credit as a result of any transaction between such Member and the Company pursuant to Code Section 83, 482, 483, 1272-1274 or 7872 or any similar provision now or hereafter in effect, and the Manager determines that any corresponding Profit or Loss of the Company should be allocated to the Members who recognized such item in order to reflect the Members' economic interests in the Company, then the Company may so allocate such Profit or Loss.

(e) The allocations set forth in Sections 3.3(a) through 3.3(d) (the "Regulatory Allocations") are intended to comply with certain requirements of Sections 1.704-1(b) and 1.704-2 of the Treasury Regulations. The Regulatory Allocations may not be consistent with the manner in which the Members intend to allocate Profit and Loss of the Company or make Distributions. Accordingly, notwithstanding the other provisions of this Article III, but subject to the Regulatory Allocations, income, gain, deduction, and loss shall be reallocated among the Members so as to eliminate the effect of the Regulatory Allocations and thereby cause the respective Capital Accounts of the Members to be in the amounts (or as close thereto as possible) they would have been if Profit and Loss (and such other items of income, gain, deduction and loss) had been allocated without reference to the Regulatory Allocations. In general, the Members anticipate that this will be accomplished by specially allocating other Profit and Loss (and such other items of income, gain, deduction and loss) among the Members so that the net amount of the Regulatory Allocations and such special allocations to each such Member is zero. In addition, if in any Taxable Year or Fiscal Period there is a decrease in partnership minimum gain, or in partner nonrecourse debt minimum gain, and application of the minimum gain chargeback requirements set forth in Section 3.3(a) or Section 3.3(b) would cause a distortion in the economic arrangement among the Members, the Members may, if they do not expect that the Company will have sufficient other income to correct such distortion, request the Internal Revenue Service to waive either or both of such minimum gain chargeback requirements. If such request is granted, this Agreement shall be applied in such instance as if it did not contain such minimum gain chargeback requirement.

Section 3.4 Tax Allocations

(a) Except as provided in Sections 3.4(b), (c) and (d), the income, gains, losses, deductions and credits of the Company will be allocated, for federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses, deductions and credits among the Members for computing their Capital Accounts; except that, if any such allocation is not permitted by the Code or other applicable law, the Company's subsequent income, gains, losses, deductions and credits will be allocated among the Members so as to reflect as nearly as possible the allocation set forth in this Agreement in computing their Capital Accounts.

(b) Items of Company taxable income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value. In making allocations pursuant to this Section 3.4(b), the Manager shall apply, in its sole discretion, any method that may be permitted under Treasury Regulations Section 1.704-3.

(c) If the Book Value of any Company asset is adjusted pursuant to the requirements of Treasury Regulation Section 1.704-1(b)(2)(iv)(e) or (f), subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c).

(d) Allocations of tax credits, tax credit recapture, and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Manager taking into account the principles of Treasury Regulation Section 1.704-1(b)(4)(ii).

(e) Allocations pursuant to this Section 3.4 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, Distributions or other Company items pursuant to any provision of this Agreement.

## ARTICLE IV
## CERTAIN TRANSACTIONS

Section 4.1 Transactions with Interested Persons. Unless otherwise provided herein or entered into in bad faith, no contract or transaction between the Company and one or more of the Manager or any Member, or between the Company and any other corporation, partnership, association or other organization in which one or more of the Manager or any Member have a financial interest or are directors, partners, shareholders, members or officers, shall be voidable solely for such reason or solely because such Manager or Member was present or participated in the authorization of such contract or transaction.

## ARTICLE V
## MANAGEMENT

Section 5.1 Management Authority. Subject to Section 6.5 and except as otherwise expressly provided in this Agreement, (a) the Manager shall conduct, direct, and exercise full control over all activities of the Company, (b) all management powers over the business and affairs of the Company shall be exclusively vested in the Manager, (c) the Manager shall have the sole power to bind or take any action on behalf of the Company, or to exercise any rights and powers (including, without limitation, the rights and powers to take certain actions, give or withhold certain consents or approvals, or make certain determinations, opinions, judgments, or other decisions) granted to the Company under this Agreement or any other agreement, instrument, or other document to which the Company is a party, and (d) the Manager will have the sole power on behalf of and in the name of the Company to carry out any and all of the objects and purposes of the Company, and to perform all acts and enter into and perform all agreements and other necessary undertakings that, in its sole discretion, it deems necessary or advisable or incident thereto.

Section 5.2 Delegation of Authority. The Manager may, from time to time, (a) appoint one or more Persons to be officers of the Company and may assign such titles and functions, and delegate such authority and duties, to such officers as it shall deem necessary or desirable, (b) appoint, employ or otherwise contract with such other Persons for the transaction of the business of the Company or the performance of services for or on behalf of the Company as it shall determine, and (c) delegate to any Person (including any Member or officer of the Company) such authority and powers to act on behalf of the Company as it shall deem advisable. In addition, the Manager shall have the right, in respect of any of the powers or obligations hereunder, to act through any duly appointed attorney-in-fact. Each such attorney shall, to the extent provided by the Manager in the power-of-attorney, have full power and authority to do and perform each and every act and duty which is permitted or required to be done by the Manager hereunder. Any appointment, employment, or other delegation pursuant to this Section 5.2 may be revoked at any time and for any or no reason by the Manager.

Section 5.3 Composition; Actions.

(a) Initially, the Company shall have one (1) Manager, who will be designated by the a vote of fifty one percent (51%) of the Units. The number of Managers may be increased at any time by the Company. The Manager shall hold office until a successor is appointed or until his or her earlier death, resignation or removal as provided in this Agreement. The Manager may be removed at any time by the Company if any of the following shall occur:

(i) An uncured Event of Default has occurred under the Guaranty Fee Agreement by and among Reynolds, the Company and the Subsidiary dated [*] (the "Guaranty Fee Agreement") based on an act or failure to act by Reynolds;

(ii) An uncured Event of Default has occurred under the Asset Management Agreement between the Subsidiary and RAM (the "Asset Manager") dated [*] (the "Asset Management Agreement") based on an act or failure to act by Reynolds;

(iii) The death of Reynolds;

(iv) RAM has disposed of all or a portion of RAM's equity membership interest which RAM held in the Company, as of the Effective Date;

(v) The Manager or any of its agents engages in willful or reckless misconduct or knowing violation of the law;

(vi) The Manager has materially failed to comply with its duties and obligations under this Agreement, including under Section 5.1 hereof and has failed to cure or has failed to undertake to reasonably cure such non-compliance within thirty (30) days after notification has been received by RAM, from a Member, of non-compliance; and/or

(vii) A right of removal otherwise set forth under the terms of this Agreement.

(b) Vacancies resulting from the death, resignation or removal of the Manager shall be filled by Blue Phoenix. Initially, the Manager shall be RAM.

(c) Any action required or permitted to be taken by the Manager at a meeting may be taken without a meeting with the written consent of the Manager. The Manager may adopt such other procedures governing meetings and the conduct of business as it shall deem appropriate.

Section 5.4 Limitation of Liability; Indemnification of Members, Managers, Officers, and Others.

(a) Except as otherwise provided in this Agreement or in any agreement entered into by such Person and the Company, neither the Manager nor any of his, her or its Affiliates shall be liable to the Company or to any Member for any act or omission performed or omitted by the Manager, in his, her or its capacity as a Manager, taken in good faith, to the maximum extent permitted by applicable law; provided that, except as otherwise provided in this Agreement, such limitation of liability shall not apply to the extent the act or omission was attributable to such Person's willful or reckless misconduct or knowing violation of law. The Manager may exercise any of the powers granted to him, her, or it by this Agreement and perform any of the duties imposed upon him, her or it hereunder either directly or by or through agents, and the Manager or any of his, her or its Affiliates shall not be responsible for any misconduct or negligence (but shall be responsible for willful or reckless misconduct) on the part of any such agent appointed by the Manager (so long as such agent was selected in good faith and with reasonable care). The Manager shall be entitled to rely upon the advice of legal counsel, independent public accountants and other experts, including financial advisors, and any act of or failure to act by the Manager in good faith reliance on such advice shall in no event subject the Manager to liability to the Company or any Member. The Manager may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture or other paper or document believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties. All fiduciary duties (including any duties of care, disclosure or loyalty or other duties imposed under applicable law) that the Manager might otherwise have to the Company or the other Members of the Company are hereby eliminated to the fullest extent permissible under Delaware law.

(b) The Company hereby agrees to indemnify and hold harmless any Person (each an "Indemnified Person") to the fullest extent permitted under the Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Company is providing immediately prior to such amendment), against all expenses, liabilities and losses (including attorney fees, judgments, fines, excise taxes or penalties) reasonably incurred or suffered by such Person (or one or more of such Person's Affiliates) by reason of the fact that such Person is or was a Member or is or was serving as a Manager, officer, employee or agent of the Company or is or was serving at the request of the Company as a manager, officer, director, principal, member, employee or agent of another partnership, corporation, joint venture, limited liability company, trust or other enterprise; provided that no Indemnified Person shall be indemnified for any expenses, liabilities and losses suffered that are attributable to such Indemnified Person's or its Affiliates' gross negligence, willful misconduct or knowing violation of law. Expenses, including attorney fees, incurred by any such Indemnified Person in defending a proceeding shall be paid by the Company in advance of the final disposition of such proceeding, including any appeal therefrom, upon receipt of an undertaking by or on behalf of such Indemnified Person to repay such amount if it shall ultimately be determined that such Indemnified Person is not entitled to be indemnified by the Company.

(c) The right to indemnification and the advancement of expenses conferred in this Section 5.4 shall not be exclusive of any other right that any Person may have or hereafter acquire under any statute, agreement, action of the Manager or otherwise.

(d) The Company may maintain insurance, at its expense, to protect any Indemnified Person against any expense, liability or loss described in paragraph (a) above whether or not the Company would have the power to indemnify such Indemnified Person against such expense, liability or loss under the provisions of this Section 5.4.

(e) Notwithstanding anything contained in this Agreement to the contrary (including in this Section 5.4), any indemnity by the Company relating to the matters covered in this Section 5.4 shall be provided out of and to the extent of Company assets only and no Member (unless such Member otherwise agrees in writing or is found in a final decision by a court of competent jurisdiction to have personal liability on account thereof) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(f) If this Section 5.4 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Indemnified Person pursuant to this Section 5.4 to the fullest extent permitted by any applicable portion of this Section 5.4 that shall not have been invalidated and to the fullest extent permitted by applicable law.

Section 5.5 Compensation and Reimbursement. No Manager employed by the Company, a Member, any Affiliate of the Company or any Affiliate of a Member shall be paid compensation by the Company for his, her or its services as a Manager. The foregoing shall not be deemed to limit or restrict the payment of any reasonable compensation or remuneration to any Person in such Person's capacity as an officer, employee, advisor or consultant to the Company or any agreement or arrangement with the Company; provided that any such compensation arrangement complies with Section 4.1 of this Agreement; provided, further, that H. Caroline Poscher shall be entitled to compensation of $[•] per year. In addition to the foregoing:

(a) The Company will pay (or will cause the Subsidiary to pay) to the Asset Manager asset management fees in accordance with the terms of the Asset Management Agreement.

(b) The Company will pay (or will cause the Subsidiary to pay) to the Co-Developers co-developer fees ("Co-Developer Fees") in accordance with the terms of a Co-Development Agreement dated [*] between the Company and the Co-Developers (the "Co-Development Agreement").

(c) The Company will pay (or will cause the Subsidiary to pay) to Reynolds guarantee fees pursuant to the terms of the Guaranty Fee Agreement (the "Credit Enhancement Fees").

(d) Furthermore, the Manager shall be entitled to be reimbursed for his, her or its reasonable out-of-pocket costs and expenses incurred in the course of its service hereunder, including, but not limited to any travel and lodgings reimbursements incurred solely with respect to its activities as Manager.

(e) The fees payable under this Section 5.5 are hereby approved as operating expenses of the Company and the Members understand that any such fee is and will be payable to applicable party, or its Affiliates, regardless of whether such payment impacts the ability of the Company to make any distributions to its Members or the amount of distributions to be made to its Members and the ability of the Company to make distributions to the Members and the amount of any distributions to be made by the Company to the Members.

Section 5.6 Devotion of Time to the Company. The Manager and the Co-Developers shall not be required to manage or assist in the management of the Company as his, her or its sole and exclusive function, and the Manager and the Co-Developers may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other interests or activities of the Manager or of the Co-Developers or to the income or proceeds derived from such interests or activities. No Manager or Co-Developer shall incur liability to the Company or to any of the Members as a result of engaging in any other interests or activities. Without limiting the generality of the foregoing, the Members expressly acknowledge and agree that (i) the Manager and the Co-Developers and his, her or its Affiliates are permitted to have, and may presently or in the future have, investments or other business relationships separate and apart from the Company (an "Other Business"), (ii) subject to Section 6.6, none of the Manager or the Co-Developers or his, her or its Affiliates will be prohibited by virtue of their investments in the Company or its service as the Manager or Co-Developers or service of the Manager or the Co-Developers from pursuing and engaging in any such activities, (iii) none of the Manager or the Co-Developers or his, her or its Affiliates will be obligated to inform or present the Company or the Members of any such opportunity, relationship or investment, even if the opportunity is of the character that if presented to the Company or to any Member, could be taken by such Person, and (iv) the other Members will not acquire or be entitled to any interest or participation in any Other Business as a result of the participation therein of the Manager or any Co-Developer or any of his, her or its Affiliates. Each Member hereby waives, releases and relinquishes any claim such Member may have against any other Member, Manager or Co-Developer, and against such Member's, Manager's or Co-Developer's respective Affiliates, under any "partnership opportunity" doctrine or other legal or equitable principle of law arising with respect to or in connection with the pursuit of any business opportunity by any other Member, Manager or Co-Developer or any of their respective Affiliates.

Section 5.7 Asset and Property Management.

(a) The Company hereby designates RAM and Blue Phoenix as the co-developers (the "Co-Developers") of the Project. The Co-Developers shall have those responsibilities and duties set forth under the Co-Development Agreement.

(b) Each of the Co-Developers shall perform its duties (i) in good faith, (ii) in a commercially reasonable manner consistent with generally accepted property and asset management practices for comparable real estate projects, and (iii) in compliance in all material respects with applicable laws, governmental regulations, rules, permits, and licenses. Each shall maintain complete and accurate books and records for the Project and shall apply accounting principles consistently followed for the Project.

(c) The duties, roles, responsibilities and compensation of each of the Co-Developers shall be set forth in the Co-Development Agreement, in the form attached hereto as Schedule B.

## ARTICLE VI
## MEMBERS

Section 6.1 Limitation of Liability. Except as otherwise provided by applicable laws, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member or Manager shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or acting as the Manager of the Company; provided that a Member shall be required to return to the Company any Distribution made to it in error. The immediately preceding sentence shall constitute a compromise to which all Members have consented within the meaning of the Act. Notwithstanding anything contained in this Agreement to the contrary, the failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Act shall not be grounds for imposing personal liability on the Members for liabilities of the Company.

Section 6.2 Lack of Authority of Individual Members. Unless delegated such power in accordance with Section 5.2, no Member shall in its capacity as such have the authority or power to act for or on behalf of the Company in any manner, to do any act that would be (or could be construed as) binding on the Company, or to make any expenditures on behalf of the Company, and the Members hereby consent to the exercise by the Manager of the powers and rights conferred upon it by law and this Agreement.

Section 6.3 No Right of Partition. No current or former Member shall have the right to seek or obtain partition by court decree or operation of law of any Company property, or the right to own or use particular or individual assets of the Company.

Section 6.4 Indemnification and Reimbursement for Payments on Behalf of a Member. If the Company is obligated to pay any amount to a governmental body (or otherwise makes a payment) because of a Member's status or that is otherwise specifically attributable to a Member (including, without limitation, federal withholding taxes with respect to foreign members, state personal property taxes, state unincorporated business taxes, etc.), then such Member shall indemnify the Company in full for the entire amount paid (including, without limitation, any interest, penalties and expenses associated with such payments). In addition, A Defaulting Member shall be liable to the Manager, each other Member and to the Company for any loss, damage or expense arising, directly or indirectly, as a result of the Defaulting Member's act or omission which constitutes an Excluded Act. The Manager may offset Distributions to which a Member is otherwise entitled under this Agreement against such Person's obligation to indemnify the Company under this section.

Section 6.5 Voting Rights.

(a) Except with respect to the matters set forth in this Section 6.5, or any other matters that this Agreement, the Act or any other applicable law requires a vote of the Company's Members, no Members shall have any voting rights. For all matters that are required pursuant to this Agreement or the Act or other applicable law to be voted on by the Company's Members, the Members shall be entitled to

vote on all such matters, with each Unit entitled to one vote per Unit, and the approval of a Majority Interest shall be necessary for all such matters, unless otherwise expressly set forth in this Agreement.

(b) Notwithstanding any provision of this Agreement to the contrary, the Manager shall not take or cause the Company to take any of the following actions (each, a "Major Decision"), without the affirmative vote of fifty one percent (51%) of the Units approving such action:

(i) Acquire any real or personal property or interest therein on behalf of the Company or the Subsidiary other than the Property and any personal property in the ordinary course of business.

(ii) Borrow money, issue evidences of indebtedness, or grant any mortgages or other encumbrances on or security interests in the assets of the Company or the Subsidiary, including without limitation, any financing or refinancing of the Property or any portion thereof, in excess of $100,000.00 not in the Budget.

(iii) Enter into or amend, modify, or terminate any contract for the servicing, operation, maintenance, and repair of the Property in excess of $100,000.00, other than any contract which: (i) is terminable without penalty upon not more than ninety (90) days' prior written notice from the Subsidiary; (ii) is entered into in the ordinary course of the Company's business; or (iii) is for work or services contemplated in the Budget.

(iv) Enter into or amend, modify, or terminate any contract for the construction, development, improvement, or rehabilitation of the Property, other than any contract which: (i) the Subsidiary's aggregate liability under such contract is less than $100,000.00 or is in the Budget; and (ii) the identity of the contract vendee as well as the work to be completed under such contract has been approved by the Members (whether by inclusion in the Budget or otherwise), or approve any single change order or series of related change orders or amend or modify any such contract, if in any such instance, the approval or modification would result in a price adjustment in excess of $100,000.00 in the aggregate under any such contract.

(v) Expend, or incur obligations to expend or approve the expenditure of funds, unless the expenditures made and obligations incurred are in the ordinary course of business, in an amount of less than $100,000.00 and in accordance with the Budget; provided, however, that approval under this provision shall not be required to pay regularly scheduled debt service payments under any authorized financing, real estate taxes then due and payable, ordinary course utility costs, or other similar non-discretionary type expenses.

(vi) Admit any additional Members, except for Transfers permitted under Article VII.

(vii) Dissolve the Company or the Subsidiary.

(viii) File any voluntary petition for the Company under the Bankruptcy Act or seek the protection of any other Federal or State bankruptcy or insolvency law or debtor relief statute.

(ix) Guaranty the payment of any money or debt of another Person or guaranty the performance of any other obligation of another Person.

(x) Enter into or amend, modify, or terminate any contract or agreement related to the development, operation, or management of the Property pursuant to which one or more parties thereto is an Affiliate of a Member.

(c) Whenever the Manager proposes to adopt, modify or revoke a Major Decision, it shall deliver a written notice to the Members describing the proposal in sufficient detail and containing sufficient information to permit the Members to make an informed decision on the proposal (a "Major Decision Notice"). Upon receipt of a Major Decision Notice, the Manager and Members will review the proposal in good faith. A "Deadlock" shall be deemed to exist if, after two (2) successive in-person meetings to approve a Major Decision, which must be scheduled within thirty (30) days of a Major Decision Notice the Manager and the Members have failed for any reason to mutually agree on accepting or rejecting the Major Decision for at least fifteen (15) days after such meetings.

(d) During the continuation of any Deadlock, the Company shall continue to operate in a manner consistent with its prior practices and this Agreement until such time as such Deadlock is resolved. If a Major Decision has been approved, the Manager is authorized to take such actions and execute all documents to effectuate such Major Decision.

(e) If the Members are unable reach agreement as to any Major Decision within the time period set forth in Section 6.5(c) (including any agreed extensions), the Deadlock shall be mediated (the "Mediation") within fifteen (15) days from the date a written request for mediation is made by the Manager or the Members and delivered to the Company. The Mediation shall take place in Washtenaw County, Michigan. The Mediation shall be conducted before a single mediator to be unanimously agreed upon by the Manager and the Members. If the Manager and the Members cannot unanimously agree on the mediator, they each shall select a mediator and such mediators shall together unanimously select a neutral mediator who will conduct the mediation. Each of the Manager and the Members shall bear the fees and expenses of its mediator and the Manager and Members shall equally bear the fees and expenses of the final mediator. If the Manager and the Members are not able to mutually approve the Major Decision under Section 6.5(b)(ii), (vii) or (ix) following the Mediation, then either party shall have the right to initiate the buy/sell provision contained in Section 7.5 within sixty (60) days of such Deadlock; provided, however, the buy/sell option may only be exercised by a Member after Final Completion of the Project. If the Manager and the Members are not able to mutually approve the Major Decision under any other subsection set forth in Section 6.5 following the Mediation, then such Major Decision shall not be approved.

Section 6.6 Confidentiality. Confidentiality. Each Member agrees that he, she or it will treat and hold as confidential all information concerning the business and affairs of the Company, Subsidiary, and their Affiliates that is of value to the Company and its Affiliates and that is not generally available to the public ("Confidential Information") and will refrain from using any Confidential Information except in connection with the operation of the business of the Company, Subsidiary, and their Affiliates; provided, however, that a Member may provide Confidential Information on a confidential basis to its agents, advisors, lenders, Affiliates, partners, investors, members, or owners, as applicable; provided, further, that in no event shall Confidential Information be shared with any person who competes with the Company. In the event that a Member is requested or required (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any Confidential Information, such Member will notify the Company promptly of the request or requirement so that the Company (at the Company's sole cost and expense) may seek an appropriate protective order or waive compliance with the provisions of this Section 6.6. If, in the absence of a protective order or the receipt of a waiver hereunder, a Member is, on the advice of counsel, compelled to disclose any Confidential Information to any tribunal, such Member may disclose the Confidential Information to the tribunal; provided, however, that, at the request of the Company, the Member will use its commercially reasonable good faith efforts (at the Company's sole cost and expense) to obtain an order

or other assurance that confidential treatment will be accorded to such portion of the Confidential Information required to be disclosed as the Company designates. The foregoing provisions will not apply to any Confidential Information which is generally available to the public prior to the time of disclosure or which becomes generally available through no fault of the applicable Member.

(b) Non-Competition. Each Member agrees that from the date of this Agreement until the date such Member shall cease to be a Member of the Company, regardless of reason for such cessation, such Member shall not, either directly or indirectly, in any manner or capacity, whether as owner, principal, agent, partner, employee, consultant or otherwise, own, manage, operate, consult with, assist, support, provide resources to, control or otherwise participate in the ownership, management, operation or control of any business competitive with that of the Subsidiary, the Company and/or any of its affiliates and comprised of greater than twenty units within the City of Ann Arbor during the term of this restriction, without the prior written consent of the other Members, such consent not to be unreasonably withheld, conditioned or delayed. The foregoing restriction shall not apply to any business or project that is currently owned and/or operated by any Members or an Affiliate.

(c) Blue Pencil. If any court of competent jurisdiction determines that any of the covenants set forth in this Section 6.6, or any part thereof, is unenforceable because of the duration or geographic scope of such provision, such court shall have the power to modify any such unenforceable provision in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Section 6.6, or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by applicable law. The parties hereto expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them.

Section 6.7 Annual Budget and Business Plan.

(a) The Manager shall prepare and deliver to the Members a proposed annual budget and business plan for the Company (collectively, the "Budget"), no later than sixty (60) days prior to the beginning of each Fiscal Year. The initial Budget for Fiscal Year 2026 is attached hereto as Schedule C.

(b) The Members shall review the proposed Budget and either approve or disapprove it within thirty (30) days after receipt thereof. If any Member shall disapprove the proposed Budget, such Member shall, on or prior to November 30 of such year, submit to the Manager its proposed revisions to the Budget, and the Manager and the Members shall work in good faith to address objections and revise and agree on the form of Budget no later than December 15 of such year. In the event that as of the commencement of any Fiscal Year all or any portion of a proposed Budget or proposed leasing guidelines have not been approved by the Members, then the Manager shall be authorized to utilize the applicable portions of the prior year's Budget, with permitted increases in each line item equal to three percent (3%). Notwithstanding the foregoing, until there is a new Budget for the current Fiscal Year in accordance herewith, the Manager may make, as applicable, the following expenditures: (i) specific capital expenditures previously approved by the Members; (ii) expenditures that are appropriate in light of an Emergency Condition; or (iii) any Uncontrollable Expenses. Notwithstanding anything to the contrary herein, any cost savings from any line item in the Budget may be applied to any particular excess expenditure as the Manager may determine in his or her reasonable discretion.

Section 6.8 Exit Financing and Vertical Financing.

(a) Reynolds shall provide, or cause to be provided, all Credit Enhancement required by the Exit Financing lender(s) as a condition to closing or funding, on terms acceptable to Reynolds as

may be determined within its sole and absolute discretion. Reynolds shall provide customary non-recourse carveout guarantees and such other customary guarantees (if any) as are required by the Exit Financing lender(s), as set forth in the Guaranty Fee Agreement. Any guarantee, indemnity, or other Credit Enhancement provided by Reynolds in connection with the Exit Financing shall include customary standstill and waiver provisions in favor of Reynolds, as set forth in the Guaranty Fee Agreement.

(b) Reynolds shall provide, or cause to be provided, all Credit Enhancement required by the Vertical Financing lender(s) as a condition to closing or funding, on terms reasonably acceptable to Reynolds as may be determined within its sole and absolute discretion . Reynolds shall provide customary non-recourse carveout guarantees and such other customary guarantees (if any) as are required by the Vertical Financing lender(s), as set forth in the Guaranty Fee Agreement. Any guarantee, indemnity, or other Credit Enhancement provided by Reynolds in connection with the Vertical Financing shall include customary standstill and waiver provisions in favor of Reynolds, as set forth in the Guaranty Fee Agreement.

(c) If the event giving rise to any payment obligation under an environmental indemnity for any of the Loans was directly caused by a Member or its Affiliates, the responsibility for such payment obligation shall belong to such Member.

(d) Each Member shall execute and deliver such further documentation and take such further actions as are reasonably requested to consummate any Exit Financing and Vertical Financing, in each case consistent with this Agreement and applicable law, but no Member shall be required to provide any guaranty of the Exit Financing or the Vertical Financing.

## ARTICLE VII
## TRANSFERS OF UNITS

Section 7.1 Transfers by Members.

(a) Subject to Section 7.1(d), no Member may directly or indirectly (including by means of a change of ownership or change of control of such Member or any Person directly or indirectly controlling such Member) sell, assign, transfer, exchange, mortgage, pledge, grant a security interest in, or otherwise dispose of or encumber (including by operation of law) all or any of such Member's Units (each such event, a "Transfer") without the express, written consent of the Manager or except as provided in Section 7.1(b), and no such Transfer shall relieve the Transferor of its obligations under this Agreement unless such Transferee is admitted as a substitute Member pursuant to Section 7.2.

(b) The restrictions set forth in Section 7.1(a) shall not apply with respect to any Transfer of Units by any Member to a Permitted Transferee of such Member; provided that the restrictions contained in this Article VII shall continue to be applicable to the transferred Units after any such Transfer; provided further that the Transferees of such Units shall have executed and delivered to the Manager: (i) an agreement in form and substance satisfactory to the Manager to be bound by the terms in this Agreement on the same manner and to the same extent as the transferor thereof, and assuming the obligations of the transferor under this Agreement with respect to the Units so transferred; and (ii) a replacement guaranty of such transferring Member to a lender on a Loan or an indemnity in favor of such Member with respect to such Member's guaranty of such Loan. Notwithstanding the foregoing, no party hereto shall avoid the provisions of this Agreement by making one or more Transfers to one or more Permitted Transferees and then disposing of all or any portion of such party's interest in any such Permitted Transferee.

(c) The restrictions set forth in this Section 7.1 shall continue with respect to each Unit covered thereby.

(d) Notwithstanding anything to the contrary in this Agreement, no Transfer of Units shall be permitted, nor shall any Transferee become a beneficial owner of Units pursuant to a Transfer, if such Transfer would cause (i) the Company to be treated as a publicly traded partnership within the meaning of Section 7704 of the Code or (ii) the Company to have more than 100 members (as determined for purposes of Section 7704 of the Code, including the look-through rule in Treasury Regulations Section 1.7704-1(h)(3)).

Section 7.2 Assignments Generally; Substituted Member

(a) To the extent a Transfer is permitted under this Article VII such Transfer shall be valid only if:

(i) The transferring Member ("Transferor") and the recipient (the "Transferee") each execute and deliver to the Company such documents and instruments of conveyance as may be reasonably requested by the Manager to effect such Transfer and to confirm the agreement of the Transferee to be bound by the provisions of this Agreement and the requirements of Section 7.1(b) above as to guaranty obligations related to Loans.

(ii) The Transferor and Transferee provide to the Manager any information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns (including the Transferee's taxpayer identification number). Without limiting the generality of the foregoing, the Company shall not be required to make any Distribution otherwise provided for in this Agreement with respect to any Units transferred until the Manager has received such information.

(iii) The Transferor furnishes to the Company an opinion of counsel, which counsel and opinion shall be reasonably satisfactory to the Manager (and which opinion may be waived, in whole or in part, at the Manager's discretion), dated as of a date immediately prior to the proposed Transfer that:

(A) the Transfer will not cause the Company to be deemed to be an "investment company" under the Investment Company Act of 1940, as amended,

(B) either the interest Transferred has been registered under the Securities Act and any applicable state securities laws or the Transfer is exempt from all applicable registration requirements and will not violate any Federal securities laws, state or provincial "blue sky" laws or other laws applicable to the Company or the interest and securities being transferred, and

(C) the Transfer would not cause the Company to have more than 100 partners (within the meaning of Treasury Regulation Section 1.7704-1(h), including the look-through rule in Treasury Regulation Section 1.7704-1(h)(3)).

(iv) In all cases, the Company shall be reimbursed by the transferring Member and/or Transferee for all costs and expenses that the Company reasonably incurs in connection with the Transfer.

(b) Transferees and Transferors shall have the following rights and obligations:

(i) A Transfer by a Member or other Person shall not itself dissolve the Company or entitle the Transferee to become a Member or exercise any rights of a Member.

(ii) A Transfer by a Member shall eliminate the Member's power and right to vote (in proportion to the extent of the interest transferred) on any matter submitted to the Members, and, for voting purposes, such interest shall not be counted as outstanding in proportion to the extent of the interest transferred. A Transfer by a Member shall not cause such transferring Member to be released from any liability to the Company solely as a result of the Transfer.

(iii) Profits, Losses, and other Company items shall be allocated between the Transferor and the Transferee according to Code Section 706.

(iv) A Transferee that is not admitted as a Member pursuant to Section 7.2(c) shall be entitled only to Distributions and allocations of Profits and Losses with respect to the Units held by such Transferee and shall have no other rights with respect to the Units transferred. The Transferee shall nevertheless be subject to all of the obligations applicable to a holder of Units under this Article VII. If the Transferee becomes a Member, the voting and other rights associated with the interest held by the Transferee shall be restored and be held by the Member along with all other rights with respect to the interest transferred.

(c) Subject to the other provisions of this Article VII, a Transferee may be admitted to the Company as a Member only upon satisfaction of all of the following conditions, upon which satisfaction the Transferee shall have, to the extent assigned, the rights and powers, and be subject to the restrictions and liabilities, of a Member under the Act and this Agreement, and shall be liable for any obligations of the transferring Member:

(i) The Transferee becomes a party to this Agreement as a Member by executing a counterpart signature page to this Agreement and executing such documents and instruments as the Manager may reasonably request as necessary or appropriate to confirm such Transferee as a Member in the Company and such Transferee's agreement to be bound by the terms and conditions of this Agreement;

(ii) The Transferee has complied with the requirements of Section 7.1(b) above as to guaranty obligations related to Loans;

(iii) The Transferee pays or reimburses the Company for all reasonable legal, filing and publication costs that the Company incurs in connection with the admission of the Transferee as a Member; and

(iv) If the Transferee is not a natural person of legal majority, the Transferee provides the Company with evidence reasonably satisfactory to the Manager of the authority of the Transferee to become a Member and to be bound by the terms and conditions of this Agreement.

Section 7.3 Sale of the Company

(a) If the Manager receives an offer from a Person or group of Persons acting in concert that is not an Affiliate of the Company or of any Member, to acquire all or substantially all of the Units or assets of the Company, whether through purchase, merger or otherwise (a "Company Sale"), then upon the approval of such Company Sale by the Manager and fifty one percent (51%) or greater of the

Units, the Company shall give written notice (the "Company Sale Notice") of such sale to the Members no later than fifteen (15) days prior to the consummation of the Company Sale. The Company Sale Notice shall also contain, if available, a copy of any definitive documentation pursuant to which the Units are to be sold or otherwise transferred to the acquirer (the "Sale Documentation") and will state the name and address of such acquirer and the anticipated closing date of such Company Sale. In connection with such Company Sale, each Member shall vote for, consent to and raise no objections against such Company Sale, whether structured as a sale of the Members' Units or a sale of assets, and shall become a party to the Sale Documentation. If the Company Sale is structured as a (i) merger or consolidation, each Member shall waive any dissenters' rights, appraisal rights or similar rights in connection with such merger or consolidation, if any, (ii) sale of the Units, each Member shall agree to sell all of the Units on the terms and conditions approved by the Manager and waive all minority shareholders' statutory rights of dissolution, if any, or (iii) as a sale of assets, each Member shall vote in favor of such sale and any subsequent liquidation of the Company or other distribution of the proceeds therefrom.

(b) Notwithstanding anything to the contrary herein, the obligations of the Members with respect to a Company Sale pursuant to Section 7.3(a) are subject to the satisfaction of the following conditions: (i) upon the consummation of the Company Sale, each Member shall receive the same form of consideration and the same portion of the aggregate consideration that such Member would have received if such aggregate consideration had been distributed by the Company in complete liquidation pursuant to the rights and preferences set forth in this Agreement; (ii) if any Member is given an option as to the form and amount of consideration to be received, each Member shall be given the same option; and (iii) no Member shall be required to assume any liabilities or obligations under the Sale Documentation disproportionate to any other Member except such disproportion relative to their respective Percentage Interest.

(c) In the event a Member breaches its obligations under this Section 7.3 and fails to execute and/or deliver any requisite Sale Documentation, such breaching Member hereby irrevocably appoints the Manager (or such other person as may be designated by the Manager) as its attorney in fact with full power to execute and deliver any such Sale Documentation.

Section 7.4 Tag Along Rights.

(a) If any holder of Units (a "Transferring Member") desires to Transfer (other than to a Permitted Transferee or to any other holder of Units (the "Offered Units") to a prospective transferee (a "Proposed Transferee"), and the Manager consents to such Transfer pursuant to Section 7.1(a) above, then such Transferring Member shall provide each other Member (the "Other Members") with written notice of such proposed Transfer that discloses in reasonable detail the identity of the Proposed Transferee, the Offered Units, the proposed purchase price for such Offered Units, and the definitive documentation pursuant to which the Offered Units will be sold (a "Tag-Along Notice"). Each Other Member may elect to participate in the proposed Transfer on the terms set forth in the Tag-Along Notice (pursuant to the terms of this Section 7.4) by delivering written notice to the Transferring Member within ten (10) days after receipt of the Tag-Along Notice (the "Tag-Along Period").

(b) If any Other Member has elected to participate in a proposed Transfer pursuant to subsection (a) above, then such Other Member shall be entitled to sell in the contemplated Transfer, on identical terms and conditions as the Transferring Member, a number of Units that is equal to the product obtained by multiplying (i) the total number of Offered Units subject to the Tag-Along Notice by (ii) a fraction, the numerator of which is the total number of Units owned by such Other Member and the denominator of which is the total number of Units owned by all participating Other Members and the Transferring Member. The Transferring Member will use all commercially reasonable efforts to obtain the agreement of the Proposed Transferee to the participation of the Other Members in any contemplated

Transfer, and the Transferring Member will not Transfer any of its Units to the Proposed Transferee unless (i) simultaneously with such Transfer, the Proposed Transferee purchases from all participating Other Members, on the terms and conditions specified in the Tag-Along Notice, the Units that such Other Members are entitled to sell pursuant to this subsection (b) or (ii) simultaneously with, or prior to, such Transfer, the Transferring Member purchases, on the terms and conditions specified in the Tag-Along Notice, the number of Units from all participating Other Members that such Other Members are entitled to sell pursuant to this subsection (b).

(c) If no Other Member elects to participate in the contemplated Transfer by failing to deliver written notice of such election prior to the expiration of the Tag-Along Period, then the Transferring Member may transfer the Offered Units specified in the Tag-Along Notice at a price and on material terms no more favorable to the Transferring Member or Proposed Transferee than specified in such Tag-Along Notice during the 120-day period immediately following expiration of the Tag-Along Period. Any of the Transferring Member's Units not transferred within such 120-day period shall again be subject to the provisions of this Section 7.4.

Section 7.5 Buy/Sell Rights.

(d) Following Final Completion of the Project, each Member shall have the right, subject to the last sentence of this subsection, to initiate and complete the buy-sell procedures described in this Article ("Buy-Sell Procedures") at any time with respect to the Company upon the occurrence of a Deadlock. No Member shall have the right to initiate the Buy-Sell Procedures while the Buy-Sell Procedures or a Company Sale Notice previously initiated by a Member are continuing and have not yet been completed or terminated in accordance with the applicable provisions of this Agreement.

(e) If a Member ("Offeror") elects to initiate the Buy-Sell Procedures, the Offeror shall give written Notice ("Buy-Sell Notice") to the other Member ("Offeree"), which notice shall (1) specify a price for the Property and all other assets of the Company (including the Company's membership interest in the Subsidiary and excluding the amount of Distributions of Excess Cash and Net Capital Transaction Proceeds received by the Company and distributable under Section 3.1) ("Offer Price") and (2) specifically request Offeree to respond to the Buy-Sell Notice as required under Section 7.5(c). The Buy-Sell Notice must be delivered in accordance with the notice requirements of Article 10.13.

(f) The Offeree shall have thirty (30) days from the date of the Buy-Sell Notice ("Outside Response Date") to send a written response ("Response Notice") to the Offeror, which Response Units (together with any Affiliate's interests) in the Company to the Offeror, or (2) to be the "purchaser" under the Buy-Sell Procedures and to purchase the entire Units in the Company owned by the Offeror and any Affiliates. The Response Notice may not contain any conditions or qualifications to such election and must contain one of the following statements:

> (a) In response to the Buy-Sell Notice, **[Insert name of Offeree]** hereby irrevocably elects to sell its (and any Affiliate's) Units to **[Insert name of Offeror]**; or
>
> (b) In response to the Buy-Sell Notice, **[Insert name of Offeree]** hereby irrevocably elects to purchase the Units of **[Insert name of Offeror and any Affiliate]**.

(b) If the Offeree elects to be the purchaser, its Response Notice shall constitute its legally binding obligation to complete the purchase described in this Sections 7.5, 7.6, and 7.7 and shall not be effective unless the required escrow deposit is delivered on or prior to the Outside Response Date, in an

amount equal to ten percent (10%) ("Deposit") of the amount payable to the seller as determined in subsection (g) below. The Deposit shall be delivered to the Escrow Agent. The Escrow Agent shall hold the Deposit in an interest-bearing, segregated account at a federally insured financial institution.

(c) If the Offeree elects in its Response Notice to be the seller or if the Offeree does not comply with any applicable requirement of subsection (c) or (d) above in a timely manner, then (1) the Offeree shall be designated the seller and the Offeror shall be designated as the purchaser and (2) the Offeror as purchaser shall deliver the Deposit to the Escrow Agent within five (5) days after the earlier of (y) the Outside Response Date or (z) the date of the Response Notice designating the Offeror as the purchaser. The purchaser's delivery of the Deposit to the Escrow Agent shall constitute its legally binding obligation to complete the purchase as described in this Sections 7.5, 7.6, and 7.7. If the Offeror fails to pay the Deposit as required by the preceding sentence, then the rights of the Members under Sections 7.5, 7.6, and 7.7 shall be as they were prior to the delivery of the Buy-Sell Notice, except that (i) the Offeror shall forfeit its right to initiate the Buy-Sell Procedures or to give a Buy-Sell Notice for a period of six (6) months from the date on which the Offeror was required to pay the Deposit and (ii) the Offeree shall have the unilateral right to vote on the Major Decision that gave rise to the Deadlock which caused the Offeror to elect to initiate the Buy-Sell Procedures.

(d) The purchaser shall fix a closing date ("Closing Date"), which must be a Business Day not later than forty-five (45) days following the Outside Response Date. The purchaser shall notify the seller in writing of the Closing Date not less than ten (10) days prior thereto. If the purchaser does not fix the Closing Date within thirty-five (35) days following the Outside Response Date, then the Closing Date shall automatically be the fortieth (40th) day following the Outside Response Date; *provided, however*, that if that date is not a business day, then the Closing Date shall be the next business day.

(e) If the purchaser defaults in its obligation to complete the transaction by the Closing Date, the seller shall (1) have the right, to be exercised by Notice to the purchaser and completed within thirty (30) days of the original Closing Date determined under subsection (f), to become the purchaser at a price equal to at least ninety percent (90%) of the original Offer Price, (2) be entitled to retain the Deposit (together with the interest thereon) as liquidated damages, which the Parties acknowledge to be a fair calculation of the damages suffered as a result of the purchaser's default, in lieu of any other legal and equitable remedies, (3) be entitled to pursue any and all remedies available under this Agreement or through court or other appropriate legal proceedings, whether at law or in equity and/or (4) the seller shall have the unilateral right to vote on the Major Decision that gave rise to the Deadlock which caused the initiation of the Buy-Sell Procedures.

(f) If the seller defaults in its obligation to complete the transaction by the Closing Date for any reason other than a default of the purchaser, then (1) the purchaser shall (A) have the right to the immediate return of the Deposit (together with the interest thereon) and (B) be entitled to all available legal and equitable remedies against the seller, including specific performance of the seller's obligation to complete the transaction and recovery of all losses of purchaser caused by the seller's default (including attorney's fees and costs paid or incurred in any legal or equitable action) and (2) the purchaser shall have the unilateral right to vote on the Major Decision that gave rise to the Deadlock which caused the initiation the Buy-Sell Procedures.

(g) A Member who defaults in its obligation to complete the transaction by the Closing Date shall lose its rights to give a Buy-Sell Notice for a period of twelve (12) months after its failure to perform its obligations under Sections 7.5, 7.6, and 7.7.

Section 7.6 Release or Indemnification of Guarantors. Once the purchaser is selected under the Buy-Sell Procedures, the purchaser shall replace and to obtain the release, at the cost and expense of the

Company, of the other Member and/or their Affiliates as guarantors under any payment guarantee or environmental indemnity delivered in connection with any Loans of the Company or shall provide an indemnification agreement acceptable to the seller, if a release is not agreed to by the party holding the guaranty or indemnification right.

Section 7.7 Other Buy-Sell Requirements.

(a) Each Member expressly agrees and acknowledges that TIME IS OF THE ESSENCE with respect to all time requirements, delivery and payment dates and other deadlines set forth in Sections 7.4, 7.5, and 7.6. In that regard, all payments and other actions or documents required to be paid, delivered, received or taken on or prior to a specified date shall be so paid, delivered, received or taken on or prior to the specified or required date unless such date is extended in writing by the Member entitled to such performance or payment and failure to make such payment or performance by such date shall be a default under this Agreement by such party.

(b) All payments required under Sections 7.4, 7.5, and 7.6, including the Deposit and the required payment on the Closing Date, shall be made in U.S. dollars in immediately available funds and paid through wire transfer. The party entitled to keep the Deposit under the terms of Sections 7.5 and 7.6 shall also be entitled to any interest that was earned on the Deposit.

(c) On the Closing Date, (1) the seller shall convey to the purchaser good and marketable title to its Units, and shall cause and arrange for any of its Affiliates that hold Units to convey good and marketable title to those Units, in each case free and clear of all Liens except for those securing Existing Financing or the Vertical Financing, and (2) the purchaser shall accept the conveyance of the Units from the seller (and any Affiliate) and assume all obligations with respect to those Units accruing or arising after the date of the conveyance.

(d) The Company shall distribute to its Members in accordance with Section 4.1 the amount of any Distributions of Excess Cash and Net Capital Transaction Proceeds that it holds one (1) Business Day prior to the Closing Date. If the Company is prohibited by the terms of any Exit Financing, the Vertical Financing or any other agreement of the Company from making such a distribution, the purchaser shall pay to seller on the Closing Date (in addition to the other amounts payable under Sections 7.5, 7.6, and 7.7) the amount that would have been distributed to seller under Section 3.1 had such distribution been permitted.

(e) Between the date of the Buy-Sell Notice and the Closing Date, the Members shall conduct the business, operations and financial affairs of the Company and the Subsidiary only in the ordinary course and consistent with the prior practices of the Company and the Subsidiary in accordance with this Agreement, the Budget and all other applicable Major Decisions of the Members.

(f) If the purchaser is not the Manager, the purchaser shall automatically without any further action or Approval by any other Member become the Manager immediately after it has qualified as the purchaser pursuant to Sections 7.4, 7.5, and 7.6. If the purchaser breaches its obligation to purchase the Units of the seller pursuant to Sections 7.4, 7.5, and 7.6, the seller shall become the Manager under this Agreement.

(g) Any risk of casualty, condemnation or loss prior to the Closing Date shall be borne by the purchaser, who shall succeed to all rights to insurance proceeds (other than loss of rent proceeds allocable to any period prior to the Closing Date) or condemnation awards, without credit or offset against any amounts owed by purchaser to seller.

(h) The cost of any new or downdated title insurance policy or endorsements to any existing title insurance policy on the Property, in either case desired by the purchaser or, if applicable, required by the terms of any of the Loans or new financing, shall be paid by the purchaser as its own cost and expense.

(i) The cost of any transfer taxes that would be required to be paid in connection with a deemed sale of the Property shall not be deducted in determining the amount each Member would receive upon a sale of the Property under Sections 7.4, 7.5, and 7.6 and any transfer taxes actually required to be paid in connection with any sale under Sections 7.4, 7.5, and 7.6 shall be paid by the Members in proportion to their respective Percentage Interests. The cost of any fees or expenses incurred in connection with (1) obtaining the consent of the applicable lender under the Loan Documents or (2) amending the Loan Documents to ensure compliance with all applicable requirements and conditions of any Loan Documents in effect at the time of the Transfer shall be Company Costs and paid by the Company. Except as expressly set forth in this Agreement, the payment of the fees and disbursements of each Member's attorneys shall be the sole responsibility of that Member and no other Member or the Company shall be required to pay or bear any part of those fees and expenses directly or indirectly. All other costs shall be borne by the party who customarily bears such costs in the location of the principal place of business of the Company.

(j) In no event shall any Member be required to repay or to cause the Company to repay any indebtedness of the Company or any Subsidiary at the Closing.

(k) In connection with any specific performance remedy available under Sections 7.6 and applicable law, the Members each agree that the judge presiding over the court having jurisdiction over the specific performance remedy shall be entitled to order the appropriate Member or other Person to execute all necessary documents and to further appoint an appropriate Person to be authorized to execute such documents on behalf of the defaulting Member or other Person.

(l) Each Member agrees to cooperate and to take all reasonable actions and execute all documents reasonably necessary or appropriate to facilitate and accomplish the transactions described in or contemplated under Sections 7.4, 7.5, and 7.6.

Section 7.8 Void Assignment. Any Transfer by any Member in contravention of this Agreement shall be void and ineffectual and shall not bind or be recognized by the Company or any other party. In the event of any Transfer in contravention of this Agreement, the purported transferee shall have no right to any profits, losses or Distributions of the Company or any other rights of a Member.

Section 7.9 Covenants of the Members. Each Member represents and agrees for the benefit of the other Member that:

(a) It recognizes that (1) the direct and indirect restrictions on Transfer of the Units of the Member and the ownership and other interests in each Member have been a material inducement for the other Member's entry into this Agreement; and (2) it will comply strictly with the restrictions on Transfer set forth in this Article 7.

(b) Except to the extent permitted by this Article 7, the Members will not (1) Transfer any of their direct or indirect equity interests in the Company or within a Member, (2) grant any option or other contractual right to acquire any of their direct or indirect interests in the Company, the Subsidiary, or a Member or any of their interest in the equity or profits of the Company, the Subsidiary, or a Member, (3) give or agree to give any other Person the right to vote or take other action with respect to their equity interests in the Company, the Subsidiary or a Member or (4) give or agree to give any other Person the right to control the management and affairs of the Company, the Subsidiary or a Member.

(c) No Member shall be at any time a Prohibited Person or be owned or controlled by any Prohibited Person.

## ARTICLE VIII
## DISSOLUTION AND LIQUIDATION AND VALUATION

Section 8.1 Dissolution. The Company shall be dissolved, and its affairs shall be wound up and terminated, upon: (a) the Members' approval of such dissolution and liquidation; (b) a sale of all or substantially all of its assets of the Company or the Subsidiary; or (c) an administrative dissolution or the entry of a decree of judicial dissolution of the Company under the Act. Except as set forth above or as otherwise required by law, the Company is intended to have perpetual existence. The Company shall not be dissolved by the admission of additional or substitute Members or by an Event of Withdrawal, and upon and after any such admission or event, the Company shall continue in existence subject to the terms and conditions of this Agreement.

Section 8.2 Liquidation of Company Interests.

(a) Upon dissolution, the Company shall be liquidated in an orderly manner. The Manager shall act (or it may appoint one or more Members, officers, or other Persons to act) as the liquidator to wind up the affairs of the Company pursuant to this Agreement and terminate the Company. The costs of liquidation shall be borne by the Company. Prior to final distribution and termination, the liquidator shall continue to operate the Company and its assets with all of the power and authority of the Manager. The steps to be accomplished by the liquidators are as follows:

(i) the liquidator shall pay, satisfy and discharge all debts, obligations, and other liabilities of the Company and the Subsidiary to its creditors (including, without limitation, all sales commissions or other expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, establishing cash reserves to be held in escrow for contingent or unforeseen liabilities of the Company, in such amounts and for such holding periods as the liquidator may reasonably determine); and

(ii) after payment or provision for payment of all of the Company's liabilities has been made in accordance with subparagraph (i), (A) a final allocation of all items of income, gain, loss, and expense shall be made in accordance with Section 3.2 hereof, and (B) all remaining assets of the Company shall be distributed to the Members in accordance with Section 3.1(b).

(b) The distribution of cash and/or property to a Member in accordance with the provisions of this Section 8.2 constitutes a complete return to such Member of its Capital Contributions and a complete distribution to the Member of its interest in the Company and the Company's property. This paragraph constitutes a compromise to which all Members have consented within the meaning of the Act.

(c) Upon completion of the distribution of the Company's assets as provided in this Agreement, the Company shall be terminated (and the Company shall not be terminated prior to such time), and the Manager (or such other Person or Persons as the Act may require or permit) shall file certificate of cancellation with the Delaware Secretary of State, cancel any other filings made pursuant to this Agreement that are or should be canceled and take all such other actions as may be necessary to terminate the Company. The Company shall be deemed to continue in existence for all purposes of this Agreement until it is terminated pursuant to this Section 8.2(c).

(d) A reasonable time shall be allowed for the orderly winding up of the business and affairs of the Company and the liquidation of its assets pursuant to this Section 8.2 in order to minimize any losses otherwise attendant upon such winding up.

(e) The liquidators shall not be personally liable for the return of Capital Contributions or any portion thereof to any Member (it being understood that any such return shall be made solely from Company assets).

## ARTICLE IX
## BOOKS OF ACCOUNT

Section 9.1 Records and Accounting. The Company shall keep, or cause to be kept, appropriate books and records with respect to the Company's business, including all books and records necessary to provide any information, lists and copies of documents required to be provided pursuant to Section 9.5 or pursuant to applicable laws. All matters concerning (a) the determination of the relative amount of allocations and Distributions among the Members pursuant to Article III, and (b) accounting procedures and determinations, and other determinations not specifically and expressly provided for by the terms of this Agreement, shall be determined by the Manager, whose determination shall be final and conclusive as to all of the Members absent manifest error.

Section 9.2 Bank Accounts. The Company may establish accounts for the deposit of Company funds, in such types and at such institutions, as shall be determined from time to time by the Manager.

Section 9.3 Fiscal Year. The Fiscal Year of the Company shall be the calendar year, or such other annual accounting period as may be established by the Manager.

Section 9.4 Tax Elections.

(a) The Taxable Year of the Company shall be the same as the Company's Fiscal Year, unless the Manager shall determine otherwise in its sole discretion and in compliance with applicable laws.

(b) The Manager shall in its reasonable discretion determine whether to make or revoke any available election pursuant to the Code. Each Member will upon request supply any information necessary to give proper effect to any such election.

Section 9.5 Reports; Financial Statements. The Company shall deliver to each Member the Company's tax return and Form K-1 for each Taxable Year at such time as will enable the Members to file their respective tax returns on a timely basis (including extensions), and such other information as may be necessary for the preparation of each such Member's United States federal and state income tax returns. Upon written request to the Company, each Member shall have the right to receive all of the following information from the Company as soon as available, unaudited consolidated statements of income and cash flows of the Company for such fiscal quarter and for the period from the beginning of the fiscal year to the end of such fiscal quarter, and an unaudited consolidated balance sheet of the Company as of the end of such fiscal quarter.

Tax Controversies

(a) The Manager hereby appoints the Blue Phoenix as the partnership representative as provided in Code Section 6223(a) (the "PR"). The PR can be removed at any time by the Manager. In the event of the resignation or removal of the PR, the Manager shall select a replacement. If the resignation or removal of the PR occurs prior to the effectiveness of the resignation or removal under applicable

Treasury Regulations or other administrative guidance, the PR that has resigned or been removed shall not take any actions in its capacity as PR except as directed by the successor PR.

(b) The PR is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by taxing authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. The PR shall promptly notify the Manager of the commencement of any tax audit of the Company, upon receipt of a tax assessment and upon the receipt of a notice of final partnership administrative adjustment or final partnership adjustment, and shall keep the Manager reasonably informed of the status of any tax audit or resulting administrative or judicial proceeding. Without the consent of the Manager, the PR shall not extend the statute of limitations, file a request for administrative adjustment, file suit relating to any Company tax refund or deficiency or enter into any settlement agreement relating to items of income, gain, loss or deduction of the Company with any taxing authority. No Member or Equity Owner (defined below) shall have the right to participate in the audit of any Company tax return or any administrative or judicial proceedings conducted by the PR arising out of or in connection with any such audit.

(c) The PR, with the consent of the Manager, shall have the right to make on behalf of the Company any and all tax elections under the Bipartisan Budget Act of 2015, including the following: (i) to opt out under Code Section 6221(b), if available; (ii) to pay the Company level imputed underpayment under Code Section 6225; or (iii) to push out any underpayment to Members and former Members ("Former Members") under Code Section 6226. Each Member and Former Member shall take all such actions as requested by the PR, including without limitation, filing any amended tax returns, taking into account any adjustments and paying any taxes, interest and penalties arising from the PR's election under Code Section 6226.

(d) If the Manager directs the PR to cause the Company to pay the imputed underpayment under Code Section 6225 (including any interest and penalties), the PR shall use commercially reasonable efforts to reduce any taxes payable by the Company by taking into account modifications available under Code Sections 6225(c)(2), (3), (4), and (5). The Manager may seek reimbursement from the Members and Former Members who were owners with respect to such audited tax year (collectively, the "Equity Owners") for their equitable share of such imputed underpayment (including any interest and penalties) (the "Underpayment Share") and each such Equity Owner agrees to pay such Underpayment Share to the Company. Any such payments made by an Equity Owner shall not be treated as a capital contribution. The Company shall have a right of setoff against distributions otherwise owing to an Equity Owner in the amount of his, her or its Underpayment Share. Any imputed underpayment paid by the Company on behalf of an Equity Owner and not reimbursed by that Equity Owner shall be treated as a distribution to such Equity Owner.

(e) The PR shall not have any liability to the Company or any Member for any acts or omissions in his, her or its capacity as the PR, other than as a result of the PR's fraud, willful misconduct or gross negligence. The Company shall reimburse the PR for all costs and expenses reasonably incurred by him, her or it on behalf of the Company, other than as a result of the PR's fraud, willful misconduct or gross negligence. The Company shall indemnify, defend and hold harmless the PR from and against any and all claims, liabilities, costs and expenses (including reasonable attorney fees and court costs) incurred by him, her or it as a consequence as serving or acting as the PR, other than as a result of the PR's fraud, willful misconduct or gross negligence.

## ARTICLE X
## MISCELLANEOUS

Section 10.1 Further Action. The parties shall execute and deliver all documents, instruments, and certificates, provide all information, and take or refrain from taking all such further actions as may be necessary or appropriate to achieve the purposes of this Agreement and effect the provisions hereof, as determined in good faith by the Manager.

Section 10.2 Title to Company Assets. The Company's assets will be deemed to be owned by the Company as an entity, and no Member, individually or collectively, will have any ownership interest in any Company asset or any portion thereof.

Section 10.3 Creditors. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company or any of its Affiliates, and no creditor who makes a loan to the Company or any of its Affiliates may have or acquire at any time as a result of making the loan any direct or indirect interest in Company Profits, Losses, Distributions, capital or property other than as a creditor.

Section 10.4 Amendments, Modifications, or Waivers. Any provision of this Agreement may be amended, modified or waived only upon the prior written approval of all of the Members. In addition, this Agreement may be amended by the Manager to: (a) correct any errors in this Agreement; and (b) to amend Schedule A hereto to reflect changes in ownership in accordance with this Agreement.

Section 10.5 Successors and Assigns. Except as otherwise provided herein, this Agreement shall inure to the benefit of and be binding upon the Members and their respective heirs, executors, administrators, legal representatives, successors and permitted assigns, whether so expressed or not.

Section 10.6 Cumulative Remedies. Each Member shall have all rights and remedies set forth in this Agreement and all rights and remedies which such Person has been granted at any time under any other agreement or contract and all of the rights which such Person has under any law. Any Person having any rights under any provision of this Agreement or any other agreements contemplated by this Agreement shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law. No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

Section 10.7 Equitable Remedies. Each Member acknowledges that a breach or threatened breach by such Member of any of its obligations under this Agreement would give rise to irreparable harm to the other parties hereto, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such Member of any such obligations, each of the other parties shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

Section 10.8 Governing Law; Choice of Forum. All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement and the exhibits and schedules hereto shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State

of Delaware. Each Party hereby irrevocably (a) submits to the exclusive jurisdiction of any Michigan State or Federal Court sitting in the County of Oakland (Michigan) in any action or proceeding arising out of or relating to this Agreement, the relations between the Parties and any matter, action or transaction described in this Agreement, (b) agrees that any such courts shall have exclusive jurisdiction over such actions or proceedings, (c) waives the defense of inconvenient forum to the maintenance and continuation of such action or proceeding, (d) consents to the service of any and all process in any such action or proceeding by the mailing of copies (certified mail, return receipt requested and postage prepaid) of such process to them at their addresses specified in Exhibit A and (e) agrees that a final and non-appealable judgment rendered by a court of competent jurisdiction in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Section 10.9 Compliance with Laws. At all times during the term of this Agreement, the Company shall obtain and maintain all permits, licenses and approvals as may be required by applicable law in order to engage in its activities as described in this Agreement, and shall otherwise operate in such a manner so as to comply with all laws that may be applicable to the Company or its affairs.

Section 10.10 Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained in this Agreement.

Section 10.11 Counterparts. This Agreement may be executed simultaneously in two or more separate counterparts, any one of which need not contain the signatures of more than one party, but each of which will be an original and all of which together shall constitute one and the same agreement binding on all the parties hereto.

Section 10.12 Descriptive Headings; Interpretation. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement. Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa. The use of the word "including" in this Agreement shall be by way of example rather than by limitation. Reference to any agreement, document or instrument means such agreement, document or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and if applicable hereof. The use of the words "or," "either" and "any" shall not be exclusive. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

Section 10.13 Notices. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given when (a) delivered personally to the recipient, (b) telecopied to the recipient (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if telecopied before 5:00 p.m. Eastern time on a business day, and otherwise on the next business day, (c) one business day after being sent to the recipient by reputable overnight courier service (charges prepaid), or (d) sent by e-mail to the recipient. Such notices, demands and other communications shall be sent to the Members and to the Company at the addresses set forth on the attached Schedule A.

Section 10.14 Complete Agreement. This Agreement and any exhibits attached hereto embodies the complete agreement and understanding among the parties and terminates, supersedes and preempts any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

Section 10.15 Business Days. If any time period for giving notice or taking action under this Agreement expires on a day which is a Saturday, Sunday, or legal holiday in the jurisdiction in which the Company's principal office is located, the time period shall automatically be extended to the business day immediately following such Saturday, Sunday, or legal holiday.

Section 10.16 Delivery by Facsimile or other Electronic Means. This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or electronic transmission in "pdf" or comparable form, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or "pdf" to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or as a "pdf" as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

Section 10.17 Acknowledgment re: Taft Stettinius & Hollister LLP. The parties have agreed that Taft Stettinius & Hollister LLP ("Taft"), has represented the Company, Blue Phoenix 19, LLC and Prentice Partners of Ann Arbor, LLC in all aspects of the transaction relative to the issuance of Units in the Company and this Agreement. The parties are aware that Taft has represented, currently represents and will continue to represent the Estate of Margaret S. Poscher, H. Caroline Poscher, Prentice Partners of Ann Arbor LLC, Blue Phoenix 19, LLC and their respective Affiliates (the "Poscher Group") on an ongoing basis, and in connection with future transactions and other legal matters, resulting in potential conflicts of interest. The parties agree to waive such potential conflicts of interest and further agree that: (i) the Poscher Group may retain Taft to represent them in all unrelated matters, (ii) Taft has prepared this Agreement and related documents in its role as attorney for the Company, and each party has been advised to, and has had the ability to, retain separate counsel to review such documents on its behalf; and (iii) should a dispute arise among any of the parties with respect to the subject matter of this Agreement which involves a litigation, mediation or arbitration proceeding, Taft may continue representing the Poscher Group in all unrelated matters.

[*Signatures on the following page*]

The parties hereto have caused this Agreement to be signed as of the date first above written.

**MANAGER:**

Reynolds Asset Mgmt, LLC, a New Jersey limited liability company

By: ______________________________
Name: Louis J. Reynolds, IV
Title: Manager

**MEMBERS:**

Blue Phoenix 19 LLC, a _____ limited liability company

By: ______________________________
Name: H. Caroline Poscher
Title: Manager

Prentice Partners of Ann Arbor, LLC, a Michigan limited liability company

By: ______________________________
Name: H. Caroline Poscher
Title: Personal Representative of the Estate of Margaret Poscher, Deceased

American Platinum Builders, a _________

By: ______________________________
Name: ______________________________
Title: ______________________________

Louis J. Reynolds IV
By: ______________________________
Louis J. Reynolds IV

**SCHEDULE A**

**TABLE OF MEMBERS**
**(as of [•], 2026)**

| Member/Address | Initial Capital Contribution | Common Units | Percentage Interest |
|---|---|---|---|
| The Estate of Margaret Poscher, Deceased<br>[Address]<br>Attn: Heidi Caroline Poscher<br>Email: | $59.00 | 59,000 | 59% |
| Blue Phoenix 19, LLC<br>[Address]<br>Attn: Heidi Caroline Poscher<br>Email: | $22.00 | 22,000 | 22% |
| Prentice Partners of Ann Arbor, LLC<br>[Address]<br>Attn: Heidi Caroline Poscher<br>Email: | $5.00 | 5,000 | 5% |
| American Platinum Builders ___<br>[Address]<br>Attn:<br>Email: | $5.00 | 5,000 | 5% |
| Louis J. Reynolds IV<br>[Address]<br>Email: | $5.00 | 5,000 | 5% |
| Reserved Interests (Steven Pullins and Nathan Vohwinkle 2% each) | $4.00 | 4,000 | 4% |
| **Totals:** | **$100.00** | **100,000** | **100.00%** |

**SCHEDULE B**

**CO-DEVELOPMENT AGREEMENT**

[Incomplete]

**SCHEDULE C**

**INITIAL BUDGET**

[Incomplete]

[Schedule C to Limited Liability Company Agreement of South Town By 4M JV LLC]

**EXHIBIT 5**

**(Prentice Loan)**

PROMISSORY NOTE

Date: July 29, 2022

**FOR VALUE RECEIVED,** the undersigned Borrower promises to pay to the order of the Lender the principal sum of Eight Million Five Hundred Thousand Dollars ($8,500,000), together with interest as described below.

**1. Borrower:**
Name: SouthTown by 4M LLC
Address: 1919 S. Industrial Hwy Ann Arbor MI 48104

**2. Lender:**
Name: Prentice Partners of Ann Arbor LLC
Address: 1919 S. Industrial Hwy Ann Arbor MI 48104

**3. Principal Amount:**
The principal amount of this Note is Eight Million Five Hundred Thousand Dollars ($8,500,000).

**4. Interest Rate:**
The principal amount shall bear interest at the rate of 0% per annum.

**IN WITNESS WHEREOF,** the Borrower has executed this Promissory Note as of the date first written above.

SouthTown by 4M, LLC
By: Margaret Poscher
Its: Sole Member

**Acknowledgment:**

State of Michigan
County of Washtenaw

The foregoing instrument was acknowledged before me this 9th day of January, *2025,* by Margaret Poscher, Sole Member of SouthTown by 4M, LLC, who is/are known to me or has/have produced identification as proof of identity.

Dana M. Lemke
Notary Public
My Commission Expires: 06-30-2027

DANA M. LEMKE
Notary Public, State of Michigan
County of Wayne
My Commission Expires 06-30-2027
Acting in the County of Washtenaw